1           STATE OF MINNESOTA                 DISTRICT COURT

2     COUNTY OF HENNEPIN        FOURTH JUDICIAL DISTRICT
      ************************************************
3     Charles Everett Cook, Sylvia Mae Cook,
      and Timothy Blake Cook, natural persons,
4
                    Plaintiffs,
5
          v.
6
      City of Minneapolis, a municipal entity; Minneapolis
7     Police Officer Mark Johnson, Badge #003459, in his
      individual, personal and official capacity; Sgt. D.
8     Smulski, in his individual, personal and official
      capacity; Officer K. Blackwell, in his individual,
9     personal and official capacity; Officer Geoffrey
      Toscano,
      Badge #007257, in his individual, personal and official
10    capacity; Officer Bevan Blauert, Badge #003459, in his
      individual, personal and official capacity; Officer Jon
11    Petron, Badge #5671, in his individual, personal and
      official capacity; Officer Christopher House, Badge
      #3165,
12    in his individual, personal and official capacity; Sgt.
      Robert Kroll, Badge #003874, in his individual,
      personal
13    and official capacity; Officer Christie Nelson, Badge
      #4959, in his individual, personal and official
      capacity;
14    Officer William Willner, Badge #7783, in his
      individual,
      personal and official capacity; Officer Westlund, Badge
15    #7674, in his individual, personal and official
      capacity;
      Officer Roger Smith, Badge #006689, in his individual,
16    personal and official capacity; Officer Jason King,
      Badge
      #003704, in his individual, personal and official
17    capacity; Officer Timothy Hanks, Badge #002660, in his
      individual, personal and official capacity; and
      Officers
18    Jane Doe and Richard Roe, unknown and unnamed
      Minneapolis
      Police Officers, in their individual, personal and
19    official capacities;

20              Defendants.
      ************************************************
21              DEPOSITION OF

22          LIEUTENANT ROBERT KROLL

23          Taken March 28, 2007
            Scheduled for 1:15 p.m.
24
            Reported By:  Lori Morrow, RPR, CRR

25    PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545

2

1            Deposition of LIEUTENANT ROBERT KROLL, taken on

2     the 28th day of March, 2007, commencing at 1:15 p.m., at

3     the CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

4     Street, Suite 300, Minneapolis, Minnesota, before Lori

5     Morrow, Registered Professional Reporter and Certified

6     Realtime Reporter and a Notary Public in and for the

7     State of Minnesota.

8

9                    APPEARANCES:
10
       On Behalf of the Plaintiffs:
11
         Maya C. Sullivan, Esquire
12       LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
         941 Hillwind Road NE
13       Suite 200
         Minneapolis, Minnesota 55432
14       (763) 515-0092
         Fax (763) 515-0093
15
       On Behalf of the Defendants:
16
         Tracey L. Nelson, Esquire
17       CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
         333 South 7th Street
18       Suite 300
         Minneapolis, Minnesota 55402
19       (612) 673-2063

20                    **********

21         NOTE:  The original transcript will be
             delivered
       to Maya C. Sullivan, Esquire, pursuant to the
       applicable
22     Rules of Civil Procedure.

23

24

25

3

```
 1                          INDEX

 2   WITNESS:

 3   Lieutenant Robert Kroll

 4
     EXAMINATION BY:              PAGE:
 5
     Ms. Sullivan................4, 40
 6
     Ms. Nelson..................38
 7

 8   OBJECTIONS BY:

 9   Ms. Nelson..................18, 21, 22, 23, 24, 25, 35,
40

10
     EXHIBITS MARKED AND REFERRED TO:        (NONE)
11
                      **********
12

13

14

15

16

17

18

19

20

21
```

22

23

24

25


4


1              LIEUTENANT ROBERT KROLL,

2     duly sworn, was examined and testified as follows:

3                    EXAMINATION

4     BY MS. SULLIVAN:

5          Q    Sergeant Kroll, as I said, I'm Maya Sullivan,

6     and I'm one of the attorneys who represents the

7     Plaintiffs in this matter.  The other attorney is

8     Mr. Albert Goins, whom you may or may not know.

9               Just for the record initially, can you please

10    state and spell your first and last name?

11         A    Robert, R-O-B-E-R-T, Kroll, K-R-O-L-L.

12         Q    All right.  And, Sergeant Kroll, have you

13    participated in depositions in the past?

14         A    Yes.

15         Q    Okay.  I just want to give you a few reminders

16    about procedure before we get started.

17              First, I will be asking you questions

18    throughout.  Your attorney may follow up with some

19    additional questions.  She may also at times object to

20    things.  Please just make sure you wait for her

21      instructions regarding whether to answer or not answer.

22              Additionally, I do need you to give verbal

23      answers.  So please no nodding of the head and "uh-huh"

24      and that type of thing.

25              Do you have any questions before we get started?


5


1       A    No.

2       Q    Okay.  Sergeant Kroll, who is your employer?

3       A    City of Minneapolis.  Also, I'm a lieutenant.

4       Q    I'm sorry, Lieutenant.  Do we have sergeant

5       somewhere?  Sorry about that.  All right.  Lieutenant

6       Kroll, how long have you been with the Minneapolis Police

7       Department?

8       A    Since January of 1989.

9       Q    And prior to beginning with the Minneapolis

10      Police Department, were you working in the same field or

11      doing something different?

12      A    No.  This is my first police job.

13      Q    Okay.  And your assignment -- your current

14      assignment with the Minneapolis Police Department is

15      what?

16      A    Second Precinct patrol supervisor.

17      Q    And did you have that position at the time of

18      the incident which was January 13 of 2005?

19      A    No.

20      Q    Okay.  What was your position at that time?

21      A   I believe I was a sergeant assigned to the Water

22  Works Unit.

23      Q   Okay.  And what is the Water Works Unit?

24      A   It's a unit that no longer exists, but we had

25  personnel there for a homeland security mission due to

6

1   the water level threats.

2       Q   Okay.  And at the time of the incident, were you

3   also part of the SWAT team, or emergency response unit?

4       A   Yes.

5       Q   Okay.  And how long had you been part of that

6   unit?

7       A   Total time, approximately 15 years.

8       Q   Okay.  All right.  And in order to be on the

9   SWAT team, do you receive any specific or specialized

10  type of training different than just a standard police

11  officer may receive?

12      A   Yes.

13      Q   Okay.  Is that ongoing training, or is it just a

14  one-time type of a training?

15      A   There's initial and then ongoing, both.

16      Q   Okay.  How are people selected to participate on

17  that team --

18      A   There's a --

19      Q   -- or apply for it?

20      A    -- number of factors.

21      Q    Okay.

22      A    Background, history with the department, resume,

23   oral interview, physical agility test, weapons

24   qualifications.

25      Q    So it is similar to actually getting another

7

1    position within the department then?

2       A    Yes.

3       Q    Okay.  All right.  And within your training for

4    the team or conducting high risk entries, do you ever

5    receive any specific training or special training

6    regarding how to handle ill persons or elderly persons

7    when conducting these type of entries?

8       A    I don't recall any specialized training as a

9    part of SWAT for that, no.

10      Q    Have you received specialized training at any

11   time as a police officer in this type of -- in dealing

12   with those type of individuals?

13      A    Yes.

14      Q    Okay.  And what have you learned?  What kind of

15   training have you received about that?

16      A    It's too tough to recall.  I've received

17   different types of in-service training on dealing with

18   persons with disabilities.  I don't recall specifically.

19      Q    Okay.  But is it safe to say that you generally

20    would not treat, say, a person who was crippled and

21    couldn't walk the same as you would treat an able-bodied

22    adult when you're encountering them in an entry?

23        A   On an entry, that depends on the circumstances.

24        Q   Okay.  What would be the circumstances?

25        A   Well, high risk entries are different in

8

1    themselves.  They're high risk for a reason.  So anybody

2    there, potentially, has the capability of being armed.

3        Q   Okay.  Do you know, just give me a ballpark

4    figure, about how many of these high risk entries do you

5    conduct or are you part of maybe in the scope of a year

6    or so?

7        A   That fluctuates.

8        Q   Okay.  Can you give me a range, please?

9        A   Years ago we would do 700 a year.  And now

10   they're down to probably 200 a year.

11       Q   Okay.  And when you say we, what -- do you mean

12   that you would be part of or do you mean that the

13   department would do?

14       A   The SWAT team would do.

15       Q   Okay.  And are you on every entry that the SWAT

16   team does?

17       A   No.  It's rotational.

18       Q   Okay.  And so I'm asking specifically about your

19    involvement or participation.  How many would you say

20    that you have personally done?  And again, it doesn't

21    have to be an exact number.

22         A    Personally, over my career with SWAT, it's

23    somewhere in the neighborhood of 2,000 high risk entries.

24         Q    Okay.  And so how many approximately would you

25    say you do a year, which was my original question.


9


1         A    Oh, a year?

2         Q    Uh-huh.

3         A    That depends, because I'm somewhat promoted out

4    of SWAT.  I'm still in, but I'm in another position.  I'm

5    not in the full-time unit.  The full-time unit, they do

6    them on a daily basis.  So right now, I think, last year,

7    I did around 35.

8         Q    Okay.  And at what points were you promoted to

9    the Second Precinct patrol supervisor position?

10         A    I was promoted last April and transferred to the

11    Second Precinct in June.

12         Q    Okay.  So before you were promoted in April of

13    last year, how many do you think you were averaging per

14    year?

15         A    Again, that prior year I was assigned to STOP,

16    which is our full-time SWAT, so I did more.  I don't have

17    a number.  And then prior to that, I was at Water Works,

18    so I did less.  It's just a fluctuating number.

19      Q   Okay.  Thank you.  And were you part of the team

20   that entered 3845 Second Avenue South in Minneapolis on

21   January 13 of 2005?

22      A   Yes.

23      Q   Okay.  And what information were you provided

24   with prior to the entry?

25      A   There was a high likelihood that there was armed

10

1   robbery suspects inside that location.

2      Q   Suspects, plural, or one?

3      A   At least one, possibly more.

4      Q   Were you given the name of the alleged

5   individuals?

6      A   At the time, I believe so.

7      Q   Okay.  You were given two names?

8      A   No.  A name.

9      Q   Okay.  And were you given a description, a

10   physical description of the individual?

11      A   Yes.

12      Q   What would the physical description have

13   included?  I don't need specifics, but what types of

14   details would you have been given?

15      A   Sex, age, race.

16      Q   Okay.  Do you recall what the identifiers were

17   in this case?

18      A    Younger adult, black male.

19      Q    Okay.  Did you conduct the briefing that took

20  place prior to the entry?

21      A    Yes.

22      Q    Okay.  And what information did you provide the

23  officers who were part of the briefing?

24      A    The briefing is twofold.  The affiant, or the

25  unit that we're supporting, it gives a brief on the

11

1  subject and what the warrant is about.  And then I do the

2  brief for the team for positions, assignments, and entry

3  method.

4      Q    Okay.  And what information did you give the

5  team about who you were looking for, what you were doing,

6  why you were going there?

7      A    Again, that's the affiant.  I don't give that to

8  the team.

9      Q    Okay.  Do you know what the affiant gave, what

10  information was given?

11      A    Just general terms, it was a -- the description

12  I provided, that it was for an armed robbery suspect.

13      Q    Okay.  And are you aware of whether or not the

14  robbery suspect was arrested?

15      A    No.

16      Q    No, he wasn't arrested, or no --

17      A    I'm not aware.

18      Q    Did you see him?

19      A    I saw two parties meeting the description.

20      Q    Okay.  And were either of those individuals --

21   I'm sorry.  Strike that.

22           What was the condition, physical condition of

23   those individuals that you say met that description?

24      A    What do you mean by physical condition?

25      Q    Were either of them injured?


12


1       A    No.

2       Q    Neither of them were injured?

3       A    Not to my knowledge.

4       Q    Okay.  If someone was wearing a cast, would you

5    notice that?

6       A    I believe so.

7       Q    Okay.  Are you aware of whether anybody other

8    than the robbery suspect was arrested as a result of the

9    accident?

10      A    No, I am not.

11      Q    You state in your police report that the robbery

12   suspect was likely to be armed and to confront police if

13   encountered.  Was the suspect armed?

14      A    No.

15      Q    Did he confront you or any of the officers?

16      A    No.

17    Q   You state that you yelled "police search

18    warrant" throughout the residence when you were entering.

19    However, you did not show the warrant to the occupants at

20    their request, did you?

21    A   Which part was the question?  Yes, I did yell

22    "police" throughout.  Did I show them paper?  No.

23    Q   All right.

24    A   Two questions.

25    Q   And who did show them the search warrant?


13


1    A   Specifically, I don't know.

2    Q   Okay.  But it wasn't you?

3    A   No.

4    Q   Did you see anyone show it to them?

5    A   I don't recall that.

6    Q   In your report, you state that you poke checked

7    the older male with your weapon muzzle and forced him

8    downward and then kicked him down onto the ground.  You

9    did this even though you noticed that he was elderly?

10    A   I wouldn't consider him too elderly to be forced

11    to the floor when he's not compliant.

12    Q   Well, you specifically said he was elderly.  So

13    I'm just trying to clarify.

14    A   Right.

15    Q   You did that even though you acknowledge he

16    was --

17    A   He was the older person of the home.  And I did

18   use force to put him on the ground to overcome his

19   resistance.

20    Q   Right.  You said you kicked him down onto the

21   ground.

22    A   That's what it says, yes.

23    Q   Okay.  And did you notice the stint in his neck?

24    A   No.

25    Q   If you had noticed the stint, would you have

14

1   kicked him?

2    A   In the manner that I -- I know the report says

3   "kicked."  In the manner that I did it, yes.

4    Q   And what manner would that be?

5    A   I used my foot and assisted him with the bottom

6   of my foot to push him to the ground.  It wasn't a kick

7   with a thrust to my toe for pain compliance impact.  It

8   was a push with my foot to the bottom.  The bottom -- the

9   sole of my foot pushing him down.

10    Q   And you would have put the foot at where on his

11   body then in order to accomplish that?

12    A   I don't recall specifically.  I would have to

13   review my report.

14    Q   Your report doesn't say.  But I'm just trying to

15   get an understanding of, you said that you didn't do it

16      to impact force or pain on him, but you did it just to

17      get him to the floor.

18          A    Right.

19          Q    So I'm just trying to understand how you would

20      place your foot on him to accomplish just getting him on

21      the floor as opposed to causing pain to him.  How would

22      you -- how would you do that?  How would your foot be

23      placed?

24          A    With the sole -- again, with the sole of my foot

25      somewhere to his body, probably midsection area, and push


15


1       down.

2           Q    Okay.  And how long did you leave him on the

3       ground?

4           A    I don't know.

5           Q    Did you notice the weather?

6           A    The weather?

7           Q    Uh-huh.

8           A    No.

9           Q    Do you recall him asking for a blanket or

10      something to cover him up with?

11          A    No.

12          Q    Okay.  Had he asked for a blanket, would you

13      have provided him with one?

14          A    Would I have at the entry point?

15          Q    Yes.

16          A    No.

17          Q    Would you have instructed or allowed someone

18     else to provide him with a blanket had he asked for one

19     or had you heard him ask for one?

20          A    After the scene is secure, yes.  That's not up

21     to me.  We're in there for a matter of minutes, so we

22     secure everybody.  And when everybody in the house is

23     secure and there are no longer threats, we leave.  So

24     it's up to the affiants what happens from there on.

25          Q    Okay.  So my question was, if you had heard him


16


1      ask for a blanket or a cover, and the scene was secured,

2      would you have provided one to him or instructed someone

3      to give him one?

4          A    Me, no.

5          Q    Okay.  And do you recall whether or not the

6      front door of the house was opened while the incident was

7      going on?

8          A    No, I don't recall.

9          Q    Okay.  And are you one of the individuals who

10     went to one of the other levels of the house, the lower

11     level or the upper level or the --

12         A    Yes.

13         Q    -- third level?

14         A    Yes.

15      Q    Okay.  Which level did you go to?

16      A    Every one of them.  Possibly not the basement.

17      Q    Okay.  When you came into the home, explain to

18   me what you observed.

19      A    Numerous people in the living room portion of

20   the house, which led to the front entrance.

21      Q    You say numerous people.  Were any of them women

22   or any of them men?

23      A    Several women and children we initially

24   encountered.

25      Q    About how many women would you say you saw?


17


1      A    I would have to guess.

2      Q    That's fine.

3      A    Again, without reviewing my report, three or

4   four.

5      Q    And about how many children?

6      A    Seven or eight.

7      Q    Do you recall if there was a basic age range of

8   the children who were present?

9      A    Mainly younger, meaning, you know, three, four.

10      Q    Okay.  Do you recall any infants?

11      A    Not specifically.

12      Q    What was the demeanor of the women and children?

13      A    They were upset.

14      Q    Anything else?

15      A    No.

16      Q    Were they scared?

17      A    I believe so.

18      Q    Did you feel that the women or children

19  presented a threat to you or any of the officers?

20      A    Initially, everyone is a threat until you make

21  an assessment and see their hands.  At that point, they

22  were not.  We didn't handcuff the women.  We let them

23  hold onto the children.

24      Q    But you did put guns in their faces?

25      A    That's a difficult term.  I wouldn't say we put

18

1   guns in their faces.  If I was to put a gun in your face,

2   I would walk right up to you and put the gun in your

3   face.  We have our firearms drawn.  Everywhere our

4   eyes -- our firearms are out, and they go everywhere our

5   eyes look within the house.  So at different times,

6   they're pointed at people.  But I wouldn't consider it

7   gun in face.

8       Q    Okay.  So you pointed the guns at the women and

9   children?

10      A    Everywhere our eyes go, the muzzle of our

11  weapons goes.

12      Q    Okay.  So again, you pointed -- so then,

13  obviously, your eyes went and looked at the women and

14   children.

15        A    Yes.

16        Q    So you're saying that you did put the guns in

17   the faces of the women and children, correct?

18                  MS. NELSON:   Objection.   That

19         mischaracterizes his testimony.

20   BY MS. SULLIVAN:

21        Q    I'll rephrase it.   You did point the guns at the

22   women and children, correct?

23        A    Yes.

24        Q    Okay.   Do you normally point guns at children?

25        A    Every time in a high risk entry.


19


1         Q    Okay.   I'm confused, because one of the other

2    officers testified that they don't usually point guns at

3    children in these type of entries.   So I'm trying to get

4    some understanding and clarification about what the

5    actual procedure is.   So are you telling me that at every

6    high risk entry you do point guns at children?

7         A    We don't keep weapons trained and pointed and

8    aimed at children, but --

9         Q    I understand what you're saying.

10        A    -- throughout the course of a high risk entry

11   when you're scanning for safety reasons, every portion of

12   that house, the muzzle of your weapon does pass past

13   everyone in the house.

14      Q    Okay.   So your answer is yes, you do point guns

15   at children?   That's my question.

16      A    Well, if you want to mischaracterize it as that,

17   yes.   There's a difference, ma'am, between pointing and

18   scanning.

19      Q    Okay.   I'm just using the language that you

20   used, Lieutenant Kroll.   You previously said what you do

21   is you point the guns at them.   If you look at them, then

22   your gun goes that way.   That's what you said.   So I'm

23   just using your language.

24      A    Okay.

25      Q    And if you want to clarify --

20

1       A    I would like to --

2       Q    -- it, then you can do that.

3       A    -- clarify.   During the course of scanning for

4    our safety, the entire portions of every part of the

5    house our weapons scan, and they pass through.   Wherever

6    our eyes look, the muzzle of our weapons are pointing.

7    So at some point or another, the weapons do pass through

8    the bodies of everybody involved when you're looking.

9    And in this case, there were so many children everywhere,

10   at some point or another most of our weapons had to have

11   pointed their direction.   Now, sticking the gun in their

12   face and pointing a gun at them is quite a different

13    characterization of what we're doing.

14        Q    Okay.  So you basically are surveying the area?

15        A    Yes.

16        Q    That's what you're saying?  I'm just trying to

17    get an understanding.

18             All right.  And so once you did that with the

19    women and children who were in the area, did you perceive

20    a reason to cuff them at all?

21        A    No.

22        Q    Okay.  And that's because you didn't feel they

23    were presenting as a threat to you or any of your

24    officers at that point?

25        A    After we initially see the hands of the adults,


21


1    and they're free of weapons, we will pass and make an

2    assessment.  It's on the circumstances.  If there would

3    have been females with no children, we would have applied

4    cuffs.  But due to the number of children in there, we

5    did not cuff in this situation.  We let them attempt to

6    calm the children.

7        Q    Okay.  I'm just trying to clarify whether or not

8    you perceived them as a threat.  After you surveyed the

9    situation and the circumstances, did you perceive the

10    women as a threat?

11        A    No.

12        Q    Okay.  Did you perceive the children as a

13   threat?

14      A   No.

15      Q   Okay.  How many times have you been a defendant

16   in a similar lawsuit as this one?

17              MS. NELSON:  Objection, relevance.

18              You can answer.

19              THE WITNESS:  You need to clarify the

20         question more.  How many times have I been sued as

21         a result of a high risk entry?

22   BY MS. SULLIVAN:

23      Q   Yes.

24              MS. NELSON:  Same objection.

25              Go ahead and answer.


22


1              THE WITNESS:  I don't know that I have.

2   BY MS. SULLIVAN:

3      Q   What about other types of entries non-high risk?

4              MS. NELSON:  Same objection.

5              Go ahead and answer.

6              THE WITNESS:  I don't believe I have.

7   BY MS. SULLIVAN:

8      Q   So you're saying you've never been a named

9   defendant in a case resulting from an entry into

10   someone's home?

11      A   An entry meaning?

12      Q   Well, first you said not in high risk, so then I

13   said what about non-high risk situations, which takes

14   care --

15      A   I don't believe I --

16      Q   -- of everything else.

17      A   -- have.  I've been -- I was sued once as a

18   result of an officer needs help call where I entered a

19   home.  So I guess you've got to break the question down.

20   Are you looking for high risk, or are you looking for any

21   time I've been in a home or -- I don't understand.

22      Q   Any time you've entered a home, have you ever

23   been sued as a defendant or been a named defendant in a

24   suit due to that?

25                 MS. NELSON:   Same objection.


23


 1                 Go ahead and answer.

 2                 THE WITNESS:  I've never been sued in a

 3       high risk entry before.  There was one other time

 4       where I entered a home and was sued.

 5   BY MS. SULLIVAN:

 6      Q   Okay.  And how many internal affairs complaints

 7   have been filed against you?

 8      A   I don't know.

 9                 MS. NELSON:  Objection, relevance.

10   BY MS. SULLIVAN:

11      Q   Have there been any?

12                    MS. NELSON:  Same objection.

13                    Go ahead and answer.

14                    THE WITNESS:  Have there been any internal

15          affairs complaints filed against me?

16  BY MS. SULLIVAN:

17          Q    Yes.

18          A    Yes.

19          Q    About how many do you think?

20          A    I don't know.

21                    MS. NELSON:  Same objection.

22  BY MS. SULLIVAN:

23          Q    More than one?

24                    MS. NELSON:  Can I just do a standing

25          objection on these of relevance?


24


1                    MS. SULLIVAN:  Well, that's fine.

2                    MS. NELSON:  Okay.

3                    MS. SULLIVAN:  They're relevant, though,

4          because of the allegations of this particular

5          matter.

6                    MS. NELSON:  That's not for us to decide.

7          I'm just objecting.

8                    You can ask the question.

9                    I'm not instructing him not to answer.

10  BY MS. SULLIVAN:

11      Q    More than one?  I'll continue with my questions,

12   Lieutenant.

13      A    Yes.

14      Q    All right.  Do you think more than five?

15      A    Yes.

16      Q    More than ten?

17      A    Yes.

18      Q    More than fifteen?

19      A    I don't know.

20      Q    Okay.  But for sure more than ten?

21      A    Yes.

22      Q    Okay.  Do you know the reason they were filed?

23      A    There's a wide variety.

24      Q    Okay.  There's probably one reason or a couple

25   reasons that are the main ones that you've had.  If not,

25

1    just give me a couple.  Give me an idea of what the

2    reasons for the complaints were.

3                MS. NELSON:  I'm going to object to the

4           extent that this calls for private data.  He can

5           only answer with respect to allegations that have

6           been sustained.

7                MS. SULLIVAN:  Well, actually, I'm not

8           asking for a detailed description of what the

9           complaint may have contained.  What I'm asking for

10          is what reason was given for the complaint.  And

11          that's a different question.  And that information

12          is actually on-line.  I've personally viewed it.

13          So it's not private information.  It's public if

14          it's on the Internet, so.

15               MS. NELSON:  It's my understanding that

16          the only information that is public is if the

17          allegations have been sustained.

18               MS. SULLIVAN:  The information I viewed

19          says the reason for the complaint as well as

20          whether it was sustained or not actually.

21               MS. NELSON:  And are you saying that

22          you've looked --

23               MS. SULLIVAN:  So I'm just asking -- I'm

24          trying to get an understanding.

25               MS. NELSON:  Okay.  Well, I'm going to


26


1          instruct you to only answer to the extent of

2          allegations that have been sustained.

3     BY MS. SULLIVAN:

4          Q    Okay.  That's fine.  So if you can answer the

5     question then regarding sustained allegations, what the

6     reason for the internal affairs complaint was.

7          A    Failure to wear a seat belt, failure to give

8     name and badge number.

9          Q    Have you ever been suspended during your time as

10      a Minneapolis Police officer?

11          A    Yes.

12          Q    Were you suspended as a result of the January

13      13, 2005, incident?

14          A    No.

15          Q    You said in your report that you began using

16      profanities and threatened to shoot the elderly man.  Why

17      would you begin to use profanities at him?

18          A    Because he was not compliant throughout my

19      course of entry and giving him verbal commands.

20          Q    What words did you use?

21          A    I don't recall specifically.

22          Q    Do you usually use profanities in order to make

23      someone comply with your orders?

24          A    As part of our force continuum, if a subject is

25      noncompliant --

27

1                    [Reporter's Note:  People talking

2                     loudly in the hallway outside the

3                     conference room.]

4                    MS. NELSON:  Hold on.  Can we go off the

5               record, please?

6                        (Off the record)

7                    MS. NELSON:  I'm sorry.

8       BY MS. SULLIVAN:

9           Q    All right.  I'll restate the question.  Do you

10  normally use profanities if you are trying to get someone

11  to be compliant with your orders?

12      A   Normally, no.

13      Q   Okay.  And what gets it to the point where you

14  feel that you do need to use profanity?

15      A   If the threat level is high enough to me, and I

16  feel I can accomplish what I'm trying to do in a more

17  expedient manner by using a threatening tone and/or

18  profanities to gain compliance, I will do that in certain

19  situations.

20      Q   You say if the threat level is high enough.  And

21  so what would make the threat level high enough?

22      A   When we have armed robbery, at least an armed

23  robbery subject still somewhere within the house, and

24  you've got someone blocking your entryway to get to him.

25      Q   Okay.  So you're talking about if the overall


28


 1  threat level is high enough, not with that specific

 2  individual that you're encountering?

 3      A   Combination of both.

 4      Q   Okay.  So then if it's a combination of both, I

 5  want to ask then about the elderly gentleman you were

 6  encountering.  Did you perceive a threat by him in the

 7  encounter that you all had?

 8      A   Yes.

9       Q    What was the threat you perceived from the

10   elderly gentleman?

11       A    Well, when he's blocking your access to search

12   other areas of the house, and he has another male near

13   him that's large, neither of which is complying with

14   verbal commands at gunpoint to get on the ground and

15   prone their hands -- get down and show their hands -- to

16   prone out and show their hands, it's been my training and

17   experience that they're, A, either concealing a weapon,

18   planning a counter attack or stalling so evidence can be

19   destroyed or a threat could be launched against us.

20       Q    I'm sorry.  Can you clarify the last part what

21   you said, or a threat can be lodged against us?

22       A    Launched against us.

23       Q    Okay.  Explain what you mean by that.

24       A    Well, when you have an armed robbery suspect

25   that could be a high likelihood that's armed in another


29


1   room, and they're distracting you, and you have to deal

2   with that person, your threat level increases when that

3   noncompliant person draws your attention away from areas

4   where there are armed suspects inside yet.  So if I have

5   to turn my back in order to deal with him and his

6   noncompliant manner, I'm subject to being shot in the

7   back, the side, whatever, without being able to defend

8   myself.

9       Q   Okay.  I just want to ask you a few more

10   questions.  You keep talking about suspects, and I just

11   want to get some clarification here.  Did you ever become

12   aware once this entry began that there was more than one

13   suspect?

14       A   I'm going by recollection.  I'm sure there was

15   at least one.

16       Q   Okay.  Right.  Otherwise you wouldn't have been

17   there if there wasn't at least one suspect.  Isn't that

18   correct?

19       A   That depends again on the circumstances.  They

20   could have done -- they could have taken the subject off

21   outside the house and still had us execute a high risk

22   warrant.  That's been done before.

23       Q   Right.  But he wouldn't have been there, but --

24   all right.  Moving on.  Was the individual suspect

25   someone who had a gun or weapon on him when you found

30

1    him?

2        A   Not visible to me.

3        Q   Were any weapons or guns found within the

4    search?

5        A   I don't know.

6        Q   Did you find any?

7        A   I did not.  But I don't search for them.

8      Q   I understand that.

9      A   This is a -- there is two different complete

10   roles here, and --

11     Q   I understand that.

12     A   -- you seem to not be able to understand.

13     Q   No, please.

14     A   We secure people.

15          MS. SULLIVAN:  I'm sorry, Off -- please

16       instruct your client, Ms. Nelson.  I'm trying to

17       ask him a question.  He's overbearing -- he's over

18       talking me.  I'm trying to ask a question, and he's

19       not allowing me to get it out.

20          MS. NELSON:  Okay.  Wait until --

21          MS. SULLIVAN:  I understand very well.

22          MS. NELSON:  -- she's done with her

23       question.  And then allow him to finish the answer.

24          MS. SULLIVAN:  He can finish the answer,

25       but he's not answering the question that I'm asking

31

1       him.

2    BY MS. SULLIVAN:

3      Q   And first, let me just clarify, Lieutenant.  I

4    understand there are two roles.  I understand there are

5    two teams.  I understand there's a SWAT and then the

6    investigators that come in.  And I understand that very

7    much.  I'm asking you a question about what you

8       personally saw or recovered from the home when you were

9       in there.  And then I will go on with the rest of what

10      I'm going to ask you about this.  So I'm going back to my

11      question, which is, did you see any weapons, yes or no?

12          A   No.

13          Q   Did any of the officers who were within the home

14      at the same time as you, to your knowledge, recover or

15      see any weapons, yes or no?

16          A   No.

17          Q   Okay.  Are you aware of whether or not after you

18      left investigators saw or took any weapons from the home?

19          A   I'm not aware.

20          Q   Okay.  All right.  And can you please explain to

21      me whether or not the other family members in the home or

22      other individuals who were present at the time of this

23      incident other than the elderly man seemed to be afraid

24      when you kicked him to the ground and when you placed the

25      gun near him?

32

1           A   Can you restate the question?

2           Q   Sure.  I sure can.  We've already talked about

3       the fact that you kicked the elderly gentleman to the

4       ground and that as you survey the area wherever your eyes

5       go that the gun goes.  Did you notice or observe whether

6       or not the other individuals in the area, which were

7    family members, seemed to be scared or concerned about

8    the elderly gentleman as this was going on?

9         A    I don't believe they were scared or concerned

10   about him.   They were scared and concerned from the

11   moment that we went through the door.

12        Q    Okay.  Do you recall any of them asking for them

13   to be able to take care of the elderly man who was lying

14   on the ground?

15        A    No.

16        Q    Okay.  And were the women in the area ever

17   cuffed?

18        A    I don't know.

19        Q    But you and your team did not cuff them?

20        A    I don't know that, either.

21        Q    Okay.  Do you know if you cuffed them?

22        A    I know I did not.

23        Q    Okay.  Is it safe to say that had they been

24   cuffed, it would be because there was a threat that was

25   perceived?


33


1         A    This is difficult to answer unless you

2    understand the dynamics of a high risk entry.  I'm the

3    team leader and the front part of it.  When I see hands

4    and people complying, I pass through.  That's left to my

5    trailers on the team.  They interpret a threat level

6    there, and they apply handcuffs.  That's other members of

7    the team.  My mission is to go through and lead all

8    point.  My point man and me go through everywhere in the

9    house.  Once I pass, I don't see any firearms in the

10   hands, I'm on to the next problem.  So what happens after

11   me at the tail end of that snake I have no knowledge.

12       Q   Okay.  So you don't at all at any point during

13   these entries ever instruct officers to cuff people?

14       A   Can you ask that again?

15       Q   Yes.  Do you ever instruct officers to cuff

16   individuals when you're conducting these entries?

17       A   Yes.

18       Q   Okay.  So it's possible that you may have

19   instructed someone to cuff some of the individuals who

20   are present?

21       A   Possible.

22       Q   Okay.  Were the children cuffed?

23       A   I don't believe so.

24       Q   Would you cuff children?

25       A   That depends on the circumstances.

34

1    Q   So you would cuff a six-month-old child?

2    A   No.

3    Q   Okay.  How old of a child would you cuff?

4    A   Upwards of twelve.

5    Q   Okay.  But you didn't notice any 12-year-old

6    children in this home as you previously testified?

7         A    I don't know.

8         Q    Okay.  Well, you previously --

9         A    I previously testified there were ages of four,

10   five, six.  I believe there were some older, too.  I'm

11   not positive.

12        Q    Actually, you said they were younger, and I mean

13   three to four.

14        A    Younger, but there was a spread-out age.  There

15   was -- I believe there was a teenager in there or

16   something, also.  There were several women, several

17   children.  And I was in there for only a matter of

18   minutes.

19        Q    Okay.  All right.  But you're saying that if a

20   child was 12 and up, you might cuff them, but someone who

21   is younger than that, you wouldn't cuff?

22        A    Again, it still depends on the circumstances, 12

23   and up.

24        Q    Okay.  I'm just trying to clarify at what point

25   you decide to --


35


1         A    There's no cookie cutter answer for the question

2    you're asking.

3         Q    Okay.  So you might cuff a two-year-old child,

4    and you might cuff a ten-year-old?

5         A    No, I wouldn't cuff a two-year-old.

6      Q    All right.  So they have to be an older child in

7    order for you to decide to have them cuffed?

8      A    Yes.

9      Q    Okay.  At any point during the incident, did you

10    request and receive consent from any of the individuals

11    to come near them or cause them fear of any kind?

12      A    Did I receive request to come towards --

13      Q    Did you request --

14      A    -- them and cause them fear?

15      Q    No.  Let me clarify it for you again.  I'll say

16    it exactly the way I said it before.  Did you request and

17    subsequently receive consent from any of the individuals

18    to come near them and/or cause them apprehension or fear?

19              THE WITNESS:  Can you read that back?

20              COURT REPORTER:  Sure.  "Did you request

21        and subsequently receive consent from any of the

22        individuals to come near them and/or cause them

23        apprehension or fear?"

24              MS. NELSON:  I'll object.  That's a

25        compound question.

36

1    BY MS. SULLIVAN:

2      Q    Okay.  Let me break it down for you.  I'll break

3    it down for you.  At any point while you were in the

4    home, did you request from any of the individuals the

5    right to come near them and cause them fear of any kind?

6         A    No.

7         Q    All right.  And did you -- and then if you

8    didn't request, you obviously did not receive their

9    consent to do that, did you?

10        A    No.

11        Q    Okay.  Did you attend or -- I'm sorry.  Strike

12   that.

13             Are you aware of whether or not there were -- or

14   the younger male who was near that elderly male was ever

15   placed on the ground while you were present?  I'll say it

16   again.

17             Are you aware of whether the other male -- you

18   mentioned there was another male next to the elderly

19   male.  Are you aware of whether he was ever placed on the

20   ground when you were present?

21        A    Yes, he was on the ground.

22        Q    Okay.  Do you know how he got there?

23        A    Not specifically.

24        Q    So you don't know whether or not he had been

25   ordered to get on the ground or kicked to the ground or

37

1    something else?

2         A    I ordered him to the ground.

3         Q    All right.  But you did not assist him or kick

4    him to the ground?

5       A    No.

6       Q    Did you talk to this gentleman, the younger

7   gentleman?

8       A    No.

9       Q    Did you notice him having conversation with any

10  of the officers in the home?

11      A    I noticed him yelling and distracting and

12  causing a disturbance there.  I didn't notice him having

13  any type of conversation with anybody other than making

14  requests for a search warrant, demanding we leave,

15  continuing on and on and rambling.

16      Q    Okay.  And do you recall him asking for the

17  field sergeant?

18      A    Yes.

19      Q    Did anyone ever respond to him when he was

20  asking these questions?

21      A    He was ordered to stay down and be quiet

22  numerous times.  He wouldn't comply with anything

23  verbally.

24      Q    I understand that.  I'm asking whether anyone

25  ever responded to any of his questions.

38

1       A    I don't know.

2       Q    Did you respond?

3       A    I think I told him that I was a sergeant in

4    charge of the team, and there would be a sergeant in

5    charge of the house that he could speak with when I left.

6       Q   Did you tell him this as soon as he started

7    asking for the field sergeant, or did you wait and tell

8    him later on?

9       A   I don't recall.  It must have been later,

10   because I didn't have any conversations with anybody, so

11   to speak, until I was certain the whole house was secure

12   and the suspects that were upstairs were cuffed.

13      Q   You keep saying suspects.

14      A   Two met the same general description.

15      Q   Okay.  And neither of those individuals,

16   however, were arrested, were they?

17      A   I don't know.

18            MS. SULLIVAN:  Okay.  Nothing further.

19            MS. NELSON:  I have one follow-up

20      question.

21                      EXAMINATION

22   BY MS. NELSON:

23      Q   With respect to the older gentleman, can you

24   describe how much force you used in getting him to the

25   ground?

39

1       A   Very minimal.

2       Q   Can you elaborate on that?

3       A   In my report, it says a poke check and a kick.

4    What that meant was I used a sweep of a gun barrel to

5    push him forward, and then as he was going down and

6    getting back up, I pushed back with my foot.

7        Q    And I think you also said that he was not

8    complying with your orders to get down.  What was he

9    doing?

10       A    He was noncompliant throughout.  He demanded

11   that I leave his house.  He told me that he's lived there

12   for over 30 years and I had no right to be in there.  He

13   was blocking my access to the upstairs, through the

14   kitchen to the downstairs.  He was blocking me

15   throughout.  He was noncompliant at gunpoint to get on

16   the ground.  He demanded that he see paper.  He said I

17   was too young to tell him what to do.  He said that he

18   was a long-term resident.  He's lived there longer than

19   I've been alive and I had no right to come into his house

20   and tell him what to do.

21       Q    And as a result of not complying, is that when

22   you used the force you've described?

23       A    Yes.

24                MS. NELSON:  Okay.  Thank you.

25                MS. SULLIVAN:  Follow-up.


40


1                        EXAMINATION

2    BY MS. SULLIVAN:

3      Q    You said that, in talking about the force -- I'm

4   honestly still not clear of the amount of force that you

5   caused to be thrust onto him.  You said minimal, but then

6   you said you -- a sweep with the muzzle and then a kick

7   later on.  How much force with the kick?

8      A    Very little force, minimal.  It was a push with

9   my foot rather than a kick.

10     Q    Okay.  So you stated it wrong in your report

11  then?

12     A    In the report, for simplicity that's what we

13  term that.

14     Q    You had said that he was standing in the way or

15  blocking --

16     A    Yes.

17     Q    -- the stairway.  And what was your concern

18  about if he was blocking the stairway?  What was your

19  concern?

20     A    The possibility of our armed robbery suspect

21  being up those stairs with a gun.

22     Q    But, in fact, there was no one upstairs with a

23  gun when you got up there?

24               MS. NELSON:  Objection, mischaracterizes

25          previous testimony.

41

1   BY MS. SULLIVAN:

2      Q    Was there someone upstairs with a gun when you

3   got there?

4        A    There was someone upstairs.   I did not see a

5   gun.

6        Q    Okay.

7        A    But I did not do a search.

8        Q    You didn't do a search?

9        A    I do a visual search of the person.   Once I see

10   hands and order down and the hands stay out, I clear and

11   go to the next threat.   When it's done, I don't search

12   anywhere.

13        Q    Okay.   And you saw hands?

14        A    My team searches the immediate area where their

15   hands are cuffed around their waistband, anything that's

16   accessible to them.   They don't conduct a search.

17        Q    Okay.

18        A    That's on the team that we're doing the warrant

19   for.

20        Q    Okay.   Just, please.   And you saw hands when you

21   went upstairs then?

22        A    Yes.

23        Q    Okay.   Which signifies compliance with orders?

24        A    The two individuals upstairs were completely

25   compliant.

42

1        Q    That's what I'm asking about.

2      A    Yes.

3                  MS. SULLIVAN:   Okay.   Nothing further.

4                  MS. NELSON:   Nothing further.   We'll read

5        and sign.

6

7          (Deposition concluded at 2:16 p.m.)

8                          **********
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                REPORTER'S CERTIFICATE

2

3      STATE OF MINNESOTA)
                        )   ss.
4      COUNTY OF HENNEPIN)

5           I hereby certify that I reported the deposition
       of LIEUTENANT ROBERT KROLL, on the 28th day of March,
6      2007, in Minneapolis, Minnesota, and that the witness
was
       by me first duly sworn to tell the whole truth;
7
            That the testimony was transcribed by me and is
a
8      true record of the testimony of the witness;

9           That the cost of the original has been charged
to
       the party who noticed the deposition, and that all
10     parties who ordered copies have been charged at the
same
       rate for such copies;
11
            That I am not a relative or employee or
attorney
12     or counsel of any of the parties, or a relative or
       employee of such attorney or counsel;
13
            That I am not financially interested in the
14     action and have no contract with the parties,
attorneys,
       or persons with an interest in the action that affects
or
15     has a substantial tendency to affect my impartiality;

16          That the right to read and sign the deposition
by
       the witness was reserved.
17
            WITNESS MY HAND AND SEAL, this 31st day of
March,
18     2007.

19     _____

20     Lori L. Morrow, RPR, CRR
       Notary Public, Hennepin County, Minnesota
21     My commission expires:  January 31, 2010

22

23

24

25