1

1    STATE OF MINNESOTA                    DISTRICT COURT

2    COUNTY OF HENNEPIN       FOURTH JUDICIAL DISTRICT
     *************************************************

3    Charles Everett Cook, Sylvia Mae Cook,
     and Timothy Blake Cook, natural persons,

4
                    Plaintiffs,

5
         v.

6
     City of Minneapolis, a municipal entity; Minneapolis

7    Police Officer Mark Johnson, Badge #003459, in his
     individual, personal and official capacity; Sgt. D.

8    Smulski, in his individual, personal and official
     capacity; Officer K. Blackwell, in his individual,

9    personal and official capacity; Officer Geoffrey
     Toscano, Badge #007257, in his individual, personal and

10   official capacity; Officer Bevan Blauert, Badge
     #003459, in his individual, personal and official

11   capacity; Officer Jon Petron, Badge #5671, in his
     individual, personal and official capacity; Officer

12   Christopher House, Badge #3165, in his individual,
     personal and official capacity; Sgt. Robert Kroll,

13   Badge #003874, in his individual, personal and official
     capacity; Officer Christie Nelson, Badge #4959, in his

14   individual, personal and official capacity; Officer
     William Willner, Badge #7783, in his individual,

15   personal and official capacity; Officer Westlund, Badge
     #7674, in his individual, personal and official

16   capacity; Officer Roger Smith, Badge #006689, in
     his individual, personal and official capacity; Officer

17   Jason King, Badge #003704, in his individual, personal
     and official capacity; Officer Timothy Hanks, Badge

18   #002660, in his individual, personal and official
     capacity; and Officers Jane Doe and Richard Roe,

19   unknown and unnamed Minneapolis Police Officers, in
     their individual, personal and official capacities;

20
                    Defendants.

21   *************************************************

22                    DEPOSITION OF
                  OFFICER ROGER SMITH
23               Taken March 28, 2007
                 Scheduled for 10:30 a.m.

24
            Reported By:  Lori Morrow, RPR, CRR
25   PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545

2

1           Deposition of OFFICER ROGER SMITH, taken on the

2      28th day of March, 2007, commencing at 10:30 a.m., at the

3      CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

4      Street, Suite 300, Minneapolis, Minnesota, before Lori

5      Morrow, Registered Professional Reporter and Certified

6      Realtime Reporter and a Notary Public in and for the

7      State of Minnesota.

8

9                      APPEARANCES:

10

       On Behalf of the Plaintiffs:

11

           Maya C. Sullivan, Esquire
12         LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
           941 Hillwind Road NE
13         Suite 200
           Minneapolis, Minnesota 55432
14         (763) 515-0092
           Fax (763) 515-0093
15

       On Behalf of the Defendants:
16

           Tracey L. Nelson, Esquire
17         CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
           333 South 7th Street
18         Suite 300
           Minneapolis, Minnesota 55402
19         (612) 673-2063

20                    **********

21           NOTE:  The original transcript will be
                delivered
       to Maya C. Sullivan, Esquire, pursuant to the applicable
22     Rules of Civil Procedure.

23

24

25

3

```
1                           INDEX

2    WITNESS:

3    Officer Roger Smith

4
     EXAMINATION BY:              PAGE:
5    Ms. Sullivan...............4

6

7    OBJECTIONS BY:

8    Ms. Nelson.................7, 8, 9, 16

9
     EXHIBITS MARKED AND REFERRED TO:        PAGE:
10
     Exh. No. 1:
11
          CAPRS report 1/19-20/2005
12        Roger Smith                        11

13
                       **********
14
        (REPORTER'S NOTE:  Original Exhibit is
15   attached to the original transcript.)

16

17

18

19

20

21

22

23

24
```

25

4

1                    OFFICER ROGER SMITH,

2    duly sworn, was examined and testified as follows:

3                         EXAMINATION

4    BY MS. SULLIVAN:

5        Q   Officer Smith, I'm Maya Sullivan, as I said, and

6    I'm one of the attorneys for the Plaintiffs in this

7    matter, the Cooks.  Albert Goins is the other attorney,

8    and you may have met him in the past.

9            First of all, I just want to talk about a few

10   things that you just need to keep in mind while we're

11   going through the depositions.  Have you been through

12   depositions before?

13       A   I have just through the city.

14       Q   So you are somewhat familiar with the process

15   and the procedure?

16       A   A little, yeah.

17       Q   Basically, I'll just be asking you questions,

18   and I just want you to give a frank response, an honest

19   response.  You were sworn in, so you are under oath,

20   everything that you say.

21           It's possible that your attorney may object to

22   some things that are being asked, and, if so, just wait

23   for your attorney's instructions on that.

24          Make sure that you are giving verbal responses

25   and not nodding or shaking your head or "uh-huh" or that

5

1    type of thing.

2          A    Okay.

3          Q    "Yes" or "no" is what we need or whatever the

4    answer is.

5          And that's pretty much all I have right now.  Do

6    you have any questions before we get started?

7          A    No.

8          Q    Okay.  Officer, could you please state and spell

9    your name for the record?

10          A    Sure.  It's Roger Dean Smith.  It's R-O-G-E-R,

11   last name Smith, S-M-I-T-H.

12          Q    Okay.  And who is your employer?

13          A    City of Minneapolis.

14          Q    What specific department?

15          A    I work for the STOP or SWAT Division right now.

16          Q    Okay.  Of the Minneapolis Police Department?

17          A    Yes.

18          Q    Okay.  And how long have you been employed with

19   Minneapolis Police Department?

20          A    Since September of 1993.  So I'm in my 14th

21   year.

22          Q    Okay.  And how long -- or I'm sorry.  How long

23   have you been a police officer?

24      A    For that amount of time.

25      Q    Okay.  What did you do prior to being a police

6

1    officer for the City of Minneapolis?

2      A    I was a manager for a convenience store.

3      Q    Okay.  Have your job assignments with the

4    Minneapolis Police Department stayed the same over the

5    years, or have they changed?

6      A    Pretty much stayed the same.

7      Q    And so you've been on the SWAT team then for the

8    entire time?

9      A    I've been on the SWAT team for six, seven years.

10      Q    Okay.  And what does that mean?  What is the

11    SWAT team?

12      A    SWAT team basically does callouts for

13    operations, you know, of somebody that's held up with

14    guns.  We also do entries for other cities that are

15    looking for criminals within the city.

16      Q    Okay.  And what does an entry entail?

17      A    An entry?  An entry would entail a sergeant to

18    do a recon of the address, of the house and then

19    basically getting all the information about the house and

20    then relaying that to the officers that are going to be

21    doing the entry.

22      Q    And are SWAT officers -- or excuse me.  Do SWAT

23   officers receive specialized training to participate in

24   that type of work?

25        A    Yes.



7



1         Q    Okay.  And what type of training is that, and

2    how long does it last, I guess?

3         A    You know, it's ongoing training throughout.  I

4    mean, every year, you go through --

5         Q    Continuing education?

6         A    -- training, yeah.

7         Q    How many times prior to this case have you been

8    a named defendant in a lawsuit involving the Minneapolis

9    Police Department in which so and so rights have been

10   alleged to have been violated?

11                MS. NELSON:  I'll object as relevant --

12          irrelevant, not relevant.

13                You can answer.

14                THE WITNESS:  You know, maybe one or two

15          possibly, that I can recall.

16   BY MS. SULLIVAN:

17        Q    Do you at all recall the circumstances of those

18   particular cases?

19                MS. NELSON:  Same objection.

20                You can answer.

21   BY MS. SULLIVAN:

22        Q    Were they similar in terms of the type of

23    entry --

24         A    No.

25         Q    -- that you had here in this case?


8

1         A    No.

2         Q    Okay.  How many internal affairs complaints have

3    been filed against you?

4              MS. NELSON:  Same objection.

5              You can answer.

6              THE WITNESS:  None that I know of.

7    BY MS. SULLIVAN:

8         Q    And how many high risk entry warrants do you

9    think, just approximately, that you may have assisted on

10   or been part of over the six or seven years you've been

11   on the SWAT team?

12        A    Probably 250 to 300.

13        Q    Do you receive any specialized training

14   regarding dealing with elderly, ill, or young children

15   when exercising a high risk or other type of warrant?

16        A    No.

17        Q    In your participation in these type of warrants

18   then, is it safe to say that you don't deal with or

19   behave differently toward elderly, young, or ill people?

20             MS. NELSON:  Objection, mischaracterizes

21          previous testimony.

22          MS. SULLIVAN:  Okay.  Do you want me to

23          rephrase it, or do you want him to answer the

24          question?

25          MS. NELSON:  If you understand the


9


1          question, you can answer it.  If you need her to

2          clarify it, then please ask her to.

3   BY MS. SULLIVAN:

4       Q    I can clarify it for you.

5       A    Yeah, clarify it.

6       Q    No problem.  My question was, first, do you

7   receive any specialized training in doing these type of

8   warrants with specifically elderly, ill, or young

9   children.  I can break that up for you if that's easier.

10  Do you handle high risk warrants -- or high risk entries,

11  I'm sorry, the same as with a normal adult that you would

12  if you saw someone who was ill or elderly when you

13  entered the home?

14          MS. NELSON:  I'll object as vague, too, as

15          in what specific --

16          MS. SULLIVAN:  I asked about his behavior

17          and how he dealt with those individuals initially.

18          MS. NELSON:  Okay.

19          THE WITNESS:  You know, it's a pretty much

20          common sense deal, you know, you -- just like you

21          would in a squad.  I mean, it's -- you see what you

22        see, and you deal with it as it comes.

23   BY MS. SULLIVAN:

24        Q    Okay.  So but I'm still trying to get an

25   understanding of what is different about how you would


10


1    deal with an ill person if you encountered them on a high

2    risk entry warrant.

3        A    I mean, without getting into specifics, I mean,

4    if somebody is in a wheelchair, you deal with that

5    differently, you know.

6        Q    And what do you mean by differently, though?  I

7    mean, do you --

8        A    Well, you still want to see hands, but that

9    person might not be able to show you their hands, you

10   know, if they're in a wheelchair.  So you still -- I

11   mean, people can hide stuff in wheelchairs and hide their

12   hands and all kinds of things, so.

13       Q    Okay.  But the bottom line is that you take

14   their condition under consideration.  Is that accurate?

15       A    Yeah.

16       Q    Okay.  And when you're dealing with young

17   children or infants, would the same be the case?

18       A    Yes.

19       Q    Okay.  I just want to turn your attention to the

20   incident for which we're here talking about.  Were you

21    part of the team that entered the home located at 3845

22    Second Avenue South in Minneapolis, Minnesota?

23        A    Yes, I was.

24        Q    I'm sorry.  And that was on January 13, 2005?

25        A    Yes.


11


1        Q    Okay.  And what information were you provided

2    with during the briefing?

3        A    Just the briefing that -- I mean, I guess I

4    can't recall exactly what was said.  But we're briefed

5    about the whole entire house and who the suspects are

6    that we're looking for.

7        Q    Okay.  So you believe that there were more than

8    one -- there was more than one suspect?

9        A    That I -- I mean, that I can recall, yes.

10       Q    Do you have your police report with you?

11       A    No, I don't.

12       Q    Okay.  Would you like to take a look at it to

13    refresh your memory just to give me a better

14    understanding of how you were briefed?

15       A    Sure.

16            MS. NELSON:  Are you going to mark that as

17        an exhibit?

18            MS. SULLIVAN:  We can, yes.

19            (Deposition Exhibit Number 1

20            was marked for identification and is

21                 attached herewith.)

22   BY MS. SULLIVAN:

23      Q   If you could just glance over that, Officer

24   Smith, and just if that hopefully refreshes your memory

25   about how you were briefed prior to going into this

12

1   entry, and just could you explain how you were briefed

2   and what information you were given?

3      A   Well, basically, we were briefed.  Basically, my

4   whole first paragraph says, you know, that we're looking

5   for an armed suspect from a robbery and that I was going

6   to be assigned to the 12th -- or to the ram team.

7      Q   Okay.  All right.  Does that refresh your memory

8   sufficiently?

9      A   Yeah.

10     Q   All right.  Okay.  Thank you.  And so the

11   information you were given didn't include a description

12   of the individual?

13     A   Not that I recall.

14     Q   Did you receive the person's age, any

15   identifying information regarding this individual?

16     A   Not that I recall.  I thought I put it in the

17   report, but.

18     Q   How were you to know you were encountering the

19   alleged suspect if you didn't have any identifying

20    information about him?

21        A    Basically, when we go into a warrant, we secure

22    everybody that's in there.  And once we secure everybody

23    and make sure that they don't have weapons on them, then

24    the investigators come in after that.

25        Q    Okay.  All right.  I want to turn your attention

13

1    more back to the details of the entry.  Where were you in

2    the line in terms of were you first, second coming into

3    the home?

4        A    Going into the home, you mean after -- we were

5    going to go up to hit the door with the ram, but the door

6    was open, so.

7        Q    It was unlocked you mean?

8        A    Right.

9        Q    Okay.

10        A    Unlocked.  So I took the ram, set it down on the

11    porch, and then we entered -- we're basically one of the

12    last two to enter, the two ram guys are, after everybody

13    else does, so.

14        Q    Okay.  So you were one of the last people to

15    enter the house at that time --

16        A    Yeah.

17        Q    -- on the SWAT team?  At the time that you

18    entered, do you recall what you observed when you walked

19    into the home?

20      A    A lot of screaming, kids yelling.

21      Q    How many kids do you recall?

22      A    I couldn't tell you for sure.

23      Q    Okay.  Do you have an estimate?  I mean, it was

24   more than one for sure --

25      A    For sure, yeah.


14


1      Q    -- I'm assuming, since you say kids?

2      A    Yeah.

3      Q    Do you think it was more than two?

4      A    It was probably five maybe.

5      Q    Maybe five?  Okay.  Do you recall their ages?

6      A    No.

7      Q    Do you recall if any of them were infants?

8      A    I don't believe so.

9      Q    As a result of the incident, are you aware of

10   whether the robber suspect was actually arrested?

11      A    I'm unaware.

12      Q    Do you know if anybody was arrested as a result

13   of the incident?

14      A    No.

15      Q    No, nobody was arrested, or no, you don't know?

16      A    No, I don't know if anybody was.

17      Q    All right.  I have a couple more questions.  In

18   your supplemental police report, you indicated that the

19  adult women that you initially encountered were screaming

20  frantically and asking for a search warrant.  Was a

21  search warrant shown to them at any point, to your

22  knowledge?

23      A   Not that I know of.

24      Q   Why not?

25      A   We don't carry -- we don't carry the search

15

1   warrant with us.

2       Q   Did they ask about the search warrant or the

3   field sergeant, or did you hear them ask about the search

4   warrant or the field sergeant?

5       A   When we were securing people, yeah.

6       Q   And what was your response?

7       A   I don't know if I even responded.  I can't

8   recall.

9       Q   Do you normally respond if someone asks for a

10  search warrant or a --

11      A   If they would ask me personally, yeah.

12      Q   You say in your report that the older male that

13  you encountered had to be forced to the ground.  Who

14  forced him to the ground?

15      A   You know, with everybody that was there, I, you

16  know, I can't recall for sure who would have put him to

17  the ground.  I think I might have assisted.  I can't

18  recall who else might have done it.

19      Q    Did you notice if the older gentleman may have

20  appeared ill?

21      A    He didn't appear to me to be, you know, ill.

22      Q    He appeared older or elderly, though?

23      A    Older, yeah.

24      Q    Did you notice the stint in his neck?

25      A    No.


16


1       Q    Did you notice how long he was on the ground?

2       A    No, I don't know.

3       Q    Would you say it was a significant period of

4   time?

5               MS. NELSON:  Objection, vague.

6               THE WITNESS:  No.

7   BY MS. SULLIVAN:

8       Q    No, it was not?

9       A    No.

10      Q    Do you recall what the weather was like on that

11  day, Officer Smith?

12      A    No, I don't.

13      Q    It was January in Minnesota, so you probably

14  could guess it was cold, you're just not sure exactly?

15      A    Right.

16      Q    Would you normally leave someone who was ill or

17  elderly in front of an open doorway in extreme or cold

18    temperatures while securing a warrant or high risk

19    warrant?

20         A   Well, we're -- I mean, we're certainly not going

21    to look behind us to see what we left open.  You

22    understand, because then you're taking your eyes off --

23         Q   I understand that.

24         A   So no.

25         Q   No, you would not normally leave them --


17


1          A   No.

2                    MS. NELSON:  Wait.

3                    THE WITNESS:  Repeat that question.

4     BY MS. SULLIVAN:

5          Q   Would you normally leave an elderly or ill

6     person in front of an open doorway --

7          A   No.

8          Q   -- in cold temperatures or in frigid

9     temperatures?

10         A   No.

11         Q   But in this case, the elderly gentleman was left

12    in front of the doorway.  Can you give me any kind of

13    explanation or give me an understanding of why that

14    happened?

15         A   I have no answer.  I mean --

16         Q   Okay.  And you said you don't normally look

17    behind you because you don't want to take your eyes off

18 of what's going on.  And that's understandable.  But what

19 if the person is bringing to your attention that the door

20 is open, and they are ill or cold and that type of thing.

21     A    Just depends if they're secure or not, I mean,

22 if the whole area is under control.

23     Q    If the individual is secure or the entire

24 residence is secure?

25     A    Basically, everybody that's -- everybody that's


18


1  in the room, that's in the house.

2     Q    Do you recall whether you thought or felt that

3  the women and children in the living room area when you

4  first encountered them, whether they presented any kind

5  of threat to you or any of the officers?

6     A    I don't recall if they were a threat or

7  anything.  I mean, the other officers went, you know,

8  completely past them.  But they were, you know -- I mean,

9  it's pretty hard to, you know, think of what a threat

10 could be, because once you let your guard down on

11 something like that, that's when something terrible

12 happens.

13     Q    That's understandable.  I guess what I'm trying

14 to understand, though, is do you recall handcuffing any

15 of the women or children who were in the area?

16     A    No.

17      Q    And do you normally in a high risk situation

18   cuff individuals who seem to be presenting some sort of

19   threat to you?

20      A    Not right away.

21      Q    But you do cuff them at some point?

22      A    (Nods head.)

23      Q    All right.  But you don't recall cuffing the

24   women and children at all --

25      A    No.


19


1      Q    -- during the encounter?  So would it be safe to

2   say that you did not feel that they presented any kind of

3   a threat to you or to any of the other officers?

4      A    I wouldn't say that.

5      Q    Well, then please explain why you wouldn't cuff

6   them at any point.

7      A    We would as a team cuff them.  But they are just

8   going to be secured at gunpoint, you know, not direct

9   gunpoint.  I'm not going to be pointing my gun directly

10   at you, but I might have it at a ready position just in

11   case a gun was presented.

12      Q    Okay.  I'm just trying to again understand here.

13   So are you saying that in lieu of cuffing them, you would

14   gun check them?  Is that what you're saying?

15      A    Somebody would check them and then handcuff

16   them, or, you know, I don't know if the investigators

17    came in.  I couldn't tell you.  I mean, I can't recall

18    two years ago what happened exactly at that residence.

19    But, basically, that's typically -- and one person or two

20    persons that are assigned to the team usually go and cuff

21    people while everybody else is securing and so -- until

22    they're cuffed.

23         Q    Okay.  So if someone wasn't cuffed, then the

24    exception would be that the area was secure, and those

25    individuals didn't pose a threat then.  I'm just trying

20

1     to get an understanding.

2          A    If somebody was not cuffed?

3          Q    Right.  If they were never cuffed, and you had

4     been through, you had looked around, done whatever you

5     had to do while you were in there, the assumption then

6     would be that they did not pose a threat?

7          A    I would say that that's up to the investigators.

8     So that's not even on our --

9          Q    Okay.  I'm asking you as a SWAT team member,

10    would the assumption be since you did not cuff that

11    individual, and you're the individuals who are going in

12    first doing the surveying and clearing of the area, would

13    the assumption be that there was no threat that was being

14    posed by those individuals?

15         A    Still, I guess, I mean, you're going to have to

16   rephrase it differently.

17       Q    Well, okay.  Let me just --

18       A    I would see them as a threat until they're

19   searched and until the area is searched around them.

20       Q    Okay.  And do you normally search the area and

21   search the individuals fairly soon as you --

22       A    We search the individuals, and then the

23   investigators search the area.

24       Q    Okay.  Let me finish my question.  My question

25   was, do you normally search the area upon entering into


21


 1   the residence or upon entering into the building?

 2       A    No.

 3       Q    Okay.  At what point would you have searched the

 4   area?

 5       A    We wouldn't.  The SWAT team wouldn't.

 6       Q    Okay.  Excuse me.  I thought you just said that

 7   you searched the area, and the investigators searched the

 8   individuals.

 9       A    Switch that around.

10       Q    The other way around?

11       A    Yeah.

12       Q    Okay.  So at what point would you search the

13   individuals?  Immediately upon entering into the house or

14   sometime later?

15       A    Once they're secure.

16      Q   Do you know if anyone, any of the other officers

17  involved or yourself, attended a hearing relating to this

18  particular incident involving one of the Plaintiffs?

19      A   I don't know.  I don't know if anybody did.

20      Q   Did you?

21      A   No.

22      Q   Okay.  And let me just clarify.  When I say

23  hearing, I mean a criminal hearing regarding a disorderly

24  conduct matter that the individual was charged with as a

25  result of this incident.  And you're saying you did not

22

1   attend that hearing?

2       A   I did not.

3       Q   And you don't recall whether or not or you don't

4   know whether any of the other officers involved attended?

5       A   I don't know.

6           MS. SULLIVAN:  Okay.  I don't have

7        anything else for you right now.

8           MS. NELSON:  I don't have anything.  We'll

9        read and sign.

10

11      (Deposition concluded at 10:55 a.m.)

12                          **********

13

14

15

16

17

18

19

20

21

22

23

24

25

23

1                    REPORTER'S CERTIFICATE

2

3    STATE OF MINNESOTA)
                     )   ss.
4    COUNTY OF HENNEPIN)

5            I hereby certify that I reported the deposition
     of OFFICER ROGER SMITH, on the 28th day of March, 2007,
6    in Minneapolis, Minnesota, and that the witness was by
me
     first duly sworn to tell the whole truth;
7
             That the testimony was transcribed by me and is
a
8    true record of the testimony of the witness;

9            That the cost of the original has been charged
to
     the party who noticed the deposition, and that all
10   parties who ordered copies have been charged at the
same
     rate for such copies;
11
             That I am not a relative or employee or
attorney

12    or counsel of any of the parties, or a relative or
employee of such attorney or counsel;

13

             That I am not financially interested in the
14    action and have no contract with the parties,
attorneys,

    or persons with an interest in the action that affects
or

15    has a substantial tendency to affect my impartiality;

16            That the right to read and sign the deposition
by

    the witness was reserved.

17

            WITNESS MY HAND AND SEAL, this 31st day of
March,

18    2007.

19    _____

20    Lori L. Morrow, RPR, CRR
    Notary Public, Hennepin County, Minnesota
21    My commission expires:  January 31, 2010

22

23

24

25