1

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2                          THIRD DIVISION
   _____
3    Charles Everett Cook, et al.,

4            Plaintiffs,

5    v.

6    City of Minneapolis, et al.,

7            Defendants.

8    _____

9                       DEPOSITION OF

10                      MARK A. JOHNSON

11                   Taken March 29, 2007
                    Commencing at 1:05 p.m.
12

13

14

15

16

17

18

19

20           REPORTED BY:  JANE C. NORMAN, RPR
            PARADIGM REPORTING & CAPTIONING INC.
21                   1400 RAND TOWER
                 527 MARQUETTE AVENUE SOUTH
22           MINNEAPOLIS, MINNESOTA  55402
                     (612) 339-0545
23                   1(800) 545-9668
                    FAX (612) 337-5575
24

25

2

```
 1          Deposition of MARK A. JOHNSON, taken on

 2   March 29, 2007, commencing at approximately 1:05

 3   p.m., at the law offices of the MINNEAPOLIS CITY

 4   ATTORNEY, 300 Lincoln Centre, 333 South Seventh

 5   Street, Minneapolis, Minnesota, before Jane C.

 6   Norman, Registered Professional Reporter and Notary

 7   Public of and for the State of Minnesota.

 8

 9

10

11                    **********

12

13                     APPEARANCES

14   ON BEHALF OF PLAINTIFFS:

15          ALBERT TURNER GOINS, SR., ESQ.
            GOINS LAW OFFICE, P.C.
16          301 Fourth Avenue South
            Minneapolis, Minnesota  55415-1015
17          612.339.3848

18   ON BEHALF OF DEFENDANTS:

19          TRACEY L. NELSON, ESQ.
            ASSISTANT CITY ATTORNEY
20          OFFICE OF MINNEAPOLIS CITY ATTORNEY
            300 Lincoln Centre
21          333 South Seventh Street
            Minneapolis, Minnesota  55402-2453
22          612.673.2066

23   NOTE:  The original transcript will be delivered to
     Albert Turner Goins, Sr., Esq., pursuant to the
24   applicable Rules of Civil Procedure.

25
```

3

1                    I N D E X

2  WITNESS: MARK A. JOHNSON                          PAGE

3      EXAMINATION BY MR. GOINS ...................   4

4

5
   OBJECTIONS:  6, 27, 28, 38, 39, 47, 48, 49, 53, 61,
6              63

7

8
   REQUEST FOR PRODUCTION:  58
9

10

11  EXHIBITS MARKED AND REFERRED TO:  (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    MARK A. JOHNSON,

 2   having been first duly sworn, testifies as follows:

 3                      EXAMINATION

 4   BY MR. GOINS:

 5      Q    Give me your full name, please, Officer.

 6      A    Mark Armin Johnson.

 7      Q    Could you spell that, please?

 8      A    M-A-R-K, A-R-M-I-N, J-O-H-N-S-O-N.

 9      Q    Where are you currently employed?

10      A    City of Minneapolis Police Department.

11      Q    How long have you been employed there?

12      A    12 years.

13      Q    In what role?

14      A    Police officer.

15      Q    Okay.  Tell me a little bit about your

16   educational background.

17      A    I obviously graduated from high school,

18   have a two-year degree from Alexandria Technical

19   College.

20      Q    What's that degree in?

21      A    It's an associate's applied science for

22   law enforcement.

23      Q    Is that where you got your so-called

24   Skills training as they call it?

25      A    Yes.
```

5

```
 1      Q      And tell me, are you POST board certified?

 2      A      Yes.

 3      Q      Have you talked to your other fellow

 4   officers about the depositions that have been

 5   conducted in this lawsuit?

 6      A      No.

 7      Q      Do you know the other officers who were

 8   involved in this lawsuit?

 9      A      Yes.

10      Q      Okay.  Let's go through them.  Do you know

11   Officer -- Sergeant -- Sergeant Don Smallski (ph)?

12      A      Yes.

13      Q      How do you know Sergeant Smallski?

14      A      He was my sergeant.

15      Q      When?

16      A      Well, actually for the past probably five,

17   six years.

18      Q      So he's still your sergeant?

19      A      Yes.

20      Q      Again, you didn't tell me what precinct

21   you're in.

22      A      Third precinct.

23      Q      Have you had your deposition taken before,

24   Officer?
```

```
25      A    Yes.



6



 1      Q    How many times?

 2      A    Once.

 3      Q    What was the context?

 4      A    It was a civil suit for a death case.

 5      Q    Was I involved in that case?

 6      A    No.

 7      Q    Who was the plaintiff's attorney, if you

 8   recall?

 9      A    Can't remember.

10      Q    Okay.  Who died?

11      A    Christopher Burns.

12      Q    Christopher Burns was the decedent?

13      A    Yes.

14      Q    And were you involved in applying deadly

15   force?

16           MS. NELSON:  I'm gonna object to

17   relevance.

18           MR. GOINS:  Yeah, fine.

19      Q    Go ahead.  Were you involved in applying

20   deadly force?

21           MS. NELSON:  You can go ahead and answer.

22      A    Yes.

23      Q    Tell me about it.

24      A    Well --
```

25          MS. NELSON:   Same objection.   Go ahead and

7

1    answer.

2         A    It was -- actually we didn't apply deadly

3    force.   My partner applied a lateral vascular neck

4    restraint and Mr. Burns died.

5         Q    Was he the individual where you were

6    called to the scene of a domestic assault and when

7    you got there -- alleged domestic assault and when

8    you got to the location officers ended up in a

9    scuffle with this individual named Christopher

10   Burns and he ended up dying?

11        A    Yes.

12        Q    When did that happen?

13        A    Oh, I believe it's been three years ago

14   now.

15        Q    What happened with that lawsuit?

16        A    It's still pending.

17        Q    And you've testified and given a

18   deposition in that lawsuit?

19        A    I've given a deposition, yes.

20        Q    Now again -- you said your partner was who

21   again?

22        A    Officer Luke Peterson.

23        Q    Where is Luke Peterson right now?

```
24      A    I believe he's in the gang unit.  The

25   metro gang unit.
```

8

```
 1      Q    Were you guys split up after that

 2   incident?

 3      A    No.

 4      Q    All right.  Let's go through these other

 5   -- he was -- I don't recall that Officer Peterson

 6   was involved in this search that occurred on

 7   January 14th of -- 2005, Tracey?

 8           MS. NELSON:  I think it was 2005.

 9      Q    Was Officer Peterson involved in that

10   search January 14, 2005 at the Cook residence?

11      A    I don't believe so.

12      Q    All right.  How about Officer -- is it

13   Katie Blackwell?

14      A    Yes.

15      Q    Do you know Officer Blackwell?

16      A    She was in my unit at that time.

17      Q    What unit was that?

18      A    It was the third precinct directed patrol.

19      Q    What's that mean, third precinct directed

20   patrol?

21      A    It used to be a CRT, C-R-T, team, used to

22   be a Community Response Team, but they changed it

23   to directed patrol.  We basically did street level
```

24    crimes and hit hot spots and stuff like that.

25        Q    Okay.  We never really finished with your

9

1    background.  Let me just go back for completeness

2    sake.  Education here in Minnesota, right?

3        A    Yes.

4        Q    Where did you go to high school?

5        A    Winona Senior High.

6        Q    So you grew up in Winona?

7        A    Yes.

8        Q    Play any sports?

9        A    Hockey.

10        Q    Anything else?

11        A    I played baseball, but not, you know, for

12    the high school or anything.

13        Q    Defenseman in hockey?

14        A    Forward.

15        Q    And then did you play in any sports in

16    college?

17        A    Just played rec league hockey.

18        Q    Now, did you have any additional training

19    after your degree from Alexandria?

20        A    Yes.

21        Q    Okay.  Now for a while you were on the CRT

22    team; were you on the CRT team January 14th of

23    2005?

24        A    Yes, the directed patrol team, yes.

25        Q    So directed patrol is what the CRT team

10

1    used to be?

2        A    Yes.

3        Q    And Sergeant Smallski's been in charge of

4    that for how long, if you know?

5        A    He was in charge of it for about two and a

6    half years.

7        Q    Who is your sergeant now?

8        A    Now I'm back on the street.

9        Q    Where on the street?

10        A    Third precinct middle watch.

11        Q    And what are the hours for middle watch?

12        A    Four p.m. until two a.m.

13        Q    Okay.  Let's keep going through the

14    officers.  Officer Geoffrey Toscano.

15    G-E-O-F-F-R-E-Y T-O-S-C-A-N-O.  Do you know Officer

16    Toscano?

17        A    He's my partner.

18        Q    Current partner, right?

19        A    Yes.

20        Q    Was he involved in a lawsuit with the --

21    when Mr. Burns died?

22        A    No, I don't believe so.

23    Q    He's been involved in other lawsuits

24    though, hasn't he?

25    A    I don't know.


11


 1    Q    You don't know?

 2    A    Well, I know he's got one, but I don't

 3    know what he's got going with -- with them.  I

 4    don't keep up on lawsuits.

 5    Q    Which one does he have, do you know?

 6    A    He has told me he was recently in a

 7    deposition, but I don't know for what case.

 8    Q    This case or a different case?

 9    A    I believe this case.

10    Q    Okay.  Have you talked about his

11    deposition testimony?

12    A    No.

13    Q    Have you talked about this incident at the

14    Cook family home?

15    A    No.

16    Q    Were you part of the ERU team on that day,

17    on January 14, 2005?

18    A    No.

19    Q    Who was in the ERU team?

20    A    I can't remember.

21    Q    Can't remember anybody?

22      A    Well, I know Officer Toscano was, like

23  Sergeant Kroll (ph) was the sergeant.

24      Q    You mean Lieutenant Kroll?

25      A    He's Lieutenant Kroll now.  And I don't


12


1   remember who else was the entry team.

2       Q    How about Bevan Blauert, B-L-A-U-E-R-T; do

3   you know Bevan, B-E-V-A-N, Blauert?

4       A    Not personally, no.

5       Q    Was he on the CRT team or the entry team?

6       A    I believe the entry team.

7       Q    What's the difference?

8       A    He's -- those guys are -- ERU now are SWAT

9   team and they do entries where the CRT team or

10  directed patrol or any other units that do warrants

11  will call the ERU, SWAT team to come make entry

12  into the house and secure it and then we go in and

13  search it and go from there.

14      Q    What were you told, if anything -- we'll

15  go back to the officers in a minute, like Officer

16  Christopher House.  Let's just finish up -- let's

17  be semi-systematic.  Officer Christopher House, do

18  you know him?

19      A    He was on the unit with me.

20      Q    Okay.  What unit?

21      A    Directed patrol.

22      Q    And you said Sergeant Kroll, now

23  Lieutenant Kroll, he was the head of the ERU entry

24  team?

25      A    Yes.


13


1      Q    Do you know him pretty well?

2      A    Yes.

3      Q    Did you work with him prior to January 14,

4  2005?

5      A    I believe he was my sergeant for

6  approximately two years.

7      Q    Okay.  So had you gone on a lot of entries

8  with him?

9      A    No.

10     Q    Okay.  How about Officer Kristi Nelson, do

11  you know her?

12     A    She was on the directed patrol unit with

13  me.

14     Q    Do you know her pretty well?

15     A    Yes.

16     Q    Socialize with her?

17     A    No.

18     Q    How about Officer William Willner,

19  W-I-L-L-N-E-R?

20     A    He was also on the unit with me.

21      Q      Know him pretty well?

22      A      Yes.

23      Q      Socialize with him?

24      A      Yes.

25      Q      Been to his house?


14


1      A      Yes.

2      Q      Would you say you're friends with him?

3      A      I would say so.

4      Q      How long have you known Officer Willner?

5      A      Oh, probably about five years.

6      Q      Officer Westlund, do you know him?

7      A      He was also on my unit.

8      Q      Friends with him?

9      A      At work.

10      Q      At work friends then?

11      A      Yeah.

12      Q      Been to his home?

13      A      No.

14      Q      Any other officers you can recall that

15      were involved in this case that -- like Officer --

16      now I've got Officer Jason King, he's an officer.

17      Do you know him?

18      A      Yes.

19      Q      Friends with him?

20      A      At work, yes.

```
21      Q    How about Officer Roger Smith, do you know

22  him?

23      A    Not personally.

24      Q    He's a little bit older officer, huh?

25      A    Yes.



    15



 1      Q    How about Officer John Petron?

 2      A    He was on our unit at the time.

 3      Q    Friends with him?

 4      A    No.

 5      Q    Some reason you're not friends with him?

 6      A    I didn't know him very well.  He came from

 7  a different precinct to our unit and he wasn't on

 8  our unit very long.

 9      Q    Officer -- is it Timothy Hand?

10           MS. NELSON:  Hanks.

11           MR. GOINS:  We need to get the caption

12  corrected probably.  Otherwise he floats around

13  there in limbo.

14      Q    Do you know Officer Timothy Hanks?

15      A    Yes.

16      Q    Friends with him?

17      A    I talk to him at work, yeah.

18      Q    So if you saw any of these officers

19  committing misconduct would you report it?
```

20      A     Yes.

21      Q     Why?

22      A     Because it's the right thing to do.

23      Q     Have you ever done that in the past?

24      A     Reported misconduct?

25      Q     Yeah.  About another officer.


16


1       A     No, I don't believe I've ever seen

2    misconduct.

3       Q     How long have you been a Minneapolis

4    officer; 12 years?

5       A     12 years.

6       Q     And the entire time you've been on the MPD

7    you've never seen any misconduct by a fellow

8    officer?

9       A     Yes.

10      Q     Which?  Yes, you have or you haven't?

11      A     No, I haven't.

12      Q     Okay.  Have you ever seen any video tapes

13    of any officers committing misconduct?

14      A     On like what type of video tapes?

15      Q     Anything, news reports --

16      A     Yes.

17      Q     You've seen the Minneapolis officers

18    commit misconduct?

19      A     Yes.

20      Q    You've seen the video tape of the officer

21   who is alleged to have committed misconduct when he

22   slapped a person with his hands behind his back?

23      A    No.

24      Q    You never saw that?

25      A    No.


17


1       Q    What have you seen on video tapes or news

2    reports of Minneapolis police officers committing

3    misconduct?

4       A    I don't know if I've seen Minneapolis

5    officers; I've seen other officers.  I think years

6    back I've seen -- well, probably, what, 15 years

7    ago now there's an officer that they had on video

8    tape punching a juvenile.  I can't remember what

9    that was for.  I think that was before I was on the

10   department.

11      Q    And would you have considered that to be

12   misconduct?

13      A    I didn't know the whole facts of the case.

14      Q    Okay.  So you'd have to know the whole

15   facts of the case before you'd report misconduct,

16   is that correct?

17      A    Yes.

18      Q    Now, in this situation January 14, 2005,

19     you know the residence that I'm referring to, the

20     Cook family home?

21          A     Yes.

22          Q     What address was that?

23          A     I can't recall.

24          Q     Was it 3845 Second Avenue South?

25          A     That's probably correct.


18


1           Q     Do you recall making an entry at that

2     residence?

3           A     Yes.

4           Q     Do you recall when you did it?

5           A     I don't remember the time, but I know it

6     was dark out.

7           Q     Do you think you did it after eight p.m.

8     at night, 20 hundred hours?

9           A     That could be possible.

10          Q     Did you have a briefing -- first of all,

11    do you know if you had a search warrant -- your

12    team had a search warrant when you made that entry?

13          A     Yes, we did.

14          Q     Who did the search warrant, which officer?

15          A     I believe Officer Blackwell did.

16          Q     Officer Katie Blackwell?

17          A     Yes.

18          Q     Who was she doing the search warrant on?

19     A    I can't remember his name, but we were

20   working some robberies that were in the area, I

21   believe we arrested or retained an individual and

22   he gave us the info about a possible robbery

23   suspect and he lived at that address.

24     Q    So the warrant was a person warrant as you

25   understood it?


19

1     A    Yes.

2     Q    So if the warrant was a person warrant did

3   you have a picture of the person you were looking

4   for before you went into that house?

5     A    I believe we did, yes.

6     Q    What was the picture -- give me the

7   description.

8     A    I believe it was a younger black male, I

9   can't remember his height.

10     Q    Anything else?

11     A    Also I remember -- no, I can't really

12   remember much of it.

13     Q    So you can't remember anything else about

14   who you were looking for?

15     A    No.

16     Q    What was the age of the quote, unquote

17   "younger black male?"

18      A      I think it was between 18 and 21.

19      Q      Okay.  Was this a knock-and-announce or a

20   no-knock warrant?

21      A      I don't know.

22      Q      Do you know the difference?

23      A      Yes.

24      Q      What's the difference?

25      A      A no-knock you can just -- basically the

20

1   enter team can kick in the door and obviously you

2   have to yell, you know, your presence, the police.

3   A knock warrant from what I know is you have to

4   knock on the door, I think you have to give them

5   ample time to answer the door before you can go in.

6      Q      Well, which was this?

7      A      I don't know.

8      Q      What did you do in this case?

9      A       I waited for the entry team to go in and

10   then after they secured it I went inside the

11   residence.

12      Q      So you don't know the authority under

13   which you were entering then, is that correct?

14      A       I don't know if it was a knock or a

15   no-knock warrant.

16      Q      Okay.  Did you have a briefing before you

17   went on this warrant?

18     A     Yes.

19     Q     Who held the briefing?

20     A     I believe, I think it was Officer

21  Blackwell.  I can't really recall.

22     Q     Where was the briefing held?

23     A     The third precinct directed patrol office.

24     Q     Which is where?

25     A     It's on the second floor at the third

21

1  precinct, 3000 Minnehaha.

2     Q     Do you know when the briefing was held?

3     A     It would be just, you know, before we went

4  and executed the warrant.

5     Q     How much before?

6     A     I would say it was probably about 20

7  minutes.

8     Q     How did you get there to the location?

9     A     In a marked squad car.

10    Q     And what were your instructions; what were

11  you supposed to do, if anything?

12    A     I secured the outside perimeter and waited

13  for the entry team to declare that it was code four

14  inside.

15    Q     Do you know of any reason why you're the

16  reporting officer on this case?

17     A     Because what we would do is if we'd arrest

18     somebody usually the person that took the

19     individual to jail, got all his -- did all the

20     paperwork for him, would come back to the station,

21     enter all the info and so when you enter the info

22     you're the reporting officer; that's how the

23     computer puts it in.

24     Q     So your number is 003459, is that correct?

25     A     Yes.


22


1     Q     And that's your employee number, your

2     badge number, which?

3     A     Both.

4     Q     So would it be fair to say you entered all

5     the information regarding the allegation of the

6     offense of obstructing legal process against the

7     arrested individuals at this address?

8     A     Yes.

9     Q     Who was the arrested person or individual

10    at this address?

11    A     I can't remember his first name.  His last

12    name was Cook.

13    Q     Can you describe him?

14    A     Yes, I believe he was probably about 6

15    foot, oh, about 230 pounds, black male, I can't

16    remember his age, but I would say he was probably

17   my age.

18      Q   Which is what?

19      A   35.

20      Q   Okay.  Would you say he could have been as

21   old as 40 years old?

22      A   Yes.

23      Q   Why was he arrested?

24      A   The entry team said he was obstructing

25   when they made entry.


23


1      Q   Who told you that from the entry team?

2      A   Sergeant Bob Kroll and other members of

3   the entry team.

4      Q   What specifically did Sergeant Kroll, now

5   Lieutenant Kroll, tell you at the time?

6      A   That he wanted Mr. Cook arrested for

7   obstructing.

8      Q   Did he tell you what he did?

9      A   No.

10      Q   Did you see any conduct by Mr. Cook

11   personally, Officer Johnson, that indicated that he

12   had obstructed legal process?

13      A   Yes.

14      Q   What did you see?

15      A   After they code four the scene I went

16    inside, Mr. Cook was yelling and screaming, trying

17    to get up off the floor, yelling and screaming and

18    telling people to shoot him now and all kinds of

19    other remarks.

20         Q    Which Mr. Cook was saying that?

21         A    The individual that I took to jail.

22         Q    So this would have been Timothy Cook, the

23    35- to 40-year-old, not a man, say, in his 60s or

24    70s?

25         A    He was also talking.


24


1          Q    I'm asking you though the person that you

2     arrested for obstructing legal process.

3          A    Well, that's what I saw.

4          Q    You saw him yelling?

5          A    I heard him yelling and screaming and

6     trying to get off the floor and basically taking

7     our -- there was a bunch of people in there so he

8     was basically taking our attention away from the

9     other individuals inside the house so we had to

10    watch him.

11         Q    He was handcuffed when you saw him, wasn't

12    he?

13         A    Yes.

14         Q    When you say he was trying to get up off

15    the floor what specifically was he doing?

16   A   Trying to sit up.

17   Q   Is it wrong for him to try to sit up?

18   A   Excuse me?

19   Q   Was it wrong for him to try to sit up?

20   A   Yes.

21   Q   Why?

22   A   Because they were -- we were still looking

23  around, still making sure the scene is secure.

24   Q   And somebody told him not to sit up?

25   A   Yes.


25


1   Q   Who told him that?

2   A   Numerous officers.

3   Q   Did you tell him that?

4   A   No.

5   Q   Who were the numerous officers who told

6  Mr. Cook, don't sit up?

7   A   I don't know.

8   Q   You're sure that that happened?

9   A   Yes.

10   Q   So you're saying because he tried to sit

11  up handcuffed -- was he handcuffed front or back?

12   A   I believe in the back.

13   Q   So he was handcuffed behind his back and

14  because he tried to sit up that constituted

15    obstructing legal process?

16         A    No, that's not totally it.

17         Q    Well, let's figure out -- we'll go through

18    it methodically and we'll figure out what's totally

19    it.  He also yelled, is that also part of it?

20         A    Yes.

21         Q    And what did he yell specifically?

22         A    I don't know specifically, but he was

23    yelling and screaming, saying shoot me now, drawing

24    our attention away from the other individuals on to

25    him.


26

1         Q    And that's obstructing legal process in

2    your mind?

3         A    Well, Officer -- like I said, Sergeant

4    Kroll also informed us that he was to be arrested

5    for obstructing legal process.

6         Q    What facts -- let's stick with what you

7    saw, then we'll talk about what Sergeant Kroll may

8    or may not have told you.

9         A    I believe I already have.

10         Q    Well, that's fine if you believe that.

11    Let's continue with what you saw.  Have you told me

12    everything that you saw that you believed

13    obstructed legal process?

14         A    Yes.

15      Q    Okay.  So yelling and screaming, trying to

16  sit up handcuffed behind your back, and distracting

17  officers from other people?

18      A    Yes.

19      Q    Okay.  How did he distract the officers

20  from other people?

21      A    Like I have stated three times before, he

22  kept yelling and screaming, causing a disturbance,

23  taking -- drawing our attention away from the other

24  individuals in the house is distracting us away

25  from the other individuals.


27


1       Q    I see.  And what was he yelling and

2   screaming?

3            MS. NELSON:   Objection, asked and answered

4   several times now.

5            MR. GOINS:   I don't think it's been

6   answered completely.

7            MS. NELSON:   I think he stated that he has

8   answered it completely.

9   BY MR. GOINS (continuing):

10      Q    Well, go ahead and answer it again

11  completely.

12      A    Like I said for the fourth time now, he

13  was stating, shoot me now, yelling and screaming

14    other stuff that I couldn't understand.

15         Q    Okay.  So there's some things you can't

16    recall then?

17         A    Yes.

18         Q    And have you tried to search your memory

19    -- now I heard the shoot me now statement; I want

20    to get the other part, okay?  So it may be five

21    times, all right?  Some things he was yelling you

22    can't recall, is that correct?

23         A    Yes, because he was yelling and he was

24    very disturbed.

25         Q    He was disturbed in what sense?


28


1         A    Like I said, yelling and screaming, acting

2    irrational, saying to shoot me now, take me to

3    jail, and basically just trying to draw our

4    attention to him away from all the other

5    individuals.

6         Q    Who were all the other individuals?

7         A    I believe there was the elderly male and

8    female, I believe there were three other females

9    and possibly -- I know there was one, maybe

10   possibly two toddlers or babies.

11        Q    Were they a danger to you?

12             MS. NELSON:  I'll object to the term

13   "danger" as vague.

14          MR. GOINS:   Good.

15     Q    Okay.  Now would you answer the question,

16   please?

17     A    I believe anybody in the house could be a

18   danger to us.

19     Q    Including the infants, huh?

20     A    Well, maybe not the infants.

21     Q    But you -- nevertheless you put weapons --

22   trained weapons, including automatic weapons on the

23   infants, didn't you?

24     A    No, I didn't.

25     Q    Did you have an automatic weapon with you?


29


1      A    No.

2      Q    Did any of the officers have automatic

3    weapons?

4      A    Yes.

5      Q    Did you see them trained on children?

6      A    No.

7      Q    You didn't see any officer point a weapon

8    at a child?

9      A    No.

10     Q    Or at an adult holding a child?

11     A    No.

12     Q    Did you see the officers point the

13    automatic weapons at anyone in the residence?

14        A    No.

15        Q    What did they do with the automatic

16    weapons?

17        A    I don't know, I wasn't in there when they

18    entered the residence.

19        Q    I thought you said you were in there when

20    Sergeant Kroll was in there and he said, arrest Mr.

21    Timothy Cook.

22        A    That was after they made entry and

23    handcuffed the individuals.

24        Q    Well, were you in there at the same time

25    as Sergeant Kroll or not?


30


1         A    After they made entry, yes.

2         Q    Okay.  And after they made entry the ERU

3    team was in the house, right?

4         A    Yes.

5         Q    And you were in the house, right?

6         A    Yes.

7         Q    Did you see Sergeant Kroll with an

8    automatic weapon?

9         A    Yes.

10        Q    Did you see him point it at anyone?

11        A    No.

12        Q    Why not?

13     A     Because, like I stated, they made entry,

14   they do their thing, I'm sitting outside and they

15   are -- we go in after the incident appears to be

16   code four.

17     Q     Well, the reason potentially you didn't

18   see Sergeant Kroll point a weapon was by the time

19   you got in there everyone was handcuffed, including

20   Timothy Cook, correct?

21     A     Yes.

22     Q     Okay.  So you don't know what Sergeant

23   Kroll did prior to the time that you got in there,

24   correct?

25     A     Correct.


31


1     Q     You don't know who he pointed a weapon at,

2   correct?

3     A     Correct.

4     Q     So the people who you were being

5   distracted from by Mr. Timothy Cook were people who

6   were already code four secured, as you would say in

7   police jargon, by the time you entered the house,

8   correct?

9     A     Yes.

10     Q     Did you tell Mr. Cook to be quiet?

11     A     No, I don't believe I did.

12      Q     Because you were just gonna follow what

13   Sergeant Kroll told you to do, right?

14      A     He's the supervisor so I was -- yes, I was

15   gonna follow his directions.

16      Q     All right.  And did you ever testify at

17   any trial in criminal proceedings against Timothy

18   Cook for obstructing legal process?

19      A     No, I don't believe so.

20      Q     Are you aware the charge against him was

21   dismissed?

22      A     No.

23      Q     And what, to you, is obstructing legal

24   process?

25      A     To me, obstructing legal process is I go


32


1   to arrest somebody and they say -- I go to try to

2   put handcuffs on them and they try to stop me from

3   putting handcuffs on them, actively or passively

4   resist.  Or if I'm trying to arrest an individual

5   and another individual comes in and tries to

6   actively, you know, stop me from effecting a lawful

7   arrest on that person.

8      Q     Okay.  Is that pretty much it for your

9   definition?

10      A     Yes.

11      Q     Who did Mr. Cook keep you from arresting?

12      A      Like I said, he -- I was following the

13  orders of the entry team and Sergeant Kroll.

14      Q      Who else on the entry team besides

15  Sergeant Kroll's instructions were you following?

16      A      Well, basically Sergeant Kroll.

17      Q      What specifically did Sergeant Kroll tell

18  you?

19      A      He informed me to take Mr. Cook to jail

20  for obstructing legal process.

21      Q      That was it?

22      A      Yes.

23      Q      He didn't tell you why?

24      A      No.

25      Q      Did anybody ever say, while you were

33

1  present, I'd like to see a search warrant?

2      A      Not that I can recall.

3      Q      Did any officer say, including Sergeant --

4  particularly supervisors, Sergeant Smallski or

5  Sergeant Kroll, here's a search warrant for the

6  house?

7      A      I believe Sergeant Smallski gave them a

8  copy of the search warrant.

9      Q      Why do you believe that?

10      A      I believe, I think I saw that.

11      Q    Did you ever hear Sergeant Smallski ask --

12  by the way, did I ask you if this was a

13  knock-and-announce?

14      A    I don't know; I think you might have.

15      Q    Was it?

16      A    I can't remember.

17      Q    Did you see the entry team knock and

18  announce?

19      A    I was too far to see what they were --

20      Q    I'm sorry?

21      A    I was too far to see what they were doing.

22      Q    Too far what?

23      A    As in distance-wise.

24      Q    Where were you distance-wise when the

25  entry team went into the residence?


34


1       A    Probably another house down, house and a

2   half to the south.

3            MR. GOINS:  Go off the record for a

4   second.

5            (Discussion held off the record.)

6       Q    Where were you in relation to Sergeant

7   Smallski and Officer Blackwell when the entry team

8   went in?

9       A    I don't know where they were.

10      Q    Where were you?

11      A     I was standing behind a tree.

12      Q     Where?

13      A     To the south of the house.

14      Q     In the yard?

15      A     No.

16      Q     Where?

17      A     I believe there's a fence, I was standing

18    -- then there's a sidewalk and I was standing on

19    the boulevard.

20      Q     Full uniform?

21      A     I believe I was in jeans, a rain vest with

22    a -- my badge on a chain around my neck.

23      Q     Okay.  Did you review any of the reports

24    in this case including supplements one through

25    five -- and the supplement one would be Sergeant

35

1     Smallski and Officer Blackwell's, supplement two

2     would be Officer Toscano, supplement three would be

3     Officer Blauert, supplement four would be Officer

4     Petron, P-E-T-R-O-N, supplement five would be

5     Officer House -- before you did your report for the

6     public data portion?

7       A     No.

8       Q     Why not?

9       A     I don't read other officers' reports; I

10    only testified on what I did -- I only write what I

11    did.

12         Q    Well, did you write a supplement?

13         A    I believe I did.  If not, I think I might

14    have put it in public info.

15         Q    How about did you review supplement six of

16    Sergeant Kroll?

17         A    No.

18         Q    Supplement seven of Officer Nelson?

19         A    No.

20         Q    Supplement eight of Officer Willner?

21         A    No.

22         Q    I don't see supplement nine.  How about

23    supplement 10 of Officer Westlund?

24         A    No.

25         Q    So you didn't look at any of the reports


36


1    before you did your public data report indicating

2    the reason for the arrest of Timothy Cook?

3         A    No.

4         Q    Do you know if Timothy Cook was injured by

5    any of the entry team before you got in?

6         A    No.

7         Q    Did you hear Sergeant Smallski say to

8    anyone in the house, you need to shut up?

9         A    No.

10     Q     Or you need to just shut up?

11     A     No.

12     Q     Never heard that?

13     A     Nope.

14     Q     Okay.  Were you in the house at the same

15  time as Sergeant Smallski?

16     A     Yes.

17     Q     By the way, the older black male, did you

18  see him, Mr. Charles Cook?

19     A     Yes.

20     Q     Was he uncooperative?

21     A     He was a little boisterous, but I don't

22  know about -- I mean, you could say he was

23  uncooperative, but I think we got him to settle

24  down after a little while.

25     Q     Did he appear to need medical attention?


37


1     A     No.

2     Q     Why do you believe that?

3     A     He never asked for any medical attention.

4     Q     Did he look like he had any medical

5  devices on his person or body?  Catheter or

6  something?

7     A     If I recall, I think he had some kind of a

8  medical device.

9       Q       Did you try to ascertain why he had that

10      medical device?

11      A       No.

12      Q       So you didn't determine if he needed

13      medical assistance once you got in the house and

14      the entry team had put him on the floor by an open

15      door in January in Minnesota?

16      A       I personally didn't, no.

17      Q       Did you see him on the floor by an open

18      door of the residence?

19      A       When I came in I believe he was sitting

20      down already.  And as a matter of fact, we had him

21      move and I believe I gave him, and I think it was

22      probably his wife, a blanket.

23      Q       Did you ever find the individual you were

24      looking for?

25      A       I don't believe so, no.


38


1       Q       You don't know, do you?

2       A       No, we didn't.

3       Q       You didn't find --

4       A       I don't believe we did, no.

5       Q       Who told you that you didn't find him?

6       A       Well, I know we didn't arrest anybody for

7       what we were looking for so ...

8       Q       So you don't believe -- who were you

9    looking for, by the way, what was that person's

10   name?

11        A    I can't recall his name.

12        Q    Did anybody tell you his name before you

13   went in the house?

14        A    Yes.

15        Q    Who told you his name?

16        A    I believe Sergeant Smallski and Officer

17   Blackwell.

18        Q    Did you see anybody kick Mr. Timothy Cook?

19        A    No.

20        Q    You didn't see Sergeant Kroll kick Timothy

21   Cook?

22        A    No.

23        Q    Can you agree that Timothy Cook would be

24   pretty resentful if Sergeant Kroll had kicked him?

25             MS. NELSON:  Objection, speculation.  You

39

1    can answer if you know the answer.

2         A    I don't know.

3         Q    You don't have any idea that somebody

4    would be resentful if somebody -- police officer

5    had kicked him while they were --

6              MS. NELSON:  Same objection.

7              MR. GOINS:  That's fine, Counsel, you can

8    object, but I get to finish my question.

9        Q    Do you agree that someone would likely be

10   resentful if a police officer, upon entering their

11   home, kicked them?

12       A    Well, he could be.

13       Q    Okay.  And you didn't find out anything

14   about Sergeant Kroll's conduct before you took

15   Timothy Cook into custody, right?

16       A    Like I said, I wasn't in the residence

17   when Sergeant Kroll and the entry team were in.

18       Q    Did you ever hear Timothy Cook say he was

19   looking for the field sergeant?

20       A    No.

21       Q    And that he wanted to know the reasons for

22   the weapons being out?

23       A    No.

24       Q    Have you had any training in multicultural

25   issues or diversity training while you've been on

40

1    the Minneapolis Police Department?

2        A    Yes.

3        Q    What training have you had?

4        A    Just some in-service.

5        Q    When was that?

6        A    Just, I mean, throughout my 12-year career

7    we've had numerous training on multicultural

8    issues.

9        Q    Tell me something, one thing you've

10   learned in that training.

11       A    Well, when I was in the academy I spent

12   two to three days at the -- what's it called --

13   it's at the Sabathani for the gay, lesbian,

14   bisexual, transgender office down there and I went

15   to numerous meetings and conferences with them and

16   basically saw different points of view on people's

17   sexuality and sexual preferences.

18       Q    Okay.  What else?

19       A    I've also, through my years in the

20   department, have worked with other -- different

21   cultures, you know, not just African Americans, but

22   Somalians, Hispanics.  I've learned in their

23   cultures that what -- you know, what you could say

24   that might make them mad, what you have to do to --

25   that you might not know -- what am I trying to

41

1    say -- that something that you might not think is

2    offensive in your culture might be offensive in

3    theirs.

4        Q    Anything else?

5        A    No, that's about it.

6        Q    What was the last time you went to one of

7    these in-services?

8        A    We go every year.

9        Q    When was the last time you went to one of

10   these in-services?

11       A    A multicultural one?

12       Q    Um-hum, yes.

13       A    I don't know offhand.

14       Q    So you can't remember the last one you

15   went to, right?

16       A    No.

17       Q    Would you agree that it's misconduct for a

18   police officer to use profanity towards someone in

19   the line of duty?

20       A    No.

21       Q    Why is it not misconduct?

22       A    I believe using profanity is a use of

23   force issue.  I think it should be on the use of

24   force scale.

25       Q    It is?  Where?

42

1        A    Not in Minneapolis.  I said it should be.

2        Q    So it's not, but you just think it should

3    be?

4        A    I believe when I was in Tucson profanity

5    was part of the use of force.  I believe sometimes

6    when you're dealing with some people that just,

7    sir, will you get on the floor doesn't work.

8    Sometimes you have to escalate your voice and

9    possibly your words to let them know that they need

10   to cooperate with you.

11        Q    Well, when were in Tucson?

12        A    January of '95, I believe, until August of

13   '95.

14        Q    Doing what?

15        A    Police officer.

16        Q    Was that before you became a Minneapolis

17   officer?

18        A    Yes.

19        Q    So that was your first job as a police

20   officer?

21        A    Well, I worked briefly in Goodview,

22   Minnesota.

23        Q    Okay.  Let's talk about that because I

24   missed that.  What was your first job as a police

25   officer?


43


1        A    Goodview, Minnesota was a part-time

2    position.

3        Q    Goodhue, Minnesota?

4        A    Goodview.

5        Q    Goodview?

6    A    Yes.

7    Q    And tell me about that.

8    A    I basically only worked there a couple

9  weeks and I got the Tucson Police Department job.

10    Q    Okay.  Why did you go to Tucson?

11    A    They had a job.

12    Q    And nobody else did?

13    A    Well, I was applying to numerous

14  departments and they offered me a job so I took it.

15    Q    Why did you leave Tucson?

16    A    Because I'm from Minnesota.

17    Q    So how did you find out about Minneapolis?

18    A    Just -- there's a POST line that you can

19  call and they tell you all the jobs that are

20  testing or you can apply for throughout the state.

21    Q    Did you ever hear any audio tape taken as

22  a result of the execution of this search warrant at

23  the Cook residence?

24    A    No.

25    Q    Did you see any officers making an audio

44

1  tape?

2    A    No.

3         MR. GOINS:  Can we go off for one second?

4         (Discussion held off the record.)

5    Q    Let's go back.  Who is Sergeant Michael

6    Young?

7         A    He's also on the ERU, now SWAT team.

8         Q    Was he there on this date?

9         A    I can't remember.

10        Q    You don't recall seeing him on January 14,

11   15, 2005?

12        A    No, I can't recall.

13        Q    So you agree that use of profanity is not

14   properly a part of the use of force report -- or

15   use of force continuum as trained on by the

16   Minneapolis Police Department; you agree with that?

17        A    Yes.

18        Q    So you agree that that's not a proper use

19   of force, correct?

20        A    No.

21        Q    So in other words, you just don't like the

22   policy, is that your position?

23        A    I believe the policy should be changed.

24        Q    So you believe the policy is wrong, is

25   that right?

45

1         A    Yes, I do.

2         Q    Okay.  So which do you follow, your

3    beliefs or the policy?

4         A    I follow policy, but obviously, yes, I

5    have swore at an individual in the past.

6         Q    Well, so if you follow the policy and you

7    know the policy is the policy and you've sworn at

8    individuals in the past, you understand you've

9    broken the policy, right?

10        A    Yes.

11        Q    Or violated the policy?

12        A    Yes.

13        Q    And any other officer who does the same

14   thing would have also violated the policy, correct?

15        A    Yes.

16        Q    And that would be the improper use of

17   force, correct?

18        A    No.

19        Q    Who decides --

20        A    It's not --

21        Q    Hold on, hold on.  Who decides what's an

22   improper use of force?

23        A    Well, the policy, but it's not considered

24   force.

25        Q    What's it considered?


46


1         A    It's considered -- in the Minneapolis

2    Police Department policy it's considered basically

3    under language.  If you get -- if you violate the

4    -- if you swear at somebody and they make a

5    complaint and you go down and admit to it you're

6    gonna get a -- you're gonna be found that you

7    violated the language policy that you -- you're not

8    going to be -- say that you used excessive force on

9    an individual.

10       Q    Are you aware that Sergeant Kroll swore at

11   Mr. Cook?

12       A    No.

13       Q    Why are you unaware of that?  Because you

14   don't think it happened or you just don't know it

15   happened?

16       A    Like I've stated, I wasn't inside the

17   residence when they made entry.

18       Q    Do you have any reason to dispute that

19   Sergeant Kroll swore at Mr. Cook?

20       A    Yes, I -- I could.

21       Q    You could believe that?

22       A    No, I could dispute it.

23       Q    How could you dispute that?

24       A    Because I didn't hear it and there's

25   obviously people out there that make up accusations

47

1    against the police that are sometimes not true.

2        Q    So you don't believe Sergeant Kroll's own

3    report then if in his own report he admitted that

4    he used profanity against Mr. Cook?

5         MS. NELSON:  Objection, misstates prior

6    testimony.  You can answer if you want.

7    A    Like I said, I didn't read Sergeant

8    Kroll's report.

9    Q    Sergeant Kroll admitted in his report that

10   he used profanity against Mr. Cook.

11   A    That he obviously -- then he obviously

12   used profanity against Mr. Cook.

13   Q    But you're not gonna believe it because

14   whatever Sergeant Kroll would have told you,

15   including take Timothy Cook into custody for

16   obstructing legal process, you would have done

17   sight unseen without any investigation of your own

18   if Sergeant Kroll told you to do it, correct?

19   A    I believe the way you stated the question

20   was would you believe it that it could have

21   happened.  I didn't know.

22   Q    I said would you dispute it.

23   A    I believe you said would you dispute that

24   an individual said Sergeant Kroll swore at him.

25   And I said yes, I could dispute it.

48

1    Q    That's not what I said.

2    A    I believe you did.

3    Q    That's not what I said and the record will

4    reflect what I said.  Now --

5             MS. NELSON:  Objection, argumentative.

6        Q    Isn't it also true --

7             MR. GOINS:  Your objection's untimely and

8    therefore waived.

9        Q    Isn't it also true that you took whatever

10   Sergeant Kroll said sight unseen without

11   investigation, including his statement that Mr.

12   Timothy Cook should be taken into custody for

13   obstructing legal process, just like you didn't

14   know that he used profanity, you took his word that

15   Mr. Cook should go into custody for obstructing

16   legal process, isn't that correct?

17            MS. NELSON:  Objection to form, compound

18   question.

19       Q    Go ahead and answer.

20            MS. NELSON:  You can answer.

21       A    Like I said, Sergeant Kroll is a licensed

22   police officer, he told me to arrest the individual

23   for obstructing legal process.  He actually

24   arrested him for obstructing legal process and I

25   transported him to jail.

49

1        Q    Now you're saying Sergeant Kroll -- who

2    affected the arrest, you or Sergeant Kroll?

3      A    Well, they already had him handcuffed and

4  he said that he was going to be -- he was going to

5  arrested for obstructing legal process.

6      Q    Handcuffed just means detained, right?

7      A    Yes.

8      Q    And you filled out the report, correct?

9      A    I filled out the information, yes.

10     Q    Because you took Sergeant Kroll at his

11  word, correct?

12     A    Yes.

13     Q    Did you even bother to ask him what he'd

14  done?

15          MS. NELSON:  Objection, argumentative.

16     A    I don't believe so, no.

17     Q    How long did you stay in the house?

18     A    I would say approximately maybe 30 to 45

19  minutes.  I don't know off --

20     Q    What did you do in that 30 to 45 minutes

21  besides take Timothy Cook into custody?

22     A    At first -- well, I took Mr. Cook, I

23  escorted him to the squad car, put him in the back

24  of the squad car, went back in the house, walked

25  upstairs, noticed the condition of the house, that

50

1  it was a mess.  I went back downstairs and --

2      Q    Well, wait a minute.  You noticed the

3    condition of the house was a mess?

4        A    Upstairs, yes.

5        Q    Do you know who had been upstairs prior to

6    your getting up there?

7        A    No.

8        Q    Do you know that the entry team had

9    already been up there?

10       A    Okay, it's possible, yes.

11       Q    What else did you do, please?

12       A    Went downstairs, started gathering the

13   names of the individuals downstairs and I stood

14   with them until we were ready to leave.

15       Q    Gathered the names of the individuals who

16   were downstairs?

17       A    Yes.

18       Q    Where did you write those, please?

19       A    On a notepad.

20       Q    Where is the notepad, please?

21       A    I don't know.

22       Q    Why don't you know?

23       A    When I'm done with my notepads I usually

24   just toss them.

25       Q    Have you looked for the notepad recently?

51

1        A    No.

2      Q     Okay.   What else did you do besides write

3  names on the notepad?

4      A     That's it.

5      Q     What was the purpose of writing the names

6  on the notepad?

7      A     Usually when we go into a house or if

8  we're dealing with people we write down their

9  names.

10     Q     Did you ever ask anybody in the house,

11  we're -- say to them, we're looking for Cortez

12  Cook, can you tell us where he is, you personally?

13     A     No, not me personally.

14     Q     Why not?

15     A     I just didn't.

16     Q     What was the object of the game, as they

17  say, in going in that house?

18     A     Like I stated earlier, we had information

19  that a robbery suspect was inside that house.

20     Q     And you had that robbery suspect's name, I

21  trust, didn't you?

22     A     Yes.

23     Q     And what was that person's name?

24     A     I guess it was Cortez Cook.  I can't

25  remember, but I believe that's who it was.

52

1      Q     Well, when you got to the residence

2    wouldn't it have made sense to say, is Cortez Cook

3    here, folks, we're looking for him; if he is he

4    needs to come with us and if he's not, where is he;

5    wouldn't that have made sense?

6        A    Maybe other individuals did that.

7        Q    Did you ever find out if other individuals

8    did that?

9        A    I believe they did.

10       Q    Why do you believe that?

11       A    Well, because obviously that does make

12   sense to say, where is Mr. Cook.

13       Q    Right.  Is that why you believe it because

14   it's logical or do you have any other prescient

15   facts that you perceived through your five senses?

16       A    I believe that's a logical explanation to

17   say, yes, is Mr. Cook here.  But we're also gonna

18   search the house to see if Mr. Cook is there

19   because sometimes people hide.

20       Q    But you didn't even know if anybody had

21   asked where he was, did you?

22       A    Like I've stated before, I concern myself

23   about what I do.  I'm not gonna testify what other

24   people do.

25       Q    You were there and you saw what other

1   officers did and you know you're gonna concern

2   yourself with what you do, but you're obviously

3   taking orders from Sergeant Kroll, you're there

4   with Officer Blackwell as the affiant on the

5   warrant, Sergeant Smallski is your supervisor; I

6   want to figure out what you were there to do other

7   than to hold these people at gunpoint?

8       MS. NELSON:  Objection, misstates prior

9   testimony regarding holding them at gunpoint.  You

10  can answer.

11      Q    Do you believe they were held at gunpoint?

12      A    I didn't hold them at gunpoint.

13      Q    How were they held; by handcuffs?

14      A    Some of them were not handcuffed and

15  sitting on the couch.

16      Q    Okay.  So some of them were cooperating

17  obviously, just obeying the police presence, we'll

18  call it, submitting to the police presence,

19  correct?

20      A    Yes.

21      Q    And some of them were cuffed, correct?

22      A    I believe it was just Mr. Timothy Cook.

23      Q    Okay.  And you guys had searched the house

24  with who?  Who searched the house, the ERU or the

25  directed patrol, CRT team; who searched?

54

1      A     The directed patrol.

2      Q     And as you searched -- were you present

3   when other officers searched?

4      A     When they were downstairs, yes.

5      Q     Did you hear any officer say, where is

6   Cortez Cook?

7      A     I can't recall.

8      Q     Did you hear any officer say, you know

9   what, it looks like nobody knows where Cortez Cook

10   is?

11      A     I can't recall that.

12      Q     Did you hear anybody say, here's a picture

13   of who we're looking for?

14      A     I can't recall.

15      Q     Well, what was the object of the search?

16      A     Like I've stated, we were in there looking

17   for a robbery suspect.

18      Q     But you didn't even know his name.

19      A     Well, I did that night.

20      Q     Oh, you did?

21      A     Yes.

22      Q     And -- but you didn't see -- did you see

23   -- let's go through it systematically and then

24   we'll get close to the end.  Did you see anybody on

25   the first floor who looked like the suspect?

```
 1     A     No.

 2     Q     Okay.  Did you see anybody upstairs who

 3  looked like the suspect?

 4     A     I didn't see anybody upstairs.

 5     Q     So nobody's upstairs and nobody downstairs

 6  looks like the suspect?

 7     A     No.

 8     Q     Is that a correct or incorrect?

 9     A     That's correct.

10     Q     All right.  Why did you stay for 35

11  minutes?

12     A     I also believed we were there looking for

13  a weapon that could have been used in the

14  robberies.

15     Q     You believed that based on what?

16     A     The briefing that Sergeant Smallski and

17  Officer Blackwell gave.

18     Q     Did you find a weapon?

19     A     I don't believe so, no.

20     Q     Did you ask anybody in the house if there

21  was a weapon in the house?

22     A     I personally didn't, no.

23     Q     Then what were you doing in the search,

24  what were you specifically doing?

25     A     Like I stated, I wasn't searching, I was
```

1    downstairs staying with the individuals that were

2    downstairs.

3        Q    What were you doing as you stayed with the

4    individuals downstairs?  You weren't reading them

5    bedtime stories.  What were you doing?

6        A    I was just standing there.

7        Q    What other precincts have you worked in

8    besides the third?

9        A    The downtown command.

10       Q    By the way, what was the race of everybody

11   in that house except for the police officers?

12       A    They were African Americans.

13       Q    Did they speak English?

14       A    Yes.

15       Q    So I guess I didn't go to the trouble of

16   having this CAPRS report marked as an exhibit,

17   maybe I should, but all the information in the

18   CAPRS report other than supplements, would it be

19   fair to say you entered that information?

20       A    The general information, yes.  Like the

21   incident address, the --

22       Q    Arrested person, the other persons and so

23   forth?

24       A    Yes.

25       Q    So obviously you got the name of Timothy

57

1   Blake Cook; he's the arrested person, correct?

2        A    Yes.

3        Q    You got the name of Charles Everett Cook

4   as an other person, correct?

5        A    Yes.

6        Q    By the way, why do you say that Mr. Cook's

7   appearance was dirty?

8        A    The -- Mr. Timothy Cook?

9        Q    Charles Everett Cook, the man who is

10  approximately 69 or 70 years old.

11       A    I think he was disheveled and dirty.

12       Q    Were you aware of the fact that he was ill

13  and that he was on dialysis?

14       A    Well, that's still -- even if you're ill

15  you could be dirty.

16       Q    Yeah.  How about that Mekala Shonda (ph)

17  Morris, you have her as an other person.  Where was

18  she in the house?

19       A    I believe she was sitting on the couch in

20  the -- in the lower level.

21       Q    How about Jaquida (ph) Ann Cook, where was

22  she in the house?

23       A    Is she a younger female?

24       Q    According to your report, a 22-year-old

25  female.

58

```
 1      A    I believe she was seated on the couch also

 2   in the lower level.

 3            MR. GOINS:  Counsel, there's no supplement

 4   nine and I have, it looks like, a complete CAPRS

 5   report for MP-05-0100496, but for some reason

 6   there's no supplement nine.  I wonder why.  If you

 7   could find that, I'd appreciate it.

 8            MS. NELSON:  I will look for that.

 9      Q    Were you in the home at the same time as

10   Officer Roger Smith was in there?

11      A    I believe so.

12      Q    See him point his weapon at anyone?

13      A    No.

14      Q    Did he tell you that he had to use force

15   on anyone?

16      A    No.

17      Q    Did you have a debriefing after the

18   search?

19      A    No.

20      Q    So it would be fair to say that you heard

21   no officer say, hurry up, old man, shut the fuck

22   up, get the fuck downstairs; is that fair to say

23   you never heard that?

24      A    Yes, it is fair to say that I didn't hear

25   it.
```

59

```
 1      Q      And you never heard someone say, shut the
 2  fuck up and get down on the floor; did you hear
 3  that?
 4      A      No, I didn't.
 5      Q      You never heard someone say, you need to
 6  learn some fucking respect?
 7      A      No.
 8      Q      But again, you didn't hear Sergeant Kroll
 9  use any profanity, right?
10      A      No.
11      Q      But Sergeant Kroll admits in his report,
12  I'll represent to you, that he did use profanity so
13  do you believe Sergeant Kroll if he said that in
14  his report?
15      A      Yes.
16      Q      Did you hear anybody say, sit down, shut
17  the fuck up and get your hands up?
18      A      No.
19      Q      Did you hear somebody say when they asked
20  to see a search warrant, we don't have to show you
21  a fucking thing, my dad -- I'm sorry, strike that.
22  We don't have to show you a fucking thing; did you
23  hear anybody say that?
24      A      No.
25      Q      Did you hear anybody say, shut the fuck
```

60

1   up, old man, before I shoot you in the belly; did

2   you hear that?

3       A    No.

4       Q    But again, you weren't in the house until

5   after the CRT team -- or the entry team, rather,

6   had called code four or secure, correct?

7       A    That's correct.

8       Q    How long was that period of time from the

9   time they went in until they called the code four

10  clear?

11      A    I believe it was probably a couple

12  minutes.

13      Q    Did you hear somebody say to Mr. Timothy

14  Cook, the one who Sergeant Kroll told you to

15  arrest, Mr. Mouth, and told him that he was going

16  downtown?  Did they call him Mr. Mouth?

17      A    I didn't hear that.

18      Q    So you heard the officer say please and

19  thank you?

20      A    I don't know if they said please or thank

21  you.

22      Q    Did you hear the officers make any

23  requests of these people in this home?

24      A    Yes.

25      Q    Well, what requests did you hear them

61

1   make?

2       A   When I was inside Mr. Cook was still

3   yelling and people were telling him, you know, shut

4   up, be quiet.

5       Q   And the shut up and be quiet was necessary

6   because otherwise it would distract officers from

7   doing what?  Finding someone who had been described

8   to them in the photograph?

9       A   It's distracting the officers from

10  everybody else in the house.

11      Q   And that's the shut up and -- the talking

12  or saying anything is distracting, is that why he

13  had to be arrested?

14      A   That's not the only reason he was

15  arrested.

16      Q   Because -- and also because he was sitting

17  up?

18      A   No.

19      Q   Well, give me the rest of it one more

20  time, then we'll probably be done after we look at

21  some pictures.  He was sitting --

22          MS. NELSON:  Objection, asked and

23  answered.

24      Q   He's sitting up, he's distracting the

25  officers, and what else is he doing?

62

```
1      A    Like I've stated before, when I entered a
2    few moments later Sergeant Kroll informed me that
3    he was to be transported to jail because he was
4    arresting him for obstructing legal process.
5      Q    Have you ever had anybody when you went in
6    on search warrants -- you've gone in on other
7    search warrants before, haven't you?
8      A    Yes, as a uniformed police officer.
9      Q    So would the answer be yes?
10     A    Yes.
11     Q    And when you went in on those search
12   warrants have you ever had people ask to see the
13   warrant?
14     A    Me, no.
15     Q    I didn't mean ask you.  Have you ever
16   heard someone, while you were in on a search
17   warrant, ask to see a search warrant?
18     A    Yes.
19     Q    Are you trained on a response that you're
20   supposed to provide when someone asks to see the
21   search warrant?
22     A    You give them the search warrant.
23     Q    Did you see anybody give these people a
24   search warrant when they went into their home?
```

25      A     I believe we were given the search warrant

63

1    after the entry team made entry, it was code four.

2        Q     Could you imagine that people would be

3    alarmed and disturbed when they see police officers

4    come into their home at 10:00 at night --

5            MS. NELSON:  Objection, speculation.

6            MR. GOINS:  Can I finish the question?

7            MS. NELSON:  Sounded like you were

8    finished.

9            MR. GOINS:  Doesn't sound like that at

10   all.

11   BY MR. GOINS (continuing):

12       Q     Can you imagine that people would be

13   resentful and alarmed and disturbed when someone

14   comes in their home -- police officers come into

15   their home at 10:00 in the evening in the middle of

16   winter in Minnesota and they have no reason why and

17   they ask for a search warrant and they don't get a

18   search warrant; can you imagine that that could

19   create alarm, disturbance, resentment?

20           MS. NELSON:  Objection, speculation.

21           MR. GOINS:  No, it isn't; it calls for his

22   opinion.  I don't want him to speculate, I asked

23   him to give his opinion.

24       A     Well, like I said, we did -- a search

25   warrant was produced after the entry team had

64

1   entered.

2       Q    And the entry team was in there for how

3   long again?

4       A    A couple of minutes.

5       Q    And you don't know what went on when the

6   entry team was in there, correct?

7       A    That's correct.

8       Q    So in your opinion, people are just

9   supposed to lie down on the ground, be handcuffed

10  and sit still until the police officers tell them

11  that they have lawful authority to come into their

12  home unannounced; is that your opinion?

13      A    Well, I -- from what I have seen in the

14  past, 99 -- well, a hundred percent of the time the

15  entry team, if they kick in the door they yell,

16  search warrant, police.

17      Q    You never heard that on this occasion, did

18  you?

19      A    Like I said, I was too far away to hear

20  what they were doing.

21      Q    So would it be fair to say that you don't

22  know if they even announced their authority as they

23  entered the residence; true or false?

24    A   True.

25        MR. GOINS:  Thank you.  I'm done.


65


1        MS. NELSON:  We'll read and sign.

2        (Deposition concluded at 2:08 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

1   STATE OF MINNESOTA    )
                          )  ss
2   COUNTY OF HENNEPIN    )

3

4

5

            I hereby certify that I reported the
6   deposition under oath of MARK A. JOHNSON, on the
    29th day of March, 2007, in Minneapolis, Minnesota,
7   and that the witness was by me first duly sworn to
    tell the whole truth;

8
            That the testimony was transcribed under
9   my direction and is a true record of the testimony
    of the witness;

10
            That the cost of the original has been
11  charged to the party who noticed the deposition,
    and that all parties who ordered copies have been
12  charged at the same rate for such copies;

13          That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
14  relative or employee of such attorney or counsel;

15          That I am not financially interested in
    the action and have no contract with the parties,
16  attorneys, or persons with an interest that affects
    or has a substantial tendency to affect my
17  impartiality;

18          That the right to read and sign the
    deposition by the witness was reserved.
19
            WITNESS MY HAND AND SEAL THIS 1st day of
20  April, 2007.

21

22          _____

```
23              Jane C. Norman, RPR
    (SEAL)      Notary Public
24              Hennepin County, Minnesota
                My commission expires:  1/31/2010
25
```

*Plain Text Attachment*

```
1
```

```
          1    STATE OF MINNESOTA                 DISTRICT COURT

          2    COUNTY OF HENNEPIN      FOURTH JUDICIAL DISTRICT
               ************************************************
          3    Charles Everett Cook, Sylvia Mae Cook,
               and Timothy Blake Cook, natural persons,
          4
                               Plaintiffs,
          5
                    v.
          6
               City of Minneapolis, a municipal entity; Minneapolis
          7    Police Officer Mark Johnson, Badge #003459, in his
               individual, personal and official capacity; Sgt. D.
          8    Smulski, in his individual, personal and official
               capacity; Officer K. Blackwell, in his individual,
          9    personal and official capacity; Officer Geoffrey
Toscano,
               Badge #007257, in his individual, personal and official
         10    capacity; Officer Bevan Blauert, Badge #003459, in his
               individual, personal and official capacity; Officer Jon
         11    Petron, Badge #5671, in his individual, personal and
               official capacity; Officer Christopher House, Badge
#3165,
         12    in his individual, personal and official capacity; Sgt.
               Robert Kroll, Badge #003874, in his individual,
personal
         13    and official capacity; Officer Christie Nelson, Badge
               #4959, in his individual, personal and official
capacity;
         14    Officer William Willner, Badge #7783, in his
individual,
               personal and official capacity; Officer Westlund, Badge
         15    #7674, in his individual, personal and official
capacity;
               Officer Roger Smith, Badge #006689, in his individual,
         16    personal and official capacity; Officer Jason King,
Badge
               #003704, in his individual, personal and official
```

```
     17     capacity; Officer Timothy Hanks, Badge #002660, in his
            individual, personal and official capacity; and
Officers
     18     Jane Doe and Richard Roe, unknown and unnamed
Minneapolis
            Police Officers, in their individual, personal and
     19     official capacities;

     20               Defendants.
            **************************************************
     21                    DEPOSITION OF

     22               LIEUTENANT ROBERT KROLL

     23                 Taken March 28, 2007
                       Scheduled for 1:15 p.m.
     24
                  Reported By:  Lori Morrow, RPR, CRR
     25     PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545
```

2

```
      1              Deposition of LIEUTENANT ROBERT KROLL, taken on

      2     the 28th day of March, 2007, commencing at 1:15 p.m.,
at

      3     the CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South
7th

      4     Street, Suite 300, Minneapolis, Minnesota, before Lori

      5     Morrow, Registered Professional Reporter and Certified

      6     Realtime Reporter and a Notary Public in and for the

      7     State of Minnesota.

      8

      9                    APPEARANCES:
     10
            On Behalf of the Plaintiffs:
     11
                Maya C. Sullivan, Esquire
     12          LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
                941 Hillwind Road NE
     13          Suite 200
                Minneapolis, Minnesota 55432
     14          (763) 515-0092
```

```
              Fax (763) 515-0093
    15
          On Behalf of the Defendants:
    16
              Tracey L. Nelson, Esquire
    17        CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
              333 South 7th Street
    18        Suite 300
              Minneapolis, Minnesota 55402
    19        (612) 673-2063

    20                    *********

    21            NOTE:  The original transcript will be
delivered
              to Maya C. Sullivan, Esquire, pursuant to the
applicable
    22        Rules of Civil Procedure.

    23

    24

    25




3




    1                      INDEX

    2     WITNESS:

    3     Lieutenant Robert Kroll

    4
          EXAMINATION BY:             PAGE:
    5
          Ms. Sullivan................4, 40
    6
          Ms. Nelson.................38
    7

    8     OBJECTIONS BY:

    9     Ms. Nelson.................18, 21, 22, 23, 24, 25, 35,
40

    10
          EXHIBITS MARKED AND REFERRED TO:         (NONE)
    11                    *********
    12
```

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1               LIEUTENANT ROBERT KROLL,

2    duly sworn, was examined and testified as follows:

3                     EXAMINATION

4    BY MS. SULLIVAN:

5       Q   Sergeant Kroll, as I said, I'm Maya Sullivan,

6    and I'm one of the attorneys who represents the

7    Plaintiffs in this matter.  The other attorney is

8    Mr. Albert Goins, whom you may or may not know.

9               Just for the record initially, can you please

10   state and spell your first and last name?

11       A   Robert, R-O-B-E-R-T, Kroll, K-R-O-L-L.

12       Q    All right.  And, Sergeant Kroll, have you

13   participated in depositions in the past?

14       A    Yes.

15       Q    Okay.  I just want to give you a few reminders

16   about procedure before we get started.

17            First, I will be asking you questions

18   throughout.  Your attorney may follow up with some

19   additional questions.  She may also at times object to

20   things.  Please just make sure you wait for her

21   instructions regarding whether to answer or not answer.

22            Additionally, I do need you to give verbal

23   answers.  So please no nodding of the head and "uh-huh"

24   and that type of thing.

25            Do you have any questions before we get started?


5


1        A    No.

2        Q    Okay.  Sergeant Kroll, who is your employer?

3        A    City of Minneapolis.  Also, I'm a lieutenant.

4        Q    I'm sorry, Lieutenant.  Do we have sergeant

5    somewhere?  Sorry about that.  All right.  Lieutenant

6    Kroll, how long have you been with the Minneapolis Police

7    Department?

8        A    Since January of 1989.

9        Q    And prior to beginning with the Minneapolis

10   Police Department, were you working in the same field or

11   doing something different?

12      A    No.  This is my first police job.

13      Q    Okay.  And your assignment -- your current

14  assignment with the Minneapolis Police Department is

15  what?

16      A    Second Precinct patrol supervisor.

17      Q    And did you have that position at the time of

18  the incident which was January 13 of 2005?

19      A    No.

20      Q    Okay.  What was your position at that time?

21      A    I believe I was a sergeant assigned to the Water

22  Works Unit.

23      Q    Okay.  And what is the Water Works Unit?

24      A    It's a unit that no longer exists, but we had

25  personnel there for a homeland security mission due to

6

1   the water level threats.

2       Q    Okay.  And at the time of the incident, were you

3   also part of the SWAT team, or emergency response unit?

4       A    Yes.

5       Q    Okay.  And how long had you been part of that

6   unit?

7       A    Total time, approximately 15 years.

8       Q    Okay.  All right.  And in order to be on the

9   SWAT team, do you receive any specific or specialized

10  type of training different than just a standard police

11   officer may receive?

12        A    Yes.

13        Q    Okay.  Is that ongoing training, or is it just a

14   one-time type of a training?

15        A    There's initial and then ongoing, both.

16        Q    Okay.  How are people selected to participate on

17   that team --

18        A    There's a --

19        Q    -- or apply for it?

20        A    -- number of factors.

21        Q    Okay.

22        A    Background, history with the department, resume,

23   oral interview, physical agility test, weapons

24   qualifications.

25        Q    So it is similar to actually getting another

7

1    position within the department then?

2         A    Yes.

3         Q    Okay.  All right.  And within your training for

4    the team or conducting high risk entries, do you ever

5    receive any specific training or special training

6    regarding how to handle ill persons or elderly persons

7    when conducting these type of entries?

8         A    I don't recall any specialized training as a

9    part of SWAT for that, no.

10        Q    Have you received specialized training at any

11    time as a police officer in this type of -- in dealing

12    with those type of individuals?

13        A    Yes.

14        Q    Okay.  And what have you learned?  What kind of

15    training have you received about that?

16        A    It's too tough to recall.  I've received

17    different types of in-service training on dealing with

18    persons with disabilities.  I don't recall specifically.

19        Q    Okay.  But is it safe to say that you generally

20    would not treat, say, a person who was crippled and

21    couldn't walk the same as you would treat an able-bodied

22    adult when you're encountering them in an entry?

23        A    On an entry, that depends on the circumstances.

24        Q    Okay.  What would be the circumstances?

25        A    Well, high risk entries are different in

8

1    themselves.  They're high risk for a reason.  So anybody

2    there, potentially, has the capability of being armed.

3        Q    Okay.  Do you know, just give me a ballpark

4    figure, about how many of these high risk entries do you

5    conduct or are you part of maybe in the scope of a year

6    or so?

7        A    That fluctuates.

8        Q    Okay.  Can you give me a range, please?

9        A    Years ago we would do 700 a year.  And now

10    they're down to probably 200 a year.

11       Q    Okay.  And when you say we, what -- do you mean

12    that you would be part of or do you mean that the

13    department would do?

14       A    The SWAT team would do.

15       Q    Okay.  And are you on every entry that the SWAT

16    team does?

17       A    No.  It's rotational.

18       Q    Okay.  And so I'm asking specifically about your

19    involvement or participation.  How many would you say

20    that you have personally done?  And again, it doesn't

21    have to be an exact number.

22       A    Personally, over my career with SWAT, it's

23    somewhere in the neighborhood of 2,000 high risk entries.

24       Q    Okay.  And so how many approximately would you

25    say you do a year, which was my original question.

9

1        A    Oh, a year?

2        Q    Uh-huh.

3        A    That depends, because I'm somewhat promoted out

4    of SWAT.  I'm still in, but I'm in another position.  I'm

5    not in the full-time unit.  The full-time unit, they do

6    them on a daily basis.  So right now, I think, last year,

7    I did around 35.

8        Q    Okay.  And at what points were you promoted to

9    the Second Precinct patrol supervisor position?

10    A   I was promoted last April and transferred to the

11   Second Precinct in June.

12    Q  Okay.  So before you were promoted in April of

13   last year, how many do you think you were averaging per

14   year?

15    A   Again, that prior year I was assigned to STOP,

16   which is our full-time SWAT, so I did more.  I don't have

17   a number.  And then prior to that, I was at Water Works,

18   so I did less.  It's just a fluctuating number.

19    Q  Okay.  Thank you.  And were you part of the team

20   that entered 3845 Second Avenue South in Minneapolis on

21   January 13 of 2005?

22    A   Yes.

23    Q  Okay.  And what information were you provided

24   with prior to the entry?

25    A   There was a high likelihood that there was armed

10

1   robbery suspects inside that location.

2    Q  Suspects, plural, or one?

3    A   At least one, possibly more.

4    Q  Were you given the name of the alleged

5   individuals?

6    A   At the time, I believe so.

7    Q  Okay.  You were given two names?

8    A   No.  A name.

9      Q    Okay.  And were you given a description, a

10    physical description of the individual?

11     A    Yes.

12     Q    What would the physical description have

13    included?  I don't need specifics, but what types of

14    details would you have been given?

15     A    Sex, age, race.

16     Q    Okay.  Do you recall what the identifiers were

17    in this case?

18     A    Younger adult, black male.

19     Q    Okay.  Did you conduct the briefing that took

20    place prior to the entry?

21     A    Yes.

22     Q    Okay.  And what information did you provide the

23    officers who were part of the briefing?

24     A    The briefing is twofold.  The affiant, or the

25    unit that we're supporting, it gives a brief on the


11

1     subject and what the warrant is about.  And then I do the

2     brief for the team for positions, assignments, and entry

3     method.

4      Q    Okay.  And what information did you give the

5     team about who you were looking for, what you were doing,

6     why you were going there?

7      A    Again, that's the affiant.  I don't give that to

8     the team.

9      Q   Okay.  Do you know what the affiant gave, what

10  information was given?

11     A   Just general terms, it was a -- the description

12  I provided, that it was for an armed robbery suspect.

13     Q   Okay.  And are you aware of whether or not the

14  robbery suspect was arrested?

15     A   No.

16     Q   No, he wasn't arrested, or no --

17     A   I'm not aware.

18     Q   Did you see him?

19     A   I saw two parties meeting the description.

20     Q   Okay.  And were either of those individuals --

21  I'm sorry.  Strike that.

22         What was the condition, physical condition of

23  those individuals that you say met that description?

24     A   What do you mean by physical condition?

25     Q   Were either of them injured?


12


1      A   No.

2      Q   Neither of them were injured?

3      A   Not to my knowledge.

4      Q   Okay.  If someone was wearing a cast, would you

5  notice that?

6      A   I believe so.

7      Q   Okay.  Are you aware of whether anybody other

8       than the robbery suspect was arrested as a result of the

9       accident?

10          A   No, I am not.

11          Q   You state in your police report that the robbery

12      suspect was likely to be armed and to confront police if

13      encountered.   Was the suspect armed?

14          A   No.

15          Q   Did he confront you or any of the officers?

16          A   No.

17          Q   You state that you yelled "police search

18      warrant" throughout the residence when you were entering.

19      However, you did not show the warrant to the occupants at

20      their request, did you?

21          A   Which part was the question?   Yes, I did yell

22      "police" throughout.   Did I show them paper?   No.

23          Q   All right.

24          A   Two questions.

25          Q   And who did show them the search warrant?


13


1           A   Specifically, I don't know.

2           Q   Okay.   But it wasn't you?

3           A   No.

4           Q   Did you see anyone show it to them?

5           A   I don't recall that.

6           Q   In your report, you state that you poke checked

7       the older male with your weapon muzzle and forced him

8    downward and then kicked him down onto the ground.  You

9    did this even though you noticed that he was elderly?

10        A   I wouldn't consider him too elderly to be forced

11   to the floor when he's not compliant.

12        Q   Well, you specifically said he was elderly.  So

13   I'm just trying to clarify.

14        A   Right.

15        Q   You did that even though you acknowledge he

16   was --

17        A   He was the older person of the home.  And I did

18   use force to put him on the ground to overcome his

19   resistance.

20        Q   Right.  You said you kicked him down onto the

21   ground.

22        A   That's what it says, yes.

23        Q   Okay.  And did you notice the stint in his neck?

24        A   No.

25        Q   If you had noticed the stint, would you have

14

1    kicked him?

2         A   In the manner that I -- I know the report says

3    "kicked."  In the manner that I did it, yes.

4         Q   And what manner would that be?

5         A   I used my foot and assisted him with the bottom

6    of my foot to push him to the ground.  It wasn't a kick

7    with a thrust to my toe for pain compliance impact.  It

8    was a push with my foot to the bottom.  The bottom -- the

9    sole of my foot pushing him down.

10       Q   And you would have put the foot at where on his

11   body then in order to accomplish that?

12       A   I don't recall specifically.  I would have to

13   review my report.

14       Q   Your report doesn't say.  But I'm just trying to

15   get an understanding of, you said that you didn't do it

16   to impact force or pain on him, but you did it just to

17   get him to the floor.

18       A   Right.

19       Q   So I'm just trying to understand how you would

20   place your foot on him to accomplish just getting him on

21   the floor as opposed to causing pain to him.  How would

22   you -- how would you do that?  How would your foot be

23   placed?

24       A   With the sole -- again, with the sole of my foot

25   somewhere to his body, probably midsection area, and push

15

1    down.

2        Q   Okay.  And how long did you leave him on the

3    ground?

4        A   I don't know.

5        Q   Did you notice the weather?

6        A   The weather?

 7      Q   Uh-huh.

 8      A   No.

 9      Q   Do you recall him asking for a blanket or

10   something to cover him up with?

11      A   No.

12      Q   Okay.  Had he asked for a blanket, would you

13   have provided him with one?

14      A   Would I have at the entry point?

15      Q   Yes.

16      A   No.

17      Q   Would you have instructed or allowed someone

18   else to provide him with a blanket had he asked for one

19   or had you heard him ask for one?

20      A   After the scene is secure, yes.  That's not up

21   to me.  We're in there for a matter of minutes, so we

22   secure everybody.  And when everybody in the house is

23   secure and there are no longer threats, we leave.  So

24   it's up to the affiants what happens from there on.

25      Q   Okay.  So my question was, if you had heard him


16


 1   ask for a blanket or a cover, and the scene was secured,

 2   would you have provided one to him or instructed someone

 3   to give him one?

 4      A   Me, no.

 5      Q   Okay.  And do you recall whether or not the

6    front door of the house was opened while the incident was

7    going on?

8         A    No, I don't recall.

9         Q    Okay.  And are you one of the individuals who

10   went to one of the other levels of the house, the lower

11   level or the upper level or the --

12        A    Yes.

13        Q    -- third level?

14        A    Yes.

15        Q    Okay.  Which level did you go to?

16        A    Every one of them.  Possibly not the basement.

17        Q    Okay.  When you came into the home, explain to

18   me what you observed.

19        A    Numerous people in the living room portion of

20   the house, which led to the front entrance.

21        Q    You say numerous people.  Were any of them women

22   or any of them men?

23        A    Several women and children we initially

24   encountered.

25        Q    About how many women would you say you saw?


17


1         A    I would have to guess.

2         Q    That's fine.

3         A    Again, without reviewing my report, three or

4    four.

5         Q    And about how many children?

6      A    Seven or eight.

7      Q    Do you recall if there was a basic age range of

8   the children who were present?

9      A    Mainly younger, meaning, you know, three, four.

10     Q    Okay.  Do you recall any infants?

11     A    Not specifically.

12     Q    What was the demeanor of the women and children?

13     A    They were upset.

14     Q    Anything else?

15     A    No.

16     Q    Were they scared?

17     A    I believe so.

18     Q    Did you feel that the women or children

19   presented a threat to you or any of the officers?

20     A    Initially, everyone is a threat until you make

21   an assessment and see their hands.  At that point, they

22   were not.  We didn't handcuff the women.  We let them

23   hold onto the children.

24     Q    But you did put guns in their faces?

25     A    That's a difficult term.  I wouldn't say we put

18

1   guns in their faces.  If I was to put a gun in your face,

2   I would walk right up to you and put the gun in your

3   face.  We have our firearms drawn.  Everywhere our

4   eyes -- our firearms are out, and they go everywhere our

5    eyes look within the house.  So at different times,

6    they're pointed at people.  But I wouldn't consider it

7    gun in face.

8        Q    Okay.  So you pointed the guns at the women and

9    children?

10       A    Everywhere our eyes go, the muzzle of our

11   weapons goes.

12       Q    Okay.  So again, you pointed -- so then,

13   obviously, your eyes went and looked at the women and

14   children.

15       A    Yes.

16       Q    So you're saying that you did put the guns in

17   the faces of the women and children, correct?

18              MS. NELSON:  Objection.  That

19       mischaracterizes his testimony.

20   BY MS. SULLIVAN:

21       Q    I'll rephrase it.  You did point the guns at the

22   women and children, correct?

23       A    Yes.

24       Q    Okay.  Do you normally point guns at children?

25       A    Every time in a high risk entry.


19


1        Q    Okay.  I'm confused, because one of the other

2    officers testified that they don't usually point guns at

3    children in these type of entries.  So I'm trying to get

4    some understanding and clarification about what the

5   actual procedure is.  So are you telling me that at every

6   high risk entry you do point guns at children?

7       A   We don't keep weapons trained and pointed and

8   aimed at children, but --

9       Q   I understand what you're saying.

10      A   -- throughout the course of a high risk entry

11  when you're scanning for safety reasons, every portion of

12  that house, the muzzle of your weapon does pass past

13  everyone in the house.

14      Q   Okay.  So your answer is yes, you do point guns

15  at children?  That's my question.

16      A   Well, if you want to mischaracterize it as that,

17  yes.  There's a difference, ma'am, between pointing and

18  scanning.

19      Q   Okay.  I'm just using the language that you

20  used, Lieutenant Kroll.  You previously said what you do

21  is you point the guns at them.  If you look at them, then

22  your gun goes that way.  That's what you said.  So I'm

23  just using your language.

24      A   Okay.

25      Q   And if you want to clarify --


20


1       A   I would like to --

2       Q   -- it, then you can do that.

3       A   -- clarify.  During the course of scanning for

4    our safety, the entire portions of every part of the

5    house our weapons scan, and they pass through.  Wherever

6    our eyes look, the muzzle of our weapons are pointing.

7    So at some point or another, the weapons do pass through

8    the bodies of everybody involved when you're looking.

9    And in this case, there were so many children everywhere,

10   at some point or another most of our weapons had to have

11   pointed their direction.  Now, sticking the gun in their

12   face and pointing a gun at them is quite a different

13   characterization of what we're doing.

14        Q    Okay.  So you basically are surveying the area?

15        A    Yes.

16        Q    That's what you're saying?  I'm just trying to

17   get an understanding.

18             All right.  And so once you did that with the

19   women and children who were in the area, did you perceive

20   a reason to cuff them at all?

21        A    No.

22        Q    Okay.  And that's because you didn't feel they

23   were presenting as a threat to you or any of your

24   officers at that point?

25        A    After we initially see the hands of the adults,

21

1    and they're free of weapons, we will pass and make an

2    assessment.  It's on the circumstances.  If there would

3    have been females with no children, we would have applied

 4   cuffs.  But due to the number of children in there, we

 5   did not cuff in this situation.  We let them attempt to

 6   calm the children.

 7       Q   Okay.  I'm just trying to clarify whether or not

 8   you perceived them as a threat.  After you surveyed the

 9   situation and the circumstances, did you perceive the

10   women as a threat?

11       A   No.

12       Q   Okay.  Did you perceive the children as a

13   threat?

14       A   No.

15       Q   Okay.  How many times have you been a defendant

16   in a similar lawsuit as this one?

17              MS. NELSON:  Objection, relevance.

18              You can answer.

19              THE WITNESS:  You need to clarify the

20         question more.  How many times have I been sued as

21         a result of a high risk entry?

22   BY MS. SULLIVAN:

23       Q   Yes.

24              MS. NELSON:  Same objection.

25              Go ahead and answer.


22


 1              THE WITNESS:  I don't know that I have.

 2   BY MS. SULLIVAN:

3      Q    What about other types of entries non-high risk?

4                 MS. NELSON:  Same objection.

5                 Go ahead and answer.

6                 THE WITNESS:  I don't believe I have.

7  BY MS. SULLIVAN:

8      Q    So you're saying you've never been a named

9  defendant in a case resulting from an entry into

10 someone's home?

11     A    An entry meaning?

12     Q    Well, first you said not in high risk, so then I

13 said what about non-high risk situations, which takes

14 care --

15     A    I don't believe I --

16     Q    -- of everything else.

17     A    -- have.  I've been -- I was sued once as a

18 result of an officer needs help call where I entered a

19 home.  So I guess you've got to break the question down.

20 Are you looking for high risk, or are you looking for any

21 time I've been in a home or -- I don't understand.

22     Q    Any time you've entered a home, have you ever

23 been sued as a defendant or been a named defendant in a

24 suit due to that?

25                 MS. NELSON:  Same objection.


23


1                 Go ahead and answer.

2                 THE WITNESS:  I've never been sued in a

3          high risk entry before.  There was one other time

4           where I entered a home and was sued.

5   BY MS. SULLIVAN:

6      Q   Okay.  And how many internal affairs complaints

7   have been filed against you?

8      A   I don't know.

9              MS. NELSON:  Objection, relevance.

10  BY MS. SULLIVAN:

11     Q   Have there been any?

12             MS. NELSON:  Same objection.

13             Go ahead and answer.

14             THE WITNESS:  Have there been any internal

15      affairs complaints filed against me?

16  BY MS. SULLIVAN:

17     Q   Yes.

18     A   Yes.

19     Q   About how many do you think?

20     A   I don't know.

21             MS. NELSON:  Same objection.

22  BY MS. SULLIVAN:

23     Q   More than one?

24             MS. NELSON:  Can I just do a standing

25      objection on these of relevance?

24

1              MS. SULLIVAN:  Well, that's fine.

```
 2                    MS. NELSON:  Okay.

 3                    MS. SULLIVAN:  They're relevant, though,

 4          because of the allegations of this particular

 5          matter.

 6                    MS. NELSON:  That's not for us to decide.

 7          I'm just objecting.

 8                    You can ask the question.

 9                    I'm not instructing him not to answer.

10  BY MS. SULLIVAN:

11      Q   More than one?  I'll continue with my questions,

12  Lieutenant.

13      A   Yes.

14      Q   All right.  Do you think more than five?

15      A   Yes.

16      Q   More than ten?

17      A   Yes.

18      Q   More than fifteen?

19      A   I don't know.

20      Q   Okay.  But for sure more than ten?

21      A   Yes.

22      Q   Okay.  Do you know the reason they were filed?

23      A   There's a wide variety.

24      Q   Okay.  There's probably one reason or a couple

25  reasons that are the main ones that you've had.  If not,
```

25

```
 1  just give me a couple.  Give me an idea of what the
```

2    reasons for the complaints were.

3              MS. NELSON:  I'm going to object to the

4         extent that this calls for private data.  He can

5         only answer with respect to allegations that have

6         been sustained.

7              MS. SULLIVAN:  Well, actually, I'm not

8         asking for a detailed description of what the

9         complaint may have contained.  What I'm asking for

10        is what reason was given for the complaint.  And

11        that's a different question.  And that information

12        is actually on-line.  I've personally viewed it.

13        So it's not private information.  It's public if

14        it's on the Internet, so.

15             MS. NELSON:  It's my understanding that

16        the only information that is public is if the

17        allegations have been sustained.

18             MS. SULLIVAN:  The information I viewed

19        says the reason for the complaint as well as

20        whether it was sustained or not actually.

21             MS. NELSON:  And are you saying that

22        you've looked --

23             MS. SULLIVAN:  So I'm just asking -- I'm

24        trying to get an understanding.

25             MS. NELSON:  Okay.  Well, I'm going to

26

1          instruct you to only answer to the extent of

2          allegations that have been sustained.

3     BY MS. SULLIVAN:

4          Q    Okay.  That's fine.  So if you can answer the

5     question then regarding sustained allegations, what the

6     reason for the internal affairs complaint was.

7          A    Failure to wear a seat belt, failure to give

8     name and badge number.

9          Q    Have you ever been suspended during your time as

10    a Minneapolis Police officer?

11         A    Yes.

12         Q    Were you suspended as a result of the January

13    13, 2005, incident?

14         A    No.

15         Q    You said in your report that you began using

16    profanities and threatened to shoot the elderly man.  Why

17    would you begin to use profanities at him?

18         A    Because he was not compliant throughout my

19    course of entry and giving him verbal commands.

20         Q    What words did you use?

21         A    I don't recall specifically.

22         Q    Do you usually use profanities in order to make

23    someone comply with your orders?

24         A    As part of our force continuum, if a subject is

25    noncompliant --

27

```
 1                    [Reporter's Note:  People talking

 2                    loudly in the hallway outside the

 3                    conference room.]

 4                    MS. NELSON:  Hold on.  Can we go off the

 5            record, please?

 6                       (Off the record)

 7                    MS. NELSON:  I'm sorry.

 8    BY MS. SULLIVAN:

 9       Q   All right.  I'll restate the question.  Do you

10    normally use profanities if you are trying to get someone

11    to be compliant with your orders?

12       A   Normally, no.

13       Q   Okay.  And what gets it to the point where you

14    feel that you do need to use profanity?

15       A   If the threat level is high enough to me, and I

16    feel I can accomplish what I'm trying to do in a more

17    expedient manner by using a threatening tone and/or

18    profanities to gain compliance, I will do that in certain

19    situations.

20       Q   You say if the threat level is high enough.  And

21    so what would make the threat level high enough?

22       A   When we have armed robbery, at least an armed

23    robbery subject still somewhere within the house, and

24    you've got someone blocking your entryway to get to him.

25       Q   Okay.  So you're talking about if the overall
```

28

1   threat level is high enough, not with that specific

2   individual that you're encountering?

3        A   Combination of both.

4        Q   Okay.  So then if it's a combination of both, I

5   want to ask then about the elderly gentleman you were

6   encountering.  Did you perceive a threat by him in the

7   encounter that you all had?

8        A   Yes.

9        Q   What was the threat you perceived from the

10  elderly gentleman?

11       A   Well, when he's blocking your access to search

12  other areas of the house, and he has another male near

13  him that's large, neither of which is complying with

14  verbal commands at gunpoint to get on the ground and

15  prone their hands -- get down and show their hands -- to

16  prone out and show their hands, it's been my training and

17  experience that they're, A, either concealing a weapon,

18  planning a counter attack or stalling so evidence can be

19  destroyed or a threat could be launched against us.

20       Q   I'm sorry.  Can you clarify the last part what

21  you said, or a threat can be lodged against us?

22       A   Launched against us.

23       Q   Okay.  Explain what you mean by that.

24       A   Well, when you have an armed robbery suspect

25  that could be a high likelihood that's armed in another

1    room, and they're distracting you, and you have to deal

2    with that person, your threat level increases when that

3    noncompliant person draws your attention away from areas

4    where there are armed suspects inside yet.  So if I have

5    to turn my back in order to deal with him and his

6    noncompliant manner, I'm subject to being shot in the

7    back, the side, whatever, without being able to defend

8    myself.

9        Q   Okay.  I just want to ask you a few more

10   questions.  You keep talking about suspects, and I just

11   want to get some clarification here.  Did you ever become

12   aware once this entry began that there was more than one

13   suspect?

14       A   I'm going by recollection.  I'm sure there was

15   at least one.

16       Q   Okay.  Right.  Otherwise you wouldn't have been

17   there if there wasn't at least one suspect.  Isn't that

18   correct?

19       A   That depends again on the circumstances.  They

20   could have done -- they could have taken the subject off

21   outside the house and still had us execute a high risk

22   warrant.  That's been done before.

23       Q   Right.  But he wouldn't have been there, but --

24   all right.  Moving on.  Was the individual suspect

25   someone who had a gun or weapon on him when you found

30

```
 1   him?

 2        A   Not visible to me.

 3        Q   Were any weapons or guns found within the

 4   search?

 5        A   I don't know.

 6        Q   Did you find any?

 7        A   I did not.  But I don't search for them.

 8        Q   I understand that.

 9        A   This is a -- there is two different complete

10   roles here, and --

11        Q   I understand that.

12        A   -- you seem to not be able to understand.

13        Q   No, please.

14        A   We secure people.

15              MS. SULLIVAN:  I'm sorry, Off -- please

16          instruct your client, Ms. Nelson.  I'm trying to

17          ask him a question.  He's overbearing -- he's over

18          talking me.  I'm trying to ask a question, and he's

19          not allowing me to get it out.

20              MS. NELSON:  Okay.  Wait until --

21              MS. SULLIVAN:  I understand very well.

22              MS. NELSON:  -- she's done with her

23          question.  And then allow him to finish the answer.

24              MS. SULLIVAN:  He can finish the answer,

25          but he's not answering the question that I'm asking
```

31

 1       him.

 2   BY MS. SULLIVAN:

 3       Q    And first, let me just clarify, Lieutenant.  I

 4   understand there are two roles.  I understand there are

 5   two teams.  I understand there's a SWAT and then the

 6   investigators that come in.  And I understand that very

 7   much.  I'm asking you a question about what you

 8   personally saw or recovered from the home when you were

 9   in there.  And then I will go on with the rest of what

10   I'm going to ask you about this.  So I'm going back to my

11   question, which is, did you see any weapons, yes or no?

12       A    No.

13       Q    Did any of the officers who were within the home

14   at the same time as you, to your knowledge, recover or

15   see any weapons, yes or no?

16       A    No.

17       Q    Okay.  Are you aware of whether or not after you

18   left investigators saw or took any weapons from the home?

19       A    I'm not aware.

20       Q    Okay.  All right.  And can you please explain to

21   me whether or not the other family members in the home or

22   other individuals who were present at the time of this

23   incident other than the elderly man seemed to be afraid

24   when you kicked him to the ground and when you placed the

25   gun near him?

32

1    A    Can you restate the question?

2    Q    Sure.  I sure can.  We've already talked about

3    the fact that you kicked the elderly gentleman to the

4    ground and that as you survey the area wherever your eyes

5    go that the gun goes.  Did you notice or observe whether

6    or not the other individuals in the area, which were

7    family members, seemed to be scared or concerned about

8    the elderly gentleman as this was going on?

9    A    I don't believe they were scared or concerned

10   about him.  They were scared and concerned from the

11   moment that we went through the door.

12   Q    Okay.  Do you recall any of them asking for them

13   to be able to take care of the elderly man who was lying

14   on the ground?

15   A    No.

16   Q    Okay.  And were the women in the area ever

17   cuffed?

18   A    I don't know.

19   Q    But you and your team did not cuff them?

20   A    I don't know that, either.

21   Q    Okay.  Do you know if you cuffed them?

22   A    I know I did not.

23   Q    Okay.  Is it safe to say that had they been

24   cuffed, it would be because there was a threat that was

25   perceived?

33

```
 1        A    This is difficult to answer unless you
 2   understand the dynamics of a high risk entry.  I'm the
 3   team leader and the front part of it.  When I see hands
 4   and people complying, I pass through.  That's left to my
 5   trailers on the team.  They interpret a threat level
 6   there, and they apply handcuffs.  That's other members of
 7   the team.  My mission is to go through and lead all
 8   point.  My point man and me go through everywhere in the
 9   house.  Once I pass, I don't see any firearms in the
10   hands, I'm on to the next problem.  So what happens after
11   me at the tail end of that snake I have no knowledge.
12        Q    Okay.  So you don't at all at any point during
13   these entries ever instruct officers to cuff people?
14        A    Can you ask that again?
15        Q    Yes.  Do you ever instruct officers to cuff
16   individuals when you're conducting these entries?
17        A    Yes.
18        Q    Okay.  So it's possible that you may have
19   instructed someone to cuff some of the individuals who
20   are present?
21        A    Possible.
22        Q    Okay.  Were the children cuffed?
23        A    I don't believe so.
24        Q    Would you cuff children?
25        A    That depends on the circumstances.
```

34

```
 1      Q    So you would cuff a six-month-old child?
 2      A    No.
 3      Q    Okay.  How old of a child would you cuff?
 4      A    Upwards of twelve.
 5      Q    Okay.  But you didn't notice any 12-year-old
 6    children in this home as you previously testified?
 7      A    I don't know.
 8      Q    Okay.  Well, you previously --
 9      A    I previously testified there were ages of four,
10    five, six.  I believe there were some older, too.  I'm
11    not positive.
12      Q    Actually, you said they were younger, and I mean
13    three to four.
14      A    Younger, but there was a spread-out age.  There
15    was -- I believe there was a teenager in there or
16    something, also.  There were several women, several
17    children.  And I was in there for only a matter of
18    minutes.
19      Q    Okay.  All right.  But you're saying that if a
20    child was 12 and up, you might cuff them, but someone who
21    is younger than that, you wouldn't cuff?
22      A    Again, it still depends on the circumstances, 12
23    and up.
24      Q    Okay.  I'm just trying to clarify at what point
25    you decide to --
```

35

```
 1        A    There's no cookie cutter answer for the question

 2   you're asking.

 3        Q    Okay.  So you might cuff a two-year-old child,

 4   and you might cuff a ten-year-old?

 5        A    No, I wouldn't cuff a two-year-old.

 6        Q    All right.  So they have to be an older child in

 7   order for you to decide to have them cuffed?

 8        A    Yes.

 9        Q    Okay.  At any point during the incident, did you

10   request and receive consent from any of the individuals

11   to come near them or cause them fear of any kind?

12        A    Did I receive request to come towards --

13        Q    Did you request --

14        A    -- them and cause them fear?

15        Q    No.  Let me clarify it for you again.  I'll say

16   it exactly the way I said it before.  Did you request and

17   subsequently receive consent from any of the individuals

18   to come near them and/or cause them apprehension or fear?

19                  THE WITNESS:  Can you read that back?

20                  COURT REPORTER:  Sure.  "Did you request

21           and subsequently receive consent from any of the

22           individuals to come near them and/or cause them

23           apprehension or fear?"

24                  MS. NELSON:  I'll object.  That's a
```

```
25          compound question.
```

36

```
 1   BY MS. SULLIVAN:
 2       Q   Okay.  Let me break it down for you.  I'll break
 3   it down for you.  At any point while you were in the
 4   home, did you request from any of the individuals the
 5   right to come near them and cause them fear of any kind?
 6       A   No.
 7       Q   All right.  And did you -- and then if you
 8   didn't request, you obviously did not receive their
 9   consent to do that, did you?
10       A   No.
11       Q   Okay.  Did you attend or -- I'm sorry.  Strike
12   that.
13           Are you aware of whether or not there were -- or
14   the younger male who was near that elderly male was ever
15   placed on the ground while you were present?  I'll say it
16   again.
17           Are you aware of whether the other male -- you
18   mentioned there was another male next to the elderly
19   male.  Are you aware of whether he was ever placed on the
20   ground when you were present?
21       A   Yes, he was on the ground.
22       Q   Okay.  Do you know how he got there?
23       A   Not specifically.
24       Q   So you don't know whether or not he had been
```

25    ordered to get on the ground or kicked to the ground or

37

1    something else?

2    A    I ordered him to the ground.

3    Q    All right.  But you did not assist him or kick

4    him to the ground?

5    A    No.

6    Q    Did you talk to this gentleman, the younger

7    gentleman?

8    A    No.

9    Q    Did you notice him having conversation with any

10   of the officers in the home?

11   A    I noticed him yelling and distracting and

12   causing a disturbance there.  I didn't notice him having

13   any type of conversation with anybody other than making

14   requests for a search warrant, demanding we leave,

15   continuing on and on and rambling.

16   Q    Okay.  And do you recall him asking for the

17   field sergeant?

18   A    Yes.

19   Q    Did anyone ever respond to him when he was

20   asking these questions?

21   A    He was ordered to stay down and be quiet

22   numerous times.  He wouldn't comply with anything

23   verbally.

24     Q   I understand that.  I'm asking whether anyone

25   ever responded to any of his questions.


38

1     A   I don't know.

2     Q   Did you respond?

3     A   I think I told him that I was a sergeant in

4   charge of the team, and there would be a sergeant in

5   charge of the house that he could speak with when I left.

6     Q   Did you tell him this as soon as he started

7   asking for the field sergeant, or did you wait and tell

8   him later on?

9     A   I don't recall.  It must have been later,

10   because I didn't have any conversations with anybody, so

11   to speak, until I was certain the whole house was secure

12   and the suspects that were upstairs were cuffed.

13     Q   You keep saying suspects.

14     A   Two met the same general description.

15     Q   Okay.  And neither of those individuals,

16   however, were arrested, were they?

17     A   I don't know.

18            MS. SULLIVAN:  Okay.  Nothing further.

19            MS. NELSON:  I have one follow-up

20        question.

21                        EXAMINATION

22   BY MS. NELSON:

23     Q   With respect to the older gentleman, can you

24    describe how much force you used in getting him to the

25    ground?


39


1        A    Very minimal.

2        Q    Can you elaborate on that?

3        A    In my report, it says a poke check and a kick.

4    What that meant was I used a sweep of a gun barrel to

5    push him forward, and then as he was going down and

6    getting back up, I pushed back with my foot.

7        Q    And I think you also said that he was not

8    complying with your orders to get down.  What was he

9    doing?

10       A    He was noncompliant throughout.  He demanded

11   that I leave his house.  He told me that he's lived there

12   for over 30 years and I had no right to be in there.  He

13   was blocking my access to the upstairs, through the

14   kitchen to the downstairs.  He was blocking me

15   throughout.  He was noncompliant at gunpoint to get on

16   the ground.  He demanded that he see paper.  He said I

17   was too young to tell him what to do.  He said that he

18   was a long-term resident.  He's lived there longer than

19   I've been alive and I had no right to come into his house

20   and tell him what to do.

21       Q    And as a result of not complying, is that when

22   you used the force you've described?

23      A   Yes.

24              MS. NELSON:  Okay.  Thank you.

25              MS. SULLIVAN:  Follow-up.


40


1                       EXAMINATION

2    BY MS. SULLIVAN:

3       Q   You said that, in talking about the force -- I'm

4    honestly still not clear of the amount of force that you

5    caused to be thrust onto him.  You said minimal, but then

6    you said you -- a sweep with the muzzle and then a kick

7    later on.  How much force with the kick?

8       A   Very little force, minimal.  It was a push with

9    my foot rather than a kick.

10      Q   Okay.  So you stated it wrong in your report

11   then?

12      A   In the report, for simplicity that's what we

13   term that.

14      Q   You had said that he was standing in the way or

15   blocking --

16      A   Yes.

17      Q   -- the stairway.  And what was your concern

18   about if he was blocking the stairway?  What was your

19   concern?

20      A   The possibility of our armed robbery suspect

21   being up those stairs with a gun.

22      Q   But, in fact, there was no one upstairs with a

23   gun when you got up there?

24            MS. NELSON:  Objection, mischaracterizes

25        previous testimony.


41


1   BY MS. SULLIVAN:

2        Q   Was there someone upstairs with a gun when you

3   got there?

4        A   There was someone upstairs.  I did not see a

5   gun.

6        Q   Okay.

7        A   But I did not do a search.

8        Q   You didn't do a search?

9        A   I do a visual search of the person.  Once I see

10  hands and order down and the hands stay out, I clear and

11  go to the next threat.  When it's done, I don't search

12  anywhere.

13       Q   Okay.  And you saw hands?

14       A   My team searches the immediate area where their

15  hands are cuffed around their waistband, anything that's

16  accessible to them.  They don't conduct a search.

17       Q   Okay.

18       A   That's on the team that we're doing the warrant

19  for.

20       Q   Okay.  Just, please.  And you saw hands when you

21  went upstairs then?

22      A    Yes.

23      Q    Okay.  Which signifies compliance with orders?

24      A    The two individuals upstairs were completely

25  compliant.


42


1      Q    That's what I'm asking about.

2      A    Yes.

3                MS. SULLIVAN:  Okay.  Nothing further.

4                MS. NELSON:  Nothing further.  We'll read

5        and sign.

6

7        (Deposition concluded at 2:16 p.m.)

8                        **********

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

1                      REPORTER'S CERTIFICATE

2

3     STATE OF MINNESOTA)
                        )   ss.
4     COUNTY OF HENNEPIN)

5            I hereby certify that I reported the deposition
      of LIEUTENANT ROBERT KROLL, on the 28th day of March,
6     2007, in Minneapolis, Minnesota, and that the witness
was
      by me first duly sworn to tell the whole truth;
7
             That the testimony was transcribed by me and is
a
8     true record of the testimony of the witness;

9            That the cost of the original has been charged
to
      the party who noticed the deposition, and that all
10    parties who ordered copies have been charged at the
same
      rate for such copies;
11
             That I am not a relative or employee or
attorney
12    or counsel of any of the parties, or a relative or
      employee of such attorney or counsel;
13
             That I am not financially interested in the
14    action and have no contract with the parties,
attorneys,
      or persons with an interest in the action that affects
or
15    has a substantial tendency to affect my impartiality;

16           That the right to read and sign the deposition
by
      the witness was reserved.

```
17
                    WITNESS MY HAND AND SEAL, this 31st day of
March,
        18      2007.

        19
                _____
        20      Lori L. Morrow, RPR, CRR
                Notary Public, Hennepin County, Minnesota
        21      My commission expires:  January 31, 2010

        22

        23

        24

        25
```

*Plain Text Attachment*

```
1
```

```
        1       STATE OF MINNESOTA                  DISTRICT COURT

        2       COUNTY OF HENNEPIN        FOURTH JUDICIAL DISTRICT
                **************************************************
        3       Charles Everett Cook, Sylvia Mae Cook,
                and Timothy Blake Cook, natural persons,
        4
                            Plaintiffs,
        5
                    v.
        6
                City of Minneapolis, a municipal entity; Minneapolis
        7       Police Officer Mark Johnson, Badge #003459, in his
                individual, personal and official capacity; Sgt. D.
        8       Smulski, in his individual, personal and official
                capacity; Officer K. Blackwell, in his individual,
        9       personal and official capacity; Officer Geoffrey
                Toscano, Badge #007257, in his individual, personal and
        10      official capacity; Officer Bevan Blauert, Badge
                #003459, in his individual, personal and official
        11      capacity; Officer Jon Petron, Badge #5671, in his
                individual, personal and official capacity; Officer
        12      Christopher House, Badge #3165, in his individual,
                personal and official capacity; Sgt. Robert Kroll,
        13      Badge #003874, in his individual, personal and official
                capacity; Officer Christie Nelson, Badge #4959, in his
```

```
14      individual, personal and official capacity; Officer
        William Willner, Badge #7783, in his individual,
15      personal and official capacity; Officer Westlund, Badge
        #7674, in his individual, personal and official
16      capacity; Officer Roger Smith, Badge #006689, in his
        individual, personal and official capacity; Officer
17      Jason King, Badge #003704, in his individual, personal
        and official capacity; Officer Timothy Hanks, Badge
18      #002660, in his individual, personal and official
        capacity; and Officers Jane Doe and Richard Roe,
19      unknown and unnamed Minneapolis Police Officers, in
        their individual, personal and official capacities;
20
                    Defendants.
21      **************************************************
                        DEPOSITION OF
22                  OFFICER BEVAN BLAUERT

23                  Taken March 28, 2007
                    Scheduled for 12:15 p.m.
24
            Reported By:  Lori Morrow, RPR, CRR
25      PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545
```

2

```
1           Deposition of OFFICER BEVAN BLAUERT, taken on
the

2       28th day of March, 2007, commencing at 12:48 p.m., at
the

3       CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

4       Street, Suite 300, Minneapolis, Minnesota, before Lori

5       Morrow, Registered Professional Reporter and Certified

6       Realtime Reporter and a Notary Public in and for the

7       State of Minnesota.

8

9
                        APPEARANCES:
10
        On Behalf of the Plaintiffs:
11
            Maya C. Sullivan, Esquire
12          LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
```

```
              941 Hillwind Road NE
13            Suite 200
              Minneapolis, Minnesota 55432
14            (763) 515-0092
              Fax (763) 515-0093
15
       On Behalf of the Defendants:
16
              Tracey L. Nelson, Esquire
17            CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
              333 South 7th Street
18            Suite 300
              Minneapolis, Minnesota 55402
19            (612) 673-2063

20                        **********

21            NOTE:  The original transcript will be
delivered
              to Maya C. Sullivan, Esquire, pursuant to the
applicable
22     Rules of Civil Procedure.

23

24

25
```

```
3
```

```
 1                       INDEX

 2     WITNESS:

 3     Officer Bevan Blauert

 4
       EXAMINATION BY:              PAGE:
 5
       Ms. Sullivan...............4
 6

 7     OBJECTIONS BY:

 8     Ms. Nelson..................8

 9
       EXHIBITS MARKED AND REFERRED TO:          (NONE)
10
```

11                    **********

12

13

14

15

16

17

18

19

20

21

22

23

24

25


4


1                    OFFICER BEVAN BLAUERT,

2    duly sworn, was examined and testified as follows:

3                      EXAMINATION

4    BY MS. SULLIVAN:

5        Q   Officer Blauert, as I said, my name is Maya

6    Sullivan, and I am one of the attorneys representing the

7    Plaintiffs in this matter.  The other one is Albert

8    Goins.

9              Just for the record, can you initially state and

10   spell your name, first and last names.

11      A    My first name is Bevan, B-E-V-A-N, and last name

12    Blauert, B-L-A-U-E-R-T.

13      Q    Thank you.  And have you taken part in

14    depositions in the past?

15      A    Yes.

16      Q    Okay.  I just want to give you a few reminders

17    about procedure while we're here doing the deposition.

18           First, I will ask that when you're responding to

19    questions that you give verbal answers.  Don't nod your

20    head or shake your head or say "uh-huh," that type of

21    thing.  Please make it clear for the record.

22           And at times your attorney may object or give

23    you different types of instructions regarding answering

24    questions.  Please make sure that you wait for her to

25    give you the instructions that may be necessary.  Do you


5


1    have any questions at this point?

2      A    No.

3      Q    Okay.  Thank you.  Officer Blauert, who is your

4    employer?

5      A    City of Minneapolis Police Department.

6      Q    All right.  How long have you been employed by

7    the Minneapolis Police Department?

8      A    Fifteen years.

9      Q    And prior to working for the Minneapolis Police

```
10    Department, were you an officer elsewhere?

11         A    No.

12         Q    Were you in a different, completely different

13    field?

14         A    No.

15         Q    You were in the law enforcement field?

16         A    No.  I was a student.

17         Q    Okay.  Over the 15 years that you have worked

18    for the Minneapolis Police Department, have your

19    assignments changed?

20         A    Yes.

21         Q    And what is your current assignment?

22         A    The Fifth Precinct.

23         Q    All right.  And at the time of the incident,

24    which was January 13 of '05, were you assigned to the

25    Fifth Precinct?
```

6

```
1          A    Yes.

2          Q    Okay.  Were you assigned to any particular team?

3          A    No.  I was working the street that day, I

4     believe.

5          Q    Okay.  Did you receive special training

6     regarding conducting high risk entries?

7          A    Yes.

8          Q    Okay.  And how long ago did you start working

9     with or participating in those type of entries?
```

10      A   I've been doing high risk warrants for

11   approximately 10 years.

12      Q   Okay.  Have you received any specific training

13   regarding conducting -- excuse me.  I have a cold.  I

14   apologize -- regarding conducting high risk warrants when

15   there are elderly or ill individuals in the residence or

16   in the home?

17      A   We conduct high risk warrants with all ages,

18   shapes, sizes, races.  It doesn't matter.

19      Q   Okay.  I guess what I'm trying to get at is

20   whether or not you would approach a perfectly healthy

21   adult person the same way that you might approach, say,

22   an ill adult that you see or encounter, or an elderly

23   adult who you encounter in these circumstances?

24      A   I don't believe we've received any training in

25   specific to age.  However, I have done high risk warrants

7

1   with elderly individuals.

2      Q   So you said you don't receive training regarding

3   age.  But you do have experience.  I guess that's what

4   you're saying --

5      A   Correct.  Everybody is treated the same in a

6   high risk warrant.

7      Q   Were you part of the team that entered 3845

8   Second Avenue South in Minneapolis on January 13 of 2005?

9      A   Yes.

10      Q   And what information were you provided regarding

11   the residence or what you were going to do on that day?

12      A   I received very little information.  I came in

13   as an extra because they needed more bodies for the

14   warrant.  I was with the understanding that we were

15   entering the house with a search warrant or arrest

16   warrant for an individual wanted for robbery who had a

17   history of weapons.

18      Q   And did you receive a description of the

19   individual you were looking for?

20      A   I did.  But I don't recall.

21      Q   Can you describe the entry into the home?

22      A   I don't recall the exact entry into the home.  I

23   don't remember if the door was open or not.

24      Q   Okay.  Can you describe what happened once you

25   all entered the home?

8

1      A   I believe when we entered the home I was

2   probably the last team member through the door.  I was

3   presented with a room full of women.  I believe they were

4   on a couch, and they already had their hands in the air.

5      Q   Did you see any children?

6      A   I believe there was at least four women and

7   multiple children.

8      Q   Did the children have their hands up?

9      A   I don't recall.

10      Q   Do you recall the demeanor of the women or the

11   children when you entered?

12      A   Repeat.  I didn't hear you.

13      Q   Sorry.  Did you recall the demeanor,

14   D-E-M-E-A-N-O-R.  Sorry.

15      A   The demeanor?  They appeared shocked, which is

16   normal for high risk warrants, because they don't know

17   that we're coming.

18      Q   And, in fact, children probably wouldn't have

19   known anything about you coming anyway, whether it was

20   high risk or not, correct?

21           MS. NELSON:  Objection, calls for

22      speculation.

23   BY MS. SULLIVAN:

24      Q   I just want to clarify.  You said they appeared

25   shocked, the children appeared shocked because they

9

1   didn't know you were coming.

2      A   Everybody appeared shocked because they didn't

3   know we were coming.

4      Q   All right.  So you came in, and you saw the

5   women, and you saw the children.  Did anyone -- did you

6   hear anyone ask for a search warrant?

7      A   After some time, I believe there was somebody

8    that asked for a search warrant.

9       Q    Do you recall if that was a woman or a man?

10      A    I believe that was an elderly male, but that was

11   some time into the warrant.

12      Q    You didn't see the elderly male when you

13   initially entered the home?

14      A    I'm having a hard time hearing you.  Can you say

15   it again?

16      Q    I said you did not see the elderly man when you

17   initially entered the home?

18      A    No.

19      Q    Okay.  At what point did you see him?

20      A    That was after the living room area was secured

21   with the women and children.  In other words, they

22   appeared to be under control.  They were explained just

23   to relax and keep their hands in the air because we were

24   conducting a high risk warrant.

25      Q    Okay.  And then where did the elderly man come


10


1    from?

2       A    I encountered him in, I think it was the

3    staircase area.  And I believe what I heard was Officers

4    had encountered him and were encountering difficulty with

5    him.

6       Q    Okay.  Did you have any kind of interaction with

7    the elderly man?

8       A    I don't believe I did, no, not at that point.

9       Q    At what point did you have interaction with him?

10      A    I believe it was quite some time later.  What

11  happened is he was delaying the team during the course of

12  the high risk warrant.  It jeopardizes our safety as well

13  as the safety of everybody in the house.  He was

14  instructed to get down on the ground and stay down on the

15  ground, which is our routine.  He was not complying with

16  those requests.  I believe I was then requested by

17  Sergeant Kroll to handcuff this individual so we could

18  continue on with our high risk warrant.

19      Q    This is the elderly man that you --

20      A    I believe it was, yes.  I don't know what his

21  name was.

22      Q    And do you recall whether or not the elderly

23  gentleman was at one point made to lie on the ground?

24      A    Repeat.

25      Q    Do you recall if he at any point during this

11

1   incident was lying on the ground?

2       A    Yes, he was lying on the ground when I

3   handcuffed him.

4       Q    How did he get to the ground?

5       A    I have no idea.

6       Q    How close would you say you were to him distance

7      wise, approximately?

8          A    When I handcuffed him?

9          Q    Uh-huh.

10         A    I had to get within touching distance of him.

11         Q    Were you kneeling like on your knees, or were

12     you standing up and leaning over to do it?

13         A    I was standing when I handcuffed him.

14         Q    Okay.

15         A    We did so with the utmost care with him, because

16     he appeared not to be a threat to me.  Although, like I

17     said, he was impeding our progress in the high risk

18     warrant.  I believe he was later charged with

19     obstruction.

20         Q    The elderly gentleman?

21         A    Correct.

22         Q    I think you might have it confused there.  But

23     going on, did you notice -- I'm sorry.  Strike that.

24              How close was your face to his face when you

25     were cuffing him?


12


1          A    I don't recall.

2          Q    I'm just trying to visualize the scene.  Were

3      you -- when you leaned over to cuff him, or when you lean

4      over to cuff individuals in this type of a seated

5      position or lying position, do you normally get close to

6      their face at all for any reason?

7      A    No.

8      Q    Okay.  Did you notice a stint coming out of the

9    elderly gentleman's neck?

10     A    I don't recall, no.

11     Q    You said you treated him with the utmost care

12   because he didn't pose a threat.  Is that correct?

13     A    What I saw what he was doing was he was holding

14   the team up in the execution of a warrant.  In that case,

15   he was creating a dangerous situation for us, because we

16   cannot execute our job.

17     Q    Okay.  But my question is -- I'm just trying to

18   clarify.  You said you treated him with the utmost care

19   because he did not pose a threat or didn't appear to pose

20   a threat?

21     A    He was not a threat to me.

22     Q    Okay.  And had he been a threat to you, what

23   would you have done differently?

24     A    I would have handcuffed him immediately.

25     Q    Was there another male in the area while you

13

1    were purveying the incident?

2      A    I don't recall if there was one or two males

3    involved in this.  There was a lot going on.

4      Q    Okay.  Are you one of the officers who went to

5    the upper level or the lower level of the home?

6        A    I don't believe I ever left the front room area.

7        Q    Okay.  You said you heard the elderly gentleman

8   ask for a warrant or ask for the search warrant.  At what

9   point was it provided to him or while you were in the

10  home?

11       A    During the execution of a high risk warrant, we

12  do not provide a search warrant.  We advise them to get

13  down, and then the search warrant is usually provided by

14  the investigators after the apartment has been secured.

15       Q    So did you advise the Plaintiffs in this matter

16  that they would receive a search warrant, be able to view

17  the search warrant later?

18       A    I didn't advise anybody anything other --

19       Q    Okay.  So --

20       A    -- than to get down and be quiet.

21       Q    Okay.  So when they were asking for the search

22  warrant, there was no response basically?

23       A    Not from myself.

24       Q    Okay.  Did you hear a response?

25       A    I don't recall.


14


1        Q    Do you normally respond if someone were to ask

2   for a search warrant during this type of an entry?

3        A    On the hundreds that I've done, usually not.

4        Q    Usually you don't respond at all?

5        A    Usually we tell them there will be one coming.

6       Q    Okay.

7       A    And it will be all explained to you after

8    everything is safe.

9       Q    Okay.  But in this particular case, you nor

10   anyone else told them that there was a warrant coming?

11      A    I don't recall.

12      Q    Okay.  You said that you didn't tell them, so

13   let's just break the question down into two.  During this

14   particular incident, you did not tell them a warrant was

15   coming, did you?

16      A    I did not, no.

17      Q    Okay.  And you don't recall whether or not

18   anybody else told them that one was on its way?

19      A    That's correct.

20      Q    Okay.  As a result of this incident, are you

21   aware of whether the robbery suspect was arrested?

22      A    I believe he was apprehended, correct.

23      Q    Did you see him?

24      A    I don't recall.

25      Q    Do you know if anyone else was arrested as a

15

1    result of the incident?

2       A    Like I stated earlier, I believe it was an

3    elderly gentleman, but I don't have any names or anything

4    like that.

5      Q   I'm not asking for a name.  I'm just asking if

6   you know of anybody else who was.  At the point that you

7   entered the residence, where were you in the succession

8   of officers coming in?  Were you first, were you last,

9   were you in the middle somewhere?

10      A   As stated earlier, I was probably the last

11   person into the room, into the residence.

12      Q   Did you have the ram?

13      A   I believe I was assigned to the ram, correct.

14      Q   Okay.  Do you remember who you were assigned to

15   that with?

16      A   No.

17      Q   In your supplemental report, you indicate that

18   there was an uncooperative male.  Was it your opinion

19   that he was uncooperative because he was asking for the

20   field sergeant and the search warrant or some other

21   reason?

22      A   The reason he was uncooperative was he was not

23   complying with our requests to lie down on the ground and

24   was impeding the process of which we were conducting a

25   high risk warrant, was not complying with verbal


16


1   commands, therefore being uncooperative.

2      Q   At the time you were conducting or participating

3   in the entry, did you ever go into the kitchen area of

4   the home?

5       A    I don't believe so.

6       Q    Do you recall the weather that day?

7       A    No.

8       Q    Do you think it would be safe to assume that it

9    was cold since it was January in Minnesota?

10      A    I don't recall.

11      Q    Okay.  I just want to get an understanding about

12   something here.  You said that you did know that the

13   elderly gentleman was lying on the ground or had been

14   placed on the ground, and you believe that you cuffed

15   him.  At the time he was lying on the ground, do you

16   recall anyone asking for a blanket to cover him up

17   because of the cold air coming in?

18      A    I don't recall.  It was inside.  I wouldn't

19   believe that would be something that would happen.

20      Q    Is that something you believe would happen if

21   the door was standing wide open?

22      A    That's speculation.  I don't think so, no.

23      Q    I'm sorry.  You don't think that if the door was

24   standing wide open someone may ask for a blanket?

25      A    During the conduction of a high risk warrant,


17


1    we're not interested in if people are cold or warm.

2       Q    And that's even if you have an ill person who

3    may be increasingly becoming more ill because of the cold

4     air?

5         A    Most high risk warrants from the time that we

6     enter to the time that we are exiting the house is less

7     than two minutes.  So in the two minutes that I contact

8     the people that are inside the house, I don't care if

9     they're warm or cold.

10        Q    Okay.  And you said you don't recall whether or

11    not anyone indicated they were cold or not?

12        A    I don't recall, no.

13        Q    Okay.  All right.  Do you know if anybody else

14    noticed whether there was a stint in the older man's neck

15    or not?

16        A    I don't recall.

17        Q    You state in your supplemental report that when

18    you entered the home that you were yelling loudly "police

19    search warrant."  Were you the only one yelling that?

20        A    That's usually common procedure.  If I put that

21    in a report, it would be a correct reflection of what I

22    did.

23        Q    I'm asking whether or not you were the only one

24    who was doing that or not.

25        A    I don't recall.


18


1         Q    Are you normally the only one who yells it?

2         A    Normally, more than one officer is yelling it as

3     we are breaching the door for our safety.

4      Q    Okay.  Is it normal for all of the officers to

5   yell it?

6      A    I don't know if I can answer that or not.

7   Sometimes it happens, sometimes it doesn't, as long as

8   the announcement is made.

9      Q    Okay.  You've conducted several hundred of these

10  types of entries, I believe you said earlier.  Is that

11  correct?

12     A    Correct.

13     Q    Would you say like 500, closer to a thousand?

14  Just could you give me a ballpark figure?

15     A    Can you rephrase?  I'm not sure what you're

16  asking.

17     Q    I said have you conducted 500, closer to a

18  thousand of these types of high risk entries?  Can you

19  give me a ballpark figure?

20     A    I would say over 200.

21     Q    All right.  And on these high risk entries that

22  you've conducted, how many, approximately again, I don't

23  need an exact number, have you conducted along with

24  Sergeant Kroll?

25     A    Probably 50.  I'm not sure.

19

1                MS. SULLIVAN:  Okay.  That's fine.  I

2           don't have any more questions.

```
 3                    MS. NELSON:  We'll read and sign.

 4

 5          (Deposition concluded at 1:08 p.m.)

 6                         **********

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

20

```
 1                    REPORTER'S CERTIFICATE

 2
```

```
 3     STATE OF MINNESOTA)
                        )   ss.
 4     COUNTY OF HENNEPIN)

 5            I hereby certify that I reported the deposition
       of OFFICER BEVAN BLAUERT, on the 28th day of March,
2007,
 6     in Minneapolis, Minnesota, and that the witness was by
me
       first duly sworn to tell the whole truth;
 7
              That the testimony was transcribed by me and is
a
 8     true record of the testimony of the witness;

 9            That the cost of the original has been charged
to
       the party who noticed the deposition, and that all
10     parties who ordered copies have been charged at the
same
       rate for such copies;
11
              That I am not a relative or employee or
attorney
12     or counsel of any of the parties, or a relative or
       employee of such attorney or counsel;
13
              That I am not financially interested in the
14     action and have no contract with the parties,
attorneys,
       or persons with an interest in the action that affects
or
15     has a substantial tendency to affect my impartiality;

16            That the right to read and sign the deposition
by
       the witness was reserved.
17
              WITNESS MY HAND AND SEAL, this 31st day of
March,
18     2007.

19     _____

20     Lori L. Morrow, RPR, CRR
       Notary Public, Hennepin County, Minnesota
21     My commission expires:  January 31, 2010

22

23

24

25
```

*Plain Text Attachment*

1

```
 1    STATE OF MINNESOTA                  DISTRICT COURT

 2    COUNTY OF HENNEPIN       FOURTH JUDICIAL DISTRICT
      **************************************************
 3    Charles Everett Cook, Sylvia Mae Cook,
      and Timothy Blake Cook, natural persons,
 4
                      Plaintiffs,
 5
           v.
 6
      City of Minneapolis, a municipal entity; Minneapolis
 7    Police Officer Mark Johnson, Badge #003459, in his
      individual, personal and official capacity; Sgt. D.
 8    Smulski, in his individual, personal and official
      capacity; Officer K. Blackwell, in his individual,
 9    personal and official capacity; Officer Geoffrey
      Toscano, Badge #007257, in his individual, personal and
10    official capacity; Officer Bevan Blauert, Badge
      #003459, in his individual, personal and official
11    capacity; Officer Jon Petron, Badge #5671, in his
      individual, personal and official capacity; Officer
12    Christopher House, Badge #3165, in his individual,
      personal and official capacity; Sgt. Robert Kroll,
13    Badge #003874, in his individual, personal and official
      capacity; Officer Christie Nelson, Badge #4959, in his
14    individual, personal and official capacity; Officer
      William Willner, Badge #7783, in his individual,
15    personal and official capacity; Officer Westlund, Badge
      #7674, in his individual, personal and official
16    capacity; Officer Roger Smith, Badge #006689, in his
      individual, personal and official capacity; Officer
17    Jason King, Badge #003704, in his individual, personal
      and official capacity; Officer Timothy Hanks, Badge
18    #002660, in his individual, personal and official
      capacity; and Officers Jane Doe and Richard Roe,
19    unknown and unnamed Minneapolis Police Officers, in
      their individual, personal and official capacities;
20
                      Defendants.
21    **************************************************

22                    DEPOSITION OF
                    OFFICER ROGER SMITH
23                  Taken March 28, 2007
```

                    Scheduled for 10:30 a.m.
      24
                 Reported By:  Lori Morrow, RPR, CRR
      25  PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545




  2


      1          Deposition of OFFICER ROGER SMITH, taken on the

      2     28th day of March, 2007, commencing at 10:30 a.m., at
the

      3     CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

      4     Street, Suite 300, Minneapolis, Minnesota, before Lori

      5     Morrow, Registered Professional Reporter and Certified

      6     Realtime Reporter and a Notary Public in and for the

      7     State of Minnesota.

      8

      9                     APPEARANCES:
      10
          On Behalf of the Plaintiffs:
      11
              Maya C. Sullivan, Esquire
      12      LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
              941 Hillwind Road NE
      13      Suite 200
              Minneapolis, Minnesota 55432
      14      (763) 515-0092
              Fax (763) 515-0093
      15
          On Behalf of the Defendants:
      16
              Tracey L. Nelson, Esquire
      17      CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
              333 South 7th Street
      18      Suite 300
              Minneapolis, Minnesota 55402
      19      (612) 673-2063

      20                    **********

      21          NOTE:  The original transcript will be
delivered
              to Maya C. Sullivan, Esquire, pursuant to the

applicable
       22     Rules of Civil Procedure.

       23

       24

       25


3


       1                         INDEX

       2     WITNESS:

       3     Officer Roger Smith

       4
             EXAMINATION BY:            PAGE:
       5
             Ms. Sullivan................4
       6

       7     OBJECTIONS BY:

       8     Ms. Nelson.................7, 8, 9, 16

       9
             EXHIBITS MARKED AND REFERRED TO:          PAGE:
      10
             Exh. No. 1:
      11
                  CAPRS report 1/19-20/2005
      12          Roger Smith                          11

      13                      *********
      14
                 (REPORTER'S NOTE:  Original Exhibit is
      15     attached to the original transcript.)

      16

      17

      18

      19

      20

```
              21

              22

              23

              24

              25




  4




       1              OFFICER ROGER SMITH,

       2    duly sworn, was examined and testified as follows:

       3                    EXAMINATION

       4    BY MS. SULLIVAN:

       5       Q   Officer Smith, I'm Maya Sullivan, as I said, and

       6    I'm one of the attorneys for the Plaintiffs in this

       7    matter, the Cooks.  Albert Goins is the other attorney,

       8    and you may have met him in the past.

       9            First of all, I just want to talk about a few

      10    things that you just need to keep in mind while we're

      11    going through the depositions.  Have you been through

      12    depositions before?

      13       A   I have just through the city.

      14       Q   So you are somewhat familiar with the process

      15    and the procedure?

      16       A   A little, yeah.

      17       Q   Basically, I'll just be asking you questions,

      18    and I just want you to give a frank response, an honest

      19    response.  You were sworn in, so you are under oath,

      20    everything that you say.
```

21          It's possible that your attorney may object to

22   some things that are being asked, and, if so, just wait

23   for your attorney's instructions on that.

24          Make sure that you are giving verbal responses

25   and not nodding or shaking your head or "uh-huh" or that

5

1    type of thing.

2         A    Okay.

3         Q    "Yes" or "no" is what we need or whatever the

4    answer is.

5              And that's pretty much all I have right now.  Do

6    you have any questions before we get started?

7         A    No.

8         Q    Okay.  Officer, could you please state and spell

9    your name for the record?

10        A    Sure.  It's Roger Dean Smith.  It's R-O-G-E-R,

11   last name Smith, S-M-I-T-H.

12        Q    Okay.  And who is your employer?

13        A    City of Minneapolis.

14        Q    What specific department?

15        A    I work for the STOP or SWAT Division right now.

16        Q    Okay.  Of the Minneapolis Police Department?

17        A    Yes.

18        Q    Okay.  And how long have you been employed with

19   Minneapolis Police Department?

20      A    Since September of 1993.  So I'm in my 14th

21  year.

22      Q    Okay.  And how long -- or I'm sorry.  How long

23  have you been a police officer?

24      A    For that amount of time.

25      Q    Okay.  What did you do prior to being a police

6

1   officer for the City of Minneapolis?

2       A    I was a manager for a convenience store.

3       Q    Okay.  Have your job assignments with the

4   Minneapolis Police Department stayed the same over the

5   years, or have they changed?

6       A    Pretty much stayed the same.

7       Q    And so you've been on the SWAT team then for the

8   entire time?

9       A    I've been on the SWAT team for six, seven years.

10      Q    Okay.  And what does that mean?  What is the

11  SWAT team?

12      A    SWAT team basically does callouts for

13  operations, you know, of somebody that's held up with

14  guns.  We also do entries for other cities that are

15  looking for criminals within the city.

16      Q    Okay.  And what does an entry entail?

17      A    An entry?  An entry would entail a sergeant to

18  do a recon of the address, of the house and then

19  basically getting all the information about the house and

20    then relaying that to the officers that are going to be

21    doing the entry.

22         Q    And are SWAT officers -- or excuse me.  Do SWAT

23    officers receive specialized training to participate in

24    that type of work?

25         A    Yes.


7

1         Q    Okay.  And what type of training is that, and

2    how long does it last, I guess?

3         A    You know, it's ongoing training throughout.  I

4    mean, every year, you go through --

5         Q    Continuing education?

6         A    -- training, yeah.

7         Q    How many times prior to this case have you been

8    a named defendant in a lawsuit involving the Minneapolis

9    Police Department in which so and so rights have been

10    alleged to have been violated?

11              MS. NELSON:  I'll object as relevant --

12         irrelevant, not relevant.

13              You can answer.

14              THE WITNESS:  You know, maybe one or two

15         possibly, that I can recall.

16    BY MS. SULLIVAN:

17         Q    Do you at all recall the circumstances of those

18    particular cases?

19                MS. NELSON:  Same objection.

20                You can answer.

21   BY MS. SULLIVAN:

22        Q   Were they similar in terms of the type of

23   entry --

24        A   No.

25        Q   -- that you had here in this case?


8


1        A   No.

2        Q   Okay.  How many internal affairs complaints have

3   been filed against you?

4                MS. NELSON:  Same objection.

5                You can answer.

6                THE WITNESS:  None that I know of.

7   BY MS. SULLIVAN:

8        Q   And how many high risk entry warrants do you

9   think, just approximately, that you may have assisted on

10   or been part of over the six or seven years you've been

11   on the SWAT team?

12        A   Probably 250 to 300.

13        Q   Do you receive any specialized training

14   regarding dealing with elderly, ill, or young children

15   when exercising a high risk or other type of warrant?

16        A   No.

17        Q   In your participation in these type of warrants

18   then, is it safe to say that you don't deal with or

19    behave differently toward elderly, young, or ill people?

20              MS. NELSON:  Objection, mischaracterizes

21         previous testimony.

22              MS. SULLIVAN:  Okay.  Do you want me to

23         rephrase it, or do you want him to answer the

24         question?

25              MS. NELSON:  If you understand the

9

1         question, you can answer it.  If you need her to

2         clarify it, then please ask her to.

3    BY MS. SULLIVAN:

4         Q    I can clarify it for you.

5         A    Yeah, clarify it.

6         Q    No problem.  My question was, first, do you

7    receive any specialized training in doing these type of

8    warrants with specifically elderly, ill, or young

9    children.  I can break that up for you if that's easier.

10   Do you handle high risk warrants -- or high risk entries,

11   I'm sorry, the same as with a normal adult that you would

12   if you saw someone who was ill or elderly when you

13   entered the home?

14              MS. NELSON:  I'll object as vague, too, as

15         in what specific --

16              MS. SULLIVAN:  I asked about his behavior

17         and how he dealt with those individuals initially.

18            MS. NELSON:  Okay.

19            THE WITNESS:  You know, it's a pretty much

20       common sense deal, you know, you -- just like you

21       would in a squad.  I mean, it's -- you see what you

22       see, and you deal with it as it comes.

23  BY MS. SULLIVAN:

24       Q   Okay.  So but I'm still trying to get an

25  understanding of what is different about how you would

10

1   deal with an ill person if you encountered them on a high

2   risk entry warrant.

3       A   I mean, without getting into specifics, I mean,

4   if somebody is in a wheelchair, you deal with that

5   differently, you know.

6       Q   And what do you mean by differently, though?  I

7   mean, do you --

8       A   Well, you still want to see hands, but that

9   person might not be able to show you their hands, you

10  know, if they're in a wheelchair.  So you still -- I

11  mean, people can hide stuff in wheelchairs and hide their

12  hands and all kinds of things, so.

13      Q   Okay.  But the bottom line is that you take

14  their condition under consideration.  Is that accurate?

15      A   Yeah.

16      Q   Okay.  And when you're dealing with young

17  children or infants, would the same be the case?

18     A    Yes.

19     Q    Okay.  I just want to turn your attention to the

20   incident for which we're here talking about.  Were you

21   part of the team that entered the home located at 3845

22   Second Avenue South in Minneapolis, Minnesota?

23     A    Yes, I was.

24     Q    I'm sorry.  And that was on January 13, 2005?

25     A    Yes.


11


1     Q    Okay.  And what information were you provided

2   with during the briefing?

3     A    Just the briefing that -- I mean, I guess I

4   can't recall exactly what was said.  But we're briefed

5   about the whole entire house and who the suspects are

6   that we're looking for.

7     Q    Okay.  So you believe that there were more than

8   one -- there was more than one suspect?

9     A    That I -- I mean, that I can recall, yes.

10     Q    Do you have your police report with you?

11     A    No, I don't.

12     Q    Okay.  Would you like to take a look at it to

13   refresh your memory just to give me a better

14   understanding of how you were briefed?

15     A    Sure.

16          MS. NELSON:  Are you going to mark that as

17     an exhibit?

18         MS. SULLIVAN:  We can, yes.

19         (Deposition Exhibit Number 1

20         was marked for identification and is

21         attached herewith.)

22  BY MS. SULLIVAN:

23    Q   If you could just glance over that, Officer

24  Smith, and just if that hopefully refreshes your memory

25  about how you were briefed prior to going into this


12


1  entry, and just could you explain how you were briefed

2  and what information you were given?

3    A   Well, basically, we were briefed.  Basically, my

4  whole first paragraph says, you know, that we're looking

5  for an armed suspect from a robbery and that I was going

6  to be assigned to the 12th -- or to the ram team.

7    Q   Okay.  All right.  Does that refresh your memory

8  sufficiently?

9    A   Yeah.

10    Q   All right.  Okay.  Thank you.  And so the

11  information you were given didn't include a description

12  of the individual?

13    A   Not that I recall.

14    Q   Did you receive the person's age, any

15  identifying information regarding this individual?

16    A   Not that I recall.  I thought I put it in the

17  report, but.

18      Q   How were you to know you were encountering the

19  alleged suspect if you didn't have any identifying

20  information about him?

21      A   Basically, when we go into a warrant, we secure

22  everybody that's in there.  And once we secure everybody

23  and make sure that they don't have weapons on them, then

24  the investigators come in after that.

25      Q   Okay.  All right.  I want to turn your attention


13


1   more back to the details of the entry.  Where were you in

2   the line in terms of were you first, second coming into

3   the home?

4       A   Going into the home, you mean after -- we were

5   going to go up to hit the door with the ram, but the door

6   was open, so.

7       Q   It was unlocked you mean?

8       A   Right.

9       Q   Okay.

10      A   Unlocked.  So I took the ram, set it down on the

11  porch, and then we entered -- we're basically one of the

12  last two to enter, the two ram guys are, after everybody

13  else does, so.

14      Q   Okay.  So you were one of the last people to

15  enter the house at that time --

16      A    Yeah.

17      Q    -- on the SWAT team?  At the time that you

18   entered, do you recall what you observed when you walked

19   into the home?

20      A    A lot of screaming, kids yelling.

21      Q    How many kids do you recall?

22      A    I couldn't tell you for sure.

23      Q    Okay.  Do you have an estimate?  I mean, it was

24   more than one for sure --

25      A    For sure, yeah.


14


1      Q    -- I'm assuming, since you say kids?

2      A    Yeah.

3      Q    Do you think it was more than two?

4      A    It was probably five maybe.

5      Q    Maybe five?  Okay.  Do you recall their ages?

6      A    No.

7      Q    Do you recall if any of them were infants?

8      A    I don't believe so.

9      Q    As a result of the incident, are you aware of

10   whether the robber suspect was actually arrested?

11      A    I'm unaware.

12      Q    Do you know if anybody was arrested as a result

13   of the incident?

14      A    No.

15      Q    No, nobody was arrested, or no, you don't know?

16       A    No, I don't know if anybody was.

17       Q    All right.  I have a couple more questions.  In

18  your supplemental police report, you indicated that the

19  adult women that you initially encountered were screaming

20  frantically and asking for a search warrant.  Was a

21  search warrant shown to them at any point, to your

22  knowledge?

23       A    Not that I know of.

24       Q    Why not?

25       A    We don't carry -- we don't carry the search


15


1  warrant with us.

2       Q    Did they ask about the search warrant or the

3  field sergeant, or did you hear them ask about the search

4  warrant or the field sergeant?

5       A    When we were securing people, yeah.

6       Q    And what was your response?

7       A    I don't know if I even responded.  I can't

8  recall.

9       Q    Do you normally respond if someone asks for a

10  search warrant or a --

11       A    If they would ask me personally, yeah.

12       Q    You say in your report that the older male that

13  you encountered had to be forced to the ground.  Who

14  forced him to the ground?

15      A   You know, with everybody that was there, I, you

16   know, I can't recall for sure who would have put him to

17   the ground.  I think I might have assisted.  I can't

18   recall who else might have done it.

19      Q   Did you notice if the older gentleman may have

20   appeared ill?

21      A   He didn't appear to me to be, you know, ill.

22      Q   He appeared older or elderly, though?

23      A   Older, yeah.

24      Q   Did you notice the stint in his neck?

25      A   No.


16

1      Q   Did you notice how long he was on the ground?

2      A   No, I don't know.

3      Q   Would you say it was a significant period of

4   time?

5              MS. NELSON:  Objection, vague.

6              THE WITNESS:  No.

7   BY MS. SULLIVAN:

8      Q   No, it was not?

9      A   No.

10      Q   Do you recall what the weather was like on that

11   day, Officer Smith?

12      A   No, I don't.

13      Q   It was January in Minnesota, so you probably

14   could guess it was cold, you're just not sure exactly?

15     A    Right.

16     Q    Would you normally leave someone who was ill or

17   elderly in front of an open doorway in extreme or cold

18   temperatures while securing a warrant or high risk

19   warrant?

20     A    Well, we're -- I mean, we're certainly not going

21   to look behind us to see what we left open.  You

22   understand, because then you're taking your eyes off --

23     Q    I understand that.

24     A    So no.

25     Q    No, you would not normally leave them --

17

1     A    No.

2                MS. NELSON:  Wait.

3                THE WITNESS:  Repeat that question.

4   BY MS. SULLIVAN:

5     Q    Would you normally leave an elderly or ill

6   person in front of an open doorway --

7     A    No.

8     Q    -- in cold temperatures or in frigid

9   temperatures?

10     A    No.

11     Q    But in this case, the elderly gentleman was left

12   in front of the doorway.  Can you give me any kind of

13   explanation or give me an understanding of why that

14   happened?

15      A   I have no answer.  I mean --

16      Q   Okay.  And you said you don't normally look

17   behind you because you don't want to take your eyes off

18   of what's going on.  And that's understandable.  But what

19   if the person is bringing to your attention that the door

20   is open, and they are ill or cold and that type of thing.

21      A   Just depends if they're secure or not, I mean,

22   if the whole area is under control.

23      Q   If the individual is secure or the entire

24   residence is secure?

25      A   Basically, everybody that's -- everybody that's

18

1   in the room, that's in the house.

2      Q   Do you recall whether you thought or felt that

3   the women and children in the living room area when you

4   first encountered them, whether they presented any kind

5   of threat to you or any of the officers?

6      A   I don't recall if they were a threat or

7   anything.  I mean, the other officers went, you know,

8   completely past them.  But they were, you know -- I mean,

9   it's pretty hard to, you know, think of what a threat

10   could be, because once you let your guard down on

11   something like that, that's when something terrible

12   happens.

13      Q   That's understandable.  I guess what I'm trying

14    to understand, though, is do you recall handcuffing any

15    of the women or children who were in the area?

16        A    No.

17        Q    And do you normally in a high risk situation

18    cuff individuals who seem to be presenting some sort of

19    threat to you?

20        A    Not right away.

21        Q    But you do cuff them at some point?

22        A    (Nods head.)

23        Q    All right.  But you don't recall cuffing the

24    women and children at all --

25        A    No.


19


1         Q    -- during the encounter?  So would it be safe to

2     say that you did not feel that they presented any kind of

3     a threat to you or to any of the other officers?

4         A    I wouldn't say that.

5         Q    Well, then please explain why you wouldn't cuff

6     them at any point.

7         A    We would as a team cuff them.  But they are just

8     going to be secured at gunpoint, you know, not direct

9     gunpoint.  I'm not going to be pointing my gun directly

10    at you, but I might have it at a ready position just in

11    case a gun was presented.

12        Q    Okay.  I'm just trying to again understand here.

13   So are you saying that in lieu of cuffing them, you would

14   gun check them?  Is that what you're saying?

15        A    Somebody would check them and then handcuff

16   them, or, you know, I don't know if the investigators

17   came in.  I couldn't tell you.  I mean, I can't recall

18   two years ago what happened exactly at that residence.

19   But, basically, that's typically -- and one person or two

20   persons that are assigned to the team usually go and cuff

21   people while everybody else is securing and so -- until

22   they're cuffed.

23        Q    Okay.  So if someone wasn't cuffed, then the

24   exception would be that the area was secure, and those

25   individuals didn't pose a threat then.  I'm just trying


20


1   to get an understanding.

2        A    If somebody was not cuffed?

3        Q    Right.  If they were never cuffed, and you had

4   been through, you had looked around, done whatever you

5   had to do while you were in there, the assumption then

6   would be that they did not pose a threat?

7        A    I would say that that's up to the investigators.

8   So that's not even on our --

9        Q    Okay.  I'm asking you as a SWAT team member,

10   would the assumption be since you did not cuff that

11   individual, and you're the individuals who are going in

12   first doing the surveying and clearing of the area, would

13    the assumption be that there was no threat that was being

14    posed by those individuals?

15        A    Still, I guess, I mean, you're going to have to

16    rephrase it differently.

17        Q    Well, okay.  Let me just --

18        A    I would see them as a threat until they're

19    searched and until the area is searched around them.

20        Q    Okay.  And do you normally search the area and

21    search the individuals fairly soon as you --

22        A    We search the individuals, and then the

23    investigators search the area.

24        Q    Okay.  Let me finish my question.  My question

25    was, do you normally search the area upon entering into

21

1    the residence or upon entering into the building?

2        A    No.

3        Q    Okay.  At what point would you have searched the

4    area?

5        A    We wouldn't.  The SWAT team wouldn't.

6        Q    Okay.  Excuse me.  I thought you just said that

7    you searched the area, and the investigators searched the

8    individuals.

9        A    Switch that around.

10        Q    The other way around?

11        A    Yeah.

12      Q    Okay.  So at what point would you search the

13  individuals?  Immediately upon entering into the house or

14  sometime later?

15      A    Once they're secure.

16      Q    Do you know if anyone, any of the other officers

17  involved or yourself, attended a hearing relating to this

18  particular incident involving one of the Plaintiffs?

19      A    I don't know.  I don't know if anybody did.

20      Q    Did you?

21      A    No.

22      Q    Okay.  And let me just clarify.  When I say

23  hearing, I mean a criminal hearing regarding a disorderly

24  conduct matter that the individual was charged with as a

25  result of this incident.  And you're saying you did not


22


1   attend that hearing?

2       A    I did not.

3       Q    And you don't recall whether or not or you don't

4   know whether any of the other officers involved attended?

5       A    I don't know.

6               MS. SULLIVAN:  Okay.  I don't have

7           anything else for you right now.

8               MS. NELSON:  I don't have anything.  We'll

9           read and sign.

10

11          (Deposition concluded at 10:55 a.m.)

12                            **********
13

14

15

16

17

18

19

20

21

22

23

24

25

23

1              REPORTER'S CERTIFICATE

2

3     STATE OF MINNESOTA)
                        )   ss.
4     COUNTY OF HENNEPIN)

5              I hereby certify that I reported the deposition
      of OFFICER ROGER SMITH, on the 28th day of March, 2007,
6     in Minneapolis, Minnesota, and that the witness was by
me
      first duly sworn to tell the whole truth;
7
               That the testimony was transcribed by me and is
a
8     true record of the testimony of the witness;

9              That the cost of the original has been charged
to

the party who noticed the deposition, and that all
10      parties who ordered copies have been charged at the
same
        rate for such copies;
11
                That I am not a relative or employee or
attorney
12      or counsel of any of the parties, or a relative or
        employee of such attorney or counsel;
13
                That I am not financially interested in the
14      action and have no contract with the parties,
attorneys,
        or persons with an interest in the action that affects
or
15      has a substantial tendency to affect my impartiality;

16              That the right to read and sign the deposition
by
        the witness was reserved.
17
                WITNESS MY HAND AND SEAL, this 31st day of
March,
18      2007.

19      _____

20      Lori L. Morrow, RPR, CRR
        Notary Public, Hennepin County, Minnesota
21      My commission expires:  January 31, 2010

22

23

24

25

*Plain Text Attachment*

1

1       STATE OF MINNESOTA                    DISTRICT COURT

2       COUNTY OF HENNEPIN       FOURTH JUDICIAL DISTRICT
        **************************************************
3       Charles Everett Cook, Sylvia Mae Cook,
        and Timothy Blake Cook, natural persons,

```
 4
                       Plaintiffs,
 5
            v.
 6
        City of Minneapolis, a municipal entity; Minneapolis
 7      Police Officer Mark Johnson, Badge #003459, in his
        individual, personal and official capacity; Sgt. D.
 8      Smulski, in his individual, personal and official
        capacity; Officer K. Blackwell, in his individual,
 9      personal and official capacity; Officer Geoffrey
        Toscano, Badge #007257, in his individual, personal and
10      official capacity; Officer Bevan Blauert, Badge
        #003459, in his individual, personal and official
11      capacity; Officer Jon Petron, Badge #5671, in his
        individual, personal and official capacity; Officer
12      Christopher House, Badge #3165, in his individual,
        personal and official capacity; Sgt. Robert Kroll,
13      Badge #003874, in his individual, personal and official
        capacity; Officer Christie Nelson, Badge #4959, in his
14      individual, personal and official capacity; Officer
        William Willner, Badge #7783, in his individual,
15      personal and official capacity; Officer Westlund, Badge
        #7674, in his individual, personal and official
16      capacity; Officer Roger Smith, Badge #006689, in his
        individual, personal and official capacity; Officer
17      Jason King, Badge #003704, in his individual, personal
        and official capacity; Officer Timothy Hanks, Badge
18      #002660, in his individual, personal and official
        capacity; and Officers Jane Doe and Richard Roe,
19      unknown and unnamed Minneapolis Police Officers, in
        their individual, personal and official capacities;
20
                       Defendants.
21      ***************************************************
                       DEPOSITION OF
22                 OFFICER TIMOTHY HANKS

23                 Taken March 28, 2007
                   Scheduled for 11:30 a.m.
24
              Reported By:  Lori Morrow, RPR, CRR
25      PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545
```

2

```
 1              Deposition of OFFICER TIMOTHY HANKS, taken on
the

 2      28th day of March, 2007, commencing at 11:22 a.m., at
the
```

```
 3      CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

 4      Street, Suite 300, Minneapolis, Minnesota, before Lori

 5      Morrow, Registered Professional Reporter and Certified

 6      Realtime Reporter and a Notary Public in and for the

 7      State of Minnesota.

 8

 9                           APPEARANCES:
10
        On Behalf of the Plaintiffs:
11
            Maya C. Sullivan, Esquire
12          LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
            941 Hillwind Road NE
13          Suite 200
            Minneapolis, Minnesota 55432
14          (763) 515-0092
            Fax (763) 515-0093
15
        On Behalf of the Defendants:
16
            Tracey L. Nelson, Esquire
17          CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
            333 South 7th Street
18          Suite 300
            Minneapolis, Minnesota 55402
19          (612) 673-2063

20                      **********

21              NOTE:  The original transcript will be
delivered
            to Maya C. Sullivan, Esquire, pursuant to the
applicable
22          Rules of Civil Procedure.

23

24

25
```

3

```
 1                          INDEX

 2    WITNESS:

 3    Officer Timothy Hanks

 4
      EXAMINATION BY:             PAGE:
 5
      Ms. Sullivan...............4
 6

 7    OBJECTIONS BY:

 8    Ms. Nelson.................6, 17

 9
      EXHIBITS MARKED AND REFERRED TO:        (NONE)
10
                      **********
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1             OFFICER TIMOTHY HANKS,

2     duly sworn, was examined and testified as follows:

3                      EXAMINATION

4     BY MS. SULLIVAN:

5        Q   Officer Hanks, my name is Maya Sullivan, as I

6     said, and I'm one of the attorneys for the Plaintiffs in

7     this matter.  The other one is Albert Goins, who you may

8     or may not know.

9             I just want to give you a few just introductory

10    pieces of information before we get started.  First of

11    all, have you ever taken part in a deposition?

12       A   Yes.

13       Q   Okay.  So you are kind of familiar with the

14    procedure and what goes on in a deposition then?

15       A   Yes.

16       Q   Okay.  Just a couple of things.  I will be

17    asking you questions.  Your attorney may follow up with

18    cross-examination.  She may also object.  If she does,

19    please just follow her instructions regarding whether you

20    should respond or answer the question.

21            I do need you to give verbal answers and not

22    nodding or "uh-huh" and that type of a thing.

23            Do you have any questions before we get started?

24       A   No.

25       Q   Okay.  Officer, can you please state and spell

1    your name for the record?

2         A    Timothy, T-I-M-O-T-H-Y, Hanks, H-A-N-K-S.

3         Q    Thank you.  And who is your employer?

4         A    City of Minneapolis.

5         Q    Okay.  And what department?

6         A    Police.

7         Q    And how long have you been employed by the

8    Minneapolis Police Department?

9         A    Since 1993.

10        Q    Okay.  And during that time as an officer with

11   the Minneapolis Police Department, have your assignments

12   changed over the years?

13        A    Yes.

14        Q    Okay.  And what is your current assignment?

15        A    I'm assigned to the STOP unit.

16        Q    Okay.  And was your assignment to the STOP unit

17   on the day of this incident, which was January 13, 2005?

18        A    I don't remember.

19        Q    Do you recall approximately how long you've been

20   with the STOP unit?

21        A    Since its inception.  So I think it's been two

22   years now.  So I think that might have been right around

23   that area when we were transitioning.

24        Q    Okay.  And by whom were you employed before the

25   Minneapolis Police Department?  Or were you a police

6

```
 1   officer prior --

 2        A    Before?  No.

 3        Q    Okay.  So this was your first police position?

 4        A    Yes.

 5        Q    Okay.  What field did you work in before?

 6        A    I was a personal trainer.

 7        Q    Okay.  How many times prior to this case have

 8   you been named as a defendant in a lawsuit involving the

 9   police department violating someone's civil rights?

10             MS. NELSON:  I'll object as irrelevant.

11             You can answer.

12             THE WITNESS:  One.

13   BY MS. SULLIVAN:

14        Q    Do you recall whether any internal affairs

15   complaints have been filed against you?

16             MS. NELSON:  Same objection.

17             Go ahead and answer.

18             THE WITNESS:  No.

19   BY MS. SULLIVAN:

20        Q    You don't recall, or there haven't been any?

21        A    There haven't been any.

22        Q    Okay.  Have you received special training in

23   conducting high risk entry warrants?

24        A    Yes.

25        Q    Okay.  And in that training, do you all receive
```

7

```
 1    any kind of distinct trainings regarding handling or

 2    dealing with the elderly or ill individuals who you may

 3    encounter on those warrants or on those entries?

 4         A    No.

 5         Q    You do not?

 6         A    No.

 7         Q    Okay.  How do you normally handle the elderly or

 8    ill individuals when you encounter them as opposed to a

 9    perfectly healthy adult in that type of an entry?

10         A    I guess it's discretionary.  You know, you use

11    your own discretion.

12         Q    And what does that mean, that if you use your

13    discretion, you may treat them less aggressively, or what

14    does that mean?

15         A    If they pose a threat, I use the necessary

16    force.  If they don't, then you don't use the necessary

17    force.

18         Q    Were you part of the team that entered 3845

19    Second Avenue South in Minneapolis on January 13, 2005?

20         A    Yes.

21         Q    And what information were you provided regarding

22    this entry during the briefing?

23         A    Be more specific, would you?

24         Q    What information were you given about what you

25    were going there to do, or who were you looking for?
```

8

1      A    The information that we had was -- or that I
2  received was that we were looking for a robbery suspect.
3      Q    Do you recall if you received a description of
4  the individual?
5      A    Other than that he was a black -- a teenage,
6  black male.
7      Q    Okay.  So you did know he was a teenage, black
8  male?
9      A    Yeah.
10     Q    When you entered the home, can you explain or
11 describe what you saw or observed?
12     A    When I came up to the front door, the front door
13 was unlocked, and I opened it and announced "police
14 search warrant" loud.  There were three or four women and
15 some children sitting in the living room.  That's right
16 inside the front door and off to the right.  Everyone's
17 hands I saw, so, I mean, they weren't -- because I think
18 they were holding kids, so nobody was ordered to the
19 floor for the fact that they had children in their hands.
20     Q    Do you remember how many children were in the
21 room or in the area?
22     A    No.
23     Q    Do you know if there was more than one child?
24 You said children, so.
25     A    Yeah, there was more than one.  I would say two

9

1    to three.

2         Q    Okay.  Were the children crying?

3         A    I don't recall.

4         Q    Do you recall the demeanor of the children or

5    the women at all?

6         A    The women seemed frightened, I mean, because we

7    startled them when we came in.

8         Q    Do you recall anyone asking for the search

9    warrant or to view the search warrant?

10        A    I did hear someone say that, but I couldn't tell

11   you who it was.

12        Q    Do you recall if anyone responded?

13        A    No.

14        Q    No, no one responded, or no, you don't recall if

15   anybody responded?

16        A    No, I don't recall.

17        Q    Is a warrant normally shown if someone asks for

18   it?

19        A    Not right away, no.

20        Q    But it is shown at some point?

21        A    I'm not an investigator, so that is not my role.

22        Q    Okay.  Did you instruct them to ask one of the

23   investigators?

24        A    No.

25        Q    Or did anyone instruct them to ask one of the

10

1    investigators for the warrant?

2        A    I just want to clarify.  I mean, I just want to

3    be sure.  Are you talking about when we're actively

4    moving through this house --

5        Q    Right. you said that you did --

6        A    -- to do the search?

7        Q    -- hear somebody ask for the warrant, and you

8    said you don't recall responding or anybody else

9    responding --

10       A    No.  As the team is doing -- or clearing the

11   house, they wouldn't receive a response right away until

12   the investigators came in and -- until the investigators

13   who actually have the search warrant would come in.

14       Q    I understand you're saying that those are the

15   individuals who would actually show them the warrant.

16       A    Right.

17       Q    But I'm asking whether or not you instructed

18   them to ask the investigators when they came into the

19   home.  So, for example, how are they to know that you

20   wouldn't personally or you all on the SWAT team wouldn't

21   personally have the warrant?

22       A    The question wasn't directed to me, so no, I

23   don't know if someone responded or not.

24       Q    Okay.  All right.  Do you know whether or not

25   the robbery suspect or the alleged robbery suspect was

11

1    arrested as a result of this incident?

2        A    I think he was taken into custody.

3        Q    But you're not sure?

4        A    We retrieved two males from the -- two teenage

5    males from the second floor of the house.  So I don't

6    remember if they actually had had him in custody or not,

7    no.  My job is to secure the house.

8        Q    Okay.  With regard to others who were in the

9    household at the time of the incident, do you recall if

10   anyone else was arrested as a result of it?

11       A    No, I don't recall.

12       Q    Do you recall the elderly -- the more elderly,

13   or older, gentleman who was in the home at the time of

14   the incident?

15       A    Yes.

16       Q    Okay.  And at one point, the police report, the

17   main police report indicates that he was forced to the

18   ground.  Did you assist in forcing him to the ground?

19       A    No.

20       Q    Do you know who did?

21       A    It was Sergeant Kroll.

22       Q    Is that the only person?

23       A    Yes.

24       Q    Did you notice whether or not the gentleman

25   appeared to be ill?

12

```
 1      A    No.

 2      Q    No, you didn't notice?

 3      A    No, I didn't notice that he looked ill.

 4      Q    Okay.  Did you notice the stint hanging out of

 5   his neck?

 6      A    No.

 7      Q    Do you recall the weather on that day?

 8      A    Middle of January, I think, and it was cold and

 9   wintery.

10      Q    Right.  But you don't know for sure the exact

11   weather.  You just know it was probably cold since it's

12   Minnesota, and it was the middle of January?

13      A    Yes.

14      Q    Do you recall how long the elderly gentleman was

15   required to remain on the floor after being put on the

16   floor?

17      A    As far as a timetable, no.

18      Q    Okay.  Do you recall the positioning of his body

19   in relationship to the front door when he was placed on

20   the ground -- or forced onto the ground?  I'm sorry.

21      A    Like the distance from where he was at to the

22   front door?

23      Q    Right.

24      A    About 15 feet.
```

25      Q   Fifteen feet?


13


 1      A   I would say.  I don't know what -- I mean, in

 2   proximity to the front door, he was actually -- I mean,

 3   he would be -- I'm trying to remember the way the house

 4   is set up.  The front door is here.  He was probably

 5   here.  So about 10 to 15 feet maybe.

 6      Q   Okay.  You said the front door is here, and he's

 7   probably here.  And here meaning -- is that near where

 8   the stairs begin then?

 9      A   Yes.

10      Q   Okay.  So you're saying you think it's about 10

11   to 15 feet from the front door --

12      A   Yes, just --

13      Q   -- to the stairs?

14      A   -- my guesstimation.

15      Q   Okay.  And you think that he was simply right

16   there at the bottom of the stairs then?

17      A   Yeah.  He was just to the stairs and -- he was

18   probably about here.  But I don't -- yeah, just at the

19   base of the stairs and maybe to the right -- to the left

20   of the stairs if you're facing the stairway in the house.

21      Q   Okay.  Do you recall his wife or him asking for

22   a blanket or something to cover him up with as he lie on

23   the ground?

24      A   No.

25      Q    Okay.  If you had heard that, would you have

14

1    attempted to assist him with that?

2       A    If I would have heard that, yes.

3       Q    Do you normally assist if you see someone is ill

4    or sick or elderly in this type of a situation if they

5    ask or inquire about a blanket or something to that

6    degree?

7       A    Yes.

8       Q    And I just want to clarify something.  Earlier,

9    you said that you don't recall whether or not anybody was

10   arrested as a result of this incident.  Is that correct?

11      A    We had -- we -- once we secure the residence and

12   everyone is taken into custody, we leave.  Whatever the

13   investigators do after that, I mean, we might find out

14   later, you know.  And so I don't recall.  I just --

15   there's a lot of incidents I don't know if people are

16   taken into custody.

17      Q    Okay.  So you just don't know?

18      A    Yeah.

19      Q    All right.  Can you give me an idea of once you

20   walked into the home, once you entered into the home --

21   first of all, it sounded like you were saying you were

22   first because you said you opened the door and walked in.

23   Is that correct, or is that accurate?

24      A   Yes.

25      Q   Okay.  So you were the first one to actually

15

1   walk into the home.  And at that time, is that when you

2   yelled or began to say "search warrant" or "police," that

3   type of thing?

4       A   As soon as the door is breached or as soon as

5   the door was opened, yes.

6       Q   And were other officers saying that at the same

7   time as you, or was it just you?

8       A   It was a number of us.  We all say that.

9       Q   Okay.  Did you go to the second level to secure

10  the robbery suspect, or was that other officers who --

11      A   I was on the second level.  I went to the second

12  level.

13      Q   Along with?

14      A   Sergeant Kroll, and I don't remember who the

15  third person was.

16      Q   If you enter a home, particularly on a high risk

17  entry situation, and you perceive someone or persons to

18  be a threat, what procedure do you use, or what do you

19  do?

20      A   What type of threat, though?  You have to be --

21      Q   A harmful threat.

22      A   -- more specific.

23      Q   A threat of harm to you or any of your officers

24   who are with you.

25       A   You will be ordered to the ground at gunpoint.


16


 1       Q   I'm sorry?

 2       A   You will be ordered to the ground at gunpoint.

 3       Q   Is that the only time you order people to the

 4   ground at gunpoint?

 5       A   It is procedure to put everybody down on the

 6   floor at gunpoint when entering on a high risk warrant.

 7       Q   Okay.  I just want to clarify then, because I

 8   asked you if you perceive a threat, what do you do, and

 9   you said that you order them to the ground at gunpoint.

10   But then you said on a high risk warrant you put

11   everybody down.  So that sounds like regardless of

12   whether you perceive a threat or not, you're putting them

13   down to the ground at gunpoint.

14       A   With the exception if you have women with kids,

15   as long as you can see hands, they're not perceived as

16   threats, I mean, obviously.  But as far as a true threat,

17   whichever that may be, I mean, I guess that would be a

18   person who is not showing their hands or a person with a

19   weapon in their hand, something along that line, then you

20   will be ordered to the ground, and then if you don't

21   comply with that, you'll be forced to the ground.

22       Q   Okay.  And at what point do you decide to cuff

23    any of the individuals who may be present at this type of

24    entry?

25         A    Once we have that area secured.  So once all the

17

1    threats are checked out or whatnot, then people will be

2    handcuffed.

3         Q    And at that point, do you generally cuff the

4    women and children, or do you only cuff the males or

5    others who may not be holding children?

6         A    It changes every time.  It's a lot of

7    discretion.  I have seen some women that have kids be

8    cuffed in the front and just given their child back, and

9    I've seen where teams -- where some of us, they don't

10   cuff them at all.  I don't usually cuff people, so it's

11   the discretion of the person who was assigned to doing

12   that.

13        Q    Okay.  You said that you may or may not cuff the

14   women.  I'm just trying to get an understanding.  You

15   said you don't personally, but, I mean, the officer there

16   may or may not cuff the women who are holding children.

17   If they do not cuff them, is that because they may feel

18   that that person is complying with the orders that they

19   have been given?

20            MS. NELSON:  Objection, calls for

21        speculation.

22            You can answer.

23                    THE WITNESS:  Can you repeat the question?

24   BY MS. SULLIVAN:

25        Q    Sure.  If the women who are present are not


18


1    cuffed -- let me back up.  I'm sorry.  You initially said

2    that usually you don't cuff women, or, if you don't, it's

3    because you can see their hands if they're holding

4    children.  But then you said that you may cuff them or

5    other officers may cuff them and then give the child back

6    and cuff them in the front.  And so I'm just trying to

7    understand that if you do not cuff them, or if they are

8    not cuffed, does that mean that they are not being

9    perceived as a threat?

10        A    They're being compliant or -- yeah, they're

11   usually being compliant.  So they're not perceived as a

12   threat.

13        Q    Okay.  Do you normally cuff children?

14        A    No.

15        Q    Do children usually get gun checked?

16        A    Get who?

17        Q    Gun checked, the gun put into their face?

18        A    No.

19        Q    Do you recall that happening in this incident?

20        A    No.

21        Q    You don't recall it happening, or it didn't

22    happen?

23         A    I don't recall it happening.

24         Q    So if it did happen, then that would be out of

25    the ordinary then for the procedure when doing these type


19


1    of entries?

2         A    Yeah, to point a gun at a kid.

3         Q    Yes.

4         A    Yes.

5         Q    Okay.  Did you enter the lower level of the home

6    while you were on the entry?

7         A    The basement?

8         Q    Uh-huh.

9         A    I don't recall.  We usually -- procedure, we

10    usually do clear the basement.  So more than likely, I

11    went down there.  But I don't recall if I did or not.

12         Q    Do you recall encountering -- well, strike that.

13    I'm sorry.  How many males do you recall being in the

14    home?

15         A    A total of four.

16         Q    Okay.  And earlier you indicated that two

17    younger males were upstairs when you went upstairs,

18    correct?

19         A    Yes.

20         Q    And you already talked about the elderly

21    gentleman who was forced to the ground.  So that leaves

22    one additional male.  Where did he come from?

23         A    He came from the second floor with the elderly

24    male.

25         Q    He came from the second floor?


20


1          A    The elderly male and the other guy actually came

2    downstairs as I was coming through the kitchen.

3          Q    Okay.  I'm sorry.  Let me just clarify.  You're

4    saying the elderly male came from upstairs?

5          A    Right.

6          Q    I was actually asking about the fourth male.

7    Where did he come from?

8          A    The fourth male was with him, and they came down

9    the stairs together.

10         Q    Can you describe the fourth male?

11         A    He was a larger black male.  I didn't have any

12    contact with him.

13         Q    Do you recall whether that male was cuffed at

14    all?

15         A    I'm sure he was once we had that -- once the

16    main floor was secured, he was cuffed.

17         Q    Okay.  Do you recall if he was forced to the

18    ground at all?

19         A    He was ordered to the ground.

20         Q    So he was on the ground as well as the elderly

21    gentleman?

22         A    Yes.

23         Q    Okay.  And he was also cuffed?

24         A    Who?

25         Q    The younger of the two.


21


1          A    Yeah, I just stated that.

2          Q    The fourth one?

3          A    Yes.

4          Q    Well, you said he was probably cuffed when you

5    secured the area.

6          A    Yeah.  I mean, once the area was secured, I'm

7    sure he was cuffed.

8          Q    Do you recall any conversation going on between

9    him and any of the officers that took place while you

10   were there?

11         A    I know that he -- there was conversation between

12   him and other officers.  What he was saying I don't know.

13         Q    Was it a loud conversation?

14         A    Yes.  He was very loud.

15         Q    Well, I'm asking about the conversation.  So

16   that also means were the officers loud?

17         A    Not as loud as he would have been, no.  I mean,

18   they weren't upset at him, but he was very upset.

19         Q    Did you physically touch any of the individuals

20   who were in the home during the incident?

21     A    No.

22     Q    Did anybody?

23     A    I can't attest to what other officers did, so I

24  don't know.

25     Q    Okay.  So you did not observe any of the


22


1   officers -- you can't say for sure whether any of them

2   physically touched any of the individuals in the home?

3      A    Well, I mean, Sergeant Kroll, there was contact

4   between Sergeant Kroll and the elderly guy.  And outside

5   of that, no, I don't think so.

6      Q    Okay.  Have you been on any other previous high

7   risk entries with Sergeant Kroll in the past?

8      A    Yes, I have.

9      Q    Do you have an approximate number of how many of

10  those you've done with him?  Just a guess.  It doesn't

11  have to be exact.

12     A    No.  I've been doing this for over 10 years, and

13  I've done close to a thousand of them, so, no, not an

14  exact number.

15     Q    Do you know whether or not you've done like half

16  of them with him or maybe a quarter of them with him or

17  10 percent, just generally?

18     A    In general, no.  I honestly cannot give you a

19  general number.  A general number, because I did one

20   service with him one month, a general number would

21   probably be 35 to 40.

22        Q    Okay.  So it depends on, it sounds like you guys

23   have different types of assignments on a monthly basis,

24   and so that you might end up working with him or some

25   other officers or sergeants doing this type of --


23


1         A    Yeah.  Each team rotates monthly, so a team

2    would rotate on as a primary team to do warrants, and

3    then they have a sergeant.  And so it changes every 28

4    days.

5                   MS. SULLIVAN:   Okay.  I don't have any

6         other questions.

7                   MS. NELSON:   I don't have any questions.

8         We'll read and sign.  Thank you.

9

10        (Deposition concluded at 11:44 a.m.)

11                         **********

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

```
1                    REPORTER'S CERTIFICATE

2

3     STATE OF MINNESOTA)
                       )   ss.
4     COUNTY OF HENNEPIN)

5           I hereby certify that I reported the deposition
      of OFFICER TIMOTHY HANKS, on the 28th day of March,
2007,
6     in Minneapolis, Minnesota, and that the witness was by
me
      first duly sworn to tell the whole truth;
7
            That the testimony was transcribed by me and is
a
8     true record of the testimony of the witness;

9           That the cost of the original has been charged
to
      the party who noticed the deposition, and that all
10    parties who ordered copies have been charged at the
same
      rate for such copies;
11
            That I am not a relative or employee or
attorney
12    or counsel of any of the parties, or a relative or
      employee of such attorney or counsel;
13
            That I am not financially interested in the
14    action and have no contract with the parties,
attorneys,
      or persons with an interest in the action that affects
or
```

15    has a substantial tendency to affect my impartiality;

16          That the right to read and sign the deposition
by
      the witness was reserved.

17          WITNESS MY HAND AND SEAL, this 31st day of
March,
18    2007.

19    _____

20    Lori L. Morrow, RPR, CRR
      Notary Public, Hennepin County, Minnesota
21    My commission expires:  January 31, 2010

22

23

24

25