```
 1    STATE OF MINNESOTA                 DISTRICT COURT

 2    COUNTY OF HENNEPIN      FOURTH JUDICIAL DISTRICT
      ************************************************
 3    Charles Everett Cook, Sylvia Mae Cook,
      and Timothy Blake Cook, natural persons,
 4
                    Plaintiffs,
 5
           v.
 6
      City of Minneapolis, a municipal entity; Minneapolis
 7    Police Officer Mark Johnson, Badge #003459, in his
      individual, personal and official capacity; Sgt. D.
 8    Smulski, in his individual, personal and official
      capacity; Officer K. Blackwell, in his individual,
 9    personal and official capacity; Officer Geoffrey
      Toscano, Badge #007257, in his individual, personal and
10    official capacity; Officer Bevan Blauert, Badge
      #003459, in his individual, personal and official
11    capacity; Officer Jon Petron, Badge #5671, in his
      individual, personal and official capacity; Officer
12    Christopher House, Badge #3165, in his individual,
      personal and official capacity; Sgt. Robert Kroll,
13    Badge #003874, in his individual, personal and official
      capacity; Officer Christie Nelson, Badge #4959, in his
14    individual, personal and official capacity; Officer
      William Willner, Badge #7783, in his individual,
15    personal and official capacity; Officer Westlund, Badge
      #7674, in his individual, personal and official
16    capacity; Officer Roger Smith, Badge #006689, in his
      individual, personal and official capacity; Officer
17    Jason King, Badge #003704, in his individual, personal
      and official capacity; Officer Timothy Hanks, Badge
18    #002660, in his individual, personal and official
      capacity; and Officers Jane Doe and Richard Roe,
19    unknown and unnamed Minneapolis Police Officers, in
      their individual, personal and official capacities;
20
                    Defendants.
21    ************************************************
                      DEPOSITION OF
22                OFFICER BEVAN BLAUERT

23                 Taken March 28, 2007
                  Scheduled for 12:15 p.m.
24
              Reported By:  Lori Morrow, RPR, CRR
25    PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545
```

2

```
     1              Deposition of OFFICER BEVAN BLAUERT, taken on
the

     2     28th day of March, 2007, commencing at 12:48 p.m., at
the

     3     CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

     4     Street, Suite 300, Minneapolis, Minnesota, before Lori

     5     Morrow, Registered Professional Reporter and Certified

     6     Realtime Reporter and a Notary Public in and for the

     7     State of Minnesota.

     8

     9                        APPEARANCES:
    10
           On Behalf of the Plaintiffs:
    11
                Maya C. Sullivan, Esquire
    12          LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
                941 Hillwind Road NE
    13          Suite 200
                Minneapolis, Minnesota 55432
    14          (763) 515-0092
                Fax (763) 515-0093
    15
           On Behalf of the Defendants:
    16
                Tracey L. Nelson, Esquire
    17          CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
                333 South 7th Street
    18          Suite 300
                Minneapolis, Minnesota 55402
    19          (612) 673-2063

    20                      **********

    21              NOTE:  The original transcript will be
delivered
           to Maya C. Sullivan, Esquire, pursuant to the
applicable
    22     Rules of Civil Procedure.

    23

    24

    25
```

3

```
 1                          INDEX

 2   WITNESS:

 3   Officer Bevan Blauert

 4
     EXAMINATION BY:            PAGE:
 5
     Ms. Sullivan...............4
 6

 7   OBJECTIONS BY:

 8   Ms. Nelson.................8

 9
     EXHIBITS MARKED AND REFERRED TO:        (NONE)
10

11                    **********

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              OFFICER BEVAN BLAUERT,

 2   duly sworn, was examined and testified as follows:

 3                    EXAMINATION

 4   BY MS. SULLIVAN:

 5      Q   Officer Blauert, as I said, my name is Maya

 6   Sullivan, and I am one of the attorneys representing the

 7   Plaintiffs in this matter.  The other one is Albert

 8   Goins.

 9           Just for the record, can you initially state and

10   spell your name, first and last names.

11      A   My first name is Bevan, B-E-V-A-N, and last name

12   Blauert, B-L-A-U-E-R-T.

13      Q   Thank you.  And have you taken part in

14   depositions in the past?

15      A   Yes.

16      Q   Okay.  I just want to give you a few reminders

17   about procedure while we're here doing the deposition.

18           First, I will ask that when you're responding to

19   questions that you give verbal answers.  Don't nod your

20   head or shake your head or say "uh-huh," that type of

21   thing.  Please make it clear for the record.

22           And at times your attorney may object or give

23   you different types of instructions regarding answering

24   questions.  Please make sure that you wait for her to

25   give you the instructions that may be necessary.  Do you
```

5

1    have any questions at this point?

2       A    No.

3       Q    Okay.  Thank you.  Officer Blauert, who is your

4    employer?

5       A    City of Minneapolis Police Department.

6       Q    All right.  How long have you been employed by

7    the Minneapolis Police Department?

8       A    Fifteen years.

9       Q    And prior to working for the Minneapolis Police

10   Department, were you an officer elsewhere?

11      A    No.

12      Q    Were you in a different, completely different

13   field?

14      A    No.

15      Q    You were in the law enforcement field?

16      A    No.  I was a student.

17      Q    Okay.  Over the 15 years that you have worked

18   for the Minneapolis Police Department, have your

19   assignments changed?

20      A    Yes.

21      Q    And what is your current assignment?

22      A    The Fifth Precinct.

23      Q    All right.  And at the time of the incident,

24   which was January 13 of '05, were you assigned to the

25   Fifth Precinct?

6

1      A   Yes.

2      Q   Okay.  Were you assigned to any particular team?

3      A   No.  I was working the street that day, I

4   believe.

5      Q   Okay.  Did you receive special training

6   regarding conducting high risk entries?

7      A   Yes.

8      Q   Okay.  And how long ago did you start working

9   with or participating in those type of entries?

10      A   I've been doing high risk warrants for

11   approximately 10 years.

12      Q   Okay.  Have you received any specific training

13   regarding conducting -- excuse me.  I have a cold.  I

14   apologize -- regarding conducting high risk warrants when

15   there are elderly or ill individuals in the residence or

16   in the home?

17      A   We conduct high risk warrants with all ages,

18   shapes, sizes, races.  It doesn't matter.

19      Q   Okay.  I guess what I'm trying to get at is

20   whether or not you would approach a perfectly healthy

21   adult person the same way that you might approach, say,

22   an ill adult that you see or encounter, or an elderly

23   adult who you encounter in these circumstances?

24      A   I don't believe we've received any training in

25    specific to age.  However, I have done high risk warrants

7

1    with elderly individuals.

2        Q    So you said you don't receive training regarding

3    age.  But you do have experience.  I guess that's what

4    you're saying --

5        A    Correct.  Everybody is treated the same in a

6    high risk warrant.

7        Q    Were you part of the team that entered 3845

8    Second Avenue South in Minneapolis on January 13 of 2005?

9        A    Yes.

10        Q    And what information were you provided regarding

11    the residence or what you were going to do on that day?

12        A    I received very little information.  I came in

13    as an extra because they needed more bodies for the

14    warrant.  I was with the understanding that we were

15    entering the house with a search warrant or arrest

16    warrant for an individual wanted for robbery who had a

17    history of weapons.

18        Q    And did you receive a description of the

19    individual you were looking for?

20        A    I did.  But I don't recall.

21        Q    Can you describe the entry into the home?

22        A    I don't recall the exact entry into the home.  I

23    don't remember if the door was open or not.

24        Q    Okay.  Can you describe what happened once you

25   all entered the home?

8

1      A   I believe when we entered the home I was

2   probably the last team member through the door.  I was

3   presented with a room full of women.  I believe they were

4   on a couch, and they already had their hands in the air.

5      Q   Did you see any children?

6      A   I believe there was at least four women and

7   multiple children.

8      Q   Did the children have their hands up?

9      A   I don't recall.

10     Q   Do you recall the demeanor of the women or the

11   children when you entered?

12     A   Repeat.  I didn't hear you.

13     Q   Sorry.  Did you recall the demeanor,

14   D-E-M-E-A-N-O-R.  Sorry.

15     A   The demeanor?  They appeared shocked, which is

16   normal for high risk warrants, because they don't know

17   that we're coming.

18     Q   And, in fact, children probably wouldn't have

19   known anything about you coming anyway, whether it was

20   high risk or not, correct?

21          MS. NELSON:  Objection, calls for

22       speculation.

23   BY MS. SULLIVAN:

24      Q   I just want to clarify.  You said they appeared

25   shocked, the children appeared shocked because they

9

1    didn't know you were coming.

2       A   Everybody appeared shocked because they didn't

3    know we were coming.

4       Q   All right.  So you came in, and you saw the

5    women, and you saw the children.  Did anyone -- did you

6    hear anyone ask for a search warrant?

7       A   After some time, I believe there was somebody

8    that asked for a search warrant.

9       Q   Do you recall if that was a woman or a man?

10      A   I believe that was an elderly male, but that was

11   some time into the warrant.

12      Q   You didn't see the elderly male when you

13   initially entered the home?

14      A   I'm having a hard time hearing you.  Can you say

15   it again?

16      Q   I said you did not see the elderly man when you

17   initially entered the home?

18      A   No.

19      Q   Okay.  At what point did you see him?

20      A   That was after the living room area was secured

21   with the women and children.  In other words, they

22   appeared to be under control.  They were explained just

23   to relax and keep their hands in the air because we were

24    conducting a high risk warrant.

25         Q    Okay.  And then where did the elderly man come

10

 1    from?

 2         A    I encountered him in, I think it was the

 3    staircase area.  And I believe what I heard was Officers

 4    had encountered him and were encountering difficulty with

 5    him.

 6         Q    Okay.  Did you have any kind of interaction with

 7    the elderly man?

 8         A    I don't believe I did, no, not at that point.

 9         Q    At what point did you have interaction with him?

10         A    I believe it was quite some time later.  What

11    happened is he was delaying the team during the course of

12    the high risk warrant.  It jeopardizes our safety as well

13    as the safety of everybody in the house.  He was

14    instructed to get down on the ground and stay down on the

15    ground, which is our routine.  He was not complying with

16    those requests.  I believe I was then requested by

17    Sergeant Kroll to handcuff this individual so we could

18    continue on with our high risk warrant.

19         Q    This is the elderly man that you --

20         A    I believe it was, yes.  I don't know what his

21    name was.

22         Q    And do you recall whether or not the elderly

23    gentleman was at one point made to lie on the ground?

24         A    Repeat.

25         Q    Do you recall if he at any point during this


11


1    incident was lying on the ground?

2         A    Yes, he was lying on the ground when I

3    handcuffed him.

4         Q    How did he get to the ground?

5         A    I have no idea.

6         Q    How close would you say you were to him distance

7    wise, approximately?

8         A    When I handcuffed him?

9         Q    Uh-huh.

10        A    I had to get within touching distance of him.

11        Q    Were you kneeling like on your knees, or were

12   you standing up and leaning over to do it?

13        A    I was standing when I handcuffed him.

14        Q    Okay.

15        A    We did so with the utmost care with him, because

16   he appeared not to be a threat to me.  Although, like I

17   said, he was impeding our progress in the high risk

18   warrant.  I believe he was later charged with

19   obstruction.

20        Q    The elderly gentleman?

21        A    Correct.

22        Q    I think you might have it confused there.  But

23   going on, did you notice -- I'm sorry.  Strike that.

24        How close was your face to his face when you

25   were cuffing him?


12


1        A   I don't recall.

2        Q   I'm just trying to visualize the scene.  Were

3    you -- when you leaned over to cuff him, or when you lean

4    over to cuff individuals in this type of a seated

5    position or lying position, do you normally get close to

6    their face at all for any reason?

7        A   No.

8        Q   Okay.  Did you notice a stint coming out of the

9    elderly gentleman's neck?

10       A   I don't recall, no.

11       Q   You said you treated him with the utmost care

12   because he didn't pose a threat.  Is that correct?

13       A   What I saw what he was doing was he was holding

14   the team up in the execution of a warrant.  In that case,

15   he was creating a dangerous situation for us, because we

16   cannot execute our job.

17       Q   Okay.  But my question is -- I'm just trying to

18   clarify.  You said you treated him with the utmost care

19   because he did not pose a threat or didn't appear to pose

20   a threat?

21       A   He was not a threat to me.

22     Q    Okay.  And had he been a threat to you, what

23  would you have done differently?

24     A    I would have handcuffed him immediately.

25     Q    Was there another male in the area while you

13

1   were purveying the incident?

2      A    I don't recall if there was one or two males

3   involved in this.  There was a lot going on.

4      Q    Okay.  Are you one of the officers who went to

5   the upper level or the lower level of the home?

6      A    I don't believe I ever left the front room area.

7      Q    Okay.  You said you heard the elderly gentleman

8   ask for a warrant or ask for the search warrant.  At what

9   point was it provided to him or while you were in the

10  home?

11     A    During the execution of a high risk warrant, we

12  do not provide a search warrant.  We advise them to get

13  down, and then the search warrant is usually provided by

14  the investigators after the apartment has been secured.

15     Q    So did you advise the Plaintiffs in this matter

16  that they would receive a search warrant, be able to view

17  the search warrant later?

18     A    I didn't advise anybody anything other --

19     Q    Okay.  So --

20     A    -- than to get down and be quiet.

21     Q    Okay.  So when they were asking for the search

22    warrant, there was no response basically?

23         A    Not from myself.

24         Q    Okay.  Did you hear a response?

25         A    I don't recall.


14


1          Q    Do you normally respond if someone were to ask

2     for a search warrant during this type of an entry?

3          A    On the hundreds that I've done, usually not.

4          Q    Usually you don't respond at all?

5          A    Usually we tell them there will be one coming.

6          Q    Okay.

7          A    And it will be all explained to you after

8     everything is safe.

9          Q    Okay.  But in this particular case, you nor

10    anyone else told them that there was a warrant coming?

11         A    I don't recall.

12         Q    Okay.  You said that you didn't tell them, so

13    let's just break the question down into two.  During this

14    particular incident, you did not tell them a warrant was

15    coming, did you?

16         A    I did not, no.

17         Q    Okay.  And you don't recall whether or not

18    anybody else told them that one was on its way?

19         A    That's correct.

20         Q    Okay.  As a result of this incident, are you

21    aware of whether the robbery suspect was arrested?

22         A    I believe he was apprehended, correct.

23         Q    Did you see him?

24         A    I don't recall.

25         Q    Do you know if anyone else was arrested as a


15


1    result of the incident?

2         A    Like I stated earlier, I believe it was an

3    elderly gentleman, but I don't have any names or anything

4    like that.

5         Q    I'm not asking for a name.  I'm just asking if

6    you know of anybody else who was.  At the point that you

7    entered the residence, where were you in the succession

8    of officers coming in?  Were you first, were you last,

9    were you in the middle somewhere?

10         A    As stated earlier, I was probably the last

11    person into the room, into the residence.

12         Q    Did you have the ram?

13         A    I believe I was assigned to the ram, correct.

14         Q    Okay.  Do you remember who you were assigned to

15    that with?

16         A    No.

17         Q    In your supplemental report, you indicate that

18    there was an uncooperative male.  Was it your opinion

19    that he was uncooperative because he was asking for the

20    field sergeant and the search warrant or some other

21    reason?

22        A    The reason he was uncooperative was he was not

23    complying with our requests to lie down on the ground and

24    was impeding the process of which we were conducting a

25    high risk warrant, was not complying with verbal

16

1    commands, therefore being uncooperative.

2        Q    At the time you were conducting or participating

3    in the entry, did you ever go into the kitchen area of

4    the home?

5        A    I don't believe so.

6        Q    Do you recall the weather that day?

7        A    No.

8        Q    Do you think it would be safe to assume that it

9    was cold since it was January in Minnesota?

10        A    I don't recall.

11        Q    Okay.  I just want to get an understanding about

12    something here.  You said that you did know that the

13    elderly gentleman was lying on the ground or had been

14    placed on the ground, and you believe that you cuffed

15    him.  At the time he was lying on the ground, do you

16    recall anyone asking for a blanket to cover him up

17    because of the cold air coming in?

18        A    I don't recall.  It was inside.  I wouldn't

19    believe that would be something that would happen.

20      Q    Is that something you believe would happen if

21  the door was standing wide open?

22      A    That's speculation.  I don't think so, no.

23      Q    I'm sorry.  You don't think that if the door was

24  standing wide open someone may ask for a blanket?

25      A    During the conduction of a high risk warrant,


17


1   we're not interested in if people are cold or warm.

2       Q    And that's even if you have an ill person who

3   may be increasingly becoming more ill because of the cold

4   air?

5       A    Most high risk warrants from the time that we

6   enter to the time that we are exiting the house is less

7   than two minutes.  So in the two minutes that I contact

8   the people that are inside the house, I don't care if

9   they're warm or cold.

10      Q    Okay.  And you said you don't recall whether or

11  not anyone indicated they were cold or not?

12      A    I don't recall, no.

13      Q    Okay.  All right.  Do you know if anybody else

14  noticed whether there was a stint in the older man's neck

15  or not?

16      A    I don't recall.

17      Q    You state in your supplemental report that when

18  you entered the home that you were yelling loudly "police

19  search warrant."  Were you the only one yelling that?

20      A   That's usually common procedure.  If I put that

21   in a report, it would be a correct reflection of what I

22   did.

23      Q   I'm asking whether or not you were the only one

24   who was doing that or not.

25      A   I don't recall.


18


1      Q   Are you normally the only one who yells it?

2      A   Normally, more than one officer is yelling it as

3   we are breaching the door for our safety.

4      Q   Okay.  Is it normal for all of the officers to

5   yell it?

6      A   I don't know if I can answer that or not.

7   Sometimes it happens, sometimes it doesn't, as long as

8   the announcement is made.

9      Q   Okay.  You've conducted several hundred of these

10   types of entries, I believe you said earlier.  Is that

11   correct?

12      A   Correct.

13      Q   Would you say like 500, closer to a thousand?

14   Just could you give me a ballpark figure?

15      A   Can you rephrase?  I'm not sure what you're

16   asking.

17      Q   I said have you conducted 500, closer to a

18   thousand of these types of high risk entries?  Can you

19    give me a ballpark figure?

20         A    I would say over 200.

21         Q    All right.  And on these high risk entries that

22    you've conducted, how many, approximately again, I don't

23    need an exact number, have you conducted along with

24    Sergeant Kroll?

25         A    Probably 50.  I'm not sure.


19


1                    MS. SULLIVAN:  Okay.  That's fine.  I

2              don't have any more questions.

3                    MS. NELSON:  We'll read and sign.

4

5         (Deposition concluded at 1:08 p.m.)

6                        **********

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

1                    REPORTER'S CERTIFICATE

2

3        STATE OF MINNESOTA)
                          )   ss.
4        COUNTY OF HENNEPIN)

5                I hereby certify that I reported the deposition
         of OFFICER BEVAN BLAUERT, on the 28th day of March,
2007,
6        in Minneapolis, Minnesota, and that the witness was by
me
         first duly sworn to tell the whole truth;
7
                 That the testimony was transcribed by me and is
a
8        true record of the testimony of the witness;

9                That the cost of the original has been charged
to
         the party who noticed the deposition, and that all
10       parties who ordered copies have been charged at the
same
         rate for such copies;
11
                 That I am not a relative or employee or
attorney
12       or counsel of any of the parties, or a relative or
         employee of such attorney or counsel;
13
                 That I am not financially interested in the
14       action and have no contract with the parties,
attorneys,

or persons with an interest in the action that affects

or

15      has a substantial tendency to affect my impartiality;

16              That the right to read and sign the deposition

by

the witness was reserved.

17

                WITNESS MY HAND AND SEAL, this 31st day of

March,

18      2007.

19

        _____

20      Lori L. Morrow, RPR, CRR
        Notary Public, Hennepin County, Minnesota
21      My commission expires:  January 31, 2010

22

23

24

25