```
1    STATE OF MINNESOTA                    DISTRICT COURT

2    COUNTY OF HENNEPIN       FOURTH JUDICIAL DISTRICT
     **************************************************
3    Charles Everett Cook, Sylvia Mae Cook,
     and Timothy Blake Cook, natural persons,
4
                 Plaintiffs,
5
          v.
6
     City of Minneapolis, a municipal entity; Minneapolis
7    Police Officer Mark Johnson, Badge #003459, in his
     individual, personal and official capacity; Sgt. D.
8    Smulski, in his individual, personal and official
     capacity; Officer K. Blackwell, in his individual,
9    personal and official capacity; Officer Geoffrey
     Toscano, Badge #007257, in his individual, personal and
10   official capacity; Officer Bevan Blauert, Badge
     #003459, in his individual, personal and official
11   capacity; Officer Jon Petron, Badge #5671, in his
     individual, personal and official capacity; Officer
12   Christopher House, Badge #3165, in his individual,
     personal and official capacity; Sgt. Robert Kroll,
13   Badge #003874, in his individual, personal and official
     capacity; Officer Christie Nelson, Badge #4959, in his
14   individual, personal and official capacity; Officer
     William Willner, Badge #7783, in his individual,
15   personal and official capacity; Officer Westlund, Badge
     #7674, in his individual, personal and official
16   capacity; Officer Roger Smith, Badge #006689, in his
     individual, personal and official capacity; Officer
17   Jason King, Badge #003704, in his individual, personal
     and official capacity; Officer Timothy Hanks, Badge
18   #002660, in his individual, personal and official
     capacity; and Officers Jane Doe and Richard Roe,
19   unknown and unnamed Minneapolis Police Officers, in
     their individual, personal and official capacities;
20
                 Defendants.
21   **************************************************
                    DEPOSITION OF
22               OFFICER TIMOTHY HANKS

23               Taken March 28, 2007
               Scheduled for 11:30 a.m.
24
          Reported By:  Lori Morrow, RPR, CRR
25   PARADIGM REPORTING & CAPTIONING INC. (612) 339-0545
```

2

1          Deposition of OFFICER TIMOTHY HANKS, taken on the

2     28th day of March, 2007, commencing at 11:22 a.m., at the

3     CITY OF MINNEAPOLIS ATTORNEY'S OFFICE, 333 South 7th

4     Street, Suite 300, Minneapolis, Minnesota, before Lori

5     Morrow, Registered Professional Reporter and Certified

6     Realtime Reporter and a Notary Public in and for the

7     State of Minnesota.

8

9                       APPEARANCES:
10
      On Behalf of the Plaintiffs:
11
          Maya C. Sullivan, Esquire
12        LAW OFFICE OF MAYA C. SULLIVAN, L.L.C.
          941 Hillwind Road NE
13        Suite 200
          Minneapolis, Minnesota 55432
14        (763) 515-0092
          Fax (763) 515-0093
15
      On Behalf of the Defendants:
16
          Tracey L. Nelson, Esquire
17        CITY OF MINNEAPOLIS ATTORNEY'S OFFICE
          333 South 7th Street
18        Suite 300
          Minneapolis, Minnesota 55402
19        (612) 673-2063

20                      **********

21          NOTE:  The original transcript will be delivered
           to Maya C. Sullivan, Esquire, pursuant to the applicable
22         Rules of Civil Procedure.

23

24

25

3

```
 1                         INDEX

 2    WITNESS:

 3    Officer Timothy Hanks

 4
      EXAMINATION BY:                PAGE:
 5
      Ms. Sullivan................4
 6

 7    OBJECTIONS BY:

 8    Ms. Nelson.................6, 17

 9
      EXHIBITS MARKED AND REFERRED TO:         (NONE)
10
                   **********
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

25

4

```
 1              OFFICER TIMOTHY HANKS,
 2    duly sworn, was examined and testified as follows:
 3                       EXAMINATION
 4    BY MS. SULLIVAN:
 5        Q   Officer Hanks, my name is Maya Sullivan, as I
 6    said, and I'm one of the attorneys for the Plaintiffs in
 7    this matter.  The other one is Albert Goins, who you may
 8    or may not know.
 9            I just want to give you a few just introductory
10    pieces of information before we get started.  First of
11    all, have you ever taken part in a deposition?
12        A   Yes.
13        Q   Okay.  So you are kind of familiar with the
14    procedure and what goes on in a deposition then?
15        A   Yes.
16        Q   Okay.  Just a couple of things.  I will be
17    asking you questions.  Your attorney may follow up with
18    cross-examination.  She may also object.  If she does,
19    please just follow her instructions regarding whether you
20    should respond or answer the question.
21            I do need you to give verbal answers and not
22    nodding or "uh-huh" and that type of a thing.
23            Do you have any questions before we get started?
24        A   No.
```

25      Q   Okay.  Officer, can you please state and spell

5

1   your name for the record?

2      A   Timothy, T-I-M-O-T-H-Y, Hanks, H-A-N-K-S.

3      Q   Thank you.  And who is your employer?

4      A   City of Minneapolis.

5      Q   Okay.  And what department?

6      A   Police.

7      Q   And how long have you been employed by the

8   Minneapolis Police Department?

9      A   Since 1993.

10      Q   Okay.  And during that time as an officer with

11   the Minneapolis Police Department, have your assignments

12   changed over the years?

13      A   Yes.

14      Q   Okay.  And what is your current assignment?

15      A   I'm assigned to the STOP unit.

16      Q   Okay.  And was your assignment to the STOP unit

17   on the day of this incident, which was January 13, 2005?

18      A   I don't remember.

19      Q   Do you recall approximately how long you've been

20   with the STOP unit?

21      A   Since its inception.  So I think it's been two

22   years now.  So I think that might have been right around

23   that area when we were transitioning.

24      Q   Okay.  And by whom were you employed before the

25   Minneapolis Police Department?  Or were you a police

6

1   officer prior --

2      A   Before?  No.

3      Q   Okay.  So this was your first police position?

4      A   Yes.

5      Q   Okay.  What field did you work in before?

6      A   I was a personal trainer.

7      Q   Okay.  How many times prior to this case have

8   you been named as a defendant in a lawsuit involving the

9   police department violating someone's civil rights?

10              MS. NELSON:  I'll object as irrelevant.

11              You can answer.

12              THE WITNESS:  One.

13   BY MS. SULLIVAN:

14      Q   Do you recall whether any internal affairs

15   complaints have been filed against you?

16              MS. NELSON:  Same objection.

17              Go ahead and answer.

18              THE WITNESS:  No.

19   BY MS. SULLIVAN:

20      Q   You don't recall, or there haven't been any?

21      A   There haven't been any.

22      Q   Okay.  Have you received special training in

23   conducting high risk entry warrants?

24      A   Yes.

25      Q   Okay.  And in that training, do you all receive

7

1    any kind of distinct trainings regarding handling or

2    dealing with the elderly or ill individuals who you may

3    encounter on those warrants or on those entries?

4       A   No.

5       Q   You do not?

6       A   No.

7       Q   Okay.  How do you normally handle the elderly or

8    ill individuals when you encounter them as opposed to a

9    perfectly healthy adult in that type of an entry?

10      A   I guess it's discretionary.  You know, you use

11   your own discretion.

12      Q   And what does that mean, that if you use your

13   discretion, you may treat them less aggressively, or what

14   does that mean?

15      A   If they pose a threat, I use the necessary

16   force.  If they don't, then you don't use the necessary

17   force.

18      Q   Were you part of the team that entered 3845

19   Second Avenue South in Minneapolis on January 13, 2005?

20      A   Yes.

21      Q   And what information were you provided regarding

22   this entry during the briefing?

23      A   Be more specific, would you?

24      Q   What information were you given about what you

25   were going there to do, or who were you looking for?


8


1      A   The information that we had was -- or that I

2   received was that we were looking for a robbery suspect.

3      Q   Do you recall if you received a description of

4   the individual?

5      A   Other than that he was a black -- a teenage,

6   black male.

7      Q   Okay.  So you did know he was a teenage, black

8   male?

9      A   Yeah.

10      Q   When you entered the home, can you explain or

11   describe what you saw or observed?

12      A   When I came up to the front door, the front door

13   was unlocked, and I opened it and announced "police

14   search warrant" loud.  There were three or four women and

15   some children sitting in the living room.  That's right

16   inside the front door and off to the right.  Everyone's

17   hands I saw, so, I mean, they weren't -- because I think

18   they were holding kids, so nobody was ordered to the

19   floor for the fact that they had children in their hands.

20      Q   Do you remember how many children were in the

21   room or in the area?

22      A   No.

23      Q    Do you know if there was more than one child?

24 You said children, so.

25      A    Yeah, there was more than one.  I would say two


9


1  to three.

2      Q    Okay.  Were the children crying?

3      A    I don't recall.

4      Q    Do you recall the demeanor of the children or

5  the women at all?

6      A    The women seemed frightened, I mean, because we

7  startled them when we came in.

8      Q    Do you recall anyone asking for the search

9  warrant or to view the search warrant?

10      A    I did hear someone say that, but I couldn't tell

11 you who it was.

12      Q    Do you recall if anyone responded?

13      A    No.

14      Q    No, no one responded, or no, you don't recall if

15 anybody responded?

16      A    No, I don't recall.

17      Q    Is a warrant normally shown if someone asks for

18 it?

19      A    Not right away, no.

20      Q    But it is shown at some point?

21      A    I'm not an investigator, so that is not my role.

22     Q    Okay.  Did you instruct them to ask one of the

23  investigators?

24     A    No.

25     Q    Or did anyone instruct them to ask one of the

10

1  investigators for the warrant?

2     A    I just want to clarify.  I mean, I just want to

3  be sure.  Are you talking about when we're actively

4  moving through this house --

5     Q    Right. you said that you did --

6     A    -- to do the search?

7     Q    -- hear somebody ask for the warrant, and you

8  said you don't recall responding or anybody else

9  responding --

10     A    No.  As the team is doing -- or clearing the

11  house, they wouldn't receive a response right away until

12  the investigators came in and -- until the investigators

13  who actually have the search warrant would come in.

14     Q    I understand you're saying that those are the

15  individuals who would actually show them the warrant.

16     A    Right.

17     Q    But I'm asking whether or not you instructed

18  them to ask the investigators when they came into the

19  home.  So, for example, how are they to know that you

20  wouldn't personally or you all on the SWAT team wouldn't

21  personally have the warrant?

22          A    The question wasn't directed to me, so no, I

23     don't know if someone responded or not.

24          Q    Okay.  All right.  Do you know whether or not

25     the robbery suspect or the alleged robbery suspect was

11

1      arrested as a result of this incident?

2           A    I think he was taken into custody.

3           Q    But you're not sure?

4           A    We retrieved two males from the -- two teenage

5      males from the second floor of the house.  So I don't

6      remember if they actually had had him in custody or not,

7      no.  My job is to secure the house.

8           Q    Okay.  With regard to others who were in the

9      household at the time of the incident, do you recall if

10     anyone else was arrested as a result of it?

11          A    No, I don't recall.

12          Q    Do you recall the elderly -- the more elderly,

13     or older, gentleman who was in the home at the time of

14     the incident?

15          A    Yes.

16          Q    Okay.  And at one point, the police report, the

17     main police report indicates that he was forced to the

18     ground.  Did you assist in forcing him to the ground?

19          A    No.

20          Q    Do you know who did?

21      A   It was Sergeant Kroll.

22      Q   Is that the only person?

23      A   Yes.

24      Q   Did you notice whether or not the gentleman

25   appeared to be ill?


12


1       A   No.

2       Q   No, you didn't notice?

3       A   No, I didn't notice that he looked ill.

4       Q   Okay.  Did you notice the stint hanging out of

5   his neck?

6       A   No.

7       Q   Do you recall the weather on that day?

8       A   Middle of January, I think, and it was cold and

9   wintery.

10      Q   Right.  But you don't know for sure the exact

11   weather.  You just know it was probably cold since it's

12   Minnesota, and it was the middle of January?

13      A   Yes.

14      Q   Do you recall how long the elderly gentleman was

15   required to remain on the floor after being put on the

16   floor?

17      A   As far as a timetable, no.

18      Q   Okay.  Do you recall the positioning of his body

19   in relationship to the front door when he was placed on

20   the ground -- or forced onto the ground?  I'm sorry.

21      A    Like the distance from where he was at to the

22    front door?

23      Q    Right.

24      A    About 15 feet.

25      Q    Fifteen feet?

13

1      A    I would say.  I don't know what -- I mean, in

2    proximity to the front door, he was actually -- I mean,

3    he would be -- I'm trying to remember the way the house

4    is set up.  The front door is here.  He was probably

5    here.  So about 10 to 15 feet maybe.

6      Q    Okay.  You said the front door is here, and he's

7    probably here.  And here meaning -- is that near where

8    the stairs begin then?

9      A    Yes.

10      Q    Okay.  So you're saying you think it's about 10

11    to 15 feet from the front door --

12      A    Yes, just --

13      Q    -- to the stairs?

14      A    -- my guesstimation.

15      Q    Okay.  And you think that he was simply right

16    there at the bottom of the stairs then?

17      A    Yeah.  He was just to the stairs and -- he was

18    probably about here.  But I don't -- yeah, just at the

19    base of the stairs and maybe to the right -- to the left

20    of the stairs if you're facing the stairway in the house.

21        Q    Okay.  Do you recall his wife or him asking for

22    a blanket or something to cover him up with as he lie on

23    the ground?

24        A    No.

25        Q    Okay.  If you had heard that, would you have

14

1    attempted to assist him with that?

2        A    If I would have heard that, yes.

3        Q    Do you normally assist if you see someone is ill

4    or sick or elderly in this type of a situation if they

5    ask or inquire about a blanket or something to that

6    degree?

7        A    Yes.

8        Q    And I just want to clarify something.  Earlier,

9    you said that you don't recall whether or not anybody was

10   arrested as a result of this incident.  Is that correct?

11       A    We had -- we -- once we secure the residence and

12   everyone is taken into custody, we leave.  Whatever the

13   investigators do after that, I mean, we might find out

14   later, you know.  And so I don't recall.  I just --

15   there's a lot of incidents I don't know if people are

16   taken into custody.

17       Q    Okay.  So you just don't know?

18       A    Yeah.

19       Q    All right.  Can you give me an idea of once you

20    walked into the home, once you entered into the home --

21    first of all, it sounded like you were saying you were

22    first because you said you opened the door and walked in.

23    Is that correct, or is that accurate?

24        A    Yes.

25        Q    Okay.  So you were the first one to actually

15

1    walk into the home.  And at that time, is that when you

2    yelled or began to say "search warrant" or "police," that

3    type of thing?

4        A    As soon as the door is breached or as soon as

5    the door was opened, yes.

6        Q    And were other officers saying that at the same

7    time as you, or was it just you?

8        A    It was a number of us.  We all say that.

9        Q    Okay.  Did you go to the second level to secure

10    the robbery suspect, or was that other officers who --

11        A    I was on the second level.  I went to the second

12    level.

13        Q    Along with?

14        A    Sergeant Kroll, and I don't remember who the

15    third person was.

16        Q    If you enter a home, particularly on a high risk

17    entry situation, and you perceive someone or persons to

18    be a threat, what procedure do you use, or what do you

19   do?

20        A    What type of threat, though?  You have to be --

21        Q    A harmful threat.

22        A    -- more specific.

23        Q    A threat of harm to you or any of your officers

24   who are with you.

25        A    You will be ordered to the ground at gunpoint.


16


1         Q    I'm sorry?

2         A    You will be ordered to the ground at gunpoint.

3         Q    Is that the only time you order people to the

4    ground at gunpoint?

5         A    It is procedure to put everybody down on the

6    floor at gunpoint when entering on a high risk warrant.

7         Q    Okay.  I just want to clarify then, because I

8    asked you if you perceive a threat, what do you do, and

9    you said that you order them to the ground at gunpoint.

10   But then you said on a high risk warrant you put

11   everybody down.  So that sounds like regardless of

12   whether you perceive a threat or not, you're putting them

13   down to the ground at gunpoint.

14        A    With the exception if you have women with kids,

15   as long as you can see hands, they're not perceived as

16   threats, I mean, obviously.  But as far as a true threat,

17   whichever that may be, I mean, I guess that would be a

18   person who is not showing their hands or a person with a

19    weapon in their hand, something along that line, then you

20    will be ordered to the ground, and then if you don't

21    comply with that, you'll be forced to the ground.

22        Q   Okay.  And at what point do you decide to cuff

23    any of the individuals who may be present at this type of

24    entry?

25        A   Once we have that area secured.  So once all the


17


1    threats are checked out or whatnot, then people will be

2    handcuffed.

3        Q   And at that point, do you generally cuff the

4    women and children, or do you only cuff the males or

5    others who may not be holding children?

6        A   It changes every time.  It's a lot of

7    discretion.  I have seen some women that have kids be

8    cuffed in the front and just given their child back, and

9    I've seen where teams -- where some of us, they don't

10   cuff them at all.  I don't usually cuff people, so it's

11   the discretion of the person who was assigned to doing

12   that.

13       Q   Okay.  You said that you may or may not cuff the

14   women.  I'm just trying to get an understanding.  You

15   said you don't personally, but, I mean, the officer there

16   may or may not cuff the women who are holding children.

17   If they do not cuff them, is that because they may feel

18    that that person is complying with the orders that they

19    have been given?

20              MS. NELSON:  Objection, calls for

21      speculation.

22              You can answer.

23              THE WITNESS:  Can you repeat the question?

24    BY MS. SULLIVAN:

25     Q   Sure.  If the women who are present are not

18

1    cuffed -- let me back up.  I'm sorry.  You initially said

2    that usually you don't cuff women, or, if you don't, it's

3    because you can see their hands if they're holding

4    children.  But then you said that you may cuff them or

5    other officers may cuff them and then give the child back

6    and cuff them in the front.  And so I'm just trying to

7    understand that if you do not cuff them, or if they are

8    not cuffed, does that mean that they are not being

9    perceived as a threat?

10     A   They're being compliant or -- yeah, they're

11    usually being compliant.  So they're not perceived as a

12    threat.

13     Q   Okay.  Do you normally cuff children?

14     A   No.

15     Q   Do children usually get gun checked?

16     A   Get who?

17     Q   Gun checked, the gun put into their face?

18      A    No.

19      Q    Do you recall that happening in this incident?

20      A    No.

21      Q    You don't recall it happening, or it didn't

22  happen?

23      A    I don't recall it happening.

24      Q    So if it did happen, then that would be out of

25  the ordinary then for the procedure when doing these type


19


1   of entries?

2       A    Yeah, to point a gun at a kid.

3       Q    Yes.

4       A    Yes.

5       Q    Okay.  Did you enter the lower level of the home

6   while you were on the entry?

7       A    The basement?

8       Q    Uh-huh.

9       A    I don't recall.  We usually -- procedure, we

10  usually do clear the basement.  So more than likely, I

11  went down there.  But I don't recall if I did or not.

12      Q    Do you recall encountering -- well, strike that.

13  I'm sorry.  How many males do you recall being in the

14  home?

15      A    A total of four.

16      Q    Okay.  And earlier you indicated that two

17    younger males were upstairs when you went upstairs,

18    correct?

19        A    Yes.

20        Q    And you already talked about the elderly

21    gentleman who was forced to the ground.  So that leaves

22    one additional male.  Where did he come from?

23        A    He came from the second floor with the elderly

24    male.

25        Q    He came from the second floor?


20


1        A    The elderly male and the other guy actually came

2    downstairs as I was coming through the kitchen.

3        Q    Okay.  I'm sorry.  Let me just clarify.  You're

4    saying the elderly male came from upstairs?

5        A    Right.

6        Q    I was actually asking about the fourth male.

7    Where did he come from?

8        A    The fourth male was with him, and they came down

9    the stairs together.

10        Q    Can you describe the fourth male?

11        A    He was a larger black male.  I didn't have any

12    contact with him.

13        Q    Do you recall whether that male was cuffed at

14    all?

15        A    I'm sure he was once we had that -- once the

16    main floor was secured, he was cuffed.

17        Q    Okay.  Do you recall if he was forced to the

18   ground at all?

19        A    He was ordered to the ground.

20        Q    So he was on the ground as well as the elderly

21   gentleman?

22        A    Yes.

23        Q    Okay.  And he was also cuffed?

24        A    Who?

25        Q    The younger of the two.


21


1        A    Yeah, I just stated that.

2        Q    The fourth one?

3        A    Yes.

4        Q    Well, you said he was probably cuffed when you

5    secured the area.

6        A    Yeah.  I mean, once the area was secured, I'm

7    sure he was cuffed.

8        Q    Do you recall any conversation going on between

9    him and any of the officers that took place while you

10   were there?

11       A    I know that he -- there was conversation between

12   him and other officers.  What he was saying I don't know.

13       Q    Was it a loud conversation?

14       A    Yes.  He was very loud.

15       Q    Well, I'm asking about the conversation.  So

16    that also means were the officers loud?

17        A   Not as loud as he would have been, no.  I mean,

18    they weren't upset at him, but he was very upset.

19        Q   Did you physically touch any of the individuals

20    who were in the home during the incident?

21        A   No.

22        Q   Did anybody?

23        A   I can't attest to what other officers did, so I

24    don't know.

25        Q   Okay.  So you did not observe any of the


22


1    officers -- you can't say for sure whether any of them

2    physically touched any of the individuals in the home?

3        A   Well, I mean, Sergeant Kroll, there was contact

4    between Sergeant Kroll and the elderly guy.  And outside

5    of that, no, I don't think so.

6        Q   Okay.  Have you been on any other previous high

7    risk entries with Sergeant Kroll in the past?

8        A   Yes, I have.

9        Q   Do you have an approximate number of how many of

10    those you've done with him?  Just a guess.  It doesn't

11    have to be exact.

12        A   No.  I've been doing this for over 10 years, and

13    I've done close to a thousand of them, so, no, not an

14    exact number.

15        Q   Do you know whether or not you've done like half

16    of them with him or maybe a quarter of them with him or

17    10 percent, just generally?

18       A   In general, no.  I honestly cannot give you a

19    general number.  A general number, because I did one

20    service with him one month, a general number would

21    probably be 35 to 40.

22       Q   Okay.  So it depends on, it sounds like you guys

23    have different types of assignments on a monthly basis,

24    and so that you might end up working with him or some

25    other officers or sergeants doing this type of --

23

1       A   Yeah.  Each team rotates monthly, so a team

2    would rotate on as a primary team to do warrants, and

3    then they have a sergeant.  And so it changes every 28

4    days.

5               MS. SULLIVAN:  Okay.  I don't have any

6      other questions.

7               MS. NELSON:  I don't have any questions.

8      We'll read and sign.  Thank you.

9

10     (Deposition concluded at 11:44 a.m.)

11                    **********

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1                    REPORTER'S CERTIFICATE

2

3        STATE OF MINNESOTA)
                         )   ss.
4        COUNTY OF HENNEPIN)

5            I hereby certify that I reported the deposition
         of OFFICER TIMOTHY HANKS, on the 28th day of March,
2007,
6        in Minneapolis, Minnesota, and that the witness was by
me
         first duly sworn to tell the whole truth;
7
             That the testimony was transcribed by me and is
a
8        true record of the testimony of the witness;

9            That the cost of the original has been charged
to
         the party who noticed the deposition, and that all
10       parties who ordered copies have been charged at the
same
         rate for such copies;
11
             That I am not a relative or employee or

attorney
        12    or counsel of any of the parties, or a relative or
              employee of such attorney or counsel;
        13
                   That I am not financially interested in the
        14    action and have no contract with the parties,
attorneys,
              or persons with an interest in the action that affects
or
        15    has a substantial tendency to affect my impartiality;

        16           That the right to read and sign the deposition
by
              the witness was reserved.
        17
                   WITNESS MY HAND AND SEAL, this 31st day of
March,
        18    2007.

        19
              _____
        20    Lori L. Morrow, RPR, CRR
              Notary Public, Hennepin County, Minnesota
        21    My commission expires:  January 31, 2010

        22

        23

        24

        25