1

|  |  |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
|  | DISTRICT OF MINNESOTA |
| 2 | - - - - - - - - - - - - - - - - - - - - - - - - - - |
|  | Charles Everett Cook, Sylvia Mae Cook, |
| 3 | and Timothy Blake Cook, natural persons, |
| 4 | Plaintiffs, |
| 5 | vs                          Court File 06-0022 |
| 6 | City of Minneapolis, a municipal entity; |
|  | Minneapolis Police Officer Mark Johnson, Badge |
| 7 | #003459, in his individual, personal and official |
|  | capacity, Sgt. D. Smulski, in his individual, |
| 8 | personal and official capacity; Officer K. Blackwell, |
|  | in his individual, personal and official capacity; |
| 9 | Officer Geoffrey Toscano, Badge #007257, in his |
|  | individual, personal and official capacity; Officer |
| 10 | Bevsn Blauert, Badge #003459 in his individual, |
|  | personal and official capacity; Officer Jon Petron, |
| 11 | Badge #4671, in his individual, personal and official |
|  | capacity; Officer Christopher House, Badge #3165, in his |
| 12 | individual, personal and official capacity; Sgt. Robert |
|  | Kroll, Badge #003874, in his individual, personal and |
| 13 | official capacity; Officer Christie Nelson, Badge #4959, in |
|  | her individual, personal and official capacity; Officer |
| 14 | William Willner, Badge #7783, in his individual, personal |
|  | and official capacity; Officer Westlund, Badge #7674, in |
| 15 | his individual, personal and official capacity; Officer |
|  | Roger Smith, Badge #006689, in his individual, personal and |
| 16 | official capacity; Officer Jason King, Badge #003704, in |
|  | his individual, personal and official capacity; Officer |
| 17 | Timothy Hands, Badge #002660, in his individual, personal |
|  | and official capacity; and Officer Jane Doe and Richard |
| 18 | Roe, unknown, unnamed officers of the Minneapolis, in their |
|  | personal, individual |
| 19 | and official capacity; |
| 20 | Defendants. |

```
                  - - - - - - - - - - - - - - - - - - - - - - - - - -
- -
         21        Whereupon, the following deposition was taken of
                   JONATHAN PETRON, pursuant to Notice, according to the
Rules
         22   of Civil Procedure for the State of Minnesota, taken
on the
              13th day of February, 2007 before Lorie M. Jensen,
Notary
         23   Public, Washington County, Minnesota.

         24

         25
```

Jensen Reporting   (651) 351-9500

2

```
          1        APPEARANCES:

          2

          3        Albert T. Goins, Attorney at Law, Goins Petry
Law, 301
          4   Fourth Avenue South, 378 Grain Exchange Building,

          5   Minneapolis, Minnesota 55415, appearing as Counsel for
and
          6   on behalf of the Plaintiffs;

          7

          8        Tracy Nelson, Assistant City Attorney, City
Attorney's
          9   Office, 333 South 7th Street, Suite 300, Minneapolis,

         10   Minnesota 55402, appearing as Counsel for and on
behalf of
         11   the Defendants.

         12
```

13

14

15

16

17

18

19

20

21

22

23

24

25


Jensen Reporting  (651) 351-9500


3


1

2        INDEX:

3

4        EXAMINATION BY:

5

6        Mr. Goins          4

7

8

9

10      EXHIBITS:

11

12      Petron Deposition Exhibit

13      Number 1 - Page 11

14

15      OBJECTIONS:

16      BY MS. NELSON:   Page 9

17

18

19

20

21

22

23

24

25

Jensen Reporting   (651) 351-9500

4

1   Whereupon, the following proceedings were duly held
and

2   made a part of the record, as follows, to-wit:

3                   JONATHAN PETRON,

4          having been first duly sworn, was examined,

5          and testified, under oath, as follows:

```
           6                    EXAMINATION:

           7   BY MR. GOINS:

           8   Q.   Officer Petron, you understand you're here for

           9        deposition today, correct?

          10   A.   That's correct.

          11   Q.   My name is Albert Goins, I represent the
plaintiffs

          12        the Cook family and you're a named defendant in
this

          13        case, are you aware of that?

          14   A.   Yes.

          15   Q.   What documents have you reviewed in preparation
for

          16        your deposition?

          17   A.   I reviewed my police report, my supplement as
well as

          18        the other supplements written by the other
officers.

          19   Q.   And who were they?

          20   A.   Well, I would have to take a look at my report if
you

          21        could allow me to.

          22   Q.   Do you remember who they are?

          23   A.   I remember some of them.

          24   Q.   Tell me the ones you remember?

          25   A.   Sergeant Smulski, Sergeant Kroll, Bevan Blauert,
Mark
```

Jensen Reporting  (651) 351-9500

5

```
 1        Johnson, and that's all I can really recall.

 2   Q.   That's fine.  Did you look at your own report?

 3   A.   Yes, I did.

 4   Q.   Any other documents showed to you by your
counsel?

 5   A.   No.

 6   Q.   I'm sorry?

 7   A.   No.

 8   Q.   Okay.  You talk to anybody else other than your

 9        counsel about this deposition?

10   A.   No.

11   Q.   Did I ask you if you've had your deposition taken
in

12        the past?

13   A.   No, you haven't.

14   Q.   Have you?

15   A.   No.

16   Q.   Have you ever been the subject of a lawsuit
before?

17   A.   No.

18   Q.   Have you testified in court in the past?

19   A.   Yes.

20   Q.   How many times do you think you've testified in
court?

21   A.   Maybe approximately eight times.

22   Q.   What kind of cases?

23   A.   Traffic cases, trespassing cases, theft cases.

24   Q.   That it?

25   A.   That's all I can think of right now.
```

Jensen Reporting  (651) 351-9500

6

1    Q.    On this date of January 13th, 2005, do you
remember

2          making an entry at 3845 2nd Avenue South pursuant
to a

3          search warrant?

4    A.    Yes.  It would be nice if I could review the
report

5          though, can I have a copy of it in front of me?

6    Q.    No, no, not unless you need to refresh your

7          recollection about a specific question.

8    A.    I want to make sure if you mention an address
that's

9          the address the one that the warrant was executed
on.

10   Q.    Do you have any reason to dispute or question
that it

11         was 3845 2nd Avenue South?

12   A.    No, none.  I just want to be accurate.

13   Q.    Here's how we'll do this because that's what the
rules

14         provide for, if you need to refresh your
recollection,

15         you can refer to your report.  Do you have a copy
of

16         it with you?

17   A.    No, I don't.

18   Q.    We'll get to that point and we'll confirm that

before

19      we conclude.  Tell me your full name again?

20   A.   Jonathan Jacob Petron.

21   Q.   So it's pronounced Petron?

22   A.   Petron, yes, sir.

23   Q.   Tell me a little bit about your background?

24   A.   I worked as a police officer for the City of

25      Minneapolis for a little over eight years.


Jensen Reporting  (651) 351-9500


7


1   Q.   Where is your education from?

2   A.   Graduating from Minnetonka High School,
Alexandria

3      Technical College, graduated in '97 with a two
year

4      degree in law enforcement and was hired in '98 by
the

5      City of Minneapolis.

6   Q.   I assume you've got your post certification?

7   A.   Yes, I do.

8   Q.   Have you ever lost your post certification?

9   A.   No, I have not.

10   Q.   Have you ever received any discipline while
you've

11      been with the Minneapolis Police Department?

12   A.   No, I have not.

13   Q.   Do you know if there was an Internal Affairs

14        investigation with respect to this incident involving

15        the entry at 3845 2nd Avenue South on or about January

16        13th, 2005?

17   A.   I don't recall if there was or not was not.

18   Q.   Do you remember what your role was with respect to

19        this entry at this residence assuming that is the

20        correct address?

21   A.   Yes.

22   Q.   What was your role?

23   A.   My role was a perimeter officer.  We stood by as the

24        entry team entered the residence.

25   Q.   So you were not part of the entry team, is that

Jensen Reporting  (651) 351-9500

8

1        correct?

2   A.   Correct.

3   Q.   You were working with the CRT team under Sergeant

4        Smulski's direction?

5   A.   You're right.

6   Q.   Tell me a couple of background things and we'll

7        probably get this over pretty quickly.  Were you at

8          the briefing for the search warrant?

9    A.   Yes, I was.

10   Q.   What do you remember about the briefing?

11   A.   I remember that the search warrant was in regards
to a

12        robber, a potential robber could be residing at
the

13        address and that this potential robber has been
armed

14        in past incidents so it was considered a high
risk

15        entry being there were possible guns involved.

16   Q.   Who gave you that information, please?

17   A.   Sergeant Smulski I believe.

18   Q.   Do you remember anybody else at the briefing
giving

19        you specific information?

20   A.   I just don't recall it's been two years.

21   Q.   Sure.

22   A.   I've done lots of warrants since then so.

23   Q.   Now who have you done lots of warrants with the
entry

24        team or part of the CRT team?

25   A.   Part of the CRT team.  I was at this point in
time I

Jensen Reporting  (651) 351-9500

9

1        was with the 3rd Precinct.

2   Q.   Where are you now?

3   A.   I'm in the 5th Precinct in a similar role.

4   Q.   Why did you change, if you know?

5   A.   No specific reason other than I wanted to go to
the

6        5th Precinct.  I grew up in St. Louis Park and it
was

7        familiar to me.

8   Q.   It's familiar with that part of Minneapolis,
southwest

9        Minneapolis, is that right?

10  A.   Yes.

11  Q.   How long do you think it took the entry officers
to

12       secure the scene before the CRT team went in?

13                      MS. NELSON:  I'll object,
speculation.

14                      MR. GOINS:  I don't think it's

15       speculation.

16  Mr. Goins  (Continuing)

17  Q.   You were there at the scene at 3845 2nd Avenue
South,

18       correct, on January 13th, 2005, right?

19  A.   Yes.

20  Q.   And you were part of the CRT team, right?

21  A.   Yes.

22  Q.   You weren't part of the entry team, right?

23  A.   Correct.

24  Q.   Who was in charge of the entry team?

25  A.   Sergeant Kroll.

Jensen Reporting   (651) 351-9500

10

1    Q.    Who went in first?

2    A.    The entry team.

3    Q.    And you were at the rear perimeter, correct?

4    A.    Correct.

5    Q.    You waited until they called clear or clear of
the

6          scene, correct?

7    A.    Correct.

8    Q.    How long did it take them to call clear after
they

9          went in?

10   A.    Well, would you like me to guess?

11   Q.    No, I want you to estimate or tell me if you
know?

12   A.    Is that something you would like me to answer?

13                   MR. GOINS:  She doesn't get the
choice.

14         She can raise an objection or not.  The question

15         stands.

16                   MS. NELSON:  Can you just
instruct,

17         counsel, that I am not allowed to offer -- I

18         understand you probably did but I am not allowed
to

19         counsel or provide any answers.

20                   MR. GOINS:  Yeah.  She can't give

you

21          --

22                          THE WITNESS:  No, problem.  I would

23          guesstimate that it was longer than typical, I would

24          say maybe four to five minutes.

25                          MR. GOINS:  Thank you.


                    Jensen Reporting  (651) 351-9500



11


1                          (Whereupon, Petron Deposition Exhibit

2          Number 1 was marked for identification by the Court

3          Reporter).

4    Mr. Goins  (Continuing)

5    Q.   Showing you what's been marked as your Deposition

6          Exhibit 1, do you recognize that document?

7    A.   Yes, I do recognize that as my document.

8    Q.   Okay.  What is that, please, sir?

9    A.   This is my supplement, my report that I typed.

10   Q.   Okay.

11   A.   In regards to this incident.

12   Q.   Okay.  Does that help refresh your recollection as to

13          the time period that the entry team was in the house

14          before the CRT team went in?

15    A.    It doesn't allow me to tell you exactly how long it

16          took but it does say that 1208 which is the entry team

17          entered inside the home.

18    Q.    Do you remember what time 1280 went inside the house?

19    A.    No, I don't.

20    Q.    Would that have been called out to MDT or to main

21          dispatch?

22    A.    Generally yes, it is.

23    Q.    How is that done, if you know, in general?

24    A.    Generally the -- one of the supervisors will inform

25          dispatch of what our intentions are.

12


1    Q.    And then does --

2    A.    While in route or prior to leaving the precinct.

3    Q.    Okay.  But the actual time that the entry is done, is

4          that ever called out?

5    A.    Generally that's not called out.

6    Q.    Do you know of any reason why Sergeant Smulski would

7          be able to say in his report at 2237 hours entry was

8         made into the single family dwelling?

9    A.   Can you repeat the question?

10    Q.   Sure.  Do you know of any reason why Sergeant
Smulski

11         was able to stay in his report Supplement Number
1, at

12         2237 hours, entry was made into the single family

13         dwelling?

14    A.   Okay.  One more time, I'm sorry.

15    Q.   Sure.  That's no problem.  On his Supplement
Number 1

16         I'll represent to you that Sergeant Smulski in a

17         report that he did with Officer Kate Blackwell
wrote,

18         at 2237 hours entry was made into the single
family

19         dwelling.  Do you have any reason to know why he
would

20         have been able to pinpoint the time?

21    A.   No, I don't.

22    Q.   Do you have any reason to dispute that Sergeant

23         Smulski could pinpoint the time?

24    A.   No, I don't.

25    Q.   Did you hear any sounds as you waited to make
your

13

```
 1        entry while the ERU team was on the inside, could
you

 2        hear any sounds, voices, screaming, gunshots,

 3        anything?

 4   A.   No.

 5   Q.   Did you hear -- when you entered, which way did
you

 6        enter into the residence?

 7   A.   I recall I believe I entered in the front door.

 8   Q.   Did you see anything in specific when you entered
the

 9        front door?

10   A.   I seen several people inside the living room when
I

11        entered inside.  And I simply moved on to the

12        upstairs.

13   Q.   Why did you do that?

14   A.   I was instructed to go upstairs and start
searching

15        one of the bedrooms.

16   Q.   Who instructed you to do that, Officer Petron?

17   A.   I don't recall who instructed me.

18   Q.   Okay.  What were you searching for when you went
to

19        the upstairs bedroom?

20   A.   Anything related to a robbery such as a gun, or
purses

21        or IDs.

22   Q.   And did you know what kind of IDs you were
looking

23        for?

24   A.   Basically IDs that will lead us to believe that
they
```

25        were stolen.  I mean, I don't know how I can be more

Jensen Reporting  (651) 351-9500

14

1        specific.  The entry was based upon a robbery suspect.

2  Q.  Did you have any specific information as to the kinds

3        of things that the officers who had the search warrant

4        thought were stolen other than just IDs in general?

5  A.  Nothing specific.  I guess to answer your question we

6        were primarily looking for guns.

7  Q.  Did you find any?

8  A.  I did not.

9  Q.  Do you know if any other officers found any?

10  A.  I don't know.

11  Q.  Did you find any individuals who you were interested

12        in with respect to this robbery or alleged robbery?

13  A.  Yes.

14  Q.  Who did you find?

15  A.  I believe the two people that were up in the bedroom

16        that I went to may have been involved, I don't know.

17   Q.   Who told you they may have been?

18   A.   Nobody told me.  They were in handcuffs.

19   Q.   And they were in handcuffs when you got upstairs?

20   A.   Yes, if I remember correctly.  To be honest with you,

21        I was having a hard time remembering if there was

22        anybody in that bedroom but looking at my report, it

23        is indicating that there was two people in the bedroom

24        so that would be accurate, my supplement.

25   Q.   And in your supplement you say, I searched the


Jensen Reporting  (651) 351-9500


15


1        southeast bedroom on the upper main level and

2        maintained contact with C. Cook and J. Cook who were

3        both handcuffed and seated on the bed while officers

4        processed the scene.  Do you know who C. Cook was?

5   A.   At this time, I don't, no, I don't.

6   Q.   How about J. Cook, do you know that full name?

7   A.   No, I don't.

8   Q.   I was advised by Sergeant Smulski to transport T.B.

9        Cook to HCJ along with Officer Johnson, do you know

10      who T.B. Cook was?

11  A.  He was the person that was taken to jail for

12      obstruction.

13  Q.  Did Sergeant Smulski tell you that he had observed him

14      obstructing?

15  A.  No, Sergeant Smulski told me to -- no to answer your

16      question.

17  Q.  What did he tell you?

18  A.  He told me to go with Officer Johnson and transport

19      T.B. Cook to jail.

20  Q.  So that was possibly Timothy Cook?

21  A.  I don't know.

22  Q.  Can you describe the individual you transported?

23  A.  I would say he was approximately six feet tall,

24      definitely over 200 pounds.

25  Q.  What was his race?


Jensen Reporting  (651) 351-9500


16


1  A.  A black male.

2  Q.  Which Officer Johnson, that wasn't Bruce -- was it

3      Bruce Johnson, Mark Johnson?

4  A.  I believe it was Mark Johnson.

       5   Q.   Did Mr. Cook say anything to you when you
transported

       6        him?

       7   A.   He said that he was going to sue us.

       8   Q.   Why did he tell you that, do you know?

       9   A.   No, I don't.

      10   Q.   Did you do anything that you thought was
excessive to

      11        Mr. Cook?

      12   A.   No.

      13   Q.   When did Officer Smulski or I'm sorry, Sergeant

      14        Smulski tell you to transport Mr. Cook, T.B. Cook
to

      15        HCJ which is Hennepin County Jail, was that after
you

      16        came downstairs?

      17   A.   Yes, after I came downstairs, after I had
searched the

      18        bedroom.

      19   Q.   Go ahead, finish, I'm sorry.

      20   A.   We had been there awhile and it was my impression
that

      21        things were kind of winding down when he asked me
to

      22        assist Officer Johnson in transporting T.B. Cook
to

      23        HCJ.

      24   Q.   By the way, was it when you came back downstairs

      25        Mr. T.B. Cook was handcuffed, right?

17

1   A.   Yes.

2   Q.   Was he lying on the ground?

3   A.   I believe he was standing by the front door.

4   Q.   He was sort of already in custody at that point?

5   A.   Yes, he was in custody.

6   Q.   Did you hear anyone use profanities when you went in

7        the house?

8   A.   I can't think of any specific instances.  Often times

9        it's used.

10  Q.   I'm not talking often times, I want to talk about this

11       time?

12  A.   I can't think of a specific time.

13  Q.   Did you have your handgun drawn when you went in the

14       house?

15  A.   No.

16  Q.   You don't recall ever having -- drawing your weapon?

17  A.   No, I did not.

18  Q.   Okay.  Did you see other officers with their weapons

19       drawn?

20  A.   No.

21  Q.   Sergeant Kroll?

22  A.   No.

23  Q.   Did you even see Sergeant Kroll with a weapon?

24   A.   I don't recall seeing Sergeant Kroll a weapon.

25   Q.   Did you see him at all that day?


                    Jensen Reporting   (651) 351-9500



18


 1   A.   Yes.

 2   Q.   How about Officer Hanks, did you see him with a

 3        weapon?

 4   A.   Not inside the address, no.

 5   Q.   Outside before the entry went in, were you able
to

 6        observe those officers?

 7   A.   Yes, I don't recall them carrying weapons I guess
to

 8        answer your question.

 9   Q.   Do you know who Officer Roger Smith is, he's a
pretty

10        big officer, right?

11   A.   Roger Smith, yeah, he's good size, yes.

12   Q.   Did you see him with a weapon?

13   A.   I don't recall anyone with weapons.  We were -- I
was

14        a perimeter officer, of course, the people I was
with

15        in the back yard had weapons but as far as the
entry

16        team goes, I don't recall seeing them go in, I
don't

17      recall watching observing them hold anybody at
gun

18      point because the scene was secure by the time I
went

19      in the house.

20   Q.   When you got in the house, did you see people
lying on

21      the floor, were they seated or cuffed?  We kind
of

22      went over this, I want to get that clear and
we'll

23      probably be done.

24   A.   I saw people sitting in the living room, I
believe one

25      person was on the floor.  People were all sitting


Jensen Reporting  (651) 351-9500



19



1      handcuffed.

2   Q.   Anybody resisting that you could see?

3   A.   Not that I could see, no.

4   Q.   Okay.  Anybody being uncooperative that you could
see?

5   A.   Not that I could see, no.

6                    MR. GOINS:  Thank you very much.

7      Thanks.

8                    MS. NELSON:  We'll read and sign.

9

10

```
11
12                         * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Jensen Reporting   (651) 351-9500


20

```
1
2                         VERIFICATION
3          I, Jonathan Petron, the undersigned, do hereby
certify
4     that the foregoing deposition of my testimony is a
true and
5     correct reproduction of same, except for the following
6     changes if any, stating the page and line number of
```

said

7    change; also stating the reason.

8    Page    Line    Change                        Reason

9    _____   ____    _____
_____

10   _____   ____    _____
_____

11   _____   ____    _____
_____

12   _____   ____    _____
_____

13   _____   ____    _____
_____

14   _____   ____    _____
_____

15   _____   ____    _____
_____

16   _____   ____    _____
_____

17   _____   ____    _____
_____

18   _____   ____    _____
_____

19   _____   ____    _____
_____

20   _____   ____    _____
_____

21   _____           _____

22   Jonathan Petron                  Date

23   _____

24   WITNESS MY HAND AND SEAL this _____ day of
_____,

25   2007.

Jensen Reporting  (651) 351-9500

21

1

2          STATE OF MINNESOTA              )

3                                          )
           COUNTY OF WASHINGTON            )

4

5          I, Lorie M. Jensen, Notary Public, Washington
County,

6     Minnesota, took the foregoing deposition of JONATHAN

7     PETRON, that the witness was by me first duly sworn;

8          That the testimony was transcribed under my
direction

9     and is a true record of the testimony of the witness;

10         That the cost of the original has been charged to
the

11    party who noticed the deposition, and that all parties
who

12    ordered copies have been charged at the same rate for
such

13    copies;

14         That I am not a relative or employee or attorney
or

15    counsel of any of the parties, or a relative or
employee of

16    such attorney or counsel;

17         That I am not financially interested in the
action and

18    have no contract with the parties, attorneys, or
person

19    with an interest in the action that affects or has a

20    substantial tendency to affect my impartiality.

21          Dated this 19th day of February, 2007.

22

_____

23                               Lorie M. Jensen, Notary
Public

24                               Washington County, Minnesota

25


Jensen Reporting  (651) 351-9500