1

```
    1                 UNITED STATES DISTRICT COURT
                           DISTRICT OF MINNESOTA
    2    - - - - - - - - - - - - - - - - - - - - - - - - -
-
         Charles Everett Cook, Sylvia Mae Cook,
    3    and Timothy Blake Cook, natural persons,

    4            Plaintiffs,

    5    vs                          Court File 06-0022

    6    City of Minneapolis, a municipal entity;
         Minneapolis Police Officer Mark Johnson, Badge
    7    #003459, in his individual, personal and official
         capacity, Sgt. D. Smulski, in his individual,
    8    personal and official capacity; Officer K. Blackwell,
         in his individual, personal and official capacity;
    9    Officer Geoffrey Toscano, Badge #007257, in his
         individual, personal and official capacity; Officer
   10    Bevsn Blauert, Badge #003459 in his individual,
         personal and official capacity; Officer Jon Petron,
   11    Badge #4671, in his individual, personal and official
         capacity; Officer Christopher House, Badge #3165, in
his
   12    individual, personal and official capacity; Sgt.
Robert
         Kroll, Badge #003874, in his individual, personal and
   13    official capacity; Officer Christie Nelson, Badge
#4959, in
         her individual, personal and official capacity;
Officer
   14    William Willner, Badge #7783, in his individual,
personal
         and official capacity; Officer Westlund, Badge #7674,
in
   15    his individual, personal and official capacity;
Officer
         Roger Smith, Badge #006689, in his individual,
personal and
   16    official capacity; Officer Jason King, Badge #003704,
in
         his individual, personal and official capacity;
Officer
   17    Timothy Hands, Badge #002660, in his individual,
personal
         and official capacity; and Officer Jane Doe and
Richard
   18    Roe, unknown, unnamed officers of the Minneapolis, in
their
         personal, individual
   19    and official capacity;

   20            Defendants.
```

```
                        - - - - - - - - - - - - - - - - - - - - - - - - - -
- -
                21
                        Whereupon, the following deposition was taken of
CHRISTIE
                22      NELSON, pursuant to Notice, according to the Rules of
Civil
                        Procedure for the State of Minnesota, taken on the
13th day
                23      of February, 2007 before Lorie M. Jensen, Notary
Public,
                        Washington County, Minnesota.
                24

                25
```

                              Jensen Reporting  (651) 351-9500


2

```
                1       APPEARANCES:

                2

                3          Albert T. Goins, Attorney at Law, Goins Petry
Law, 301
                4       Fourth Avenue South, 378 Grain Exchange Building,

                5       Minneapolis, Minnesota 55415, appearing as Counsel for
and
                6       on behalf of the Plaintiffs;

                7

                8          Tracy Nelson, Assistant City Attorney, City
Attorney's
                9       Office, 333 South 7th Street, Suite 300, Minneapolis,

                10      Minnesota 55402, appearing as Counsel for and on
behalf of
                11      the Defendants.
```

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jensen Reporting  (651) 351-9500

3

```
 1

 2     INDEX:

 3

 4     EXAMINATION BY:

 5

 6     Mr. Goins          4

 7

 8
```

```
 9

10        EXHIBITS:

11

12        Nelson Deposition Exhibits

13        Number 1 - Page 24

14        Number 2 - Page 25

15

16        OBJECTIONS:

17        BY MS. NELSON:   Pages 17, 21

18

19

20

21

22

23

24

25
```

Jensen Reporting  (651) 351-9500

4

```
 1   Whereupon, the following proceedings were duly held
and

 2   made a part of the record, as follows, to-wit:

 3                CHRISTIE NELSON,

 4        having been first duly sworn, was examined,

 5        and testified, under oath, as follows:
```

6                          EXAMINATION:

7    BY MR. GOINS:

8    Q.    Officer Nelson, my name is Albert Goins, I represent

9          the plaintiffs along with Ms. Maya Sullivan in this

10         lawsuit.  I see that you brought your police report

11         with you today, I'll ask that you put it away.

12   A.    Okay.

13   Q.    We are not going to ask you to read from your report,

14         we'll ask you to testify based upon your recollection,

15         okay?

16   A.    Okay.

17   Q.    If you need to refer to any documents, you can do

18         that.  Have you had your deposition ever taken before?

19   A.    I don't think so.

20   Q.    Have you ever testified in court before?

21   A.    Yes.

22   Q.    You understand that when you give a deposition you're

23         swearing to tell the truth and giving sworn testimony

24         just like when you're in court, is that correct?

25   A.    Yeah.

5

```
        1   Q.   Do you have any doubt about that?
        2   A.   No.
        3   Q.   With respect to this also, if you answer
questions I
        4        want you to answer out loud as opposed to shaking
your
        5        head or saying uh-huh or hu-huh.  I would ask
also
        6        that if you don't understand a question say you
don't
        7        understand a question, okay?
        8   A.   Okay.
        9   Q.   You're here about an incident that occurred on
January
       10        14th, 2005, is that correct?
       11   A.   Yes.
       12   Q.   And you understand that you're a named defendant
in
       13        this lawsuit brought by Timothy Cook, Sylvia Cook
and
       14        Charles Everett Cook, is that correct?
       15   A.   Yes.
       16   Q.   Did you get served with that lawsuit at some
point in
       17        time?
       18   A.   Yes.
       19   Q.   What documents have you reviewed prior to coming
here
       20        today for your deposition?
       21   A.   Police report.
       22   Q.   Which police report was it, do you have a copy of
```

it?

23   A.   Yes.

24   Q.   Can I see the copy that you reviewed?  Okay.  Did you

25        review the reports of other officers?


                    Jensen Reporting  (651) 351-9500



6


1   A.   Not so much.

2   Q.   What do you mean not so much?

3   A.   I looked at mine but in order to find mine I saw some

4        others.

5   Q.   How many police reports did you do with respect to

6        this incident that occurred on January 14th, 2005?

7   A.   I did my supplement.

8   Q.   Let me just clarify.  Why were you -- clarify we got

9        the date correct.  Was the date of the incident

10       actually January 13th, 2005 but you did your report on

11       January 14th?

12   A.   Yeah.

13   Q.   Okay.

14   A.   If the incident and time was the 13th on the front

15       page.

16   Q.   Why were you at a residence located at 38th
Street and

17        Minnehaha Avenue, were you at that location or
were

18        you at a different location?

19   A.   What was the address?

20   Q.   You tell me, do you remember the address?

21   A.   You said 38th and Minnehaha?

22   Q.   Uh-huh.

23   A.   I believe it was on 2nd Avenue.

24   Q.   You were actually at 3845 2nd Avenue South?

25   A.   Yes.


                    Jensen Reporting   (651) 351-9500


7

1   Q.   What time did you get to that location?

2   A.   Around 10:30 p.m.

3             MS. NELSON:  Counsel, could you
just

4        instruct the witness that I can't offer even the

5        simplest questions I can't provide any advice at
this

6        time?

7             MR. GOINS:  Sure.

8   Mr. Goins (Continuing)

9   Q.   I understand you might want to look to your
counsel to

10          get conformation, but she can't provide any

11          information to you, you understand that?

12    A.    Okay.

13    Q.    If you need to refresh your recollection by

looking at

14          your report, I'll be happy to give you your

report

15          back, okay?

16    A.    All right.

17    Q.    Were you employed as a Minneapolis police officer

on

18          January 14th, 2005?

19    A.    Yes.

20    Q.    How long had you been a Minneapolis police

officer at

21          that point?

22    A.    I was hired in '97.

23    Q.    So you had been on the force for about eight

years, is

24          that correct?

25    A.    Yes.


                    Jensen Reporting  (651) 351-9500



8


1    Q.    Tell me a little bit about your educational

2          background, please?

3    A.    I graduated from the University of Minnesota.

4    Q.    In what?

```
 5    A.    Bachelor of Science.

 6    Q.    What area though?

 7    A.    Kinesiology.

 8    Q.    What is your police officer training?

 9    A.    The academy, Minneapolis.

10    Q.    Why did you become a police officer?

11    A.    Why?

12    Q.    That's correct, why?

13    A.    Because I wanted to.

14    Q.    What other jobs did you hold prior to becoming a

15          police officer?

16    A.    I worked in the health club industry.

17    Q.    What did you do?

18    A.    Worked for various health clubs in various
capacities.

19    Q.    Where did you work?

20    A.    For awhile at Lifetime Fitness.

21    Q.    Were you ever a security guard?

22    A.    No.

23    Q.    Were you a trainer?

24    A.    Not at that club, no.

25    Q.    Were you a trainer though at some club?
```

Jensen Reporting  (651) 351-9500

```
 1   A.   At U.S. Fitness which is also Bally Fitness now.

 2   Q.   You were a trainer then?

 3   A.   Yes.

 4   Q.   How long did you play that role as a trainer?

 5   A.   Maybe a couple of years right after college.

 6   Q.   Are you a weight lifter?

 7   A.   Not so much.

 8   Q.   What was your area of expertise?

 9   A.   In the health club?

10   Q.   Yes.

11   A.   I worked as an administrative assistant and
manager.

12   Q.   When you were a trainer, what was your area of

13        expertise in that?

14   A.   I was an operations manager.

15   Q.   But I thought you said you were a physical
trainer?

16   A.   I did that for awhile too.

17   Q.   What was your area of expertise as a physical
trainer?

18   A.   Setting up work-outs for members with their goals
so

19        they would come to you with their work-out goals,
set

20        them up on a work-out and subsequently take them

21        through the work-outs.

22   Q.   Okay.  How many high risk entries had you been on

23        approximately prior to January 13th, 2005?

24   A.   Less than five.

25   Q.   What is the 1280 team?
```

Jensen Reporting  (651) 351-9500

10

```
 1   A.   That is the high risk entry team.

 2   Q.   Were you a part of that team on January 13th,
      2005?

 3   A.   No.

 4   Q.   Where were you assigned?

 5   A.   I was assigned to the 3rd Precinct directed
patrol

 6        unit.

 7   Q.   What is that?

 8   A.   Our hours were from 4 p.m. to 2 p.m., 2 a.m.

 9   Q.   Who told you that you would be executing a search

10        warrant on January 13th, 2005?

11   A.   My recollection would probably be Sergeant
Smulski

12        and/or Officer Blackwell.

13   Q.   What relationship did you have to Sergeant
Smulski and

14        Officer Blackwell on that date, were they your

15        supervisors?

16   A.   Sergeant Smulski was.

17   Q.   How long had he been your supervisor?

18   A.   I had just arrived to the unit whatever the date
was

19        but it was recent coinciding with the 1st of the
year.

20   Q.   Had you had experience with Sergeant Smulski in
the
```

21      past?

22  A.  Yes.

23  Q.  How about with Sergeant Kroll?

24  A.  I knew who he was.

25  Q.  So you knew who Robert Kroll was?


Jensen Reporting  (651) 351-9500


11


1   A.  Yes.

2   Q.  What role did he play on January 13th, 2005?

3   A.  He was assigned to Squad 1280.

4   Q.  What is that, the high risk entry team?

5   A.  The entry team, yes.

6   Q.  Who gave the briefing on this search warrant?

7   A.  I don't remember.

8   Q.  Do you remember that a briefing was done?

9   A.  Yes.

10  Q.  Do you remember what assignment you were given?

11  A.  The parameter.

12  Q.  What were you told about the search warrant?

13  A.  Involved robbery suspects.

14  Q.  So you were looking for a robbery suspect at the

time

15      that you executed the warrant?

16  A.  Yes.

17   Q.   Was it a person warrant?

18   A.   Yes.

19   Q.   Do you know what a person warrant is?

20   A.   A warrant for a person.

21   Q.   It's a warrant to find and arrest a person, is
that

22        correct?

23   A.   Yes.

24   Q.   So were you ever showed the search warrant?

25   A.   No.


                    Jensen Reporting  (651) 351-9500


12

1    Q.   You never saw the search warrant?

2    A.   No.

3    Q.   Were you ever read the search warrant?

4    A.   No.

5    Q.   I'm sorry?

6    A.   No.

7    Q.   So would it be fair to say that nobody told you
what

8         you were looking for in the search warrant?

9    A.   Well, no.

10   Q.   Did you do a report that was Supplement Number 7
in

11        this incident, in fact it's the report you
brought

```
12          with you here today?

13    A.    If it's Supplement 7, yes.

14    Q.    Is the report that you did the one that you
brought

15          with you here today?

16    A.    Yes.

17    Q.    Did you say in that report what the purpose of
the

18          search warrant was?

19    A.    To look for a robbery suspect.

20    Q.    Why don't you show me where you said that in your

21          Supplement Number 7, Officer?

22    A.    Cartez, Cortez Lamar Cook.

23    Q.    Can you give me a complete sentence?

24    A.    Looking for documents that establish the
residency of

25          Cartez also known as Cortez Lamar Cook and then a
```

Jensen Reporting   (651) 351-9500

13

```
1           birth date.

2     Q.    I'm sorry for interrupting.  Actually, what it
reads

3           is I was advised by Officer K. Blackwell that we
would

4           be looking for documents that established the

5           residence of Cartez, aka Cortez Lamar Cook, 10-05

6           1985, isn't that what it says?
```

```
 7   A.   Yes.

 8   Q.   Does it say anything about looking for the
individual?

 9   A.   Can I look at it?

10   Q.   Sure.

11   A.   No.

12   Q.   I'm sorry?

13   A.   No.

14   Q.   Then who told you that you would be looking for
an

15        individual by the name of Cortez or Cartez Lamar
Cook?

16   A.   I don't remember.

17   Q.   What were you actually doing when you went on the

18        search warrant?

19   A.   Looking for documents that established the
residency

20        of Cortez also known as -- Cartez aka Cortez
Lamar

21        Cook.

22   Q.   Were you told the kind of search warrant you were

23        executing at the briefing?

24   A.   What kind?

25   Q.   Yes.
```

Jensen Reporting  (651) 351-9500

14

```
 1   A.   Yes.

 2   Q.   What were you told?

 3   A.   High risk entry.

 4   Q.   What does that mean?

 5   A.   That there was a possibility of weapons inside.

 6   Q.   Who told you that?

 7   A.   Officer Blackwell.

 8   Q.   And you just looked at your report to recollect
that,

 9        is that correct?

10   A.   Yes.

11   Q.   Okay.  But in fact, there was nothing in the
search

12        warrant that indicated that you were actually
looking

13        for the individual, you were simply looking for

14        documents, correct?

15   A.   If that's what the search warrant says.

16   Q.   Let me clarify --

17   A.   I didn't read the affidavit.

18   Q.   We're not talking about the affidavit, you know

19        there's a distinction between the affidavit and
the

20        search warrant?

21   A.   Yes.

22   Q.   Let's just clarify.  Who actually gave the
briefing?

23   A.   I don't remember if it was Sergeant Smulski,
Officer

24        Blackwell or Sergeant Kroll, I don't remember.

25   Q.   You think it was one of those three?
```

15

1   A.   It could have been.

2   Q.   Or maybe a combination of those three?

3   A.   It's possible.

4   Q.   Did you get a description or picture of Cortez
Cook?

5   A.   I don't remember.

6   Q.   Were you told that there would be other people in
the

7        house?

8   A.   Was I told, I don't remember.

9   Q.   Before you got to the house, as a part of the
briefing

10       were you advised that you were suppose to knock
and

11       announce before you entered the home?

12  A.   I was assigned to the rear perimeter.

13  Q.   Were you advised?

14  A.   I don't know, I don't remember.

15  Q.   When you do a search warrant, do you learn
whether or

16       not the search warrant is going to be -- first of
all,

17       let me establish this.  Do you know what a
no-knock

18       search warrant is?

19  A.   Yes.

20   Q.   What is that?

21   A.   No knocking.

22   Q.   What does that mean?

23   A.   No announcing.

24   Q.   What does that mean?

25   A.   No announcing your presence and authority prior
to


Jensen Reporting  (651) 351-9500



16



1         going through the threshold of the door.

2    Q.   Which means you can do what?

3    A.   Go.

4    Q.   How do you go?

5    A.   You enter.

6    Q.   In any way necessary?

7    A.   Sometimes.  I am not sure.

8    Q.   Did someone in this case that we're here about
today

9         carry what's called a battering ram?

10   A.   Was somebody assigned to the ram, is that your

11        question?

12   Q.   That's my question.

13   A.   I am sure there was somebody assigned to the ram.

14   Q.   Why are you sure about that?

15   A.   Because 1280 did the entry.

16  Q.   Do you remember someone having a ram?

17  A.   I don't remember who had the ram.

18  Q.   Do you remember someone having something called a

19       hooligan?

20  A.   I don't remember who had the hooligan.

21  Q.   But you believe there was one there?

22  A.   It's very possible there was a hooligan.

23  Q.   Is that the same as what's called -- sometimes
called

24       a hooligan or hooligan tool?

25  A.   I think so.


                    Jensen Reporting  (651) 351-9500



17


1   Q.   Were you told that -- you were assigned to the

2        perimeter, which portion of the perimeter were
you

3        going to deal with?

4   A.   The rear perimeter.

5   Q.   You just looked at your report to recall that, is
that

6        correct?

7   A.   No, I knew I was on the rear perimeter.

8   Q.   Were you told then, let me come back and I
apologize

9        if I asked you.  Were you shown a picture of
Cortez

10       Cook?

11   A.   I don't remember.

12   Q.   So you didn't know who you were looking for?

13   A.   I don't remember if I saw a picture or not.

14              MS. NELSON:  I would object that that

15        misstates the prior testimony.

16   Mr. Goins  (Continuing)

17   Q.   Well, were you shown a picture of Cortez Cook?

18   A.   Was I shown a picture of Cortez Cook, I don't

19        remember.

20   Q.   How about a picture of Cartez Cook?

21   A.   I don't remember.

22   Q.   Do you remember seeing a photograph?

23   A.   No, I don't remember.

24   Q.   Do you remember if anyone at the briefing had any

25        photographs?


              Jensen Reporting  (651) 351-9500


18


1   A.   I don't remember.

2   Q.   Do you remember if you recall that there was an image

3        of a person that you were looking for?

4   A.   I don't remember.

5   Q.   How about a description?

6   A.   I don't remember.

```
 7   Q.   Do you remember the race of the person you were

 8        looking for?

 9   A.   I believe he was an African American male.

10   Q.   Where did you get that information from that he
          was an

11        African American male?

12   A.   Probably during the briefing.

13   Q.   From whom?

14   A.   I don't remember.

15   Q.   What was your role being on the perimeter?

16   A.   I was part of the rear perimeter so.

17   Q.   Let's refer to your report, we'll have it marked
          in a

18        minute, you have it there in front of you,
          correct?

19   A.   Okay.

20   Q.   At about the third paragraph down you said as
          officers

21        entered the foyer, I observed that AP/Timothy
          Cook was

22        yelling at officers using foul language.  What

23        language was Mr. Cook using, Timothy Cook?

24   A.   Foul.

25   Q.   What language?
```

Jensen Reporting  (651) 351-9500

19

1   A.   English.

2   Q.   What language was he using specifically, what
words?

3   A.   I don't know.  It was very loud and swearing just

4        profanities.

5   Q.   What was he saying?

6   A.   I don't remember specifically what the
profanities

7        were.

8   Q.   Who was he directing those to?

9   A.   I believed it was to all of us.

10  Q.   Did you take offense at that?

11  A.   I didn't think it was appropriate.

12  Q.   What did you do about that?

13  A.   He was probably told to be quiet.

14  Q.   By you?

15  A.   Probably at some point everybody told him to be
quiet.

16       I probably did too.

17  Q.   What position was Mr. Cook in when he was saying
that

18       physically, was he standing, sitting?

19  A.   I don't remember.

20  Q.   Was he lying down?

21  A.   I do not remember.

22  Q.   Do you remember if he was handcuffed?

23  A.   I don't remember.

24  Q.   How many other people were nearby when he was
doing

25       this?

Jensen Reporting  (651) 351-9500

20

1   A.   A few.

2   Q.   How many is a few?

3   A.   Can I look?

4   Q.   If your report will help you, sure?

5   A.   I think there were like five.

6   Q.   And those were other than police officers or was
that

7        including officers?

8   A.   No, five individuals who were not police
officers.

9   Q.   Now at some point your report indicates there
were

10       five people who were initially handcuffed when

11       officers made immediate entry, why were those

12       individuals handcuffed?

13  A.   Why were they handcuffed?

14  Q.   Correct.

15  A.   Because it was during the course of a high risk
entry.

16  Q.   Are you saying there's a Minneapolis Police
Department

17       policy or procedure that says that when you are
on a

18       no-knock warrant that you immediately handcuff
the

19       people that are inside?

20  A.   I don't know, I don't know what the procedure or

what

21           that would be but I know that when we go in that
they

22           were handcuffed.

23   Q.   Have you had any training with respect to how to
do a

24           high risk entry?

25   A.   Have I, no.


Jensen Reporting  (651) 351-9500


21


1   Q.   So you don't know whether that's true or not that

2           they're suppose to be handcuffed as part of a
high

3           risk entry?

4   A.   I don't know if there's a policy or not.

5   Q.   You don't know if that policy was being followed

6           accurately?

7   A.   Okay.

8                MS. NELSON:  I would object to

9           misstates prior testimony.

10              THE WITNESS:  Can we break this
down to

11           the simple questions because there is like three
in a

12           row.

13  Mr. Goins  (Continuing)

14   Q.   If you don't understand the question that's fine.

Did

15        you not understand the question?

16   A.   They're all scrunched together.  I don't know if
there

17        is a policy and I don't know if the policy was

18        followed.  So whether or not if I know that there
is a

19        policy, do you know what I'm saying?

20   Q.   No.

21   A.   Okay.  I don't know if there's a policy.

22   Q.   Okay, okay.

23   A.   That's it.

24   Q.   So that wouldn't it be fair to say you don't know
if

25        the proper policy was followed, correct?


Jensen Reporting  (651) 351-9500


22


1    A.   I don't know.

2    Q.   That's all I want to ask.  Now who did the
handcuffing

3         of these individuals, do you know?

4    A.   No.

5    Q.   And how were they handcuffed when you saw them?

6    A.   How were they handcuffed?

7    Q.   Right, front, back, cuffed together and chained?

8    A.   I don't remember.

```
          9    Q.   How were they handcuffed?

         10    A.   What do you mean in chains?   Nobody was
handcuffed to

         11         each other.

         12    Q.   How were they handcuffed?

         13    A.   By themselves.

         14    Q.   Front or back?

         15    A.   I don't remember.

         16    Q.   Lying down?

         17    A.   I don't remember but it's possible.

         18    Q.   Was there anything covering these individuals if
you

         19         know?

         20    A.   I don't remember.

         21    Q.   You said in your report I then identified the
five

         22         people in the living room.  Who were the five
people

         23         you identified?

         24    A.   I believe they were marked as others in the
police

         25         report.
```

Jensen Reporting  (651) 351-9500

```
23
```

```
          1    Q.   Did you ask any of those people if they were
Cortez

          2         Cook?
```

```
 3    A.    I believe most of them were women.

 4    Q.    Okay.  Adults or children?

 5    A.    There were children there but I think we got
names
 6          from the adults.

 7    Q.    Okay.  What were their names?

 8    A.    I remember one was named Sylvia.

 9    Q.    Was she an older woman?

10    A.    I don't remember.

11    Q.    Did you notice whether or not she was sitting at
the
12          time that she was cuffed?

13    A.    I don't remember.

14    Q.    Did you notice whether or not there were any
infants
15          in the house?

16    A.    There were small children in the house.

17    Q.    Do you know who took care of the small children
after
18          you made the entry?

19    A.    They were -- the kids were brought down into the
main
20          room, living room, family room with the women.

21    Q.    Did you have your weapon drawn when you entered
the
22          house?

23    A.    I don't remember.

24    Q.    So you don't know if you drew your weapon?

25    A.    I don't remember.  I don't recall.
```

24

1   Q.   Do you remember pointing your weapon at anyone?

2   A.   I don't remember.

3   Q.   Do you remember seeing any other officers point their

4        weapons at any one?

5   A.   I don't remember.

6   Q.   Do you remember seeing any officers apply force to

7        anyone?

8   A.   I am sorry?

9   Q.   Do you remember seeing any officers apply force to

10       anyone?

11  A.   I don't remember.

12  Q.   Why is it that you don't remember?

13  A.   I don't.  I just know that once we were there I got

14       names of the people that were in the downstairs.  I

15       found some mailings on a piano and then left.

16  Q.   Were you told by other officers not to recall?

17  A.   No.

18                    (Whereupon, Nelson Deposition Exhibit

19       Number 1 was marked for identification by the Court

20       Reporter).

21  Mr. Goins  (Continuing)

22   Q.   Let me show you, Officer Nelson, what's been
marked as

23        your Exhibit 1.  Is that your report in this
case?

24   A.   Yes.

25   Q.   Okay.  Did you prepare any other reports in this
case


                    Jensen Reporting  (651) 351-9500


25


1         other than Exhibit 1?

2    A.   I don't believe so.

3    Q.   Okay.  Do you know if anyone was arrested as a
result

4         of this incident?

5    A.   Yes.

6    Q.   For what?

7    A.   Obstruction.

8    Q.   Who was that?

9    A.   An individual named Timothy.

10   Q.   What did you see him do to obstruct legal
process?

11   A.   I don't remember but I know that he was loud,
that's

12        all I remember.

13   Q.   Have you ever arrested anyone for obstructing
legal

14        process for being loud?

15   A.   Have I?

16   Q.   Yes.

17   A.   I don't think so.

18              (Whereupon, Nelson Deposition Exhibit

19        Number 2 was marked for identification by the Court

20        Reporter).

21   Mr. Goins   (Continuing)

22   Q.   Showing you what's been marked as Exhibit 2. Take a

23        look at that document and tell me if you've ever seen

24        that before?

25   A.   Can I read it?


Jensen Reporting   (651) 351-9500


26


1   Q.   Sure, absolutely.

2   A.   Okay.  What was your question?

3   Q.   Have you seen that before?

4   A.   Before today, no.

5   Q.   That's the search warrant for the residence at 3845

6        2nd Avenue South, it doesn't give a city address but

7        it seems to indicate it's for the City of Minneapolis,

8        County of Hennepin, State of Minnesota, would that be

9          correct?

10    A.    Yes.

11    Q.    By the way, did you see an elderly man there
looked to

12          be about 69 years old?

13    A.    Yes.

14    Q.    Did you see officers ask him to put his hands up?

15    A.    Did I see officers ask him to put his hands up?

16    Q.    Yes.

17    A.    I don't remember.

18    Q.    Did you see any officers tell him to shut up?

19    A.    I don't remember.

20    Q.    Did you hear any officers tell him to shut up?

21    A.    I don't remember.

22    Q.    Did you see any officers put their foot in that

23          elderly man's stomach?

24    A.    No.

25    Q.    Did you hear any officers use obscenities towards
any


                    Jensen Reporting  (651) 351-9500




27




1          individual?

2     A.    One more time?

3     Q.    Did you hear any officers use obscenities towards
any

4          individual?

5    A.    I don't remember.  But I know that for the man
that

6          was older, we did get -- he said he was cold, I

7          remember that and we got him like a blanket or a
sofa

8          throw or something to put on his person because
he

9          said he was cold.

10   Q.    Do you know why he was cold?

11   A.    It was really cold outside.

12   Q.    Why was he outside?

13   A.    He wasn't outside but it was really cold outside.

14   Q.    Was the house unheated?

15   A.    No, the house was heated.  Like when it is cold

16         outside I get cold inside and he said he was cold
so

17         we got him something so he wasn't cold.

18   Q.    Is it true he was placed by the door?

19   A.    It was near the door to the porch foyer area but
there

20         were two doors.

21   Q.    Did you see any officers throw any cooked food on
the

22         floor?

23   A.    No.

24   Q.    See any officers take any food out of the

25         refrigerator?

28

1   A.   No.

2   Q.   Did you see any officers kick Mr. Timothy Cook,
the

3        individual who was arrested for obstructing?

4   A.   No.

5   Q.   You didn't see any force used against Mr. Timothy

6        Cook?

7   A.   No.

8   Q.   Sorry?

9   A.   No.

10   Q.   Are you okay, officer, are you feeling ill?

11   A.   No, I'm fine.

12   Q.   Did you see anyone use what's called a poke check

13        maneuver?

14   A.   Did I see anybody poke check?

15   Q.   Do you know what a poke check maneuver is first?

16   A.   Not so much.

17   Q.   You've never heard of that?

18   A.   I've never seen it.

19   Q.   So you've never seen an officer take their MP-5,
their

20        automatic weapon or rifle and poke someone with
it in

21        a search?

22   A.   No.

23   Q.   You didn't see that happen on this occasion?

24   A.   I did not see anything.

25   Q.   Okay.


Jensen Reporting   (651) 351-9500


29

1                    MR. GOINS:  Thanks for coming in.

2                    THE WITNESS:  Thank you.

3                    MR. GOINS  We'll see if Smulski is

4         available.

5                    MS. NELSON:  We'll read and sign.

6

7

8

9

10

11

12

13                    * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

Jensen Reporting  (651) 351-9500

30

1

2          VERIFICATION

3      I, Christie Nelson, the undersigned, do hereby certify

4   that the foregoing deposition of my testimony is a true and

5   correct reproduction of same, except for the following

6   changes if any, stating the page and line number of said

7   change; also stating the reason.

8   Page    Line    Change                        Reason

9   _____   _____   _____   _____

10  _____   _____   _____   _____

11  _____   _____   _____   _____

12  _____   _____   _____   _____

13  _____   _____   _____   _____

14  _____   _____   _____   _____

```
15    _____   ____   _____
_____
16    _____   ____   _____
_____
17    _____   ____   _____
_____
18    _____   ____   _____
_____
19    _____   ____   _____
_____
20    _____   ____   _____
_____
21    _____            _____

22    Christie Nelson                Date

23    _____

24    WITNESS MY HAND AND SEAL this _____ day of
_____,

25    2007


              Jensen Reporting  (651) 351-9500




31



      1

      2
              STATE OF MINNESOTA          )
      3                                    )
              COUNTY OF WASHINGTON         )
      4

      5      I, Lorie M. Jensen, Notary Public, Washington
County,

      6   Minnesota, took the foregoing deposition of CHRISTIE

      7   NELSON, that the witness was by me first duly sworn;
```

8       That the testimony was transcribed under my
direction

9    and is a true record of the testimony of the witness;

10       That the cost of the original has been charged to
the

11    party who noticed the deposition, and that all parties
who

12    ordered copies have been charged at the same rate for
such

13    copies;

14       That I am not a relative or employee or attorney
or

15    counsel of any of the parties, or a relative or
employee of

16    such attorney or counsel;

17       That I am not financially interested in the
action and

18    have no contract with the parties, attorneys, or
person

19    with an interest in the action that affects or has a

20    substantial tendency to affect my impartiality.

21       Dated this 19th day of February, 2007.

22

_____

23                                    Lorie M. Jensen, Notary
Public

24                                    Washington County, Minnesota

25


Jensen Reporting  (651) 351-9500