1

```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2       - - - - - - - - - - - - - - - - - - - - - - - - - -

        Charles Everett Cook, Sylvia Mae Cook,
3       and Timothy Blake Cook, natural persons,

4              Plaintiffs,

5       vs                          Court File 06-0022

6       City of Minneapolis, a municipal entity;
        Minneapolis Police Officer Mark Johnson, Badge
7       #003459, in his individual, personal and official
        capacity, Sgt. D. Smulski, in his individual,
8       personal and official capacity; Officer K. Blackwell,
        in his individual, personal and official capacity;
9       Officer Geoffrey Toscano, Badge #007257, in his
        individual, personal and official capacity; Officer
10      Bevsn Blauert, Badge #003459 in his individual,
        personal and official capacity; Officer Jon Petron,
11      Badge #4671, in his individual, personal and official
        capacity; Officer Christopher House, Badge #3165, in
his
12      individual, personal and official capacity; Sgt.
Robert
        Kroll, Badge #003874, in his individual, personal and
13      official capacity; Officer Christie Nelson, Badge
#4959, in
        her individual, personal and official capacity;
Officer
14      William Willner, Badge #7783, in his individual,
personal
        and official capacity; Officer Westlund, Badge #7674,
in
15      his individual, personal and official capacity;
Officer
        Roger Smith, Badge #006689, in his individual,
personal and
16      official capacity; Officer Jason King, Badge #003704,
in
        his individual, personal and official capacity;
Officer
17      Timothy Hands, Badge #002660, in his individual,
personal
        and official capacity; and Officer Jane Doe and
Richard
18      Roe, unknown, unnamed officers of the Minneapolis, in
their
        personal, individual
19      and official capacity;

20                    Defendants.
```

- - - - - - - - - - - - - - - - - - - - - - - - - - -
- -
GEOFFREY

the
Notary

21   Whereupon, the following deposition was taken of

TOSCANO, pursuant to Notice, according to the Rules of
22   Civil Procedure for the State of Minnesota, taken on

13th day of February, 2007 before Lorie M. Jensen,

23   Public, Washington County, Minnesota.

24

25

Jensen Reporting   (651) 351-9500

2

1        APPEARANCES:

2

Law, 301

3        Albert T. Goins, Attorney at Law, Goins Petry

4   Fourth Avenue South, 378 Grain Exchange Building,

and

5   Minneapolis, Minnesota 55415, appearing as Counsel for

6   on behalf of the Plaintiffs;

7

Attorney's

8        Tracy Nelson, Assistant City Attorney, City

9   Office, 333 South 7th Street, Suite 300, Minneapolis,

behalf of

10   Minnesota 55402, appearing as Counsel for and on

11   the Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jensen Reporting   (651) 351-9500

3

1

2          INDEX:

3

4          EXAMINATION BY:

5

6          Mr. Goins          4

7

8

9

```
10

11        OBJECTIONS:

12        BY MS. NELSON:

13        Pages 8, 9, 11, 15, 16, 17

14

15

16

17

18

19

20

21

22

23

24

25
```

Jensen Reporting   (651) 351-9500

4

```
 1    Whereupon, the following proceedings were duly held
and

 2    made a part of the record, as follows, to-wit:

 3                   GEOFFREY TOSCANO,

 4        having been first duly sworn, was examined,

 5        and testified, under oath, as follows:
```

```
  6                        EXAMINATION:

  7   BY MR. GOINS:

  8   Q.   Would you state your full name please, sir?

  9   A.   Geoffrey Joseph Toscano.

 10   Q.   The spelling of Geoffrey is G-e-o-f-f-r-e-y, is
that

 11        correct?

 12   A.   Correct.

 13   Q.   Officer Toscano, what is your current employment,
sir?

 14   A.   City of Minneapolis Police Department.

 15   Q.   How long have you been so employed?

 16   A.   Ten years.

 17   Q.   Were you employed there on January 15th, 2005?

 18   A.   I was.

 19   Q.   At approximately 10:30 p.m.?

 20   A.   I was.

 21   Q.   Were you on duty at that time?

 22   A.   I was.

 23   Q.   Were you involved in an entrance of a residence

 24        located at 3845 2nd Avenue South in Minneapolis?

 25   A.   Is that the correct address?
```

Jensen Reporting  (651) 351-9500

5

```
  1                       MR. GOINS:  You can't ask your
counsel,
```

2          if you don't know you need to refer to your
report.

3                          THE WITNESS:  I need to refer to
my

4          report.

5     Mr. Goins (Continuing)

6     Q.   I'll provide you a copy of that.

7     A.   I was.

8     Q.   Do you recall that entry at all?

9     A.   I do.

10    Q.   What do you recall about it?

11    A.   I recall that we were contacted by the 3rd
Precinct

12         CRT team.  They advised us they had information
there

13         was a potential robbery suspect who was armed
staying

14         at that address.

15    Q.   Who contacted you from 3rd Precinct?

16    A.   It was Sergeant Smulski.  He didn't contact me,
he

17         contacted our warrant sergeant.

18    Q.   Who was that?

19    A.   Sergeant Kroll.

20    Q.   Sergeant Robert Kroll?

21    A.   Correct.

22    Q.   Were you present when he did that?

23    A.   No.

24    Q.   Were you at a briefing with respect to this

25         information?

Jensen Reporting   (651) 351-9500

6

```
 1   A.   I was.

 2   Q.   What was the briefing's purpose, if you know?

 3   A.   It's just like any other briefing.  The affiant's
team

 4        will give us the information on why the warrant
was

 5        drawn up.

 6   Q.   What information did you get in this case?

 7   A.   Like I said, that there was an armed robbery
suspect

 8        living at that address, living or staying.

 9   Q.   Were you shown a picture of that suspect?

10   A.   I don't recall.

11   Q.   Were you given any description of that suspect?

12   A.   I don't recall but it's normal that we are given
a

13        description.

14   Q.   Were you told the type of warrant?

15   A.   As far as?

16   Q.   Well, was it a no-knock, was it a night time,
daytime?

17   A.   I can't recall what it is, what it was.

18   Q.   What time did you execute the warrant?

19   A.   I would have to look at my report.

20   Q.   Okay.

21   A.   I don't have it listed in my report what time we
```

22          served the warrant.

23     Q.   Okay.  Do you recall what time it was?

24     A.   Late evening.

25     Q.   Do you think it was after 8:00?

7

1      A.   Yes.

2      Q.   Do you think it was after 9:00?

3      A.   Possibly.

4      Q.   Okay.  Was it dark out?

5      A.   Yes.

6      Q.   And you were part of the entry team, is that
correct?

7      A.   Correct.

8      Q.   Do you remember as part of the entry team what
exact

9           position you were assigned to by Sergeant Kroll?

10     A.   I was assigned to the ram.

11     Q.   You were the person who was to ram the door?

12     A.   Correct.  Along with Officer Roger Smith, it's a
two

13          man ram.

14     Q.   That meant, tell me if I'm just inferring this

15          incorrectly, did that mean that you were suppose
to be

16          knocking the door down as opposed to knocking on

the

17      door?

18   A.   Well, it could go either way.  No-knocks we don't have

19      to knock, we'll knock the door in.  Knocks we knock,

20      we give them a reasonable amount of time to come to

21      the door, if they don't we can still knock it in.

22   Q.   Do you remember what you did in this case?

23   A.   The door was unlocked, we did not have to ram it, no.

24   Q.   Did you knock on the door when you saw the door was

25      unlocked?


Jensen Reporting  (651) 351-9500


8


1    A.   Me, no.  The point man always checks the door to see

2        if it's unlocked and if it is then we don't have to

3        ram it.

4    Q.   Who was the point man?

5    A.   The point man was Officer Tim Hanks.

6    Q.   How long have you worked with Officer Tim Hanks?

7    A.   I been on the SWAT team for four years now so I'd done

8        two months of warrant service with him.

```
        9   Q.   Two months you say?

       10   A.   Yes, we do it in monthly rotations and I've
actually

       11        happened to have two warrant services with him
so.

       12   Q.   Okay.  In your report you stated the porch door
and

       13        the house door were unlocked?

       14   A.   Correct.

       15   Q.   How did you learn that information, you just saw
that?

       16   A.   As we approached the house, like I said, Officer
Hanks

       17        checked the door, if it's unlocked then they go
in.

       18        Being the ram team we go in last.

       19   Q.   You also stated once inside you helped to clear
the

       20        first floor and all the people that were located
on

       21        the first floor.  First of all, what was your
plan

       22        when you got to that house based on your
briefing?

       23                  MS. NELSON:  Object as vague.

       24   Mr. Goins  (Continuing)

       25   Q.   Was there a plan that was established at the
briefing
```

Jensen Reporting  (651) 351-9500

9

```
 1        as to what you were going to do?

 2   A.   Well, there's no set plan.  You don't say I am
going

 3        to go to this room, then I'll go to this room and
this

 4        room.

 5   Q.   What was the plan?

 6   A.   Essentially I was assigned to the ram, if the
door

 7        needs breaching, I breach it.  As the entry team
goes

 8        in if there's a person in the back room they see
them,

 9        they'll go there first.  As opposed to no one
being in

10        the front door.  You deal with the people as you
come

11        to them.  You don't know what people will be in a

12        house as you come to a house.

13   Q.   You didn't know who you were looking for, right?

14                  MS. NELSON:  Misstatement of prior

15        testimony.

16   Mr. Goins  (Continuing)

17   Q.   Did you know who you were looking for by name?

18   A.   I don't recall.

19   Q.   Do you recall whether or not you put that in your

20        report, I'm showing you your report?

21   A.   Right.  No, I didn't put it in my report who we
were

22        looking for.

23   Q.   You didn't put a description in your report of
who you

24        were looking for, did you?
```

25   A.   No.

Jensen Reporting  (651) 351-9500

10

1   Q.   As you sit here today, do you have any
recollection of

2        any description of at all race, gender, anything?

3   A.   I don't have a recollection, no.

4   Q.   In fact, so when you got to the first floor of
the

5        house you didn't really know what you were
suppose to

6        do other than what?  It is a bad question but I
think

7        you understood it.

8   A.   Just like any search warrant, we were given

9        information there was an armed suspect in there.
It

10        doesn't matter who is in the house, if we have

11        information that there is weapons everybody is --

12   Q.   Sorry to interrupt you, who told you there were

13        weapons in the house?

14   A.   Sergeant Smolski said there was an armed robbery

15        suspect staying at the address.

16   Q.   Do you know by the way if anybody did any
perimeter

17        surveillance when you got to the house?

18   A.   I don't know.  That's not our job.

19   Q.   So that would be done by the CRT team or the CRT
team?

20   A.   Correct.

21   Q.   When you got there, did anybody from CRT tell you
that

22        they'd done any perimeter surveillance?

23   A.   No, not that I recall.

24   Q.   Do you know what a threshold reappraisal is or

25        sometimes called threshold appraisal?


                    Jensen Reporting   (651) 351-9500




11


1   A.   No.

2   Q.   You don't know the term?

3   A.   No.

4   Q.   No one ever told you with a no-knock search
warrant

5        when you arrived at the threshold of the door,
what is

6        that?

7   A.   Entrance of the door.

8   Q.   Anybody ever taught you when you get to the
threshold

9        of a residence with a no-knock warrant, the 4th

10       ammendment and/or the Minnesota constitution may

11       require that you appraise whether or not you
should

12       knock and announce?

13                    MS. NELSON:  I object, it calls for a

14        legal conclusion.

15                    MR. GOINS:  No, it doesn't, it calls

16        for what he's been trained on.

17                    THE WITNESS:  If we've given

18        information it's a no-knock warrant, we're allowed to

19        go ahead and hit the door.

20    Mr. Goins (Continuing)

21    Q.   Who told you that?

22    A.   That's the way I've -- on a knock warranat we knock,

23        give them a reasonable time to come to the door, if

24        they don't come we hit the door.  If not it's a

25        no-knock it's for our safety.  If the Judge deems it's


Jensen Reporting  (651) 351-9500


12


1        a no-knock warrant as far as safety, we're allowed to

2        hit the door.

3    Q.   My question still stands.  Has anybody ever taught you

4        the concept of threshold reappraisal?

5    A.   No.

6    Q.    You don't know about that?

7    A.    No.

8    Q.    Have you had training specifically about the execution

9          of no-knock search warrants?

10   A.    As far as going into legal aspects of it?

11   Q.    Yes.

12   A.    No.

13   Q.    So nobody has ever trained you about the issue of

14         whether or not if you have a knock warrant that you

15         have to knock and wait a reasonable time, is that

16         correct?

17   A.    Right.

18   Q.    Have you had training about what I just said?

19   A.    Well, I don't think it would be -- no, not in the

20         specifics of going to a class and they sit down for an

21         hour and teach us, no.  Obviously, when it's a knock

22         warrant we knock and give a reasonable amount of time

23         to answer the door.

24   Q.    Who told you that that is something you're suppose to

25         do?

Jensen Reporting  (651) 351-9500

13

1    A.    I don't recall who told me that.

2    Q.    Just something you learned in the field?

3    A.    Sure.

4    Q.    Did anybody tell you any specific instructions
about

5          what you were suppose to do as the person on the
ram

6          as Officer Roger Smith in the event that the door
is

7          open?

8    A.    In the event the door is open?

9    Q.    Yeah.

10   A.    In the event the door is open, the point and
cover man

11         make entry first.

12   Q.    Who were they again?

13   A.    Officer Hanks and Sergeant Kroll.

14   Q.    So Officer Kroll -- Sergeant Kroll was the first
one

15         to go in?

16   A.    Officer Hanks would have been the first one.

17   Q.    And Sergeant Kroll would have been right behind
him?

18   A.    Correct.

19   Q.    How were they armed, if you recall?

20   A.    I don't recall.  Sub guns I'm sure.  I don't know

21         exactly what.

22   Q.    For the rest of us out in the studio audience,
what is

23         a sub gun?

24   A.    Sub machine gun.

25    Q.    It's an automatic weapon?


Jensen Reporting  (651) 351-9500



14


1    A.    Yes.

2    Q.    If you fire the trigger it will fire and keep
firing

3          as long as there's ammunition?

4    A.    If the safety is off.

5    Q.    Sure.

6    A.    I don't know if they run with the safeties on or
off.

7    Q.    You don't know either way?

8    A.    No.

9    Q.    In fact, did you see Sergeant Kroll point that
sub

10          machine gun at someone on this particular day?

11    A.    No.

12    Q.    Did you keep Sergeant Kroll in your vision
throughout

13          the entire search?

14    A.    No.

15    Q.    You don't know whether he did or not, would that
be

16          fair to say?

17    A.    No.

18    Q.    How about Officer Hanks, it's not Hand, it's
Hanks?

19   A.   Hanks.

20   Q.   We may have had the wrong name on something.  As
far

21       as Officer Hanks, did you see him with a sub
machine

22       gun?

23   A.   Yes.

24   Q.   Do you know if he had the safety off?

25   A.   No idea.


Jensen Reporting  (651) 351-9500


15


1   Q.   Did you see whether he pointed that sub machine
gun at

2       anyone?

3   A.   Didn't see.

4   Q.   Did you have your handgun out after you dropped
the

5       ram?

6   A.   Yes.

7   Q.   Do you drop the ram, do you just drop it to your
side

8       or what happens?

9   A.   We make a decision at the door who drops it.

10   Q.   Who dropped it?

11   A.   I don't recall.

12   Q.   You had your handgun out?

13   A.   Yes, once I made entry into the residence I did.

14   Q.   What did you have with you?

15   A.   At the time it was my Beretta, 92 FS.

16   Q.   Now what do you carry?

17   A.   Sig Saur PT 220.

18   Q.   S-i-g  S-a-u-r?

19   A.   PT 220.

20   Q.   How many rounds did you have in your Beretta?

21   A.   In the magazine 15 and one in the chamber.

22   Q.   Did you have the safety off?

23   A.   Yep.

24   Q.   Who did you point your weapon at?

25                    MS. NELSON:  Objection, misstates prior


                    Jensen Reporting  (651) 351-9500




16


1        testimony, assumes facts.

2   Mr. Goins  (Continuing)

3   Q.   I don't think I ever asked him but go ahead.  Who did

4        you point your weapon at?

5   A.   I don't know exactly the names.  There was, like I

6        said, a group of females and some kids in the living

7        room area.

8  Q.  Was there an elderly female who you pointed your

9      weapon at?

10  A.  I don't recall.

11  Q.  How about any small children, did you point your

12      weapon at them?

13  A.  The small children were on the laps of the
females.

14  Q.  You pointed your weapon at those children if they
were

15      in the laps of the female that you pointed your
weapon

16      at?

17              MS. NELSON:  Objection, compound

18      question.

19              THE WITNESS:  Go ahead?

20  Mr. Goins  (Continuing)

21  Q.  You can answer?

22  A.  Like I said, when I came in I went to the right.

23      There was a group of females, I don't remember if
I

24      individually pointed my gun at each person, I'm
sure

25      it was in the general direction.


Jensen Reporting  (651) 351-9500


17


1  Q.  Why did you do that?

2  A.  Like I said earlier, when we go into a building

or

3      residence where there is known to be weapons we want

4      to be able to see their hands, we want them on the

5      ground and we want to be able to handcuff them so we

6      don't get injured.

7    Q.   Who told you there was known to be weapons at the time

8         you went in the residence?

9                   MS. NELSON:  Objection, asked and

10         answered.

11                   THE WITNESS:  Armed robbery suspect.

12   Mr. Goins  (Continuing)

13    Q.   Armed robbery suspect doesn't mean there's actually

14         weapons, correct?

15    A.   I don't agree with that.

16    Q.   I'm not asking you to agree, I'm asking you to give me

17         an answer?

18    A.   That it doesn't necessarily means that there's no guns

19         in there?

20    Q.   Right.

21    A.   You commit armed robbery with a weapon, correct?

22    Q.   I'm not going to answer questions, you are going to

23         answer questions.

24    A.   My point is if there's weapon involved in the crime

25         and that's the person we go after, there is a

chance

18

| | | |
|---|---|---|
| 1 | | there were weapons in the house. |
| 2 | Q. | You thought there was a chance there were weapons |
| 3 | | there, you were speculating there were weapons there, |
| 4 | | correct? |
| 5 | A. | Sure. |
| 6 | Q. | Did you see the search warrant? |
| 7 | A. | I did not. |
| 8 | Q. | Nobody showed the search warrant at the briefing? |
| 9 | A. | I don't know, they don't show it to the officers, it's |
| 10 | | over viewed by the sergeants. |
| 11 | Q. | You were never told what to look for? |
| 12 | A. | We don't do the searches. |
| 13 | Q. | When you go in as ERU, you don't really know what the |
| 14 | | scope of the search is, right? |
| 15 | A. | We don't search.  Like I said, our job is to clear and |
| 16 | | make sure the house is code 4, everything is under |
| 17 | | control. |
| 18 | Q. | Right.  But Officer Toscano, what I'm trying to |
| 19 | | understand, first of all, you know what the |

concept of

20      the scope of the search is, you been trained on that

21      right?

22   A.   Uh-huh.

23   Q.   Is that a yes?

24   A.   Yes.

25   Q.   You didn't know what the scope of the search was for


Jensen Reporting  (651) 351-9500


19


1      this residence at 3845 2nd Avenue South on that

2      particular day January 13, 2005, correct?

3   A.   We went to the briefing, we were advised there was a

4      suspect from an armed robbery staying at the house.

5   Q.   You were never shown a photograph, right?

6   A.   I don't recall.

7   Q.   You weren't given a description that you recall,

8      correct?

9   A.   That I recall, correct.

10   Q.   You didn't know the scope of the search, correct?

11   A.   I don't agree with that.

12   Q.   What was the scope of the search?

13   A.   I think your question is misleading.

14   Q.   If you want to editorialize, fine.  Did you know
the

15        scope of the search, yes or no?

16   A.   Our job is not to search for particular weapons,

17        drugs.

18   Q.   I don't want to waste time, I understand that.  I
want

19        to move along because I've got a lot of officers
to

20        talk to.  My question is did you know the scope
of the

21        search?

22   A.   No.

23   Q.   Okay.  Thank you.  So you didn't know that the
search

24        warrant actually was to look for potentially a
hand

25        gun, correct?


                    Jensen Reporting  (651) 351-9500



20


1   A.   Correct.

2   Q.   Right.  So you didn't know exactly who you were

3        looking for and nevertheless when you went into
that

4        house, you pointed your handgun at females and
small

5        children, correct?

6   A.   I didn't say that I didn't know who I was looking
for.

```
        7         I said I don't recall at the time.

        8    Q.   So you don't have any idea as you sit here today
who

        9         you were looking for?

       10    A.   At the time --

       11    Q.   Yeah?

       12    A.   I don't know if I was given a picture or
description

       13         or not and now I can't remember if I was or not.

       14    Q.   Did you think you were looking for females or
small

       15         children on their laps?

       16    A.   No.

       17    Q.   Okay.  You said in your report that once inside I

       18         helped to clear the first floor and all people
that

       19         were located on the first floor.  Would you
explain to

       20         me what you mean by clear?

       21    A.   Just to make sure that everybody was under
control, we

       22         could see their hands, there was no weapons.  In

       23         normal cases they're handcuffed with flex cuffs.

       24    Q.   Did you cuff everybody?

       25    A.   I didn't cuff anybody.
```

Jensen Reporting  (651) 351-9500

21

1    Q.    Who did?

2    A.    I don't know.

3    Q.    Did you see if these people got cuffed though?

4    A.    I don't believe that the females were handcuffed.

5    Q.    Okay.  Who got cuffed?

6    A.    I don't know, I can't testify as to what other people

7          did.

8    Q.    I'm not asking what other people did, I'm asking if

9          you saw the people cuffed?

10   A.    I don't know.

11   Q.    Okay.  You also said in your report in the living room

12         there were three black females and two children, you

13         went on to say they were all uncooperative?

14   A.    Correct.

15   Q.    What does that mean, they were all uncooperative, sir?

16   A.    Like I said, when we make the entry we want people on

17         the ground, we want to be able to see their hands.

18         These females were screaming and yelling, they were

19         telling me that they were going to get up, they wanted

20         to call the Mayor, they were screaming other things.

21         I don't remember exactly what they were yelling.  They

22         were not cooperating in listening to my orders.

23   Q.    Did they appear to be afraid?

24    A.    I don't know.  I wouldn't say so.  They were getting

25          up and going to try to use a telephone.


                    Jensen Reporting  (651) 351-9500



22


1     Q.    Now you also said in your report, the older black male

2           kept sitting up and telling me to shoot him.  Did you

3           ever identify who that person was?

4     A.    No.

5     Q.    Then you go on to say, due to the fact that he had a

6           stint in his arm, we did not flex cuff him.  I'm not

7           trying to be a real jerk but you mean is stent, right?

8     A.    I don't know.

9     Q.    You meant a stent like a medical stent?

10    A.    Right, correct.

11    Q.    All right.  Due to this it took our attention away

12          from the other occupants because he kept sitting up

13          and yelling at us.  When you said that that older

14          black male was sitting up, was he on the ground, was

15          he on a chair, what do you mean, was he in a bed?

16   A.   He came from the hallway off to my left, somebody

17        brought him in there, had him get down on the
ground.

18        He initially got on the ground then he kept
trying to

19        stand up.

20   Q.   How old would you say this person appeared to be,
an

21        estimate?

22   A.   Sixty, 65.

23   Q.   Possibly 69?

24   A.   Possibly.

25   Q.   And did he appear to be in good health?


Jensen Reporting   (651) 351-9500


23


1    A.   I don't recall.

2    Q.   Well, you saw that he had a stent in his arm so
he

3         apparently had some medical condition, correct?

4    A.   Possible.

5    Q.   Who placed him on the ground then?

6    A.   I don't recall.

7    Q.   Do you know why they placed him on the ground?

8    A.   That's what we do on every warrant, people go on
the

9         ground and they are handcuffed.

10   Q.   Even people who are sick go on the ground?

11  A.  Yes.

12  Q.  And was he showing any signs of not cooperating?

13  A.  Yes.

14  Q.  When?

15  A.  As soon as I made contact with him.

16  Q.  How did you make contact, tell me about that?

17  A.  Like I said, there was a wall, I was standing here in

18     the living room area, he came out of the hallway, he

19     was placed on the ground to my left and immediately he

20     started standing up telling me to shoot him, just

21     shoot him.  (Witness indicating).

22  Q.  You didn't take him seriously though, did you?

23  A.  No, I told him to get back on the ground.

24  Q.  How long did it take you to clear the second and third

25     floors and then turn the scene over to Sergeant

Jensen Reporting  (651) 351-9500

24

1     Smulski's team?

2  A.  I never left the first floor.  I can't recall how long

3     it took to clear the rest of the house.

4  Q.  You said in your report, once the second and third

```
 5        floors were cleared we turned the scene over to

 6        Sergeant Smulski's team.  Do you see that?

 7   A.   Yes.

 8   Q.   Your supplement is Supplement 2, is that right?

 9   A.   Yes.

10   Q.   I'm trying to find out how long did that take
from the

11        time the point man went in, Officer Hanks, to the
time

12        you cleared and turned it over to Sergeant
Smulski's

13        team?

14   A.   I can't give you an exact time, I don't know.

15   Q.   Give me an estimate?

16   A.   I know it was a larger house.  I don't know, I

17        can't -- less than fifteen, more than five
minutes.

18   Q.   That's fair.  Did you use force on anyone other
than

19        -- when I say force I mean other than what you
would

20        call command tone, pointing your weapon at
someone, or

21        placing the older gentleman on the ground, did
you use

22        any other force along the force continuum?

23   A.   I didn't place the old man on the ground, another

24        officer did.

25   Q.   Who was the other officer?
```

Jensen Reporting  (651) 351-9500

25

```
 1   A.   Like I said, I don't know.  My attention is drawn
to
 2        the right with the females who were screaming and
 3        yelling at me.  Out of the corner of any eye I
see the
 4        movement, he goes on the ground, there was a
hallway.
 5   Q.   Did they ask you if they had a search warrant?
 6   A.   That's another thing.  They wanted to see the
search
 7        warrant.
 8   Q.   Why didn't you show it to them?
 9   A.   I don't have the search warrant.
10   Q.   Who did?
11   A.   Sergeant Smulski's team.
12   Q.   Nobody ever showed these people the search
warrants,
13        during the time your team is in there, did anyone
show
14        them a search warrant?
15   A.   No.
16                     MR. GOINS:  Thanks.  Next.
17                     MS. NELSON:  We'll read and sign.
18
19
20
21
22
```

23                    * * * * * * * *

24

25


Jensen Reporting   (651) 351-9500


26


1

2              VERIFICATION

3         I, Geoffrey Toscano, the undersigned, do hereby

4    certify that the foregoing deposition of my testimony
is a

5    true and correct reproduction of same, except for the

6    following changes if any, stating the page and line
number

7    of said change; also stating the reason.

8    Page      Line      Change                          Reason

9    _____     ____      _____
_____

10   _____     ____      _____
_____

11   _____     ____      _____
_____

12   _____     ____      _____
_____

13   _____     ____      _____
_____

14   _____     ____      _____
_____

15   _____     ____      _____
_____

16    _____   _____   _____
_____

17    _____   _____   _____
_____

18    _____   _____   _____
_____

19    _____   _____   _____
_____

20    _____   _____   _____
_____

21    _____          _____

22    Geoffrey Toscano              Date

23    _____

24    WITNESS MY HAND AND SEAL this _____ day of
_____,

25    2007.



                    Jensen Reporting  (651) 351-9500




27



1

2          STATE OF MINNESOTA              )

3                                          )
            COUNTY OF WASHINGTON           )
4

5          I, Lorie M. Jensen, Notary Public, Washington
County,

6     Minnesota, took the foregoing deposition of GEOFFREY

7     TOSCANO, that the witness was by me first duly sworn;

8          That the testimony was transcribed under my
direction

9    and is a true record of the testimony of the witness;

10       That the cost of the original has been charged to the

11    party who noticed the deposition, and that all parties who

12    ordered copies have been charged at the same rate for such

13    copies;

14       That I am not a relative or employee or attorney or

15    counsel of any of the parties, or a relative or employee of

16    such attorney or counsel;

17       That I am not financially interested in the action and

18    have no contract with the parties, attorneys, or person

19    with an interest in the action that affects or has a

20    substantial tendency to affect my impartiality.

21       Dated this 19th day of February, 2007.

22

_____

23                              Lorie M. Jensen, Notary Public

24                              Washington County, Minnesota

25

Jensen Reporting  (651) 351-9500