1

1       UNITED STATES DISTRICT COURT
        DISTRICT OF MINNESOTA

2  - - - - - - - - - - - - - - - - - - - - - - - - - - -
   Charles Everett Cook, Sylvia Mae Cook,

3  and Timothy Blake Cook, natural persons,

4      Plaintiffs,

5  vs            Court File 06-0022

6  City of Minneapolis, a municipal entity;
   Minneapolis Police Officer Mark Johnson, Badge

7  #003459, in his individual, personal and official
   capacity, Sgt. D. Smulski, in his individual,

8  personal and official capacity; Officer K. Blackwell,
   in his individual, personal and official capacity;

9  Officer Geoffrey Toscano, Badge #007257, in his
   individual, personal and official capacity; Officer

10  Bevsn Blauert, Badge #003459 in his individual,
   personal and official capacity; Officer Jon Petron,

11  Badge #4671, in his individual, personal and official
   capacity; Officer Christopher House, Badge #3165, in his

12  individual, personal and official capacity; Sgt. Robert
   Kroll, Badge #003874, in his individual, personal and

13  official capacity; Officer Christie Nelson, Badge #4959, in
   her individual, personal and official capacity; Officer

14  William Willner, Badge #7783, in his individual, personal
   and official capacity; Officer Westlund, Badge #7674, in

15  his individual, personal and official capacity; Officer
   Roger Smith, Badge #006689, in his individual, personal and

16  official capacity; Officer Jason King, Badge #003704, in
   his individual, personal and official capacity; Officer

17  Timothy Hands, Badge #002660, in his individual, personal
   and official capacity; and Officer Jane Doe and Richard

18  Roe, unknown, unnamed officers of the Minneapolis, in their
   personal, individual

19   and official capacity;

20          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

21   Whereupon, the following deposition was taken of
        CHRISTOPHER HOUSE, pursuant to Notice, according to the
22   Rules of Civil Procedure for the State of Minnesota, taken
        on the 13th day of February, 2007 before Lorie M. Jensen,
23   Notary Public, Washington County, Minnesota.

24

25

Jensen Reporting  (651) 351-9500

2

1       APPEARANCES:

2

3          Albert T. Goins, Attorney at Law, Goins Petry Law, 301

4      Fourth Avenue South, 378 Grain Exchange Building,

5      Minneapolis, Minnesota 55415, appearing as Counsel for and

6      on behalf of the Plaintiffs;

7

8          Tracy Nelson, Assistant City Attorney, City Attorney's

9   Office, 333 South 7th Street, Suite 300, Minneapolis,

10   Minnesota 55402, appearing as Counsel for and on behalf of

11   the Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jensen Reporting  (651) 351-9500

1

2       INDEX:

3

4       EXAMINATION BY:

5

6       Mr. Goins          4

7

8

9

10      EXHIBITS:

11

12       House Deposition Exhibit

13       Number 1 - Page 15

14

15

16

17

18

19

20

21

22

23

24

25

Jensen Reporting  (651) 351-9500

4

1   Whereupon, the following proceedings were duly held and

2   made a part of the record, as follows, to-wit:

3           CHRISTOPHER HOUSE,

4       having been first duly sworn, was examined,

5       and testified, under oath, as follows:

6           EXAMINATION:

7   BY MR. GOINS:

8   Q.   Would you state your full name for the record, please?

9   A.   Christopher house.

10  Q.   Would you spell your name?

11   A.   C-h-r-i-s-t-o-p-h-e-r H-o-u-s-e.

12   Q.   Is that your full name, Officer House?

13   A.   Christopher Bradley.

14   Q.   Thank you.  Where are you currently employed?

15   A.   City of Minneapolis.

16   Q.   Were you so employed on January 13th, 2005?

17   A.   Yes, sir.

18   Q.   What is your current assignment?

19   A.   Current assignment is 3rd Precinct, community response

20       team.

21   Q.   Were you a signed to the 3rd Precinct directed patrol

22       team on January 30, 2005?

23   A.   Yes.

24   Q.   Have you ever had your deposition taken before?

25   A.   Yes, sir.

Jensen Reporting  (651) 351-9500

5

1   Q.   What context?

2  A.  Lawsuit.

3  Q.  Were you a defendant or witness?

4  A.  Defendant.

5  Q.  Tell me a little bit about that?

6  A.  Car accident.

7  Q.  Any other situations where you been a defendant?

8  A.  No, sir.

9  Q.  What is your educational background?

10  A.  Bachelor's Degree in criminology from the University

11     of Minnesota.

12  Q.  When did you finish there?

13  A.  '96.

14  Q.  So you went immediately to skills training?

15  A.  Yes, sir.

16  Q.  Then did you become post board certified?

17  A.  Yes, sir.

18  Q.  And then did you join the Minneapolis Police

19     Department?

20  A.  Yes, sir.

21  Q.  Have you ever had any discipline?

22  A.  No, sir.

23  Q.  On January 13th, 2005, who were you working under?

24  A.  Sergeant Don Smulski.

25  Q.  Did you make an entry into a house at 3845 2nd Avenue

Jensen Reporting  (651) 351-9500

6

1       South Minneapolis, Minnesota on that date?

2  A.  Yes, sir.

3  Q.  Do you remember the time that you entered that house?

4  A.  I don't recall.

5  Q.  Do you remember if it was evening, or daytime or

6       morning?

7  A.  Evening hours.

8  Q.  Do you remember if it was after dark?

9  A.  I don't recall.

10  Q.  Do you remember if you were given a briefing with

11       regard to the entry of that house?

12  A.  I'm sorry regarding the entry?

13  Q.  Yes.

14   A.   I believe so, yes, sir.

15   Q.   Tell me about the briefing?

16   A.   I wasn't on the entry.

17   Q.   So you didn't have any search warrant briefing?

18   A.   As far as the search warrant, are you asking about the

19        search warrant or the entry?

20   Q.   How about with respect to the search warrant?

21   A.   A little, yes, sir.

22   Q.   What did you learn?

23   A.   That there was a search warrant for this premises.

24   Q.   Okay.  Anything else?

25   A.   No, that was about what I remember.


Jensen Reporting  (651) 351-9500


7


1   Q.   Do you understand the concept of scope of the search?

2   A.   Pardon me?

3   Q.   Do you understand what the concept scope of the search

 4     means?

 5  A.  Sure.

 6  Q.  What does that mean?

 7  A.  Scope of the search referring to what it is that we're

 8     looking for.

 9  Q.  What were you looking for on January 13, 2005?

10  A.  I don't recall.

11  Q.  You have no recollection at all?

12  A.  No, sir.

13  Q.  Showing you what's been marked as Nelson Exhibit 2,

14     that's a search warrant page, that is the actual

15     search warrant as opposed to the application.  Do you

16     recognize that document?

17  A.  As a search warrant, yes, sir.

18  Q.  Do you recognize that document as something you were

19     shown at the briefing on January 13, 2005?

20  A.  I don't recall.

21  Q.  Okay.  Do you recall if Officer Smulski told you you

22     were looking for any individual person, Sergeant

23     Smulski, I'm sorry?

24  A.  I don't recall.

25  Q.  Have you talked to Sergeant Smulski about this case?

Jensen Reporting  (651) 351-9500

8

1  A.   Not probably since the investigation.

2  Q.   Which investigation?

3  A.   Regarding the search warrant.

4  Q.   Be more specific, who conducted that investigation?

5  A.   Their precinct directed patrol.

6  Q.   You don't mean that there was an Internal Affairs

7     investigation, do you, sir?

8  A.   No, sir.

9  Q.   Okay.  You got to the house at the same time as the

10     entry unit, correct?

11  A.   Yes, sir.

12  Q.   Which portion of the perimeter or area were you

13     suppose to be on as the entry unit entered?

14  A.   I believe I was at the front and south of the address.

15  Q.   Who was next to you?

16  A.  I believe I was alone.

17  Q.  How were you dressed?

18  A.  Plain clothes.

19  Q.  Similar to what you have on today?

20  A.  Yes, sir.

21  Q.  Did you have a raid vest, do you know what that is?

22  A.  Yes, sir.

23  Q.  Did you have that on?

24  A.  Yes, sir.

25  Q.  Did you have a bullet proof vest on?


Jensen Reporting  (651) 351-9500


9


1  A.  No, sir.

2  Q.  Okay.  You don't normally wear a bullet proof when you

3     go in?

4  A.  I wasn't on the entry.

5  Q.  You just let them handle that portion?

6  A.  That's correct.

7   Q.   Who was running the entry team?

8   A.   Sergeant --

9   Q.   Bob Kroll?

10   A.   Yes, sir, thank you.

11   Q.   Did you see him with a weapon when he was in charge of

12      the entry team at the time -- right about the time of

13      the entry?

14   A.   I don't recall.

15   Q.   You didn't see whim a sub machine gun?

16   A.   I don't recall.

17   Q.   You don't?

18   A.   I mean, if you're asking if he had one, yes, he

19      probably did but I don't recall seeing.

20   Q.   Do you remember anything about who made up the entry

21      team?

22   A.   Very little.

23   Q.   Do you remember who else was on the entry team?

24   A.   Jeff Toscano, Roger Smith, Blauert.

25   Q.   Bevan Blauert?

Jensen Reporting  (651) 351-9500

10

1   A.   Yes.  That's about the extent of what I can remember.

2   Q.   Just so we're clear, it's Bevan Blauert, Officer Bevan

3        Blauert?

4   A.   I don't know his first name to be honest.

5   Q.   That's fine.  How about Officer Hanks?

6   A.   Hanks, yes.

7   Q.   Was he on the entry team?

8   A.   I believe so.

9   Q.   How about Officer King?

10  A.   I believe so.

11  Q.   Those guys are separate from you guys who were on the

12       CRT or directed patrol unit, correct?

13  A.   That's correct.

14  Q.   How long between the time -- by the way, were you ever

15       told if this was a knock and announce or a no-knock?

16  A.   I don't recall.

17  Q.   How about did you hear anybody knock and announce, you

18       know what I mean by that?

19  A.  Absolutely.  I don't recall.

20  Q.  Who did you see go in first?

21  A.  I am not watching as they go through the door.

22  Q.  Sure.  What were you specifically looking for then?

23  A.  I am watching the windows of the house.

24  Q.  Once the entry unit goes in and they call -- what do

25      they call, clear, clear the scene?


Jensen Reporting  (651) 351-9500


11


1  A.  Code 4.

2  Q.  Code 4?

3  A.  Yes, sir.

4  Q.  How long between the time they went in and they called

5      Code 4?

6  A.  I don't know.

7  Q.  Five minutes?

8  A.  I don't know.

9   Q.   If another officer testified it was less than 15 but

10      more than five, do you think he's right?

11   A.   Sure.

12   Q.   When you got in the house, what did you see?

13   A.   A lot of people.

14   Q.   How many?

15   A.   Half a dozen, maybe more.

16   Q.   What was their description if you could in general?

17   A.   Front room there was females, children, adult male,

18      two adult males, a few adult females.

19   Q.   Let's talk about the adult males.  What did you notice

20      about them?

21   A.   One seemed to be an older gentleman, one seemed to be

22      maybe roughly middled age.

23   Q.   What is that, your age?

24   A.   I hope not.  He was maybe --

25   Q.   How old are you?

Jensen Reporting  (651) 351-9500

12

1   A.   Thirty-two.

2   Q.   You're 32?

3   A.   Thirty-three.

4   Q.   Well, 66 that's pretty close.  How old was he?

5   A.   The one that I am estimating is middle aged?

6   Q.   Yeah?

7   A.   Forty.

8   Q.   Okay.  You got a long way to go obviously.

9   A.   I hope.

10   Q.   What about the one who was roughly middled age, notice

11        anything about him?

12   A.   The one that was middle aged I would say heavier set

13        guy, very mouthy.

14   Q.   What do you mean mouthy?

15   A.   Antagonistic.

16   Q.   What do you mean?

17   A.   He was antagonizing the other people there into being

18        uncooperative.

19   Q.   How were they uncooperative?

20   A.   Well, while he was in there we'd make simple requests

21     and the officers were making simple requests, no one

22     would comply.

23  Q.   Give me a for instance?

24  A.   Just asking to be quiet, settle down for a moment, we

25     can explain why we're here, we try and answer

Jensen Reporting  (651) 351-9500

13

1     questions, you couldn't because he would be shouting

2     over people.  Trying to calm down the scene and he

3     would continue to elevate it.

4  Q.   Okay.  How about the other male?

5  A.   The older gentleman?

6  Q.   Uh-huh, yes.

7  A.   When I talked to him he said that he was cold.  Other

8     than that I don't recall much of his attitude or

9     demeanor.

10  Q.   Was he fully dressed?

11  A.   I believe so, yes.

12   Q.   Where was he located when he told you he was cold, if

13       you recall?

14   A.   In the living room area.

15   Q.   Was the door to the residence open?

16   A.   I don't recall.

17   Q.   Did you notice anything about him that would indicate

18       to you that he might have had a health condition of a

19       chronic nature?

20   A.   I believe he had a shunt in his wrist.

21   Q.   Like an I.V., was attached to it?

22   A.   Correct, yes, sir.

23   Q.   Did you ask him if he had a health problem?

24   A.   At some point it was offered he was on dialysis.

25   Q.   Did you take any steps because of that with respect to

Jensen Reporting  (651) 351-9500

14

1       the older gentleman?

2   A.   Yes, sir.

3   Q.   What did you do?

4   A.   Got him some blankets from a radiator nearby, I think

5        I got him a pillow, just tried to make him

6        comfortable.

7   Q.   Was he handcuffed ever?

8   A.   I don't think so but I don't recall for sure.

9   Q.   Then what did you do after that?

10  A.   Got some blankets for the kids that were in the front

11       room.

12  Q.   Did you see any officers pointing their weapons at any

13       of these individuals in the house?

14  A.   No, sir.

15  Q.   You never saw officer -- Sergeant Kroll point his

16       weapon at someone?

17  A.   No, sir.

18  Q.   Do you know what a poke check maneuver is?

19  A.   Sure.

20  Q.   What is a poke check?  I'm not talking about when

21       we're on the ice.

22  A.   Okay.  Using a barrel of a weapon to manipulate a

23       person in the direction you need them to be.

24  Q.  And it's essentially 1poking them with the gun, right?

25  A.  Guiding them with the barrel or poking them, right.

Jensen Reporting  (651) 351-9500

15

1      If I was going to do it I would guide.

2  Q.  But you've seen officers poke people with the weapon,

3      right?

4  A.  I'm not on an entry team so I don't carry a rifle.

5  Q.  You weren't there when Officer -- Sergeant Kroll was

6      there?

7  A.  No.  We go in when they come out.

8  Q.  Can I get an answer, have you never seen an officer

9      poke someone with a weapon?

10  A.  Not that I recall right now, no.

11  Q.  Okay.  Did you ultimately go through the house?

12  A.  Yes, sir.

13  Q.  Did you ultimately find anything you thought was

14        within the scope of the search warrant?

15   A.   Me personally?

16   Q.   Yes, you personally?

17   A.   I don't believe so.

18              (Whereupon, House Deposition Exhibit

19        Number 1 was marked for identification by the Court

20        Reporter).

21              MR. GOINS:  I got some discovery I may

22        have to give you, I'm not sure if some of it is

23        privileged or not privileged, we'll have to talk about

24        it and it's kind of sensitive and I'll have to talk to

25        my co-counsel.  There's some information that I've

Jensen Reporting  (651) 351-9500

16

1        seen in the file that it's not pertinent to his

2        deposition but I will have to show it to you

3        potentially after I confer with my co-counsel, all

4        right?

5            MS. NELSON:  Okay.

6            MR. GOINS:  It's essentially e-mail

7       from some people in city government, okay?

8  Mr. Goins  (Continuing)

9  Q.   Showing you what's been marked, Officer House, as your

10       Exhibit 1?

11  A.   Sure.

12  Q.   What is that?

13  A.   Looks like my statement.

14  Q.   Okay.  It's essentially your police report, right?

15  A.   Yes, sir.

16  Q.   Okay.  Is that true and correct?

17  A.   Yes, sir.

18  Q.   And in fact, you do say at the end of that statement

19       that you found some mailings in the name of one -- by

20       the name of whom?

21  A.   Cortez Cook.

22  Q.   Who is Cortez Cook, if you know?

23  A.   He was a young man that lived at this address.

24  Q.   Okay.  Was that the person you were looking for at

25       that address?

Jensen Reporting  (651) 351-9500

17

1   A.   Yes, sir, I believe he was the person listed in the

2        search warrant.

3   Q.   But you never saw that search warrant, right?

4   A.   The one that you just showed me?

5   Q.   Uh-huh.

6   A.   Just looked at it a couple of minutes ago.

7   Q.   I mean before this, January of 2005?

8   A.   Yeah.  I don't recall.

9   Q.   The warrant is not for him, is it?

10  A.   Pardon me?

11  Q.   Is the warrant for him?

12  A.   No, I believe it was for a gun.

13  Q.   Did you ever find a gun?

14  A.   Did I, no.

15  Q.   Even though the warrant wasn't for him, he was taken

16       into custody, is that right?

17  A.  I don't know.

18  Q.  Did you see him taken into custody?

19  A.  I think everybody that was in the house at the time

20      was taken into custody for the time being.

21  Q.  Let's talk about that briefly.  Was everybody in the

22      house handcuffed?

23  A.  No.

24  Q.  Who got handcuffed?

25  A.  I don't recall.


Jensen Reporting  (651) 351-9500


18


1  Q.  Timothy Cook, the boisterous, antagonistic male?

2  A.  I believe so.

3  Q.  Charles Cook, the older gentleman, he get handcuffed?

4  A.  I don't believe so.

5  Q.  The females with the children, they get handcuffed?

6  A.  I don't believe so.

7   Q.  Core test Cook, did he get handcuffed?

8   A.  I don't know.

9   Q.  Okay.  Did you hear anything other than this person

10      who you identified in your report as being

11      antagonistic acting in any way that was uncooperative?

12  A.  I believe everybody was very loud when we first went

13      in.

14  Q.  What do you mean everybody was loud?

15  A.  Everybody that was inside the house, the residence.

16  Q.  What do you mean loud, were they singing in choir,

17      what were they doing?

18  A.  No, sir.

19  Q.  What were they doing?

20  A.  Yelling, screaming, being mad.

21  Q.  Scared and upset, angry, angry and scared?

22  A.  Could have been.

23          MR. GOINS:  Thanks.

24          MS. NELSON:  We'll read and sign.

25          * * * * * * *


Jensen Reporting  (651) 351-9500

19

1

2       VERIFICATION

3    I, Christopher House, the undersigned, do hereby

4  certify that the foregoing deposition of my testimony is a

5  true and correct reproduction of same, except for the

6  following changes if any, stating the page and line number

7  of said change; also stating the reason.

8  Page    Line    Change                    Reason

9  _____  ____  _____  _____

10  _____  ____  _____  _____

11  _____  ____  _____  _____

12  _____  ____  _____  _____

13  _____  ____  _____  _____

14  _____  ____  _____  _____

15  _____  ____  _____  _____

16  _____  ____  _____  _____

17  _____  ____  _____  _____

18  _____  ____  _____  _____

19  _____  ____  _____  _____

20  _____  ____  _____  _____

21  _____        _____

22  Christopher House        Date

23  _____

24  WITNESS MY HAND AND SEAL this _____ day of _____,

25  2007.


                Jensen Reporting  (651) 351-9500




                        20




1
        STATE OF MINNESOTA          )
2                                   )
        COUNTY OF WASHINGTON          )
3

4       I, Lorie M. Jensen, Notary Public, Washington County,

5   Minnesota, took the foregoing deposition of CHRISTOPHER

6   HOUSE, that the witness was by me first duly sworn;

7       That the testimony was transcribed under my direction

8   and is a true record of the testimony of the witness;

9       That the cost of the original has been charged to the



10  party who noticed the deposition, and that all parties who

11  ordered copies have been charged at the same rate for such

12  copies;

13      That I am not a relative or employee or attorney or

14  counsel of any of the parties, or a relative or employee of

15  such attorney or counsel;

16      That I am not financially interested in the action and

17  have no contract with the parties, attorneys, or person

18  with an interest in the action that affects or has a

19  substantial tendency to affect my impartiality.

20      Dated this 19th day of February, 2007.

21      _____

22          Lorie M. Jensen, Notary Public

23          Washington County, Minnesota

24

25

Jensen Reporting  (651) 351-9500