Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

- - - - - - - - - - - - - - - - - - - - - - -

Charles Everett Cook, et. al.,
                No. 06-579 DWF/AJB

        Plaintiffs,

vs.

City of Minneapolis, et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

      The deposition of CHARLES E. COOK, SR., taken pursuant to Notice of Taking Deposition, before Barbara A. Larsien, a Notary Public in and for the County of Hennepin, State of Minnesota, taken on the 5th day of March, 2007, at 333 South Seventh Street, Suite 300, Minneapolis, Minnesota, commencing at approximately 11:15 a.m.

Page 2

1 APPEARANCES:
2
3     ALBERT T. GOINS, SR., ESQUIRE, of the GOINS LAW OFFICE, LTD., 301 Fourth Avenue South, 378 Grain Exchange Building, Minneapolis, Minnesota 55415,
4 appeared for and on behalf of the plaintiffs.
5
6     MAYA C. SULLIVAN, ESQUIRE of the LAW OFFICES OF MAYA C. SULLIVAN, L.L.C., 941 Hillwind Road Northeast, Suite 200, Minneapolis, Minnesota 55432,
7 appeared for and on behalf of the plaintiffs.
8
9     TRACEY NELSON, ASSISTANT CITY ATTORNEY, CITY OF MINNEAPOLIS, 333 South Seventh Street, Suite 300, Minneapolis, Minnesota 55402, appeared for and on
10 behalf of the defendants.
11
12 ALSO PRESENT:
13     SYLVIA M. COOK
    TIMOTHY B. COOK
14
15     The original is in the possession of
    Attorney Tracey Nelson.
16
17                INDEX
18 CHARLES E. COOK, SR.:
19 Cross-examination by Ms. Nelson     Page 3
20 EXHIBITS:
21 Exhibit 1, Plaintiffs' Answers to
    Defendants' Interrogatories     Page 12

Page 3

1               CHARLES E. COOK,
2     the Witness in the above-entitled
3     matter after having been first duly
4     sworn, deposes, and says as follows:
5
6              CROSS-EXAMINATION
7 BY MS. NELSON:
8     Q. Mr. Cook, could you please state your full
9 name for the record?
10     A. Charles Everett Cook, Senior.
11     Q. Mr. Cook, I'm an Assistant City Attorney for
12 the City of Minneapolis and I'm --
13         MR. GOINS: Counsel, may I interrupt
14 you, did you say Everett?
15         THE WITNESS: Everett, E-V-E-R-E-T-T.
16         MR. GOINS: All right, thank you, go
17 ahead.
18 BY MS. NELSON:
19     Q. I'm an Assistant City Attorney for the City
20 of Minneapolis and I'm representing the defendants in
21 this matter for the suit that you brought in Federal
22 Court. And I'd like to go over a couple of ground
23 rules just for the court reporter's sake. First,
24 she's taking down every word that we say, so we need
25 to try to give affirmative answers, verbal answers

Page 4

1 rather than nodding of the head, or saying "Uh-huh,"
2 or "Huh-uh" because it's difficult for the court
3 reporter.
4         MR. GOINS: Okay, Counsel, I'm going to
5 interject here. Mr. Cook, for the period of time that
6 I'm here, I'm going to go ahead and defend the
7 deposition, when I leave Ms. Sullivan will take over.
8 You're not required to give affirmative answers,
9 you're required to give a truthful answer. You're
10 required to give a verbal, audible answer, not an
11 affirmative answer. Are you clear about that?
12         THE WITNESS: Yeah.
13         MR. GOINS: All right, go ahead,
14 Counsel.
15 BY MS. NELSON:
16     Q. And also I will try not to interrupt you if
17 you try not to interrupt me, even if you have an idea
18 of where my question is going and you know what the
19 answer is, if you could wait until I'm finished
20 speaking, just for the court reporter's sake. Have
21 you ever -- do you have any questions?
22     A. No.
23     Q. Also, if you don't understand a question I'm
24 asking you, will you please let me know that you need
25 clarification, otherwise I'm going to assume that you

### Page 5

1  understand what I'm asking you?
2  A. I'll try.
3  Q. Have you ever sat for a deposition before?
4  A. No.
5  Q. No, okay. And I have to ask you this, are
6  you under the influence of any drug, prescription or
7  otherwise, or alcohol that might impair your ability
8  to recall the events surrounding this incident or to
9  testify about the subject matter of this lawsuit?
10    MR. GOINS: Objection, compound
11 question, go ahead and answer, Mr. Cook.
12  A. No.
13 BY MS. NELSON:
14  Q. Did you review any documents in preparation
15 for your deposition today?
16  A. No.
17  Q. Have you talked to anyone other than your
18 attorney about your deposition today?
19  A. No.
20  Q. Mr. Cook, where do you currently live?
21  A. 3845 Second Avenue South, Minneapolis,
22 Minnesota.
23  Q. How long have you lived there?
24  A. About 40 years.
25  Q. Was that 40?

### Page 6

1  A. 40, --
2  Q. Okay --
3  A. -- uh-huh.
4  Q. -- and do you own this residence?
5  A. Yes, buying.
6  Q. Where did you live before that?
7  A. 3625 Portland, I believe.
8  Q. How long did you live there for?
9  A. We lived there about eight-ten years.
10  Q. Who do you live with in the house that you
11 live in currently?
12  A. Our baby son and my wife and granddaughter.
13  Q. Is Timothy Cook your baby son?
14  A. Yes.
15  Q. What is the name of your granddaughter?
16  A. Sapphire.
17  Q. Does anyone else live there?
18  A. No.
19  Q. Have other family members lived with you
20 there in the past though?
21  A. Yes.
22  Q. Who has lived there in the past?
23  A. I believe my granddaughters, my
24 granddaughters, Tameka Morris and Jaquita Cook.
25  Q. Anyone else?

### Page 7

1  A. Well, their children.
2  Q. Who are their children?
3  A. Tameka had two boys, Malikai and Hesikai.
4  Jaquita has Charles Lee, Camille, LaShea, I think
5  that's all.
6    MS. COOK: The baby.
7    MR. GOINS: Ms. Cook, Ms. Cook, you
8  can't help, you just have to sit quietly.
9  A. The baby wasn't born, I don't think, at that
10 time.
11    MS. SULLIVAN: Oh, no, not at the time,
12 are you asking about now or what are you asking?
13 BY MS. NELSON:
14  Q. Anytime in the past?
15  A. The baby wasn't born.
16    MR. GOINS: Let's go off the record.
17    (At this time a discussion was
18    held off the record.)
19 BY MS. NELSON:
20  Q. Has anyone else lived with you in that house
21 in the past or at anytime?
22  A. Yes, my -- one of my baby daughters, Anita
23 Cook.
24  Q. Anyone else?
25  A. Not that I'm aware of.

### Page 8

1  Q. Mr. Cook, what is your date of birth?
2  A. 5/10/35.
3  Q. Are you currently employed?
4  A. No, I'm retired.
5  Q. What are you retired from?
6  A. Minneapolis Public Schools.
7  Q. What did you do for Minneapolis Public
8  Schools?
9  A. Well, I was a -- started out as a aide to a
10 -- a aide in the schools and then I gradually moved up
11 to -- what do they call it now? Well, finally moved
12 up to suspensions.
13  Q. What did you do in suspensions?
14  A. Suspend, --
15  Q. What year --
16  A. -- anything the principal -- I'm through.
17  Q. -- what year did you start working for the
18 Minneapolis Public Schools?
19  A. 1972.
20  Q. What year did you retire?
21  A. '98.
22  Q. What did you do before that for a job?
23  A. Washed cars on Lake Street and worked for
24 Moline for awhile.
25  Q. Moline?

Page 9

1  A. Minneapolis Moline.
2  Q. I don't know what that is, what is --
3  A. Minneapolis Moline was sort of a foundry.
4  Q. Okay, what did you do for them?
5  A. Looked -- chipper, I was called a chipper.
6  Chipped engines, smooth them out. (Indicating.)
7  Q. Mr. Cook, what high school did you go to?
8  A. Well, I went to Central High School in
9  Hayton, Missouri. I went to -- I can't remember the
10 high school here in Minneapolis, the last one I went
11 to over here on Lyndale Avenue, I can't remember the
12 name of it.
13 Q. Did you graduate from it?
14 A. No, no, graduation took place, just then I
15 went to -- to the college that -- I went to Saint
16 Olaf, not Saint Olaf, I went to two colleges, I can't
17 think of the name of the colleges here and I went to
18 Saint Catherine for a little while and studied the
19 area of social work.
20 Q. Did you receive any degrees?
21 A. No.
22 Q. Have you ever attended any other classes or
23 seminars since then?
24 A. No.
25 Q. Are you married, Mr. Cook?

Page 10

1  A. Yes, 51 years.
2  Q. Nice and you have children?
3  A. Yes.
4  Q. How many children do you have?
5  A. We have six children.
6  Q. How many grandchildren do you have?
7  A. God knows, 13 or 14, somewhere in there.
8  Q. Do you know what their age ranges are?
9  A. No.
10 Q. Can you think of how old the youngest one
11 is?
12 A. About nine months, I believe.
13 Q. Can you think about how old the oldest one
14 is, approximately?
15 A. No.
16 Q. Is your oldest one a boy or girl, --
17     MR. GOINS: Oldest what?
18 BY MS. NELSON:
19 Q. -- oldest grandchild a boy or a girl?
20 A. Girl.
21 Q. Is she in high school?
22 A. No, no, no, she's married.
23 Q. Okay and do any of your children or
24 grandchildren ever stay the night over?
25 A. Yes.

Page 11

1  Q. How often?
2  A. Often.
3  Q. How many usually stay at a time?
4  A. Oh, two, three, four.
5  Q. Mr. Cook, have you ever been involved in any
6  accident that resulted in an injury?
7  A. No.
8  Q. In the 24 hours before the incident that's
9  subject to this lawsuit, had you had anything to drink
10 or had any prescription drugs or otherwise?
11 A. I don't drink. No.
12 Q. Any prescription drugs?
13 A. Well, yes, I take prescription drugs
14 everyday.
15 Q. What drugs do you take?
16     MS. SULLIVAN: You know, Counsel --
17     MR. GOINS: Hold on, hold on.
18     MS. SULLIVAN: Do you have your list?
19     MR. GOINS: Hold on.
20     THE WITNESS: No, I just got two pill
21 bottles with me, I was just going to show her.
22     MR. GOINS: You don't have to show her.
23     THE WITNESS: I don't know what they
24 are.
25     MR. GOINS: That's fine, next question.

Page 12

1  BY MS. NELSON:
2  Q. Mr. Cook, have you had a chance to look at
3  the answers to the interrogatories that we sent to
4  your attorney?
5  A. No.
6     MR. GOINS: I'm going to -- hold on,
7  I'm going to object, that assumes facts not in
8  evidence. I don't think you ever sent answers to
9  interrogatories to us.
10 BY MS. NELSON:
11 Q. Excuse me, the questions, your answers --
12 A. No, --
13 Q. -- to the questions. Mr. Cook, I'm going to
14 show you a document called, "Plaintiffs' Answers to
15 Defendants' Interrogatories," and I'm going to ask you
16 if you could look through that --
17     MR. GOINS: First of all, Counsel, are
18 you going to mark it first?
19     MS. NELSON: Not just yet.
20     MR. GOINS: Well, I'm not going to have
21 him testify about anything that's not marked.
22     MS. NELSON: Okay, I would like to
23 offer into evidence Plaintiffs' Answers to Defendants'
24 Interrogatories, Exhibit 1.
25     (At this time CHARLES E. COOK

CASE 0:06-cv-00579-DWF-AJB   Document 34-1   Filed 04/07/07   Page 4 of 10
CondenseIt™
Charles Cook

Page 13

1      Deposition Exhibit 1 was marked for
2      identification by the court reporter.)
3  BY MS. NELSON:
4      Q. I'm going to have you look at the Answers to
5  Interrogatories that have been --
6          MR. GOINS: Counsel -- Counsel, I
7  apologize, is that -- are you asking him to review
8  Exhibit 1, is that what you're asking him to do?
9          MS. NELSON: I'm asking him to review
10 it.
11         MR. GOINS: Okay, just so we're clear
12 on what Exhibit we're talking about.
13     A. (Witness reviewing document.)
14         MR. GOINS: Counsel, in the interest of
15 saving time, do you want him to look at anything in
16 particular?
17         MS. NELSON: Yes, sir, that would be a
18 good idea. May I see the document, please?
19         (At this time the Witness returns
20         Exhibit 1 to Ms. Nelson.)
21 BY MS. NELSON:
22     Q. Would you read, not read, pardon me, could
23 you just review the question to number 12 and let me
24 know if these were the drugs that you were taking at
25 the time of the incident or if they weren't?

Page 14

1      A. (Witness reviewing document.) Do you want
2  me to stop here? (Indicating.)
3      Q. May I see where you are pointing?
4      A. Prescribed?
5      Q. Yes.
6      A. (Witness reviewing document.) Okay, I would
7  say yes.
8      Q. So you were taking Trazodone then at the
9  time?
10     A. Yes, I have taken Trazodone.
11     Q. Do you know what you were taking that for?
12     A. To sleep.
13     Q. Who prescribed the Trazodone to you?
14     A. My kidney doctor.
15     Q. Your kidney doctor, who is that?
16     A. Dr. Swan, --
17     Q. Dr. Swan?
18     A. -- K. Swan.
19     Q. Dr. K. Swan, do you know the name of the
20 clinic that he's at or is it just him?
21     A. She.
22     Q. She, oh, I'm sorry.
23     A. The dialysis clinic over at Hennepin County.
24     Q. Mr. Cook, you have diabetes, is that
25 correct?

Page 15

1      A. Yes.
2      Q. How long have you had that for?
3      A. Quite a few years.
4      Q. Ten years?
5      A. I can't put a number on it, at least ten
6  years.
7      Q. 20 years?
8      A. I don't know, say ten years.
9      Q. And as treatment for the diabetes do you
10 sometimes have to wear a shunt, what's referred to as
11 a shunt?
12     A. Yeah, I have a shunt and I don't have it
13 now, I have another access. That's not for diabetes,
14 that's for my -- I don't know what you mean for
15 diabetes.
16     Q. What is the shunt for?
17     A. Kidney failure and access to where they hook
18 me up to a machine and draw out the blood, clean it,
19 and get the water off of me.
20     Q. Who does that?
21     A. The dialysis clinic, Davita, 825 South
22 Eighth Street.
23     Q. Do you wear the shunt when you're not at
24 that clinic sometimes?
25     A. What you calling a shunt, I'm not sure what

Page 16

1  you mean by a shunt?
2      Q. Do you have a medical device that is
3  sometimes located on your arm?
4      A. Yes.
5      Q. What is that?
6      A. It's my skin.
7      Q. Okay.
8      A. It's an operation that I get.
9      Q. Okay.
10     A. I can show it, --
11     Q. Oh, no, that's not --
12     A. -- you can see it.
13     Q. -- no, no, that's not necessary.
14     A. It's right here, it's nothing derogatory.
15     Q. Oh, I know, but I don't need to see it,
16 thank you though.
17     A. Okay, all right.
18         MR. GOINS: You're doing fine, just let
19 her ask another question.
20 BY MS. NELSON:
21     Q. Mr. Cook, were you in your house on Second
22 Avenue on January 13th, 2005, in the evening?
23     A. Yes.
24     Q. Did you have occasion to encounter some
25 police officers from the Minneapolis Police Department

Page 13 - Page 16
KIRBY A. KENNEDY & ASSOCIATES

Page 17

1 at that time?
2   A. Yes.
3   Q. Did they come into your house?
4   A. Yes.
5   Q. Where were you in your house when they
6 entered?
7   A. When they entered I was in my upstairs,
8 second floor, bedroom trying to rest.
9   Q. And what happened, what did you do when they
10 came in?
11   A. Well, my other grandson told me what was
12 going on downstairs, he said, the police were down
13 there, --
14   Q. Which grandson --
15   A. -- so I --
16   Q. -- I'm sorry.
17       MR. GOINS: Do you want him to answer
18 your question or do you want him to finish?
19 BY MS. NELSON:
20   Q. Why don't you finish and then I'll come back
21 to that, please continue.
22       MR. GOINS: Go ahead.
23   A. -- I came downstairs and I got to the last
24 step and one of the masked officers with a gun grabbed
25 me and threw me down.

Page 18

1 BY MS. NELSON:
2   Q. Where did he grab you on your person, on
3 your body?
4   A. I don't know where he grabbed me, but I just
5 know he grabbed me and he threw me down. I don't
6 remember what -- I don't recall where his hands were.
7   Q. Okay.
8   A. But I know he -- I got down and he told us
9 to stay down.
10   Q. Did he shove you or did he grab --
11   A. He shoved me down, --
12   Q. -- with his hands, okay?
13   A. -- that's what I'm trying to say.
14   Q. Okay and then what happened?
15   A. Well, they put his foot in my side and they
16 kept it there in the cold air and while I was laying
17 on the floor.
18   Q. Was the front door open at the time?
19   A. The front door was open at the time.
20   Q. How close to the front door were you?
21   A. Oh, maybe from here to that one -- that
22 window there. (Indicating.)
23   Q. Would that be about ten feet?
24   A. I don't know, I don't know about feet-wise.
25   Q. Well, for the record I need you to indicate

Page 19

1 something other than pointing a distance because the
2 reporter can't --
3   A. Well, what do you want me to do, measure the
4 distance?
5   Q. Just --
6   A. I can't do that.
7       MR. GOINS: If I may interject,
8 Counsel, can you give an estimate in a range of feet
9 of how far you are from where that window is?
10   A. Maybe four feet or five.
11       MR. GOINS: Okay.
12       MS. NELSON: Okay, thank you.
13 BY MS. NELSON:
14   Q. Did they handcuff you?
15   A. No.
16   Q. You said that they put their foot on you?
17   A. Yes, in my side.
18   Q. In your side?
19   A. Yes.
20   Q. Did they kick you or did they place their
21 foot on you?
22   A. No, they placed the foot on me, held me
23 down.
24   Q. And then what happened?
25   A. Pointed a gun at me and made me stay down.

Page 20

1   Q. Okay.
2   A. That's what happened.
3   Q. Did you say anything to him?
4   A. Yeah, I told him I was cold.
5   Q. Did he say anything to you?
6   A. Yeah, he told me to stay down.
7   Q. Okay, anything else?
8   A. Not that I can recall.
9   Q. Who else was in the house at the time?
10   A. My wife, my son was downstairs, my wife and
11 my two granddaughters, Tameka and Jaquita, and their
12 babies.
13   Q. How many of their children were there?
14   A. Let's see, Malikai, Hesikai, Camille,
15 Charlie, and a baby. Who was the baby?
16   Q. Okay, that's fine.
17   A. I don't know who the baby was.
18   Q. That's okay. Was there anyone else in the
19 house that you were aware of?
20   A. No.
21   Q. No.
22   A. But the officers, --
23   Q. Were --
24   A. -- Minneapolis Police and the riot squad.
25   Q. -- were any of your grandsons --

Page 21

1 A. Yeah, I'm sorry, they were in -- yeah, my
2 grandsons were there.
3 Q. Which grandsons?
4 A. Jamon, Cortez.
5 Q. What style is your home, how many floors
6 does your house have?
7 MR. GOINS: Answer the last question.
8 THE WITNESS: Huh?
9 MR. GOINS: Answer just the last
10 question about how many floors your home has.
11 A. I think it's three floors.
12 BY MS. NELSON:
13 Q. Three floors, okay. Where were your
14 granddaughters in the house?
15 A. In the living room.
16 Q. Were they sitting, were they standing?
17 A. Sitting.
18 MR. GOINS: Counsel, I assume you're
19 referring to when the officers first came in?
20 MS. NELSON: I am.
21 MR. GOINS: Go ahead.
22 A. Sitting.
23 BY MS. NELSON:
24 Q. They were sitting and where were their
25 children at that time?

Page 22

1 A. Playing around on the floor.
2 Q. And then did the police place them down on
3 the ground or were they sitting, what positions were
4 they in once the police --
5 A. Told them --
6 Q. -- arrived?
7 A. -- to stay put. (Indicating.)
8 Q. Do you know if they handcuffed any of them?
9 A. Not to my knowledge.
10 Q. Where was your wife?
11 A. Sitting on my sofa.
12 Q. After you were down on the floor or were you
13 sitting, I'm sorry, can you tell me again?
14 A. Down on the floor.
15 Q. You were down on the floor?
16 A. Laying on my right side.
17 Q. Did you stay on the floor the whole time
18 they were there?
19 A. No.
20 Q. Where else were you?
21 A. They let me up at my wife's insistence,
22 because of my shunt in my neck at that time.
23 Q. I'm sorry, what was in there?
24 A. Shunt in my neck.
25 Q. You had a --

Page 23

1 A. A catheter --
2 Q. -- catheter?
3 A. -- is what they call it, yeah.
4 Q. Okay.
5 A. And I was cold so they let me sit on the --
6 I got a sofa in my den, they let me sit there with a
7 blanket.
8 Q. Just to backtrack, what do you wear the
9 catheter for?
10 A. Dialysis treatment.
11 Q. And that's in your neck or at least --
12 A. At that --
13 Q. -- that time it was in your neck?
14 A. -- time it was in my neck, yeah.
15 Q. Do you sometimes wear that when you're
16 sleeping?
17 A. Yeah, it's -- it's -- it's a operation that.
18 Q. Oh, it's permanently in there?
19 A. It's permanent at that time, they take it
20 out.
21 Q. And so where did your wife and the police
22 officers take you to then when they got you up off the
23 ground?
24 A. Off the floor.
25 Q. Off the floor?

Page 24

1 A. To the -- in the den where I have a sofa in
2 the den.
3 Q. Okay.
4 A. They set me there.
5 Q. What were the other police officers doing at
6 the time that you saw --
7 A. Ramming my house.
8 Q. Ramming?
9 A. Messing up my house. Tearing up my house.
10 Q. Were they saying anything to each other that
11 you heard?
12 A. No. I didn't hear them, they were talking
13 to each other, but I didn't hear them.
14 Q. Did you see your son, Timothy, at anytime
15 while they were --
16 A. No, not 'til they brought him up and took
17 him to jail.
18 Q. Did you see what happened when they brought
19 him up?
20 A. No, I didn't see that.
21 Q. Did any of the police officers ever kick
22 you?
23 A. No.
24 Q. Did they shove you with their foot?
25 A. No. Just put the foot on my side, that's

Page 25

1 all, and held me down.
2 Q. When they brought you down the stairs, did
3 you come down the stairs on your own or did somebody
4 help you down the stairs?
5 A. Came down the stairs on my own to the last
6 step.
7 Q. Okay and then what happened?
8 A. Then they grabbed me and threw me down.
9 Q. Were they behind you or in front of you when
10 they grabbed you?
11 A. I don't know where they were, they were all
12 over. (Indicating.)
13 Q. You said that they were rummaging through
14 your house and tearing things up, what else did you
15 notice them do, anything else?
16 A. What else were there?
17 Q. I don't know.
18 A. Can I ask you a question, what else was
19 there for them to do? They threw -- my wife had a pot
20 of sweet potatoes that she was just seasoning on my
21 stove and they threw that down on the floor.
22 Q. Okay, anything else?
23 A. They tore up the beds up -- upstairs, in the
24 -- in the upstairs bedrooms.
25 Q. What do you mean they tore them up?

Page 26

1 A. They tore the upstairs bedroom, where the
2 boys were, they tore 'em up.
3 Q. Did they --
4 A. -- they just took all the -- everything and
5 threw it all over.
6 Q. -- did they cut the mattresses or --
7 A. No, they didn't cut nothing, --
8 Q. -- they threw --
9 A. -- they just took it off and thew it all
10 over.
11 Q. -- they threw things around?
12 A. Yeah.
13 Q. Anything else that you can remember?
14 A. What else. What else is there?
15     MR. GOINS: Objection, hold on,
16 objection, vague as to anything else. Go ahead and
17 answer if you understand the question, Mr. Cook.
18 A. I don't know what else, Ms. Attorney, what
19 else could there be?
20 BY MS. NELSON:
21 Q. Okay, so that's all that you remember?
22 A. Yeah, that's all that I remember.
23 Q. At what point did you see your grandson
24 after the police arrived?
25     MS. SULLIVAN: Objection, --

Page 27

1 BY MS. NELSON:
2 Q. Excuse me, I'm sorry, Timothy?
3 A. I didn't see Tim 'til they brought him up to
4 take him to jail. He kept objecting to their asking
5 questions for them being there, so they whisked him
6 out.
7 Q. Did you hear what he said to them?
8 A. Yeah, he asked them where was their lead
9 officer. And they kept telling him to shut up.
10 Q. What else did they say to him?
11 A. Nothing else.
12 Q. Did they swear at him?
13 A. Yeah, they swear at him, they swore at all
14 of us.
15 Q. What did they say?
16 A. No, I can't repeat what they said. They
17 said swear, cuss words, and I'm not going to repeat
18 them.
19     MR. GOINS: Mr. Cook, --
20     THE WITNESS: Yeah.
21     MR. GOINS: -- I'm going to -- even
22 though I know you're a gentleman and a Christian, for
23 the record it's important for you to say what the
24 words were and if you feel better spelling them, spell
25 the words out, okay?

Page 28

1 A. Well, they told him to "Shut the fuck up,"
2 at one point.
3 BY MS. NELSON:
4 Q. They told your son?
5 A. Yes.
6 Q. Okay.
7 A. And all the rest of us, they wouldn't let
8 none of us talk, none of us was allowed.
9 Q. How many times do you think they said that
10 particular expression?
11 A. Several times.
12 Q. Several times, was it directed just at your
13 son Timothy --
14 A. Me, --
15 Q. -- or at everybody?
16 A. -- and --
17 Q. At you?
18 A. -- at everybody else.
19 Q. Did they say any other expressions, anything
20 else?
21 A. Like what?
22 Q. Were there any other swear words they used?
23 A. I don't know, no.
24 Q. None that you recall or none --
25 A. None than I recall.

Page 29

1  Q. -- is it possible that they used other swear
2  words?
3  A. Yes, very.
4  Q. Did you see if any of the police officers
5  pushed or shoved your son, Timothy?
6      MR. GOINS: Objection, compound
7  question, lack of foundation, go ahead and answer,
8  Mr. Cook.
9  A. I don't recall that -- that I did.
10 BY MS. NELSON:
11 Q. Did you see any of the police officers kick
12 your son, Timothy?
13 A. No.
14 Q. When your son was brought up the stairs, in
15 what room did they bring him to?
16 A. The living -- through the kitchen through to
17 the living room.
18 Q. Did they handcuff him, did you see?
19 A. I believe they did.
20 Q. And when they brought him into the living
21 room, did they put him down onto the ground or was he
22 standing?
23 A. They marched him out, put him in the car,
24 took him to jail.
25 Q. Did you ever see him on the ground in the

Page 30

1  living room?
2  A. No -- yes, I did, --
3  Q. Okay.
4  A. -- I take that back, yes, I did.
5  Q. In what position was he on on the ground?
6  A. I don't know.
7  Q. Was he on his stomach, his back?
8  A. I think he was on his side, so to speak, I
9  don't know.
10 Q. Did you ever see the officers pick him up
11 then from laying down on his side?
12 A. No, I don't recall.
13 Q. At what point did they take him out to the
14 car?
15 A. I don't understand your question.
16 Q. How long was he on the floor on his side?
17     MR. GOINS: Objection, lack of
18 foundation, --
19 A. I don't know.
20     MR. GOINS: -- go ahead and answer, if
21 you know, Mr. Cook.
22 A. I don't know.
23 BY MS. NELSON:
24 Q. Did you see them walk him out to the squad
25 car?

Page 31

1  A. No, --
2      MR. GOINS: Objection, asked and
3  answered.
4  A. -- I'm on the floor myself on the sofa.
5  BY MS. NELSON:
6  Q. You were on the sofa, you could not see any
7  of --
8  A. I could not see around that.
9  Q. Have you sustained any physical injuries as
10 a result of this incident?
11 A. Yeah, but I didn't report anything.
12 Q. What kind of --
13 A. Stiffness, stiffness.
14 Q. Stiffness?
15 A. Yeah.
16 Q. Where --
17 A. From the cold air.
18 Q. -- where on your body did you feel --
19 A. All over my body, the stiffness is all over
20 my body. Remember I had a catheter in my neck that
21 was exposed to the air.
22 Q. Okay.
23 A. So I was -- that kind of stiffness is what
24 I'm talking about.
25 Q. Was the catheter pulled out of you?

Page 32

1  A. No. It was just hanging out. It's just
2  wires that hang out.
3  Q. Is that how it --
4  A. So they can connect the machine -- connect
5  me to the machine.
6  Q. -- at the time that you were wearing that
7  catheter in your neck, were those wires always out?
8  A. Yes.
9  Q. So other than the stiffness, any other
10 injuries?
11 A. No, not that -- not that I'm aware of, no.
12 Q. Did you feel stiffness before?
13 A. No.
14 Q. How long did that last?
15 A. I don't know.
16 Q. Did it last --
17 A. A week or so, --
18 Q. -- a week or so?
19 A. -- yeah.
20 Q. Did you see a doctor for the stiffness?
21 A. No.
22 Q. How else would you say that the incident
23 affected you emotionally?
24 A. Very. I've had nightmares. I often try to
25 see who's -- somebody's coming through my door.

Page 33

1 Q. That's what the nightmares are about?
2 A. Anytime, yeah. I'm always afraid of the
3 breaking into my house by the police department. I
4 still do.
5 Q. Okay, anything else?
6 A. No.
7 Q. No?
8 A. No.
9 Q. Have you sought treatment for your
10 nightmares with any doctor?
11 A. No.
12 Q. Has your grandson, Cortez Cook, ever lived
13 with you?
14 A. Yes.
15 Q. When did he live with you?
16 A. At that time and before.
17 Q. I have to ask this and I guess I apologize
18 in advance, but have you ever been convicted of a
19 crime?
20 A. No.
21 Q. How long had Cortez been living with you at
22 the time around the incident, when did he start living
23 with you at that time?
24 A. He's our grandson, we raised him.
25 Q. Did he always live with you?

Page 34

1 A. Uh-huh.
2 Q. Was there anytime that he didn't live with
3 you?
4 A. No, unless he was in jail.
5 Q. When was he in jail?
6 A. I don't know.
7 Q. Was he in jail in the last ten years?
8 A. Oh, yeah.
9 Q. Did you see any police officers that were
10 taking food jars out of the refrigerator?
11 A. No.
12 Q. Did you see any broken jars on the ground?
13 A. No.
14 Q. Do you know if the police officers took
15 anything from your house, any personal possessions of
16 anyone in --
17 A. Yeah.
18 Q. What did they take?
19 A. They took a bag out with a lot of papers and
20 stuff in it.
21 Q. Anything else?
22 A. No.
23 Q. Did they take anything of your
24 grandchildren's that you know of, any of their
25 possessions?

Page 35

1 A. If they did, I didn't -- I couldn't see.
2 Q. Did a police officer ever bring you a
3 blanket at your request?
4 A. At my wife's request.
5 Q. They brought one for you?
6 A. Yeah.
7 MS. NELSON: I think that's all the
8 questions that I have.
9 MR. GOINS: Okay, we'll read and sign.
10 (Whereupon, at 12:00 Noon, Monday,
11 March 5, 2007, the taking of the
12 deposition of CHARLES E. COOK, SR.,
13 was adjourned.)

Page 36

1 (UPON COMPLETION forward this original Reading and
  Signing Certificate to Attorney Tracey Nelson, who
2 already has the sealed original.)

4   I, CHARLES E. COOK, SR., do hereby certify
5 that I have read the foregoing transcript of my
6 Deposition and believe the same to be true and correct
7 (or, except as follows, noting the page and the line
8 number of the change or addition desired and the
9 reason why):
10 Page     Line     Change or Addition     Reason

24 Dated this ____ day of _____, 2007
25 BAL

Page 37

```
 1   STATE OF MINNESOTA )
                       ) SS.
 2   COUNTY OF HENNEPIN )

 3          Be it known that I took the deposition of
     CHARLES E. COOK, SR., on the 5th day of March, 2007,
 4   at Minneapolis, Minnesota;

 5          That I was then and there a Notary Public in
     and for the County of Hennepin, State of Minnesota,
 6   and that by virtue thereof, I was duly authorized to
     administer an oath;
 7
            That the Witness before testifying was by me
 8   first duly sworn to testify to the whole truth and
     nothing but the truth relative to said cause;
 9
            That the testimony of said Witness was
10   recorded in Stenotype by myself and transcribed into
     typewriting under my direction, and that the
11   deposition is a true record of the testimony given by
     the Witness to the best of my ability;
12
            That the cost of the original transcript has
13   been charged to the party noticing the deposition,
     unless otherwise agreed upon by Counsel, and that
14   copies have been made available to all parties at the
     same cost, unless otherwise agreed upon by Counsel;
15
            That I am not related to any of the parties
16   hereto nor interested in the outcome of the action;

17          That the reading and signing of the
     deposition by the Witness was executed as evidenced by
18   the preceding page;

19          WITNESS MY HAND AND SEAL this 8th day of
     March, 2007.
20

21
            Barbara A. Larsien
22          Court Reporter

23

24

25
```