Page 1

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
                       THIRD DIVISION
       -----------------------------
       Charles Everett Cook, et. al.,
                                    No. 06-579 DWF/AJB
            Plaintiffs,

         vs.

       City of Minneapolis, et al.,

            Defendants.
       -----------------------------









              The deposition of SYLVIA M. COOK, taken
       pursuant to Notice of Taking Deposition, before
       Barbara A. Larsien, a Notary Public in and for the
       County of Hennepin, State of Minnesota, taken on the
       5th day of March, 2007, at 333 South Seventh Street,
       Suite 300, Minneapolis, Minnesota, commencing at
       approximately 12:00 Noon.
```

Page 2

```
 1  APPEARANCES:
 2
        ALBERT T. GOINS, SR., ESQUIRE, of the GOINS
 3  LAW OFFICE, LTD., 301 Fourth Avenue South, 378 Grain
    Exchange Building, Minneapolis, Minnesota 55415,
 4  appeared for and on behalf of the plaintiffs.
 5
        MAYA C. SULLIVAN, ESQUIRE of the LAW OFFICES
 6  OF MAYA C. SULLIVAN, L.L.C., 941 Hillwind Road
    Northeast, Suite 200, Minneapolis, Minnesota 55432,
 7  appeared for and on behalf of the plaintiffs.
 8
        TRACEY NELSON, ASSISTANT CITY ATTORNEY, CITY
 9  OF MINNEAPOLIS, 333 South Seventh Street, Suite 300,
    Minneapolis, Minnesota 55402, appeared for and on
10  behalf of the defendants.
11
    ALSO PRESENT:
12
        CHARLES E. COOK, SR.
13      TIMOTHY B. COOK
14
15     The original is in the possession of
             Attorney Tracey Nelson.
16
17              INDEX
18  SYLVIA M. COOK:
19  Cross-examination by Ms. Nelson     Page 3
20  Cross-examination by Mr. Goins      Page 29
21  Recross-examination by Ms. Nelson   Page 35
22  Recross-examination by Mr. Goins    Page 40
```

KIRBY A. KENNEDY & ASSOCIATES

Page 3

```
 1             SYLVIA M. COOK,
 2       the Witness in the above-entitled
 3       matter after having been first duly
 4       sworn, deposes, and says as follows:
 5
 6             CROSS-EXAMINATION
 7  BY MS. NELSON:
 8      Q. Ms. Cook, could you state your full name for
 9  the record, please?
10      A. Sylvia Mae Williams Cook.
11      Q. As I've already stated, I'll say it again,
12  that I'm an Assistant City Attorney for the City of
13  Minneapolis and I'm representing the defendants in
14  this lawsuit. And just to go over a few ground rules,
15  to make things easier for the court reporter and to
16  make a clean record, we need verbal answers so that
17  the court reporter can write down what you're saying.
18  Also if you can refrain from saying, "Uh-huh," or
19  "Huh-uh," because it's difficult to understand whether
20  that's a yes or no later when you're looking at the
21  record. Also if you don't understand a question, can
22  you please tell me so I can clarify it or rephrase it,
23  because otherwise I'll assume that you understood the
24  question. And also I will try my very best to not
25  interrupt you when you're talking, if you can also try
```

Page 4

```
 1  to wait until I'm done asking a question before
 2  answering it, so that way there isn't, you know, we're
 3  not speaking over each other and that makes it
 4  difficult for the court reporter to get it down.
 5          Are you under the influence of any drugs,
 6  prescription or otherwise, or anything that might
 7  affect your ability to recall the events on -- in
 8  January, 2005?
 9          MR. GOINS: I'm going to object, it may
10  be beyond the witness' competence, but go ahead and
11  answer.
12      A. No.
13  BY MS. NELSON:
14      Q. Did you look at any documents in preparation
15  for your deposition today?
16      A. Yes, I think so.
17      Q. What did you look at?
18      A. I can't recall at the moment.
19      Q. Is there a reason that you can't recall?
20          MR. GOINS: Objection, argumentative,
21  go ahead and answer.
22      A. No.
23  BY MS. NELSON:
24      Q. No, okay. Do you remember where it was that
25  you read the documents or looked at the documents?
```

Page 5

1 MR. GOINS: Objection, compound
2 question, go ahead and answer.
3 A. It was in my living room.
4 BY MS. NELSON:
5 Q. In your living room, okay. Have you talked
6 to anybody about this deposition other than your
7 attorneys?
8 MR. GOINS: Objection, may call for
9 spousal communications. Answer only to the extent,
10 Ms. Cook, that you don't talk about communications
11 with your lawyer or your husband.
12 A. No.
13 Q. Ms. Cook, where do you currently live?
14 A. 3845 Second Avenue South.
15 Q. How long have you lived there?
16 A. Trying to recall, at least 30 years or more.
17 Q. Who lives there with you?
18 A. At the present?
19 Q. At the present time?
20 A. My husband, my grandson, Tim, Sapphire. Who
21 else is in that house? Occasionally my grandkids.
22 Q. Who was living with you at the time of the
23 incident?
24 MR. GOINS: Objection, vague. Go ahead
25 and answer if you know what she means by "The

Page 6

1 incident."
2 BY MS. NELSON:
3 Q. Who was living with you at the time of your
4 encounter with the police officers that's subject to
5 this lawsuit?
6 A. My husband, my granddaughter Sapphire. I
7 don't know, I'm not clear on that one, I think Tez was
8 living with us at the time. (Indicating.)
9 Q. I'm sorry, your attorney can't help you
10 during, they make objections.
11 A. Okay. Well, at the time, I'm not sure if my
12 granddaughter moved out or not.
13 Q. Okay, fair enough, anybody else?
14 A. My granddaughter, and, of course, if my
15 granddaughter was there then my grandsons, Hesikai,
16 Malikai, Charlie, I think Jamon, that's about all I
17 can think of right now. My house is so full.
18 Q. Was your grandson, Cortez, living with you
19 too?
20 A. Yeah, I think so.
21 Q. Ms. Cook, what is your date of birth?
22 A. 4/9/42.
23 Q. Are you currently employed?
24 A. No.
25 Q. Have you worked outside of the home?

Page 7

1 A. Yes.
2 Q. When did you work outside of the home?
3 A. '73 to '74.
4 Q. What did you do then?
5 A. Kitchen helper.
6 Q. Where at?
7 A. Lincoln Del, a delicatessen.
8 Q. What high school did you attend?
9 A. I didn't.
10 Q. Ms. Cook, how long have you been married?
11 A. 51 and a half years.
12 Q. How many children do you have?
13 A. Six.
14 Q. How many grandchildren do you have, I
15 understand there's quite a few?
16 A. 13 or 14.
17 Q. Ms. Cook, have you ever been involved in an
18 accident that resulted in a physical injury?
19 A. Explain, I'm not sure what you're talking
20 about.
21 Q. Just ever in your lifetime have you been
22 involved, for instance, in an auto accident, or a slip
23 and fall?
24 A. Yes.
25 Q. What happened?

Page 8

1 A. I was sore. On the treatment, I can't
2 remember.
3 Q. When was that accident?
4 A. '63.
5 Q. In the 24 hours before the incident that's
6 the subject of this lawsuit, had you taken any drugs,
7 prescription or otherwise?
8 A. I don't understand what you mean.
9 Q. At the time of the incident did you take any
10 -- did the doctor prescribe any drugs for you that you
11 were taking?
12 MR. GOINS: Object as to form, it's
13 vague. Answer if you understand, Ms. Cook.
14 A. Ask the question in the period of time in
15 which you mean.
16 BY MS. NELSON:
17 Q. Okay, on January 13th, 2005, were you taking
18 any prescription drugs around that time frame?
19 A. Morning.
20 Q. Do you remember what you were taking, what
21 prescription drugs?
22 A. Mylanta and Trazadone.
23 Q. What did you take the Trazadone for?
24 A. Muscle relax.
25 Q. Were you having -- why did you need a muscle

**Page 9**

1 relaxer?
2   A. At the time I was having problems with my, I
3 guess, my muscles and things were just tight and
4 shaky.
5   Q. Would that be your leg muscles, your arm
6 muscles, what muscles?
7   A. Legs especially.
8   Q. Any other prescription drugs that you can
9 remember?
10  A. Hormone, what's it called. Premarin.
11  Q. Anything else?
12  A. Occasionally Bufferin or aspirin.
13  Q. Okay.
14  A. And then Correctol.
15  Q. Mrs. Cook, on January 13th, 2005, in the
16 evening, did you have occasion to encounter some
17 police officers at your home?
18  A. Yes.
19  Q. Did they enter your house?
20  A. Yes.
21       (At this time Mr. Goins receives
22        a telephone call.)
23       MR. GOINS: Go ahead, Maya, take over.
24 BY MS. NELSON:
25  Q. Where were you in the house when they

**Page 10**

1 entered?
2   A. In my living room, on the sofa.
3   Q. Who else was in the living room with you at
4 that time?
5   A. My granddaughters, Tameka and Jaquita. And
6 Tameka's children, Malikai and Hesikai. And Jaquita's
7 children, Charlie, and Camille, that's about all I can
8 recall.
9       (At this time Mr. Goins returned
10       to the conference room.)
11 BY MS. NELSON:
12  Q. What happened when they entered?
13  A. Oh. When they entered, I was sitting there
14 and I heard a boom and they was there. Everybody
15 started screaming. And I myself, I jumped up. I
16 wanted to know what was going on. They put a gun in
17 my face and told me to sit down. And they wouldn't --
18 they didn't -- they tell me at the time some
19 derogatory words and I can't think of what it was. I
20 told them to tell me what it was. Babies were crying,
21 I call 'em all my babies, my grandchildren. So they
22 told me to sit down and my children, I was going to
23 get them, and -- those that wasn't on the sofa, and
24 they told me to sit down and they get the gun right in
25 my face. So I don't know, I just screamed and

**Page 11**

1 screamed and just, Lord what's happening? What is
2 going on? That kind of stuff. And one child I had in
3 my lap and he just clamped to me. I was going to put
4 a diaper on him, but it was awhile before they let me
5 do that. (Indicating.)
6   Q. Did you say anything to the police officers?
7   A. I was talking to the police and just praying
8 to God to just help me.
9   Q. Do you remember what you said?
10  A. "What are you in here for?" And "Look at my
11 babies, I'm telling you, you're scaring them." Just
12 trying to bring some peace within myself because I was
13 frightened, they was too. But my family is the most
14 important thing to me.
15  Q. Did you say anything when the police officer
16 pointed the gun at your face?
17  A. I wasn't concerned about that. I told 'em,
18 "Shoot me," because I'm too -- I'm for my family,
19 you're going to have to kill me, go on and do it, but
20 I'm telling you.
21  Q. Did you eventually sit down then?
22  A. Eventually, my --
23       MR. GOINS: Hold on, I'm going
24 interpose an objection. I'm going to object that
25 "Eventually," assumes facts not in evidence,

**Page 12**

1 mischaracterizes her testimony. Go ahead and answer.
2   A. What was the question again?
3 BY MS. NELSON:
4   Q. They were asking you to sit down, --
5   A. Right, --
6   Q. -- did you sit down?
7   A. -- for a minute.
8   Q. Okay and then what did you do?
9   A. They brought my husband down, pulled him
10 down on the floor and I started screaming, "My
11 husband, you going to hurt him, he's sick." And they
12 put him on the floor, his -- his arm behind his back.
13 And I was just screaming, "You don't know what you're
14 doing. Lord help, Jesus, you don't know what you're
15 doing, my husband is sick, put a blanket over him at
16 least." "Can you cover my children up?" I think, at
17 that time I was out of it, just take care of my
18 husband. And the next thing I know I was in the
19 dining room and I heard some noise in the kitchen.
20 And I, "What they doing to our house?" "Don't worry
21 about that," they call me names, some kind, "Sit your
22 ass down," or something like that. I don't know what
23 kind of words, they used so many words. But I was
24 going to see what they was doing in my kitchen and
25 they stopped me in my dining room. Then I came back

Page 13

1  in the living room. Then they got me in the back
2  going back in the dining room, so they stopped me
3  again. And they questioned me about if I was married
4  and this and that. And I was like what do that make
5  any reason.
6      MR. GOINS: I'm sorry, I couldn't hear
7  what you said, Ms. Cook.
8      A. I said they was asking me if I was married,
9  interrogating me about that. And I told 'em, yes.
10 And I was pleading for my husband, go and get a
11 blanket anyway. They had the gun in my face, you
12 going to do what I say or I'm going stick you in
13 something or something in the ass, or some kind of
14 word he had, all kinds of stuff.
15 BY MS. NELSON:
16     Q. How many times do you think you got up from
17 the living room and went towards the dining room?
18     A. At least two or three times.
19     Q. And each time what did they do?
20     A. Had the gun on me and told me I couldn't go
21 in there. Brought me back up in the living room, I
22 couldn't keep my eyes off my husband, because I know
23 he had a -- that catheter and I can see it's hanging
24 out and I'm telling that.
25     Q. Did they ever handcuff you?

Page 14

1      A. No.
2      Q. Did they ever put you onto the floor?
3      A. No.
4      Q. What about your granddaughters and their
5  children, your great grandchildren, were they ever
6  placed onto the floor?
7      A. No, I was screaming about the one that was
8  up in the bedroom. They tore up my house and
9  threatened us and cursed us like that --
10     Q. Okay.
11     A. -- and she was asleep. "Don't hurt my
12 baby," Sapphire. "Don't hurt my baby." I feared for
13 our lives. And I didn't know, I was between my
14 husband and my children, because I was up on the
15 floor.
16     Q. After your husband came down the stairs, did
17 you see where he went?
18     A. Yes.
19     Q. Where did he go?
20     A. They pulled him down the steps and I guess
21 the distances from about three feet away from me and
22 they -- right at the bottom of the steps they had him
23 stretched out there.
24     Q. Did they put him down on the ground?
25     A. On the floor.

Page 15

1      Q. Did you see them kick him?
2      A. Yes.
3      Q. Where did they kick him?
4      A. At the time, to me, it's -- I don't know if
5  it's on the side or back. They had his hands behind
6  his side back.
7      Q. How many times did you see them kick him?
8      A. Once.
9      Q. Just one time, okay. Did they put their
10 foot on him at anytime?
11     A. Yes.
12     Q. Where did they put their foot?
13     A. From where I seen it, it was in the back.
14     Q. On his back?
15     A. Yes.
16     Q. What did you notice the police officers
17 doing when they were in your house?
18     A. As they came in, I saw them running up the
19 steps. I saw in the kitchen, some were in the
20 kitchen. Some were in the living room. I don't know
21 how many it was, but it was just chaos. And I heard
22 the noise in the kitchen, those in the kitchen, I
23 heard the big bang and I was trying to see about that.
24     Q. Did you see what that involved?
25     A. Not until after they was gone.

Page 16

1      Q. What did you see after they left?
2      A. I had a big pot on the stove, restaurant
3  size, cooking sweet potatoes to put in the freezer.
4  And I went in there and they had throwed it all over
5  the walls, the floor, and the dishes and everything
6  laying around.
7      Q. Did you see anything else?
8      A. Glass on the floor. It was just.
9      Q. Was the glass broken or were they just on
10 the floor?
11     A. I know I have to be careful walking, that's
12 one thing, I can't remember.
13     Q. Did you see any jars of food on the floor,
14 did you see any jars of food on the floor?
15     A. I'm not clear on that.
16     Q. Did you see anything else on the floor that
17 you assume they placed there?
18     A. Yes.
19     Q. What else?
20     A. There was pots and pans, there was some
21 food. And I'm not sure if there was glasses on the
22 floor, but glass was on the floor. And different --
23 the reason that we had to walk around, I don't know if
24 it was broken glass, because I was upset with that.
25     Q. Do you know where your son, Timothy, was

Page 17

1 when the police officers came in?
2  A. He was downstairs in the basement quarters.
3  Q. At some point did he come up the stairs?
4  A. Yes.
5  Q. What happened when he came up?
6  A. They had him -- the police had him -- they
7 brought him, just him and my husband, put him on the
8 floor in the door.
9  Q. Did they handcuff him?
10  A. I'm pretty sure they did, I'm not very clear
11 on that.
12  Q. Did you see them kick him?
13  A. Yes.
14  Q. How many times did they kick him?
15  A. I'm not sure.
16  Q. Do you know where on his person they kicked
17 him?
18  A. They kicked him in his back and they had his
19 head pinned down to the floor. They was holding his
20 head, I don't know how many was around him.
21  Q. Were they saying anything to him?
22  A. If they weren't saying to him, they was
23 saying it over him.
24  Q. They were saying it over him, what was he
25 saying to them?

Page 18

1  A. He was asking --
2  Q. I'm sorry, what?
3  A. He was asking where the chief officer, where
4 was his, oh, I can't think of it. I know what the
5 question is and I know -- the squad leader or
6 something like that to that affect.
7  Q. Okay and did they say anything in response
8 to that?
9  A. "Shut your damn mouth." And "Shut your God
10 damned mouth," lawyer this and I'm telling you that.
11  Q. Did your son, Timothy, say anything else to
12 them at that time?
13  A. He was telling them they was supposed to
14 have badges, they was supposed to have what -- a
15 subpoena. We didn't seen any of that.
16  Q. Did they say anything else?
17  A. Well, we was just names, bitches, we was son
18 of a bitches.
19  Q. That's what the police officers were saying?
20  A. Yes.
21  Q. Did your son, Timothy, say anything else at
22 that time, other than what you've already noted?
23  A. I can't remember. I couldn't understand it
24 because they was screaming all over. Every once in a
25 while I would hear something.

Page 19

1  Q. Were they screaming at each other?
2  A. No.
3  Q. Who was screaming?
4  A. Policeman.
5  Q. They were screaming at your son, Timothy?
6  A. And the rest of us, yes.
7  Q. And all of you?
8  A. Uh-huh.
9  Q. Did your son, Timothy, ever yell at the
10 police officers?
11  A. He told 'em they couldn't come in and just
12 throw us around like that. And -- and I can't
13 remember anything else. I know there was things he
14 said, but he just kept on asking questions and stuff
15 like that.
16  Q. When he was saying these things to them, was
17 he yelling at them or was he speaking more like you
18 and I are speaking right now in a conversational tone?
19  A. Louder than that. We took -- louder than
20 we're speaking now.
21  Q. And then what happened, did the police
22 officers do anything to your son, Timothy, at that
23 time?
24  A. Well, he was holding his head and had his
25 hands pinned back, some cord thing. He kept on asking

Page 20

1 the -- they was going to take him out of there if he
2 didn't do this and that. He was asking for a squad
3 leader. He'd been watching too much damned TV.
4  Q. That's what the police officer said to --
5  A. Yes.
6  Q. Did you see them shove or slam your son down
7 onto the ground?
8    MR. GOINS: Objection, compound, go
9 ahead and answer.
10  A. Not on the ground, but on the floor.
11 BY MS. NELSON:
12  Q. Onto the floor, okay, how many times did you
13 see that?
14  A. In the midst of trying to take care of my
15 children, I know once, --
16  Q. Once, --
17  A. -- but I believe more, I heard noise, I'm
18 saying, --
19  Q. -- you heard noise, --
20  A. -- yes, --
21  Q. -- but you didn't see --
22  A. -- it was in the same area, but I didn't see
23 anything other than that. As I say, I was trying to
24 secure my children, my husband.
25  Q. You saw it one time though?

Page 21

1    A. (No audible response. Indicating.)
2        MR. GOINS: You have to answer out
3    loud, Ms. Cook.
4    A. I'm trying to think, I saw it one time, yes.
5    BY MS. NELSON:
6    Q. Do you know did the officers take anything
7    from your house when they left?
8    A. Yes.
9    Q. What did they take?
10   A. What I saw them take, they had more stuff,
11   --
12   Q. Okay.
13   A. -- I saw them taking our mail, I asking them
14   about that. They had some in a bag, one took
15   something out of the back, I don't know what it was.
16   Q. You said that you know that they had other
17   stuff, do you know what that other stuff was?
18   A. No, I didn't see it.
19   Q. How do you know that they had other stuff?
20   A. I saw bags going out of my house and they
21   didn't bring 'em in.
22   Q. Have you -- did you sustain any injuries
23   from the police officers on that night?
24       MR. GOINS: Objection, vague, go ahead
25   and answer.

Page 22

1    A. It appeared, I guess, a couple days later.
2    BY MS. NELSON:
3    Q. What appeared?
4    A. I came down with a bad case of bronchitis.
5    Q. And was that in connection to them coming
6    into your house?
7    A. Yes.
8    Q. How?
9    A. Well, I walk around with no shoes on. Had
10   relaxed for the evening, and sitting in a draft, no
11   blankets, and I had a pile sitting up on the radiator
12   just not quite two feet from us, but they wouldn't
13   allow me to get it.
14   Q. Did you ask them to give you a blanket?
15   A. Yes, I did.
16   Q. Did they give you a blanket?
17   A. Eventually.
18   Q. Okay.
19   A. I was getting up again to take care of my
20   family.
21   Q. Did you see if they gave any blankets to any
22   of your grandchildren to use?
23   A. The little ones, yes.
24   Q. Did you sustain any other physical injury as
25   a result of this incident?

Page 23

1    A. Explain.
2    Q. Did you sustain any bruises?
3    A. No.
4    Q. Did any of the police officers ever shove
5    you or push you?
6    A. I'd say they put their hands on me.
7    Q. Where did they put their hands on you?
8    A. Around my arms or my shoulders, something
9    like that.
10   Q. What did they do when they had their hands
11   on you?
12   A. At the time I was going in the kitchen and
13   they told me I couldn't go in there and I couldn't go
14   to my husband, go sit down.
15   Q. Did they put their hands out to stop you or
16   did they --
17   A. Yes.
18   Q. Did they ever shove or push you then?
19   A. I'm not sure.
20   Q. You don't remember or --
21   A. I'm not sure, --
22   Q. -- you don't know if they did?
23   A. -- I know they put their hands on me.
24   Q. Did you suffer emotional injury?
25   A. Yes.

Page 24

1    Q. Can you tell me about that?
2    A. I was more afraid. I heard a bump, I
3    couldn't rest. Dreams. In the middle of the night,
4    jump up and check on my children, I hear noise. I
5    didn't feel safe going to the door myself.
6    Q. I'm sorry, what was the last thing?
7    A. I said I didn't feel safe in my house, don't
8    go to the door unless -- I'd like someone to go with
9    me. And then mostly trying to take care of my
10   grandkids, they all come pile on the bed, I'm scared
11   grandma, I'm scared grandma. I try to console them,
12   was a lot strain personally on me, I guess.
13   Q. Did you go to the doctor for any of these
14   symptoms?
15   A. Not for that. Bronchitis, of course, that
16   was soreness and stuff like that, all tied together,
17   that's the words they used with me.
18   Q. Did you ever see a psychologist as a result
19   of this incident?
20   A. No.
21   Q. Have you ever seen a psychologist, or a
22   psychiatrist, have you ever seen a doctor for your
23   mental health?
24   A. Yes.
25   Q. When was that?

### Page 25

1  A. '59.
2  Q. 1959?
3  A. Uh-huh.
4  Q. What did you see the doctor for?
5  A. Seizures.
6  Q. Seizures, do you still have seizures?
7  A. Yes.
8  Q. At the time of the incident did you have any
9  kind of diseases of any kind?
10  A. Seizures.
11  Q. Other than seizures?
12  A. No.
13  Q. Are you aware of what is causing the
14  seizures, is that related to any other illness?
15  A. No.
16  Q. Do you still have nightmares?
17  A. Yes.
18  Q. How often do you have the nightmares?
19  A. I'd say frequent.
20  Q. Do you have them every night?
21  A. Not every night.
22  Q. Do you have them once a week?
23  A. More.
24  Q. Would you say you have them three times a
25  week?

### Page 26

1  A. I would say that, it would be no more than
2  three, I would say.
3  Q. And what are the nightmares about?
4  A. Some kind of trauma, concern for my family.
5  They all mixed up in it.
6  Q. Do the dreams involve the events that took
7  place when the police came into your house?
8  A. Mixed up with others, yes.
9  Q. Is there anything else, any other effects
10  that you feel from when they came into your house
11  resulting from that?
12  A. Yes.
13  Q. What else?
14  A. Seizures.
15  Q. Okay, how often do you have seizures?
16  A. Normally, I guess, it goes in sprits,
17  sometimes once a month, sometimes once in three
18  months, something like that.
19  Q. Okay and then do you take medication for
20  that?
21  A. Yes.
22  Q. What do you take?
23  A. Lamictal.
24  Q. How long have you been taking Lamictal?
25  A. At least about five years or more.

### Page 27

1  Q. When you saw the doctor for your seizures in
2  1959 --
3  A. Correction.
4  Q. Okay.
5  A. That wasn't for seizures at the time --
6  Q. I'm sorry?
7  A. That wasn't for --
8  MR. GOINS: Hold on, I'm going to
9  interpose an objection here. You mischaracterized her
10  testimony, objection; and she's about to clarify it.
11  You've assumed that she saw the doctor for seizures, I
12  think she's telling you that she didn't. Go ahead,
13  Ms. Cook.
14  A. What did they call it. I just had a baby
15  and sometime -- what they call it, post something?
16  MR. GOINS: Can I interpose, Counsel?
17  MS. NELSON: Please.
18  MR. GOINS: Is it called postpartum
19  depression, Ms. Cook?
20  A. Something.
21  BY MS. NELSON:
22  Q. Did you suffer any seizures before January
23  13th, 2005?
24  A. Yes.
25  Q. For how long have you been suffering

### Page 28

1  seizures?
2  A. My mother told me from my birth.
3  Q. Did you take any medication for those
4  seizures before the Lamictal?
5  A. Yes.
6  Q. Do you know what you took before the
7  Lamictal?
8  A. It's years ago.
9  MR. GOINS: Counsel, in the interest of
10  moving it along, can I interpose? Did you take
11  Ritalin, Ms. Cook?
12  A. No. Phenobarbital.
13  BY MS. NELSON:
14  Q. Before the incident how often were you
15  having seizures?
16  A. Clarification.
17  Q. Please.
18  A. As I say, it varied.
19  Q. Okay. Is it fair to say that they would
20  come and go, you'd have one maybe one month and then
21  not for a few months, did you have them every month?
22  A. No.
23  Q. Did you have them every year?
24  A. Yes.
25  Q. Did you have them more than once a year

### Page 29

1  before the incident?
2  A. Yes.
3  Q. About how many times do you think you had
4  them before the incident, how many times a year?
5  A. I can't say.
6  Q. Can you give a range, was it between one and
7  five?
8  A. At least.
9  Q. Was it between five and ten?
10  A. Put a number on it, I really wouldn't have
11  one.
12      MS. NELSON: I think that's all the
13  questions I have.
14      MR. GOINS: Just a couple of follow-ups
15  for clarification.
16
17      CROSS-EXAMINATION
18  BY MR. GOINS:
19  Q. Ms. Cook, I'm Albert Goins, I represent you
20  in this case along with Ms. Sullivan, I'm just going
21  to ask you a couple of follow-up questions for
22  clarification, okay?
23  A. Okay.
24  Q. Do you mind that I'm sitting behind you when
25  I ask you?

### Page 30

1  A. No.
2  Q. You testified in response to Ms. Nelson's
3  question about when police officers pointed a gun at
4  your face you said, "Shoot me," why did you say that?
5  A. Because I was going to take care of my
6  family, my husband, my children. Because I didn't
7  matter, I was concerned with my husband, my children.
8  Q. Were you in fear for the safety of your
9  husband and your children?
10  A. Oh, God, yes. Terrified.
11  Q. I want to ask you about the demeanor of
12  those police officers who came into your home?
13  A. Okay.
14  Q. Do you know what I mean by the word
15  "Demeanor?"
16  A. Not exactly.
17  Q. I want to ask you about their behavior and
18  their manners and the way they treated you, that's
19  what I mean by their demeanor, okay?
20  A. Okay.
21  Q. Did they appear to you to be respectful to
22  you?
23  A. No.
24  Q. Did they appear to you to be disrespectful?
25  A. Yes.

### Page 31

1  Q. Did they appear to you to be intentionally
2  trying to treat you with disrespect?
3  A. My belief, yes.
4  Q. I'm sorry?
5  A. My belief, yes.
6  Q. Do you know what the word "Contempt," means?
7  A. Yes.
8  Q. Were those officers treating you with
9  contempt?
10  A. Yes.
11  Q. Were they treating your family members with
12  contempt?
13  A. I would say yes.
14  Q. Were you able to observe the officers'
15  faces?
16  A. No.
17  Q. Were you able to hear the tone of their
18  voice?
19  A. Yes.
20  Q. How would you describe the tone of any, pick
21  any of the officers that you heard, how would you
22  describe the tone of that officer's voice?
23  A. First thing that comes to mind is rough.
24  Anger.
25  Q. Did you see anyone in your home at anytime

### Page 32

1  when the officers came in and let me back up before I
2  finish that question. How many groups of officers
3  came in, was there only one group, or was there more
4  than one group?
5  A. More.
6  Q. Was there an initial group of officers who
7  came in who were armed with what looked like the
8  machine guns like you see on television?
9  A. Yes.
10  Q. How many officers was in that initial group
11  of officers that came in or were in that group?
12  A. Many.
13  Q. Okay.
14  A. Clarification.
15  Q. I'm sorry?
16  A. Clarification.
17  Q. Go ahead.
18  A. They came in with masks.
19  Q. They came in with like football helmets on?
20  A. No.
21  Q. They came in with some kind of glass masks
22  over their face?
23  A. To me it looked like gas masks or something
24  like that.
25  Q. And that was the first group of officers who

Page 33

1 came in or the second group?
2  A. First.
3  Q. And those officers are the ones that had
4 machine guns, is that true?
5  A. Right.
6  Q. Did those officers point the machine guns at
7 you?
8  A. Yes.
9  Q. Did they point the machine guns at members
10 of your family?
11  A. Yes.
12  Q. Did they point them at the children?
13  A. Yes.
14  Q. Did they point them at the infants?
15  A. Yes.
16  Q. Did anyone at the time that that first group
17 of officers came in, the ones with the masks and
18 machine guns, did anyone fight with those officers?
19  A. No.
20  Q. Did anyone resist those officers?
21  A. No.
22  Q. Did anyone try to stop them from coming
23 through the door?
24  A. No.
25  Q. Did those officers tell you why they were

Page 34

1 there when they first came in?
2  A. No.
3  Q. Did you know why they were there?
4  A. No.
5  Q. Now at some point in time you testified that
6 you got up and you tried to go into the kitchen?
7  A. Yes.
8  Q. And you did that, you got up from the living
9 room and you tried to go into the kitchen, what was
10 your purpose again in doing that?
11  A. I felt like they was destroying my house. I
12 just lost control of what surrounding me and most
13 important thing was my family. Then I heard things
14 being throwed around in the kitchen, I wondered what
15 could that be.
16  Q. Did you get the impression that the officers
17 were looking for something?
18  A. At that time I couldn't see what they'd be
19 looking for.
20  Q. Let me ask you like this, if there was
21 something those officers were looking for, had they
22 asked you where it was would you have told them?
23  A. Yes.
24  Q. Did they ask you for the location of any
25 item?

Page 35

1  A. No.
2  Q. So would it be fair to say that when the
3 officers started throwing things around the house, did
4 you get the impression that they were simply trying to
5 destroy things in your home?
6  A. Yes, observation, I felt something else as
7 well.
8   MR. GOINS: I don't have any other
9 questions.
10   MS. NELSON: I have a couple follow-up
11 questions.
12
13   RECROSS-EXAMINATION
14 BY MS. NELSON:
15  Q. Have the police ever come to your house
16 before this incident?
17  A. Yes.
18  Q. When had they come?
19  A. I'm not sure.
20  Q. Did they come in the last ten years?
21  A. Yes.
22  Q. Had they come in the last five years?
23  A. Yes.
24  Q. Why did they come?
25   MR. GOINS: Objection, calls for

Page 36

1 speculation, lack of foundation. Answer only if you
2 know.
3  A. Request the -- ask the question again.
4 BY MS. NELSON:
5  Q. What did the police tell you was the purpose
6 for their coming on the occasions they came?
7   MR. GOINS: Objection, assumes facts
8 not in evidence, answer to the extent that they told
9 you anything.
10  A. Not at that particular time.
11 BY MS. NELSON:
12  Q. I'm sorry?
13  A. Not at that particular time.
14  Q. Did you find out later why they were there?
15  A. Just before they left.
16  Q. Why were they there, what did they say?
17  A. Said they were looking for guns.
18  Q. And this was on a time prior to the incident
19 when they had come?
20   MS. SULLIVAN: I'm sorry, I was going
21 to ask you to clarify that.
22   MR. GOINS: She's clarified it.
23  A. Repeat the question.
24 BY MS. NELSON:
25  Q. When the police had come to your house

KIRBY A. KENNEDY & ASSOCIATES

CASE 0:06-cv-00579-DWF-AJB   Document 34-2   Filed 04/07/07   Page 10 of 11

Condenseit!                                                              Sylvia Cook

Page 37

1  before this incident, so not involving this incident,
2  when they had come to your house before that was it
3  involving guns or was it another purpose?
4       MR. GOINS: Objection, assumes facts
5  not in evidence, calls for speculation, lack of
6  foundation. Answer only to the extent you know why
7  they came prior to 2005.
8       A. No, I can't recall at this moment.
9  BY MS. NELSON:
10      Q. Did you ever know why they were there on the
11 incidents before?
12      A. Yes.
13      Q. Is there a reason that you don't know today?
14      A. Some time ago.
15      MR. GOINS: Objection, argumentative,
16 move to strike the question.
17 BY MS. NELSON:
18      Q. Is it because its been a while and you just
19 don't recall, is that accurate?
20      A. Yes.
21      Q. Is that what you're saying? Okay. How many
22 times prior to the incident have they come to your
23 house?
24      MR. GOINS: Objection, relevance, go
25 ahead and answer.

Page 38

1       A. I'd say three or four, or more.
2  BY MS. NELSON:
3       Q. Did they ever tell you they were there in
4  relation to your grandson, Cortez Cook?
5       A. Yes.
6       Q. You testified that you thought they were
7  intentionally disrespectful, why do you think that?
8       A. The names they called me.
9       Q. Can you tell me what the names were even
10 though I know that it's not something you're probably
11 interested in saying?
12      A. They said, "Fuck you bitch," "Sit your ass
13 down," "Fuck yawl," "God damn," this, and "Hell," that
14 and that stuff.
15      Q. Did you ever yell at any of the police
16 officers?
17      MR. GOINS: Object to the term, "Yell,"
18 as being vague. Go ahead and answer, Ms. Cook, if you
19 understand that.
20      A. Yes, I did.
21 BY MS. NELSON:
22      Q. Do you recall when you yelled what you said?
23      A. "Give me a blanket for my baby." "Do you
24 care?" "Lord, help me." "Jesus." "Give me my
25 family." "Take care of me." "Kill me, let my family

Page 39

1  go."
2       Q. When they point the guns at your
3  grandchildren and great grandchildren how close were
4  they to them at that time?
5       A. They were about this distance with the gun,
6  that distance from me to you. (Indicating.)
7       Q. Would you say three feet?
8       MR. GOINS: The record reflects that
9  you're on either side of a conference room table, the
10 width, not the length of the conference room table.
11 BY MS. NELSON:
12      Q. How long did they point the guns at your
13 great grandchildren?
14      A. I can't recall.
15      Q. Did they point the gun in kind of a sweeping
16 motion, moving across the room, or at a particular
17 great grandchild?
18      A. As I recollect, there was one on each end of
19 the sofa.
20      Q. One what?
21      A. Policeman. So that they had been standing
22 to the side, they would have been all around with both
23 at each end.
24      MS. NELSON: I don't have any further
25 questions.

Page 40

1              RECROSS-EXAMINATION
2  BY MR. GOINS:
3       Q. Ms. Cook, did you think the officers were
4  going to hurt you?
5       A. Yes.
6       Q. Did you think they were going to hurt your
7  grandchildren?
8       A. That's what I was most afraid of.
9       Q. Did you think they were going to hurt your
10 husband?
11      A. Yes.
12      Q. And in fact did you see them hurt your son,
13 Timothy?
14      A. Yes.
15      MR. GOINS: No further questions, we'll
16 read and sign.
17      (Whereupon, at 12:50 p.m., Monday,
18      March 5, 2007, the taking of the
19      deposition of SYLVIA M. COOK was
20      adjourned.)

Page 37 - Page 40                                      KIRBY A. KENNEDY & ASSOCIATES

**Page 41**

1    (UPON COMPLETION forward this original Reading and Signing Certificate to Attorney Tracey Nelson, who
2    already has the sealed original.)
3
4        I, SYLVIA M. COOK, do hereby certify that I
5 have read the foregoing transcript of my Deposition
6 and believe the same to be true and correct (or,
7 except as follows, noting the page and the line number
8 of the change or addition desired and the reason why):
9   Page    Line     Change or Addition     Reason
10
11
12
13
14
15
16
17
18
19
20
21
22
23   _____
24 Dated this _____ day of _____, 2007
25 BAL

**Page 42**

1 STATE OF MINNESOTA )
                          ) SS.
2 COUNTY OF HENNEPIN )
3       Be it known that I took the deposition of SYLVIA M. COOK, on the 5th day of March, 2007, at
4 Minneapolis, Minnesota;
5       That I was then and there a Notary Public in and for the County of Hennepin, State of Minnesota,
6 and that by virtue thereof, I was duly authorized to administer an oath;
7
8       That the Witness before testifying was by me first duly sworn to testify to the whole truth and
9 nothing but the truth relative to said cause;
10      That the testimony of said Witness was recorded in Stenotype by myself and transcribed into
11 typewriting under my direction, and that the deposition is a true record of the testimony given by
12 the Witness to the best of my ability;
13      That the cost of the original transcript has been charged to the party noticing the deposition,
14 unless otherwise agreed upon by Counsel, and that copies have been made available to all parties at the
15 same cost, unless otherwise agreed upon by Counsel;
16      That I am not related to any of the parties hereto nor interested in the outcome of the action;
17      That the reading and signing of the deposition by the Witness was executed as evidenced by
18 the preceding page;
19      WITNESS MY HAND AND SEAL this 8th day of March, 2007.
20
21
22           Barbara A. Larsien
            Court Reporter
23
24
25