Page 1

```
 1        UNITED STATES DISTRICT COURT
             DISTRICT OF MINNESOTA
 2
              THIRD DIVISION
 3   -----------------------------
     Charles Everett Cook, et. al.,
 4                  No. 06-579 DWF/AJB
 5       Plaintiffs,
 6   vs.
 7   City of Minneapolis, et al.,
 8       Defendants.
 9   -----------------------------
10
11
12
13
14
15
16
17
18        The deposition of TIMOTHY B. COOK, taken
19   pursuant to Notice of Taking Deposition, before
20   Barbara A. Larsien, a Notary Public in and for the
21   County of Hennepin, State of Minnesota, taken on the
22   5th day of March, 2007, at 333 South Seventh Street,
23   Suite 300, Minneapolis, Minnesota, commencing at
24   approximately 9:10 a.m.
25
```

Page 2

```
 1   APPEARANCES:
 2
 3        ALBERT T. GOINS, SR., ESQUIRE, of the GOINS
 4   LAW OFFICE, LTD., 301 Fourth Avenue South, 378 Grain
 5   Exchange Building, Minneapolis, Minnesota 55415,
 6   appeared for and on behalf of the plaintiffs.
 7
 8        MAYA C. SULLIVAN, ESQUIRE of the LAW OFFICES
 9   OF MAYA C. SULLIVAN, L.L.C., 941 Hillwind Road
10   Northeast, Suite 200, Minneapolis, Minnesota 55432,
11   appeared for and on behalf of the plaintiffs.
12
13        TRACEY NELSON, ASSISTANT CITY ATTORNEY, CITY
14   OF MINNEAPOLIS, 333 south Seventh Street, Suite 300,
15   Minneapolis, Minnesota 55402, appeared for and on
16   behalf of the defendants.
17
          The original is in the possession of
18            Attorney Tracey Nelson.
19
20              INDEX
21   TIMOTHY B. COOK:
22   Cross-examination by Ms. Nelson       Page 3
23   Cross-examination by Ms. Sullivan     Page 53
24   Recross-examination by Ms. Nelson     Page 64
25   Recross-examination by Ms. Sullivan   Page 87
```

Page 3

```
 1            TIMOTHY B. COOK,
 2       the Witness in the above-entitled
 3       matter after having been first duly
 4       sworn, deposes, and says as follows:
 5
 6            CROSS-EXAMINATION
 7   BY MS. NELSON:
 8       Q. Can you please state your name for the
 9   record?
10       A. Timothy, middle initial is B, Cook.
11       Q. Mr. Cook, I'm an Assistant City Attorney for
12   the City of Minneapolis, --
13       A. Uh-huh.
14       Q. -- and I'm an attorney who represents the
15   City of Minneapolis, the City that you've sued in
16   State Court. Have you ever sat for a --
17           MS. SULLIVAN: Federal Court.
18   BY MS. NELSON:
19       Q. -- excuse me, Federal Court, have you ever
20   sat for a deposition before?
21       A. No.
22       Q. I'm going to ask that if you don't
23   understand a question that you let me know because
24   otherwise I'll assume that you understand it. Also,
25   the court reporter here needs to take down every word
```

Page 4

```
 1   that we say, so if you say "Uh-huh," "Huh-uh," stuff
 2   like that, she won't be able to make a clear record
 3   with it, also nodding of the head yes and no, she
 4   would not be able to make a clear record of. Also I
 5   will try very hard not to interrupt you and I would
 6   ask that you please do the same, even if you know the
 7   question I'm going to ask, please wait until I'm
 8   finished.
 9       A. I'll try.
10       Q. Okay and I think that's it. I have to ask,
11   are you under the influence of any drug, or alcohol,
12   or anything that might affect your testimony, your
13   ability to recall the events that brought us here
14   today?
15       A. No.
16       Q. Have you reviewed any documents in
17   anticipation of your testimony today?
18       A. No.
19       Q. Have you talked to anyone other than your
20   attorney about your deposition today?
21       A. No.
22       Q. Mr. Cook, where do you currently live?
23       A. 3845 Second Avenue South.
24       Q. How long have you lived there?
25       A. A little over 35 -- 37 years.
```

Timothy Cook CASE 0:06-cv-00579-DWF-AJB Document 34-2 Filed 04/07/07 Page 2 of 12
Condensed

## Page 9

1  Q. How many nieces do you have?
2  A. Oh, my God, I can't keep track of them.
3      MS. SULLIVAN: That would require some
4  counting there.
5  BY MS. NELSON:
6  Q. Approximately?
7      MS. SULLIVAN: A clarification, Tracey,
8  are you asking for just nieces, or he also has great
9  nieces. So like the nieces would have children, --
10     MS. NELSON: Okay.
11     MS. SULLIVAN: So are you asking --
12 BY MS. NELSON:
13 Q. Why don't we start with are you an only
14 child?
15 A. No.
16 Q. How many siblings do you have?
17 A. There's six of us altogether.
18 Q. And do any of your siblings have children?
19 A. Yes.
20 Q. Who has children?
21 A. Let's see, my sister Patricia.
22 Q. How many children does she have?
23 A. I don't know. I don't see them all that
24 often. I really don't keep track. We make a running
25 joke that there's one every year. Is it five?

## Page 10

1      MS. SULLIVAN: One of them passed away.
2  A. Yeah.
3      MS. SULLIVAN: You can approximate.
4  A. I'd say five.
5  BY MS. NELSON:
6  Q. And then who else has children?
7  A. My brother Terry.
8  Q. How many children does Terry have?
9  A. I believe he has two.
10 Q. Okay.
11 A. Beth has one. My brother, Junior, I haven't
12 seen since I was very young. I don't know where he
13 lives, we haven't seen him, I don't know if he has any
14 children or not. I already said Beth. Patricia,
15 Beth, Anita has, I believe, she has four, one of them
16 has actually passed away.
17 Q. And how many of your nieces or nephews have
18 children?
19 A. That's a hard question too.
20 Q. If you can't answer --
21 A. I can't answer, I don't keep track of all of
22 them.
23 Q. Okay.
24 A. All I do is buy Christmas presents and let
25 them write the names in.

## Page 11

1  Q. Have you ever had an accident that resulted
2  in an injury?
3  A. That's two questions actually. I've had an
4  accident, never been injured.
5  Q. All right. What was the accident?
6  A. I got into a car crash with a -- with my
7  brand new car, Thunderbird, with my sister, Beth.
8  Q. Were you driving?
9  A. I was driving, yes.
10 Q. Do you know what caused the accident?
11 A. Somebody hit me and then drove off.
12 Q. Going now to the incident, in the 24 hours
13 before the incident had you had anything to drink or
14 used any drugs?
15 A. No.
16 Q. Prescription or otherwise?
17 A. No, --
18 Q. Okay.
19 A. -- I don't take any drugs whatsoever. In
20 fact, I've had my appendix out and I refused to take
21 Percocet.
22 Q. In the 24 hours before the incident did you
23 have any illness, or injury, or fatigue?
24 A. No.
25 Q. In the evening of January 13th, 2005, did

## Page 12

1  you have occasion to encounter any Minneapolis police
2  officers?
3  A. Yes.
4  Q. Where was that at?
5  A. At my home at 3845.
6  Q. What time of day or night was that?
7  A. It would have been evening. The exact time,
8  I'm not aware of, at the time I wasn't looking at a
9  clock. I would say it was probably maybe close to
10 10:00 or after 10:00, I couldn't actually give an
11 exact time.
12 Q. And what happened when they?
13 A. You -- I heard -- I was in the basement
14 working on my computer. I heard a noise upstairs. I
15 assumed there was an argument with Cortez or
16 something, I didn't know. I came upstairs. Somebody
17 said that the police were breaking into the house. I
18 immediately got to the top of the stairs, which is
19 next to the kitchen. I stopped. I was immediately
20 grabbed. I was forced through the door to the side,
21 which is right to the stairs.
22 Q. Okay, let me stop you and go back and ask a
23 couple questions. Why did you assume that there would
24 be an argument involving Cortez?
25 A. Cortez on one or more occasion has taken

Page 17

1 back. They didn't handcuff me, they used some kind of
2 straps to strap my hands behind my back. They told me
3 to lay down in front of the front door, which was --
4 which they had eventually wound up closing with me on
5 the ground on the floor. I was still at this time
6 requesting and yelling to speak to their field
7 sergeant. They then put a coat or something over my
8 head while I was laying on the ground, which I
9 eventually managed to shake off.
10     At one point in time I was brought back up
11 to my knees for which my mother was still actually
12 talking to them about my father and the kids, that
13 they were scaring the kids, that my father, they
14 needed to, I think his hands were behind his back, and
15 she was trying to inform them about the shunt in his
16 arm. The one officer, who had knelt down, had -- was
17 speaking to my dad to tell him why they were there,
18 that they had a search warrant.
19     I was actually, at that particular time when
20 they mentioned the search warrant, I had asked to see
21 the search warrant, since we had not seen it, which I
22 had asked several times during this course to do so.
23 One of the officers had then come up in front of me
24 and told me that I was not a resident of the house,
25 the owner of the house, and therefore, he didn't have

Page 18

1 to show me a search warrant. This was a large
2 Minneapolis police officer who actually didn't have a
3 hood on his head at this particular time, gray hair,
4 heavyset gentleman. I told him that I lived in the
5 house, that by that simple fact alone, I had the right
6 to see the search warrant. He was arguing with me
7 about the only person he needed to show it to was my
8 father since he owned the house. I was then giving
9 instructions to my dad about telling them that I'm
10 your proxy or I'm your power of attorney and that I
11 had the right to see the search warrant, if that's
12 what they wanted. At this particular time somebody
13 was actually grabbing my hair, I don't cut my hair in
14 the wintertime. I do a lot of walking outside so I
15 need the extra fur. (Indicating.)
16   Q. Can we just stop for one second and kind of
17 go back over some ground we've just covered?
18   A. Yes.
19   Q. Okay, you said that the kids were not
20 dressed, what were they wearing?
21   A. I wasn't actually paying attention to that.
22 Usually what they're wearing is onesies, sometime
23 T-shirts and little pajama pants, or something like
24 that.
25   Q. How many kids were present in the room that

Page 19

1 you saw?
2   A. I think at that particular time there was,
3 its been a long time again, I think it was three.
4   Q. Okay and how many --
5   A. It might have been actually four.
6   Q. -- how many adults were present in the room?
7   A. Me, my mother, my father, Tameka, and if, I
8 think, Jaquita was also there.
9   Q. Who are Tameka and Jaquita?
10   A. They are my nieces.
11   Q. Whose children were they?
12   A. Tameka's, Jaquita's and Anita's, so one of
13 my sister's, Anita.
14   Q. Was Anita there too then?
15   A. No.
16   Q. Where were they in the room?
17   A. We were -- they were all in the living room
18 when I was brought in.
19   Q. And --
20   A. I think they kept everybody in the living
21 room except for -- I don't remember if Jamon was there
22 or not. I know Cortez was upstairs, he had a broken
23 leg, so he was upstairs.
24   Q. Okay.
25   A. They kept him upstairs, because I never saw

Page 20

1 him.
2   Q. The adults and children, were they sitting,
3 were they standing, were they laying down?
4   A. My father was in the living room.
5   Q. And was he sitting, standing, laying down?
6   A. He was sitting in the chair, the -- his, I
7 call it his command chair, in the living room. He was
8 handcuffed.
9   Q. Was he handcuffed in front or in back?
10   A. In back. My mother had told them to get him
11 a blanket, along with trying to get the kids also
12 blankets.
13   Q. Did anyone get them blankets?
14   A. I think eventually my father got a blanket.
15 My mother, actually they were threatening that she was
16 going to get shot if she didn't actually shut up and
17 be quiet and not move. She finally had told them that
18 they could shoot her, because she was going to get a
19 blanket for her husband and kids.
20   Q. Was she sitting, standing, kneeling, laying
21 down?
22   A. Actually she, at that time, I think she was
23 actually getting up from the -- one of the chairs in
24 the living room, I don't remember which one.
25   Q. Was she handcuffed?

Page 25

1  you're expecting us to show you some kind of respect."
2  At this particular time my head was being pulled by my
3  hair.
4      Q. Who was pulling?
5      A. The only -- I can assume was a -- there were
6  -- there was a female officer behind me.
7      Q. Okay.
8      A. After that comment, they put me back on the
9  floor in front of the door. They proceeded to go in
10 and out of the door, stepping on my back and head.
11     Q. How many times do you think they stepped on
12 your back and head?
13     A. More than 20, if I had to guess. They were
14 also opening the door, because they had to close the
15 door, because my mother was making comments about
16 being cold in the house and the kids and my father.
17 They were hitting me in the head with the door, which
18 I also mentioned about. I continued at that
19 particular time to be asking to see the search
20 warrant, which I hadn't seen, and to speak to the
21 field sergeant. At this particular time they told me
22 that I wasn't shutting up, a few more choice words,
23 and they escorted me outside to the squad car.
24     Q. Okay, hold on, while you're in the house
25 before they take you out, what are the children and

Page 26

1  adults of your family doing?
2      A. Actually, I couldn't see because I was still
3  being stepped on at this particular time and -- at the
4  door. I could only hear what was actually going on.
5      Q. What did you hear?
6      A. I heard stomping, I heard my mother talking
7  to them about, they didn't have to tear up the house.
8  My dad telling them that they didn't need to break
9  into the house, that they had been here before and
10 they have -- he's let them in the house. He didn't
11 know why they were actually doing this. There was a
12 lot of confusion with the kids crying. And, again,
13 that's mostly what I remember after that particular
14 point because I was then taken out of the house.
15     Q. What happened when you were taken out of the
16 house?
17     A. I was put into a squad car and forced to
18 listen to country music.
19     Q. How long were you in the squad car?
20     A. I couldn't tell you. I couldn't see my
21 watch, because they were behind my back. I would say,
22 if I had to guess, I'd say at least 45 minutes or
23 more.
24     Q. How long were you in the house from the time
25 the police officers came to the time they took you out

Page 27

1  to the squad car?
2      A. Again I would have to estimate, because I
3  didn't have a watch, wasn't looking at a clock, I
4  would say 15-20 minutes, maybe. It had to be less
5  than 20 minutes, no more than 20 minutes, I would say.
6      Q. Is there anything else that you remember
7  them saying to you, the police officers, saying to you
8  while you were in the house?
9      A. Other than the profanity and the push of the
10 forehead with the finger and told about the bullet.
11 There were a number of things that they actually said,
12 I wasn't actually listening or paying attention to
13 them, it was mostly profanity throughout the house.
14 Basically they just wanted me out of the house because
15 I was telling my father about being able to see the
16 search warrant and where they could actually search.
17 When I was in the squad car, I noticed that they were
18 actually searching a car out in front of the house
19 that wasn't even our car.
20         After that, they -- two officers just came
21 in, they -- I asked them why was I being arrested.
22 They told me they wouldn't tell me. Finally, when I
23 got to the jail they told me I was being arrested for
24 interference of judicial process, I think it was. I
25 was also told that when I got out of the squad car,

Page 28

1  because I had asked them to actually uncuff me, they
2  told me that I wasn't actually being restrained
3  because they said my hands slipped out of the
4  restraints. I don't know how they slipped out,
5  because I was still being restrained until they took
6  them off.
7          One of the officers held up a baggy telling
8  me that I had a bag of marijuana, which I told them I
9  didn't, because I had just recently quit smoking, so I
10 don't even smoke anymore. I told him, you know what,
11 go ahead and charge me with it, when I get out of jail
12 I'll just simply go to a lab and take a hair follicle,
13 blood, and urine test.
14     Q. Who held up the baggy?
15     A. There were -- I don't know, the two officers
16 that were in the squad car that drove me down there.
17     Q. What did this officer look like?
18     A. Brunette hair. I didn't even --
19     Q. How old?
20     A. They were young. They were young. I'd say
21 they were probably late 20's, early 30's.
22     Q. He had brown hair?
23     A. I believe it was brunette hair, I think.
24     Q. How tall, what was his build?
25     A. Again, I wasn't looking to see how tall he

Page 33

1  out of Minnesota, they didn't know how I had gotten
2  his number. I was getting pre-approved applications
3  during the trial for which I was in custody, basically
4  I was convicted for that.
5       The unlawfully obtaining public assistance,
6  they were trying to get me for -- to get me to plead
7  to the false representation, which was five years or
8  more. The wrongfully obtaining public assistance was
9  for a check that I had gotten, which I had told them
10 not to send me, because I had gotten a job. I was
11 working at Wendy's as an assistant manager, I was
12 actually working three jobs at that particular time.
13 I had passed out at one of my jobs and they told me I
14 needed a vacation. I took two weeks off and got a
15 limousine with my American Express number, because I
16 had done it before with the same company so they knew
17 my number. I got picked up in the limo one day and
18 they arrested me and they told me if I pled guilty to
19 the one charge, which had already been taken care of
20 because the Director of Economic Assistance, who I had
21 spoken to, made the woman give me the check back. She
22 had actually locked me in a room when I came to pick
23 up the check.
24 BY MS. NELSON:
25    Q.  Why did you pick up the check?

Page 34

1    A.  She told me to. She called me up, she kept
2  calling me. I kept telling her I didn't need the
3  check. She said, "Well, you're entitled to it." I
4  said, "Fine, I'll come down there and pick it up,"
5  after probably about several calls. I picked up the
6  check. Actually didn't pick it up, she said she was
7  going to get it and she locked me in the room, which
8  if I knew what I knew now, I would have been able to
9  actually claim actually kidnapping because she had no
10 right to be locking me in a room.
11   Q.  Did she say why she was locking you in the
12 room?
13   A.  She didn't tell me she was locking me in the
14 room.
15   Q.  Did she ever say why?
16   A.  No, all I know is the Director walked me
17 back, it was after the actual Court -- the actual
18 appearance in front of Judge Oleisky he released me.
19 The following Monday I went down there to speak to the
20 Director and told him what had actually happened. The
21 Director walked me back to the office, which at that
22 time was over where the -- the old building where the
23 -- what was that building -- it was on the corner
24 where the unemployment office was. I don't remember
25 where it was, over down by --

Page 35

1       MS. SULLIVAN: Was it Franklin?
2    A.  -- the stadium. By the stadium, it used to
3  be over there. He walked me over there, through the
4  skyways, out the door of the building, across
5  kitty-corner, made the woman apologize to me and give
6  me --
7  BY MS. NELSON:
8    Q.  Who is he?
9    A.  The Director of Economic Assistance at that
10 particular time. Made the woman apologize to me, I
11 could hear him yelling at her.
12   Q.  Do you know what his name was?
13   A.  I don't remember. I don't remember.
14        MS. SULLIVAN: This was over 20 years
15 ago.
16   A.  Yeah. I don't even remember. But she came
17 back crying and telling me that she was going to get
18 back, actually she testified at trial. Said that I --
19 she said that she had never made the statement that
20 she was going to get back at me. I was found guilty
21 of that charge first.
22 BY MS. NELSON:
23   Q.  Who found you guilty?
24   A.  That -- I actually had a jury trial, I was
25 found guilty by a jury trial. Then they had the other

Page 36

1  trial for the American Express and I got found guilty
2  of that also. I was told in each trial by the
3  attorney I had, which presided over -- who actually
4  assisted me in both of the cases not to testify.
5  Actually I did testify in the one trial with the check
6  because I didn't see any reason why I should even be
7  there. I got the check back, they gave it to me. The
8  guy from -- the Director told me he was going to take
9  care of the actual charges, they were going to be
10 dropped. But they never were, because soon after I
11 got picked up for the false represent -- actually it
12 was theft at the time for the credit card and they
13 changed it to false representation and added five
14 years to it.
15   Q.  Did you serve any time for this?
16   A.  I served three months and three weeks and
17 then I sued American Express.
18   Q.  What was the outcome of that case?
19   A.  I won a $25,000.00 judgment against them out
20 of Court, out of Court settlement, of which I don't
21 think I'm supposed to be talking about actually. So I
22 might be getting in trouble there.
23   Q.  So that case settled?
24   A.  Yes, out of Court.
25   Q.  What year was that in?

Page 41

1  I said 1999, I meant 1994?
2      A. Next one would probably be -- was for a
3  shipment for software and -- no, I take that back, it
4  would be the Sharper Image Corporation.
5      Q. What did that matter involve?
6      A. The manager, who I had had a problem with
7  previously concerning a customer that he didn't like,
8  was refusing to take back a gift that my grandfather,
9  my late grandfather, had purchased for me.
10     Q. Why were they refusing to take that gift
11 back?
12     A. Because they said I had actually used it and
13 it was defective and they didn't want to take it back.
14 The manager didn't like me to begin with.
15     Q. Why didn't the manager like you?
16     A. We had a confrontation concerning a customer
17 who had come in, an African American gentleman, who
18 wanted to get on the massaging table. At that time
19 they had a store that used to be in the building that
20 -- The Conservatory, that Target is in.
21     Q. Were you an employee at that store?
22     A. No, I was a customer, --
23     Q. And you had a confrontation --
24     A. -- a frequent customer. Yeah, he didn't
25 want the employee to get on the massaging mattress and

Page 42

1  I had told him that I've gotten on the mattress, he
2  didn't have a problem with me, because I was a -- I
3  bought many things in the store. He decided, well, he
4  was going to call the police on both me and the actual
5  customer in question. He was kind of surprised when a
6  salt and pepper team came up with the police
7  department, a Caucasian and an African American
8  gentleman, police officers, and they agreed with me.
9  Told him that there was nothing they were going to do
10 about it. Ever since then I had had a problem with
11 him everytime I wanted to return something to the
12 store that I had purchased. And went to Court on that
13 and I actually won.
14     Q. What Court was that in?
15     A. Minneapolis Conciliation Court.
16     Q. And the next time you sued somebody?
17     A. Let's see.
18     Q. You know, let me go back, were you there at
19 that time returning something and you were refused or
20 was that?
21     A. No, at that time I was actually -- I was
22 actually looking for -- actually I was looking for a
23 wizard, they didn't have it in stock.
24     Q. And so what did you sue for?
25     A. The incident with the guy?

Page 43

1      Q. Yeah.
2      A. I didn't sue for anything for that. What it
3  was was later on I was returning something.
4      Q. Okay.
5      A. Okay, that was the reason why you asked me
6  why he wouldn't let me return it and why he was upset
7  with me.
8      Q. Okay.
9      A. That's the reason why he was upset with me.
10     Q. And what did he say was the reason though?
11     A. For?
12     Q. For not returning it?
13     A. Basically I had opened it and used it.
14     Q. Okay and what was the next time then that
15 you sued somebody?
16     A. I think I filed a case against Kodak.
17     Q. What year would that have been in?
18     A. '90, God, I don't remember, I believe that
19 would have been in '97-'98, something like that.
20     Q. What did that involve?
21     A. It was for a camera that I had purchased and
22 it wasn't working properly and I had sent it back and
23 they had lost it. They had agreed to replace it and
24 they never replaced it. They finally, after I filed
25 suit, replaced it and the camera came broken. So I

Page 44

1  filed, after filing the suit, they decided, well, they
2  were going to take care of it and it was actually, I
3  believe, the outcome was it was settled. I believe
4  that's what it was, it was just actually settled and I
5  had to go back and sign the bottom of the Court paper
6  to show that it was settled.
7      Q. What Court was that in?
8      A. That was also Conciliation Court.
9      Q. In Minneapolis?
10     A. Yes.
11     Q. So that case settled?
12     A. Uh-huh.
13     Q. Before it went to trial?
14     A. Uh-huh.
15     Q. What was the next time?
16     A. Sharper Image again.
17     Q. What year would that have been in?
18     A. That would have been 2000, I think.
19     Q. What did that case involve?
20     A. A Yoda statue.
21     Q. What did you sue for?
22     A. It's a statue, it's a Yoda statue. The
23 statue was -- it was fading and one of the eyeballs
24 had come out of it. I sent it back to the
25 manufacturer and the manufacturer sent me not a studio

Page 49

1 information.
2 BY MS. NELSON:
3 Q. Was the money ever taken out of your
4 account?
5 A. Actually I paid for it with cash to the
6 bank, because the agreement was that she was going to
7 send it out to me by overnight, so I would get it for
8 Saturday's delivery.
9 Q. The computer?
10 A. The computer.
11 Q. And it wasn't -- it didn't require a
12 signature?
13 A. It did require a signature. As a matter of
14 fact, it was even marked adult signature required,
15 because I live in the hood and I tell everybody that,
16 make sure everything is marked adult signature
17 required so that I actually have to sign for it. As a
18 matter of fact, I have a regular driver from FedEx.
19 Q. And that driver just left it?
20 A. Actually I didn't have a regular driver back
21 then.
22 Q. But that driver just left it at your door?
23 A. He left it at my door.
24 Q. What Court did you sue that in?
25 A. That would have been in Conciliation Court.

Page 50

1 Q. What was the resolution of that?
2 A. Actually I lost.
3 Q. And did anything --
4 A. Actually I lost the case, but they wound up
5 paying me anyways because I had spoken to one of their
6 executives about the situation. Because what happened
7 was the woman claimed she gave me back the cash for
8 the refund.
9 Q. Do you know who you spoke to?
10 A. I don't remember the woman's name.
11 Q. It was a woman at Wells Fargo?
12 A. Yes, it was -- she was a manager at the
13 time. They claim to be VP's, but they're managers of
14 a branch.
15 Q. Which branch was it?
16 A. The branch on 30th and Nicollet.
17 Q. Okay.
18 A. She was supposed to give me back a refund,
19 but then she told me that the wire transfer had gone
20 through that -- earlier that morning. And she gave me
21 back a refund for the price of the wire transfer and
22 then I was supposed to go back to Mac Warehouse to get
23 my money back. And I never got my money back from Mac
24 Warehouse because they claim they never received it.
25 Q. What was the next time you sued?

Page 51

1 A. I think the last case I had was with Fuji
2 Corporation.
3 Q. And where did you sue, in what Court?
4 A. Conciliation Court.
5 Q. In Minneapolis?
6 A. Yes.
7 Q. What year would that have been?
8 A. That would have been recently, in 2003.
9 Q. What did you sue Fuji for?
10 A. I had a digital camera that I had sent back
11 to them. Actually I had a digital camera that I had
12 purchased and I had also purchased several memory
13 cards. The memory cards were mis-packaged, which I
14 had first sent those back, and they replaced them.
15 Q. How were they mis-packaged?
16 A. They, if I remember correctly, it was
17 supposed to be a 256 memory card and the actual card
18 in there was a 16 megabyte instead of a 256 megabyte.
19 Q. Okay.
20 A. They made several attempts to get me the
21 card and finally they had to send me the card and for
22 the trouble they sent me a card reader. Then the
23 camera went out, so I sent the card -- cards back and
24 the camera. And they lost both the cards and the
25 camera and at that time --

Page 52

1 Q. You sent it in the mail?
2 A. I sent it via -- I don't remember which
3 carrier I sent it, I think I sent it -- it was either
4 certified mail or Airborne or something like that.
5 Q. Would that have been United States Postal
6 Service?
7 A. Yes.
8 Q. And they never received it?
9 A. They received it, they admitted they
10 received it. But they lost it. Evidently I had
11 several things from the Internet where they had lost
12 other cameras also.
13 Q. Other cameras of yours?
14 A. No, other people.
15 Q. And what was the resolution of that case?
16 A. Actually I won in Conciliation Court.
17 Q. What did you win?
18 A. Actually nothing because they appealed it.
19 Q. And then what happened?
20 A. Judge Oleisky in that particular case ruled
21 against me stating that I needed more than just a
22 receipt to prove my case, which I don't agree with,
23 but I couldn't get an attorney to actually go for a
24 case that was merely $800.00. He said I needed an
25 attorney to actually -- and that I should appeal the

Page 57

1   Q. Were you cold?
2   A. Yes.
3   Q. Did you have on a jacket of any kind while
4   this was going on?
5   A. I believe what I had was a -- a light, long
6   sleeved sort of, I don't know how to describe it, it
7   was a button up, three button up long sleeved shirt
8   with a pair of, actually, sweat pants.
9   Q. Were you dressed, would you say, that was
10  proper attire to be outside in below zero weather?
11  A. No.
12  Q. I want to talk a little bit about the kids
13  who were in the area at the time this was going on.
14  You started describing what they were wearing, was it,
15  is it safe to say that it was probably bedtime?
16  A. Yes.
17  Q. And so were they basically wearing --
18  A. It was late evening. I know most everybody
19  in our house goes to bed at close to 10:00, maybe a
20  little bit after, after the news.
21  Q. -- okay, --
22  A. I used to stay up a little bit longer on the
23  computer or something.
24  Q. -- okay, so they were probably basically
25  wearing bedtime attire?

Page 58

1   A. Yes.
2   Q. At the time when the officer that you
3   described putting his finger in your forehead and
4   saying to you that he should put a bullet in your
5   head, at the time that happened, how did that make you
6   feel?
7   A. I was mad. I wanted to grab him and
8   actually break his finger.
9   Q. Okay, but you didn't?
10  A. But I didn't, --
11  Q. And --
12  A. -- nor could I.
13  Q. Okay, any other feelings at the time?
14  A. Again I don't actually let my feelings be
15  known, but I was scared. Maybe a little hurt.
16  Actually up until that time I actually trusted the
17  police, actually.
18  Q. What about now?
19  A. Actually, I'm not too fond of them.
20  Q. Would you say you trust them now?
21  A. No.
22  Q. You talked about the impact it had on some
23  of the children that were there, can you explain that
24  a little more?
25  A. After the incident they used to jump at

Page 59

1   every loud noise. From this day, they still talk
2   about how they're going to call the police and things
3   of this nature, which they never did before. They
4   never spoke in that term about that. They're -- I
5   know Hesikai is afraid whenever they mention anything
6   about police --
7   Q. And Hesikai --
8   A. -- or he sees it on the news or something,
9   --
10  Q. -- right, --
11  A. -- Hesikai is my infant nephew. I believe
12  he's actually, well, I shouldn't say infant, he's
13  actually two now, I think.
14  Q. -- but at the time he was the baby --
15  A. Yes, --
16  Q. -- that you were talking about?
17  A. -- one of the babies.
18  Q. Just a couple more questions about the way
19  they behaved at that incident. Did their behavior put
20  you in fear that you were going to be touched
21  offensively, before you had been touched did you fear
22  that you would be touched offensively?
23  A. Yes, my main fear was the fact that they
24  were actually going to wind up hurting somebody in the
25  house, because all it took was one of those kids

Page 60

1   getting up and running. Because the way that they
2   were acting, they were not only just abusive, but they
3   were -- they were agitated.
4   Q. Okay.
5   A. They were -- I don't think they were
6   actually thinking clearly about what they were
7   actually doing. I think if anybody had gotten up and
8   made a false move, I think they would actually maybe
9   have shot someone.
10  Q. So you were concerned about harm coming to
11  yourself and the others in the home?
12  A. Yes. And also my father, because of his
13  shunt. I believe he was actually bleeding from the
14  shunt at that particular time.
15  Q. Had he been bleeding before the police
16  arrived?
17  A. No.
18  Q. Did you consent to be touched by any of the
19  officers?
20  A. Most definitely not.
21  Q. Were you convicted of anything as a result
22  of the January 13th, 2005, incident?
23  A. No.
24  Q. Okay.
25  A. Quite the contrary.

Page 65

1 then you were talking to them and they pulled you up?
2   A. I was yelling about actually getting their
3 field sergeant. They were talking about the search
4 warrant, where they took me back up forcibly again.
5   Q. Where did they touch you when they picked
6 you up?
7   A. Back, shoulders. Like I said, there was
8 more than one hand at the time. Back of the head.
9 Especially when I was being so-called disrespectful to
10 the officers, when my hair was being pulled, when I
11 was actually tell them about my -- telling my father
12 about actually having the right to see the search
13 warrant and what to tell them. Tell them that I'm
14 your proxy, your power of attorney and that I have the
15 right to see it --
16   Q. Where did you --
17   A. -- by his permission.
18   Q. -- learn that from?
19   A. Pardon me?
20   Q. Where did you learn that from?
21   A. Actually, I've had a year of prelaw at the
22 University of Minnesota before I was actually arrested
23 the first time for the American Express, I was
24 actually going to school at the University.
25   Q. Oh, you were?

Page 66

1   A. Yeah, I was.
2   Q. Oh, okay, you didn't mention that before.
3   A. You didn't ask.
4   Q. Oh, I asked if you went to college, you said
5 no.
6   A. Oh, well, I never finished. I went to Brown
7 Institute --
8   Q. And then you were kicked out?
9   A. Yeah, I was kicked out.
10   Q. And then did you go to the U of M before
11 that or after that?
12   A. Actually that would have been actually
13 enrollment into the actual course, that actually -- I
14 think I probably went there for probably like around
15 two classes before I actually got picked up for the
16 American Express.
17       MS. SULLIVAN: Let's clarify, because
18 the Brown Institute was immediately after high school?
19       THE WITNESS: Yes.
20       MS. SULLIVAN: And the University of
21 Minnesota?
22       THE WITNESS: And I went to Brown
23 Institute for several months.
24       MS. SULLIVAN: And the University of
25 Minnesota was --

Page 67

1       THE WITNESS: Two classes.
2       MS. SULLIVAN: -- fairly recently?
3       THE WITNESS: Yes.
4       MS. SULLIVAN: Okay.
5       THE WITNESS: Well, it was fairly
6 recently from -- well, the University of Minnesota was
7 back when I was for the charge of the American
8 Express.
9       MS. SULLIVAN: Okay, but it was several
10 years after?
11       THE WITNESS: Yes.
12 BY MS. NELSON:
13   Q. So that was within the last ten years?
14   A. That would have been back in '84.
15   Q. '84 that you went to the U of M?
16   A. Yes.
17   Q. And you had gone to two actual physical
18 classes or you had two --
19   A. I went to two actual -- I don't think you'd
20 consider the one a class, I think it was an actual
21 orientation.
22   Q. Okay and from going to the orientation you
23 learned what you would be able to --
24   A. Well, no, because obviously you had -- well,
25 actually I've read legal text before, so I would have

Page 68

1 gotten that from legal text that I've actually read.
2 I've read legal text before I even went to the
3 University of Minnesota for the two classes.
4 Actually, I never actually physically went to a whole
5 semester of class, that's the whole point, I got
6 arrested for the -- for the American Express and was
7 not allowed to go back.
8   Q. Have you gone to any other college?
9   A. No.
10   Q. Ever?
11   A. No.
12   Q. Have you enrolled in any other college?
13   A. No.
14   Q. Ever?
15   A. No, just Brown Institute and the class --
16   Q. Have you had any other vocational training?
17   A. No.
18   Q. Okay. So they pick you up, with how much
19 force would you say they picked you up?
20   A. It would be forcibly, very forceful.
21 Extremely forceful, like being yanked, like this, if I
22 were to grab you and actually pull you up. Like -- I
23 can't describe it for the court stenographer, but it
24 was just them pulling me up forcibly, not allowing me
25 to actually get up on my own power. (Indicating.)

Page 73

1  A.  The doorway comes straight down, then
2  there's a door to the kitchen that comes from the door
3  past the living room and over into the kitchen. So
4  that's like a small little hallway about six feet from
5  the door, six-seven feet in length -- (Indicating.)
6  Q.  -- they're grasping you physically with
7  their hands?
8  A.  -- yes, --
9  Q.  And then they shove you down?
10  A.  -- they actually turn me --
11  Q.  They turn you?
12  A.  -- they grab me from my head --
13       MS. SULLIVAN: Excuse me, I'm sorry,
14  Ms. Nelson, it seems like you keep cutting him off
15  when he's trying to answer, it seems like you keep
16  interjecting or asking additional questions. If you
17  could please not do that, that would be greatly
18  appreciated.
19       MS. NELSON: I'm just trying to get him
20  to answer the question, --
21       MS. SULLIVAN: Okay, well --
22       MS. NELSON: -- rather than the long
23  narrative on something other than what I was referring
24  to --
25       MS. SULLIVAN: -- uh-huh, --

Page 74

1       MS. NELSON: -- because we've kind of
2  gone over --
3       MS. SULLIVAN: -- uh-huh, --
4       MS. NELSON: -- what he's said, --
5       MS. SULLIVAN: -- okay, but --
6       MS. NELSON: -- I will try not to do
7  that.
8       MS. SULLIVAN: -- if you would try not
9  to do that, that would be great.
10  BY MS. NELSON:
11  Q.  Okay, so they grab you physically with their
12  hands, they turn you around?
13  A.  They're turning me as I'm on my knees around
14  towards the door and then slamming me down in front of
15  the door.
16  Q.  And where did you land on your person?
17  A.  Flat on my front torso and my knees were
18  being pulled out from under me by the end of my feet.
19  Q.  Someone had grabbed your feet?
20  A.  Yes, I'm on my knees, so they're
21  straightening out my legs.
22  Q.  And then at some point they pull you back up
23  again or did you get up on your own?
24  A.  No, they had mentioned to get me out of
25  there, I heard someone say. And they picked me up and

Page 75

1  then slammed me onto the door, which is a door frame.
2  And they were holding me there, again pushing my head
3  into the wall and the door facing, along with my body.
4  And then again opening the door while I'm still there,
5  hitting me once again with the door.
6  Q.  Where did they hit you on your person with
7  the door?
8  A.  That would be chest, front part, side of the
9  face. And then they took me out of the house.
10  (Indicating.)
11  Q.  Did you sustain any bruising from the
12  slamming down or into the door?
13  A.  I would have had some bruises to my knees,
14  if I remember correctly. And I think I probably had
15  light bruises here, under my chest area right here.
16  And that was it other than my shoulder being sore
17  again from them putting my arms from behind my back.
18  (Indicating.)
19  Q.  How long was your shoulder sore after the
20  incident?
21  A.  Oh, at least, in fact, I think my shoulder
22  was still sore when I saw the attorney in the office,
23  actually it was still sore.
24  Q.  What attorney in the office?
25  A.  My attorneys.

Page 76

1  Q.  The attorneys that are present here?
2  A.  Yes.
3  Q.  Thank you. And the bruising that went away,
4  how long did it take for that to go away?
5  A.  Actually I didn't pay much attention to it,
6  so I didn't actually see when they actually went away.
7  I'm sure they did. I know it was longer than a day,
8  it was longer than a week.
9  Q.  You testified that you used to trust the
10  police but now you're not too fond of them, what do
11  you mean by that?
12  A.  Basically my faith in the police are gone.
13  I know that I'm different. I'm not someone who has
14  the right to walk down the street. I feel that I
15  don't have simple rights anymore. That basically I'm
16  black and I should know my place, that's why I don't
17  trust them. Where I never felt that way before.
18  Q.  You testified that --
19  A.  I know that I'm black, but -- but I'm a
20  different class. And that's the way that they made it
21  seem that I should actually feel.
22  Q.  And before this incident you didn't feel
23  that way about the police?
24  A.  No. I never felt anyway about that at all
25  about anybody.

Page 81

1  up 'til 6:00 in the morning. Actually, no, probably
2  like around 5:30, I took a half hour nap, and I
3  haven't been to sleep since.
4    Q. Okay and who are the kids that you're
5  getting ready for school?
6    A. That would be -- it went out of my head --
7  Charlie.
8    Q. Charlie, how old is Charlie?
9    A. I think he's -- is he five, six, something
10 like that.
11   Q. What grade is he in?
12   A. I think he's in first grade.
13   Q. And he lives with you?
14   A. No.
15   Q. He comes over in the morning?
16   A. He gets -- his mother drops him off in the
17 morning along with the baby.
18   Q. Along with the baby and then does the baby
19 stay with you during the day?
20   A. With my mother.
21   Q. Okay.
22   A. And my father.
23   Q. Have you sought any medical treatment for
24 your sleeping problems?
25   A. I really wouldn't have the money to do that,

Page 82

1  so again, I have to deal with it in my own way.
2    Q. So you have not sought medical --
3    A. I have --
4    Q. -- treatment for that?
5    A. -- not. I wouldn't have the means to
6  actually do something like that.
7    Q. Did you testify that you've been tearing up
8  your own stuff and breaking your computer or was that
9  --
10   A. That was them.
11   Q. Okay.
12   A. As a matter of fact, I have a recording of
13 what they did to the basement.
14   Q. What do you mean you have a recording?
15   A. I have a recording of their actual tearing
16 up of my room. The mess that they had made, the
17 broken equipment.
18   Q. Would that be a video or would that be --
19   A. Video.
20   Q. -- a video, okay. What did they break up?
21   A. They broke a Newton MessagePad.
22   Q. Okay.
23   A. A web cam.
24   Q. Okay.
25   A. They pulled out several cords from the

Page 83

1  computer. They threw memory cards, carbon memory
2  cards onto the floor, most of them were broken.
3    Q. What would they be memory cards for?
4    A. Memory cards for chips, memory chips, for
5  the Newton MessagePad.
6    Q. Okay.
7    A. They damaged the computer.
8    Q. How did they damage it?
9    A. They yanked out cords from the computer.
10   Q. Okay.
11   A. I don't know if they were yanking out cords
12 deliberately or if they were kicking the cords around.
13   Q. Did they yank it out from the wall or from
14 the back of the computer?
15   A. Actually, the cords are on the floor in
16 several strips, surge protectors. The USB cords are
17 to actual components. They broke a hard drive also.
18   Q. Where did they pull the cords out, from the
19 back of the electronic equipment or from the surge
20 protector?
21   A. Both. Power cords, USB cords.
22   Q. They're ripped out of the electronic
23 equipment?
24   A. Yes.
25   Q. Okay.

Page 84

1    A. The hard drive they had thrown down and
2  broken. As a matter of fact, I still have it. The
3  Newton MessagePad I still have. All the cards I still
4  have.
5    Q. Do they still work?
6    A. No. As a matter of fact, the Newton
7  MessagePad has a hole in the side of it.
8    Q. What kind of a hole?
9    A. There is a battery compartment in the bottom
10 of it, for some reason they decided to, I don't know
11 if they pulled out the battery or it happened when
12 they dropped it, but it has a hole in the side of it
13 where the battery fits in the bottom.
14   Q. Anything else?
15   A. The web cam, they yanked out. There's just
16 too many things to actually -- there's a whole list of
17 things, I would have to go back and grab everything
18 out. I have everything in a drawer and in a box of
19 what they actually damaged.
20   Q. Okay.
21   A. But namely the cords, the computer hard
22 drive and the Newton MessagePad, and the cards and the
23 web cam.
24   Q. You stated that your father was bleeding
25 from the shunt, how much blood?

Page 89

1  (UPON COMPLETION forward this original Reading and Signing Certificate to Attorney Tracey Nelson, who
2  already has the sealed original.)
3
4      I, TIMOTHY B. COOK, do hereby certify that I
5  have read the foregoing transcript of my Deposition
6  and believe the same to be true and correct (or,
7  except as follows, noting the page and the line number
8  of the change or addition desired and the reason why):
9  Page    Line    Change or Addition    Reason
10
11
12
13
14
15
16
17
18
19
20
21
22
23  _____
24  Dated this _____ day of _____, 2007
25  BAL

Page 90

1  STATE OF MINNESOTA )
                     ) SS.
2  COUNTY OF HENNEPIN )

3      Be it known that I took the deposition of
   TIMOTHY B. COOK, on the 5th day of March, 2007, at
4  Minneapolis, Minnesota;

5      That I was then and there a Notary Public in
   and for the County of Hennepin, State of Minnesota,
6  and that by virtue thereof, I was duly authorized to
   administer an oath;
7
       That the Witness before testifying was by me
8  first duly sworn to testify to the whole truth and
   nothing but the truth relative to said cause;
9
       That the testimony of said Witness was
10 recorded in Stenotype by myself and transcribed into
   typewriting under my direction, and that the
11 deposition is a true record of the testimony given by
   the Witness to the best of my ability;
12
       That the cost of the original transcript has
13 been charged to the party noticing the deposition,
   unless otherwise agreed upon by Counsel, and that
14 copies have been made available to all parties at the
   same cost, unless otherwise agreed upon by Counsel;
15
       That I am not related to any of the parties
16 hereto nor interested in the outcome of the action;

17     That the reading and signing of the
   deposition by the Witness was executed as evidenced by
18 the preceding page;

19     WITNESS MY HAND AND SEAL this 8th day of
   March, 2007.
20

21
           Barbara A. Larsien
22         Court Reporter
23
24
25